## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UCI INTERNATIONAL, LLC, et al.[1] | Case No. 16-11354 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF THE
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Brian Whittman, being duly sworn, states the following under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of UCI International, LLC

("UCI"),[2] a limited liability company headquartered in Lake Forest, Illinois and one of the

above-captioned debtors and debtors in possession (each, a "Debtor," and collectively, the

"Debtors").[3]  I am also a Managing Director at Alvarez & Marsal North America, LLC

("A&M"), a limited liability corporation, which has served as a restructuring advisor to the

Debtors since February 25, 2016.   Although I became the CRO of UCI on June 2, 2016,

concurrently with the filing of these chapter 11 cases, as the lead Managing Director at A&M

responsible for this engagement, I oversaw the preparations for the Debtors' chapter 11 filings,

the development of the Debtors' five year business plans, and the diligence provided to and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: UCI International, LLC (0186); Airtex Industries, LLC (0830); Airtex Products, LP (0933); ASC Holdco, Inc. (9758); ASC Industries, Inc. (7793); Champion Laboratories, Inc. (5645); UCI Acquisition Holdings (No. 1) Corp (5732); UCI Acquisition Holdings (No. 3) Corp (8277); UCI Acquisition Holdings (No. 4) LLC (8447); UCI-Airtex Holdings, Inc. (5425); UCI Holdings Limited (N/A); UCI Pennsylvania, Inc. (1527); and United Components, LLC (9857).  The mailing address for each Debtor is 1900 West Field Court, Lake Forest, Illinois 60045.

[2] UCI was known as UCI International, Inc. until April 2015.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as defined herein).

negotiations with certain of the Debtors' key constituencies.  I have twenty years of financial restructuring and bankruptcy experience.[4]

2.      As part of overseeing the Debtors' preparations for chapter 11, their five year business plans and the prepetition diligence process with key stakeholders, I have familiarized myself with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records through review of key financial documents and discussions with management.  UCI is a holding company that conducts its business operations through its wholly-owned operating subsidiaries: Airtex Products, LP ("Airtex"), ASC Industries, Inc. ("ASC"), and Champion Laboratories, Inc. ("Champion").  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their business operations, the Debtors are requesting various types of relief in certain "First Day" motions (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other goals, (a) securing authorization to utilize cash collateral on a postpetition basis in order to continue the Debtors' operations; (b) preserving customer relationships; (c) maintaining vendor confidence and employee morale; (d) ensuring the continuation of the Debtors' cash management systems and other business operations; and (e) establishing certain administrative

---

[4] For the past twenty years I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining and retail.  I have also led complex engagements for companies, secured lenders and creditors, serving in both interim management and advisory roles.  I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

procedures to facilitate a smooth transition into chapter 11.  The achievement of the

aforementioned goals will be essential to the success of these chapter 11 cases and the Debtors'

reorganization efforts.

4.    I submit this declaration (the "Declaration") in support of the First Day Motions.

I am authorized to submit this Declaration on behalf of each of the Debtors.  I am familiar with

the contents of each First Day Motion, including the exhibits attached thereto, and believe that

the relief sought (i) is necessary to preserve the value and productivity of the Debtors'

operations, (ii) is integral to the successful reorganization of the Debtors, and (iii) serves the best

interests of the Debtors' estates, their creditors and other parties in interest.

5.    Except as otherwise indicated, all facts set forth in this Declaration are based on

my personal knowledge, materials provided by, as well as discussions with, members of the

Debtors' management team, information provided by the Debtors' advisors, or information

obtained from my personal review of relevant documents.  Additionally, the opinions asserted in

this Declaration are based upon my experience and knowledge of the Debtors' operations,

financial condition, and liquidity.  If called upon to testify, I would competently testify to the

facts set forth herein.

6.    Part I of this Declaration explains the Debtors' business operations and corporate

history, along with the Debtors' prepetition capital structure and indebtedness.  Part II describes

the circumstances leading to the commencement of these chapter 11 cases.  Part III sets forth the

relevant facts in support of each of the First Day Motions.

**PART I**

A.    <u>**Overview of the Debtors' Business Operations**</u>

7.    Headquartered in Lake Forest, Illinois, Debtor UCI is a holding company that

conducts its business through three principal operating subsidiary Debtors and their respective

affiliates: Airtex, ASC, and Champion.[5]   UCI is an indirect wholly-owned subsidiary of Debtor

UCI Holdings Limited ("UCI Holdings"), a New Zealand limited liability company ("LLC") and

an intermediate parent of the other Debtors and their respective non-Debtor subsidiaries

(collectively with UCI Holdings and UCI, the "UCI Group").[6]   The UCI Group is ultimately

owned by an individual, Mr. Graeme Richard Hart.   A chart of the equity structure for Debtor

UCI and its subsidiaries is attached hereto as Exhibit A.[7]

8.     The Debtors are leaders in the design, manufacturing, and distribution of vehicle

replacement parts.[8]   The Debtors' operations include three product lines—(i) filtration, (ii) fuel

delivery systems, and (iii) cooling systems—through which the Debtors supply a broad range of

products in the automotive, trucking, construction, mining, agricultural, marine, and other

industrial markets.[9]   Debtors ASC and Champion maintain a leading market position in each of

their product lines, offering approximately 11,000 unique part numbers.   The Debtors' top three

customers include AutoZone, Inc. ("AutoZone"), General Motors Company ("GM"), and

Advance Stores Company, Inc. ("Advance"), which accounted for approximately 40% of total

net sales in 2015.   I have also been advised that, together with their non-Debtor subsidiaries, the

Debtors operate out of twelve manufacturing facilities and fourteen distribution and warehouse

facilities in North America, Europe and Asia.

9.     The Debtors employ approximately 1,800 employees, all of whom are located in

the United States.   For the year ended December 31, 2015, the Debtors had net sales of

---

[5] UCI Holdings Limited, Annual Report (Form 20-F), at 26–27, 41 (Mar. 4, 2015).

[6] Id. at 2.

[7] As reflected on Exhibit A, the immediate parent of UCI Holdings is non-Debtor UCI Holdings (No. 1) Limited ("UCI No. 1"), which is, in turn, a wholly-owned subsidiary of non-Debtor UCI Holdings (No. 2) Limited ("UCI No. 2").   The ultimate sole shareholder of UCI No. 2 is Mr. Graeme Richard Hart.

[8] UCI Holdings Limited, Annual Report (Form 20-F), at 27 (Mar. 4, 2015).

[9] Id.

approximately $784.7 million, resulting in a net loss of approximately $501.3 million. The Debtors had approximately $435.3 million in total assets and $716.8 million in total liabilities on a consolidated basis for the year ended December 31, 2015.[10]

### B.    Product Lines

10.    The Debtors' three product lines may be broken down into two primary internal segments: filtration and pumps. The Debtors conduct their filtration business through Champion, while the pumps segment operates through Airtex and ASC. As will be discussed in more detail herein, certain of the Debtors' administrative activities are provided under an agreement with Autoparts Holdings Limited ("AH"), a non-Debtor affiliate.[11] Additionally, Champion shares manufacturing capabilities with certain of AH's direct and indirect subsidiaries under shared manufacturing arrangements.[12]

### 1.    Filtration

11.    The Debtors design and manufacture filtration products for the automotive, trucking, construction, mining, agricultural, marine and other industrial markets through their Champion operating subsidiary.[13] Champion is headquartered in Lake Forest, Illinois within the Debtors' UCI headquarters and maintains primary manufacturing operations in Albion, Illinois. The Debtors' filtration segment consists of approximately 6,100 part numbers, including oil, air, fuel, cartridge, transmission and cabin air filters, PCV valves, hydraulic filters, fuel dispensing filters and fuel/water separators.[14] These filtration products serve approximately 1,700 customers across multiple channels, domestically and internationally, including premier retailers

---

[10] The Debtors' estimates are based on their 2015 unaudited financial statements.

[11] UCI Holdings Limited, Annual Report (Form 20-F), at 66 (Mar. 4, 2015).

[12] Id. at 65–66.

[13] Id. at 32.

[14] Id.

as well as the heavy duty, installer, and original equipment manufacturer ("OEM") and original equipment service providers ("OES") channels,[15] as discussed in more detail herein.

12.     The Debtors maintain a broad portfolio of filtration brands, including private label brands such as ACDelco, CARQUEST, Motorcraft, K&N and Service Champ, national consumer brands including STP and Mobil 1, and the Debtors' proprietary brands—Champ, Luber-finer, ACE and Kleener.[16]  The Debtors' filtration products are manufactured in four plants operated by the Debtors, with two located in Albion, Illinois, one in Mansfield, United Kingdom (operated by non-Debtor subsidiary Champion Laboratories (Europe) Limited), and one in Shelby Township, Michigan.  The Debtors' vehicle filtration business shares certain manufacturing and distribution facilities with the filtration business of non-Debtor affiliate AH and AH's subsidiaries, including FRAM Group Holdings Inc. (the "FRAM Group").[17]  However, the Debtors and FRAM Group maintain their own customer relationships.[18]

### 2.     Pumps

13.     The Debtors' pumps business segment is comprised of the Airtex and ASC subsidiaries, which manufacture and distribute fuel delivery and cooling systems to the light and heavy duty vehicle markets.[19]  Airtex and ASC share a common management team, distribution, and sales force.  The Debtors' international non-Debtor subsidiaries share manufacturing and assembly operations.

---

[15] Id.

[16] Id.

[17] UCI Holdings Limited, Annual Report (Form 20-F), at 66 (Mar. 4, 2015).

[18] Id.

[19] Id. at 32–33.

14.     The fuel delivery systems product line is distributed under the Debtors' proprietary Airtex brand along with certain private labels including CARQUEST and NAPA.[20] Based on discussions with the Debtors' management, I understand that approximately 2,900 part numbers are sold to approximately 400 customers, including products such as electric and mechanical fuel pumps, fuel pump assemblies, and strainers and kits.[21] Airtex owns a manufacturing facility in Fairfield, Illinois that is currently in the process of closing down and transferring the assembly portion of the plant to Puebla, Mexico, with other manufacturing being outsourced, as is more fully detailed below.

15.     ASC maintains the number one market position based on net sales in cooling systems in the North American light vehicle aftermarket, supplying approximately 2,000 part numbers, including water pump assemblies, aluminum and cast iron cooling systems, and fan clutches, to over 800 customers under the Airtex and ASC brands as well as private labels such as CARQUEST, Duralast, and Murray.[22] In addition to leading the aftermarket business, ASC maintains strong OEM sales in North America, including supplying parts for GM's "Gen V" engine program and as a preferred supplier to Ford Motor Company ("Ford"). ASC's principal manufacturing is based in North Canton, Ohio and Tianjin, China, which provides benefits such as competitive labor costs and attractive raw materials pricing. Products are then assembled at ASC's North Canton, Ohio, Puebla, Mexico, and Tianjin, China facilities and distributed from its North Canton facility. In addition to these operations, ASC assembles and distributes water and fuel pumps for the European market through its facility in Zaragoza, Spain.

---

[20] Id. at 32.

[21] Id. at 28.

[22] Id. at 28, 33.

C.     **Shared Services and Affiliate Transactions**

16.     As noted above, the Debtors utilize a coordinated global manufacturing operation. I have reviewed the information provided to me by the Debtors and have been apprised by the Debtors' management of the information that follows regarding the Debtors' shared services and affiliate transactions.

17.     As mentioned above, in the ordinary course of business the Debtors engage in various business relationships with affiliated entities in the filtration business of non-Debtor affiliate AH and AH's subsidiaries including FRAM Group (together with AH, the "AH Group") and with the Debtors' wholly-owned, non-Debtor foreign subsidiaries.  These transactions have provided cost savings to the Debtors, both in terms of general administrative and corporate overhead costs and, more significantly, the Debtors' production processes.  As a result of these arrangements, both the Debtors and their non-Debtor affiliates and subsidiaries have been able to maximize efficiencies in their respective businesses.

18.     In addition to these arrangements, the Debtors operate plants located in China, Mexico and Europe that are owned by certain of the Debtors' wholly-owned, foreign subsidiaries (the "Foreign Subsidiary Vendors").  The plants in China and Mexico supply critical components to the Debtors' plants in the United States as well as certain finished products for customers of the Debtors.

19.     The foregoing transactions, which are described in greater detail below, generally fall into the following three categories: (i) Shared Services Arrangements, (ii) Filtration Transactions, and (iii) Foreign Subsidiary Transactions (each as defined below and collectively, the "Affiliate Transactions").[23]

---

[23] Additional details on the Affiliate Transactions are discussed infra in Section III.D.

### 1.    Shared Services Arrangements

20.    In the ordinary course of business, the Debtors utilize shared service arrangements with non-Debtor affiliates (together, the "Shared Services Arrangements") that are necessary to, among other things, the Debtors' corporate administrative functions and continued operation of the Debtors' businesses.  The Debtors and their non-Debtor affiliates share costs and responsibilities for various corporate administrative services such as managerial, legal, finance, accounting, human resources, procurement, IT and warehousing, including a Joint Services Agreement (as defined herein) and additional shared services arrangements.

### 2.    Filtration Transactions

21.    The Debtors' and AH Group's respective businesses each include the production of vehicle filtration products.  In the case of the Debtors, filtration products are produced by Debtor Champion and its subsidiaries.  In order to take advantage of the operational efficiencies between the two filtration businesses, Champion and the AH Group manufacture and supply product to each other in the ordinary course of business (the "Filtration Transactions").  In addition, in the ordinary course of business, the Debtors produce on behalf of the AH Group and sell certain products to the AH Group, while the AH Group produces on behalf of the Debtors and sells certain products to the Debtors.

### 3.    Foreign Subsidiary Vendor Transactions

22.    Given the global nature of the Debtors' business, the Debtors purchase finished products and vital components for their products from their wholly owned, foreign non-Debtor subsidiaries, including the Foreign Subsidiary Vendors, in the ordinary course of business for manufacturing and sale to the Debtors' customers (the "Foreign Subsidiary Vendor Transactions").

23.     All of the relationships and Affiliate Transactions are documented and accounted for in the Debtors' books and records.  I have been advised that the Debtors' management team reviews the arrangements with the AH Group and the other non-Debtor affiliates regularly to ensure they are fair to the Debtors and reasonably calculated to achieve the Debtors' business objectives.

24.     To facilitate the Debtors' chapter 11 reorganization strategy, in the months preceding the Petition Date, the Debtors, in consultation with their advisors and after presentation of the plans to certain holders of the Debtors' prepetition Unsecured Notes (as defined herein) and their advisors (the "Ad Hoc Group"), formulated and began implementing a plan to separate the Debtors' and the AH Group's respective filtration businesses and corporate functions.  Specifically, the Debtors and AH Group transferred certain employees between each other in order to better create stand-alone functions for each business and have begun to wind down the Shared Services Arrangements and Filtration Transactions.  The Debtors continue to negotiate with AH Group regarding replacing the Shared Services Arrangements and Filtration Transactions with a transition services agreement that would cover such services in an orderly separation period.

### D.     Distribution and Customers

25.     Distribution of the Debtors' products occurs through three primary channels: the light vehicle aftermarket, heavy duty vehicle aftermarket, and OEM/OES channels.  The light vehicle aftermarket has two sub-channels: retail and traditional.[24]  The retail channel is the Debtors' largest channel overall and accounted for approximately 29% of net sales in 2015.  The Debtors distribute products to mass merchandisers and national retail chains, which in turn sell to

---

[24] UCI Holdings Limited, Annual Report (Form 20-F), at 33–35 (Mar. 4, 2015).

do-it-yourself ("DIY") customers and independent repair shops that provide installation services for customers through the "do-it-for-me" ("DIFM") market.[25]

26.     In addition to the retail channel, the Debtors distribute light vehicle aftermarket products through the traditional channel.[26]  This channel provided for 20% of the Debtors' 2015 net sales, and is comprised of established warehouses and installers.  This channel is important to the Debtors' success, as it is the primary source of products for professional mechanics operating in the DIFM market.  The Debtors have longstanding relationships with leaders in the market that they have maintained for over twenty years, including CARQUEST and other large buying groups.[27]

27.     The Debtors also operate within the heavy duty vehicle aftermarket, which I have been advised accounted for approximately 11% of the Debtors' 2015 net sales.  The Debtors supply both large distributors and individual service depots, and believe that they have ample room for growth in this industry.[28]

28.     Finally, the original equipment channel is made up of two parts: OEM and OES.[29] This combined channel provided approximately 32% of the Debtors' 2015 net sales.  The Debtors' OEM products are sold to a strategic mix of end-users, including but not limited to Ford, GM, Capterpillar/Perkins, Freightliner, Cummins, Parker-Hannifin, Harley Davidson, Onan, Polaris, Deere, Kubota, Mercury Marine, and Kohler.  The Debtors have selectively

---

[25] Id.

[26] Id.

[27] Id. at 34–35.

[28] Id. at 35.

[29] Id. at 35–36.

engaged in long life-cycle OEM contracts with Caterpillar/Perkins, Ford, and GM in their

cooling systems and fuel delivery systems product lines.[30]

29.    The OES sub-channel contains an array of dealership service bays in the

automotive, truck, motorcycle, and watercraft vehicle markets.  The Debtors' presence in this

channel allows them to capitalize on vehicle maintenance early in a vehicle's life, while

warranties and consumer maintenance are still routine.  The Debtors capitalize on their direct

ship logistics in the OES sub-channel to allow these customers, primarily service parts operations

associated with companies such as GM, Ford, and Chrysler Group LLC, to reduce their working

capital investment and improve their product flow.[31]

30.    The Debtors' top three customers overall in 2015 were Autozone, GM and

Advance, which accounted for approximately 40% of total net sales in 2015.

### E.    Corporate History and Structure

31.    UCI, through its predecessors, has been in operation since 1958.  In 2003, UCI

purchased all of the equity interests of Champion, Wells Manufacturing Corporation, Wells

Manufacturing Canada Limited (together with Wells Manufacturing Corporation, "Wells"),[32]

and Airtex along with certain affiliates.[33]  With the exception of Wells and together with ASC,

purchased in 2006, these companies represent the Debtors' primary operating subsidiaries.

32.    UCI was initially incorporated on March 8, 2006 as a holding company for United

Components, LLC ("United Components").  UCI Holdings, an entity domiciled in New Zealand

and indirectly wholly-owned by Mr. Graeme Richard Hart, was incorporated on November 26,

---

[30] UCI Holdings Limited, Annual Report (Form 20-F), at 35–36 (Mar. 4, 2015).

[31] Id.

[32] As part of a strategic review of the Debtors' businesses, on May 8, 2015, the Debtors announced that they had entered a stock purchase agreement to sell their vehicle electronics business conducted by Wells and certain related subsidiaries (the "Wells Sale").  The sale closed on July 1, 2015, netting proceeds of approximately $251.4 million.

[33] See UCI Holdings Limited, Annual Report (Form 20-F), at 26–27 (Mar. 4, 2015).

2010 for the purpose of consummating the acquisition of UCI.  On November 29, 2010, UCI

entered into the Merger Agreement by and among UCI, Rank Group Limited, an affiliate of UCI

Holdings wholly-owned by Mr. Graeme Richard Hart ("Rank Group"), and Uncle Acquisition

2010 Corp. ("Acquisition Co."), an indirect wholly-owned subsidiary of UCI Holdings, pursuant

to which Acquisition Co. agreed to be merged with and into UCI, with UCI continuing as the

surviving corporation and an affiliate of Rank Group.  On January 26, 2011, the merger was

consummated for a purchase price of $375 million and the assumption of UCI's indebtedness,

and UCI, through its merger with Acquisition Co. and survival, became a wholly-owned indirect

subsidiary of UCI Holdings (the "UCI Acquisition").[34]

33.     At the time of the UCI Acquisition in 2011, UCI (i) repaid and terminated its term

loan facility in an aggregate principal amount of $425.0 million and terminated its undrawn

revolving credit facility in an aggregate principal amount of $75.0 million; (ii) purchased $315.0

million aggregate principal amount of its floating rate senior PIK notes due 2013 (the "Senior

PIK Notes") pursuant to a tender offer; (iii) called for redemption of all the remaining Senior

PIK Notes that were not purchased as of the date of the UCI Acquisition; and (iv) deposited

$41.2 million for the satisfaction and discharge of such remaining Senior PIK Notes with the

trustee under the indenture for the Senior PIK Notes.  The redemption of the remaining Senior

PIK Notes was completed on February 25, 2011.[35]

34.     At the same time, UCI entered into (i) a $300.0 million senior secured term loan

facility (the "Senior Secured Term Loan Facility") drawn at the closing of the UCI Acquisition,

and (ii) a $75.0 million senior revolving credit facility (together with the Senior Secured Term

Loan Facility, the "Senior Secured Credit Facilities"), which was undrawn at closing.  UCI also

---

[34] See id. at 26–27.

[35] See id. at 1–2, 26.

issued $400.0 million in aggregate principal amount of the Unsecured Notes (as defined herein) and executed related guarantees.  As set forth below, the Senior Secured Credit Facilities were refinanced in full and terminated as of September 30, 2015, when UCI entered into the Prepetition ABL Credit Facility (as defined herein).

36.    The transactions that occurred at the time of the UCI Acquisition were financed with (i) the net proceeds from the issuance of the Unsecured Notes; (ii) cash in the amount of $320.0 million contributed to Acquisition Co. in connection with the UCI Acquisition; (iii) borrowings under the Senior Secured Term Loan Facility; (iv) advances from Rank Group; and (v) available cash of UCI.

### F.    Summary of Prepetition Indebtedness

36.    As of the Petition Date, the Debtors had approximately $469.4 million in aggregate funded indebtedness, comprised of $69,443,839.66 outstanding under the Prepetition ABL Credit Facility (as defined below), plus $5,803,837 in outstanding letters of credit, and $400.0 million outstanding under the Unsecured Notes (as defined below), excluding accrued interest.  The Debtors have granted security interests in and liens on all or substantially all of their assets to secure their obligations under the Prepetition ABL Credit Facility.

### 1.    The Prepetition ABL Credit Facility

37.    On September 30, 2015, UCI, as parent borrower, certain of its subsidiaries, as subsidiary borrowers (collectively, the "Prepetition Borrowers"), UCI Holdings and UCI Acquisition Holdings (No. 1) Corp, entered into that certain ABL Credit Agreement (the "Prepetition ABL Credit Agreement") with Credit Suisse AG, Cayman Islands Branch in its capacity as Administrative Agent, Collateral Agent and Issuing Lender ("Credit Suisse" and, in its capacity as Administrative Agent, Collateral Agent, the "Prepetition ABL Agent"), initially providing the Debtors with senior secured asset-based revolving loans and letters of credit of up

to a maximum aggregate principal amount of $125 million outstanding at any time (the

"Prepetition ABL Credit Facility").  Extensions of credit under the Prepetition ABL Credit

Facility are limited by a borrowing base calculated periodically based on specified percentages

of the value of eligible inventory and eligible accounts receivable, subject to certain reserves and

other adjustments.  The Debtors used the proceeds of the Prepetition ABL Credit Facility to

refinance in full and terminate all of the $74.9 million outstanding under the Debtors' then-

existing Senior Secured Credit Facilities, and to pay certain related fees and expenses.  On

November 30, 2015, the aggregate lender commitments under the Prepetition ABL Credit

Facility were decreased by $25 million to $100 million.

38.    The Prepetition ABL Credit Facility is guaranteed by each of the Debtors, and the

Debtors' obligations arising under the Prepetition ABL Credit Facility are secured by a first-

priority lien (subject to certain permitted liens) on substantially all of the assets of the Debtors

(subject to certain specified exclusions), including, without limitation, the Debtors' accounts,

cash, contracts, equipment, intellectual property, inventory and certain commercial tort claims,

together with all of the proceeds of the foregoing.  Additionally, pursuant to that certain

Guarantee and Collateral Agreement dated as of September 30, 2015, each Debtor pledged 100%

of its equity interests in its domestic subsidiaries and 65% of its equity interests in its foreign

subsidiaries to secure the Debtors' obligations under the Prepetition ABL Credit Facility.

Moreover, pursuant to that certain General Security Deed dated as of September 30, 2015, UCI

Holdings granted to Credit Suisse a security interest in all of UCI Holdings' personal property

and a mortgage of all of its interests in any land if the fair market value of such interests is $10

million or more individually.  Finally, pursuant to that certain Specific Security Deed, dated as of

September 30, 2015, UCI Holdings granted to Credit Suisse a security interest in UCI Holdings'

right, title and interest in all shares in UCI Acquisition Holdings (No. 1) Corp.

39.     Borrowings under the Prepetition ABL Credit Facility bear interest at a

fluctuating rate per annum measured by reference, at the option of the Prepetition Borrowers, to

either adjusted LIBOR or an alternate base rate, in each case plus an applicable margin.  The

Prepetition Borrowers also pay various fees, commissions and related charges and expenses

under the Prepetition ABL Credit Facility.  The Prepetition ABL Credit Facility matures on

November 15, 2018 if the Unsecured Notes (as defined herein) are not repaid in full or

refinanced by such date in accordance with the applicable terms of the Prepetition ABL Credit

Agreement.  Otherwise, the Prepetition ABL Credit Facility matures on September 30, 2020.

40.     After Credit Suisse funded the Prepetition ABL Credit Facility on September 30,

2015, but before Credit Suisse was able to syndicate a portion thereof, which was its original

intention, the Debtors' businesses suffered a significant downturn.  As a result, rather than

syndicate the Prepetition ABL Credit Facility to third-party lenders, on December 22, 2015,

Credit Suisse and Rank Group Finance Holdings Limited ("Rank Group Finance")[36] (together

with Credit Suisse, the "Prepetition ABL Lenders") entered into that certain Affiliated Lender

Assignment and Acceptance (the "Assignment and Acceptance").  The Assignment and

Acceptance provided, among other things, for the sale and assignment by Credit Suisse to Rank

Group Finance of $65.0 million of the commitments and approximately $35.7 million of the

then-outstanding principal amount of revolving loans under the Prepetition ABL Credit

Agreement.  On March 15, 2016, UCI submitted a request to Credit Suisse for an additional

borrowing of $22.25 million under the Prepetition ABL Credit Facility.  On the same date, Rank

---

[36] Rank Group Finance is owned by Mr. Graeme Richard Hart, who also indirectly owns 100% of the equity
interests of the Debtors.

Group Finance funded its pro rata share of this borrowing in the amount of $14,462,500, while

Credit Suisse did not. As a result, as of the Petition Date, Rank Group Finance held 65% and

Credit Suisse held 35% of the commitments, and Rank Group Finance held 72% and Credit

Suisse held 28% of the outstanding loans under the Prepetition ABL Credit Agreement. Also, as

of the Petition Date, $69,443,839.66 of aggregate indebtedness was outstanding under the

Prepetition ABL Credit Facility, plus $5,803,837 in outstanding letters of credit.

### 2.    The Unsecured Notes

41.    On January 26, 2011, UCI issued $400 million in aggregate principal amount of

8.625% senior unsecured notes due 2019 (the "<u>Unsecured Notes</u>") pursuant to that certain

Indenture, dated as of January 26, 2011 (as amended, restated, supplemented, or otherwise

modified from time to time, the "<u>Indenture</u>"), between UCI and Wilmington Trust, N.A., as

successor by merger to Wilmington Trust FSB, as Trustee, Paying Agent, Transfer Agent and

Registrar. On April 17, 2015, Debtor UCI Acquisition Holdings (No. 3) LLC joined the

Indenture as a co-issuer of the Unsecured Notes. The Unsecured Notes mature on February 15,

2019 and pay interest at a rate of 8.625% per annum, payable in cash in arrears semi-annually on

February 15 and August 15 of each year. The Unsecured Notes are guaranteed by each of the

Debtors. As of the Petition Date, $400 million in aggregate principal amount of Unsecured

Notes was outstanding and, as discussed below, the Debtors have not paid the February 15, 2016

interest payment.

### 3.    Trade and Other Indebtedness

42.    I have been informed that, in addition to the Prepetition ABL Credit Facility and

Unsecured Notes, as of the Petition Date, the Debtors have approximately $111 million of

outstanding unsecured debt. This amount is comprised of (i) approximately $59 million of trade

debt outstanding to parties that are unaffiliated with the Debtors, (ii) approximately $52 million

of trade debt owed by the Debtors to their non-Debtor subsidiaries and non-Debtor affiliates, and (iii) approximately $0.6 million outstanding in connection with a litigation settlement entered in 2014.[37]  Additionally, as further discussed below, the Debtors sponsor three defined benefit pension plans (collectively, the "Pension Obligations") that were underfunded by an aggregate amount of approximately $66 million at December 31, 2015.[38]

## PART II

43.    **Circumstances Leading to the Commencement of These Chapter 11 Cases.** The Debtors' bankruptcy filings are the result of the convergence of both industry-wide trends and factors specific to the Debtors that have combined to put pressure on the Debtors' businesses and have adversely impacted the Debtors' financial results.

44.    *Macroeconomic Trends.*  Four significant macroeconomic trends have adversely impacted the Debtors' business operations.  First, certain of the Debtors face competition from countries with lower production costs, particularly China.  Second, there has been a decrease in the percentage of vehicles manufactured in the United States, which is the market in which the Debtors have historically been the strongest.  Third, there has occurred a concentration of buying power among a smaller group of customers, and finally, improvements in technology and product quality have extended the longevity of light vehicle parts, delaying or reducing aftermarket sales.

---

[37] My understanding is that Debtor Champion was named as a defendant in a complaint filed by Hengst of North America, Inc. ("Hengst") on August 23, 2013 in the United States District Court for the District of South Carolina, Columbia Division, pursuant to which Hengst claimed that certain of Champion's products infringed on a Hengst patent.  UCI Holdings Limited, Annual Report (Form 20-F), at 40 (Mar. 4, 2015).  On February 14, 2014, Champion and Hengst reached a settlement of this litigation.  Id.  The settlement included the payment of $2.2 million by Champion to Hengst (the "Hengst Settlement Payment"), a license from Hengst to Champion of certain intellectual property in exchange for royalty payments, $0.8 million in rebates granted to Champion for future purchases by Champion of Hengst products, and the dismissal with prejudice of the case.  Id.  Upon information and belief, as of the Petition Date, approximately $0.6 million remains outstanding on account of the Hengst Settlement Payment.

[38] The Debtors' pension plans are further described infra in Section III.E.

45.     While the Debtors have undertaken efforts to counteract these trends, each has adversely impacted the Debtors' revenue and earnings.  While some of these efforts have helped offset the impact of these trends, the Debtors' efforts have come with a price in the form of increased manufacturing costs as the Debtors restructure their manufacturing footprint, additional write-offs of excess and obsolete inventory as the Debtors shift their product offerings to remain competitive, and other issues that have adversely impacted earnings in the near term for expected longer term profitability.

46.     ***Factors Specific to the Debtors.***  From my discussions with the Debtors' management, I understand that in the fourth quarter of 2015, three discrete developments occurred that have caused a liquidity crisis for the Debtors.  First, Airtex lost all of its business at Advance, a leading retailer in the aftermarket car products sector, and as a result determined to exit the retail market.  As of December 31, 2014, approximately 54% of Airtex's sales were generated from the retail component of the aftermarket sector, with AutoZone and Advance as Airtex's primary retail customers.  After losing the AutoZone business over the first three quarters of 2015, in the fourth quarter of 2015, Advance decided to cease purchasing from Airtex and is now sourcing directly from a manufacturer in China.  Advance has the capability to become a direct competitor of Airtex by providing volumes to Airtex's remaining customers, and management anticipated that the loss of the Advance business could cause other retail customers to review their purchase of Airtex products.  The significance of the lost Advance volumes triggered a comprehensive review of the sustainability of the Airtex business, resulting in Airtex management's decision to exit the retail sector for the supply of aftermarket fuel pumps.  As a result, it is estimated that the Airtex business will suffer approximately $80 million in

contraction of annual sales during 2016, resulting in negative EBITDA before cost reduction initiatives turn EBITDA positive in 2017.

47.     Second, in the fourth quarter of 2015, AutoZone notified ASC, which supplied seven of AutoZone's eight distribution centers, that ASC had lost the right to supply three of AutoZone's distribution centers.  This volume ceased by December 2015.  The reduction in volume was the result of an AutoZone competitive re-bid that was initiated by a competitor of ASC.  The loss of the AutoZone distribution centers combined with other pricing actions is expected to have a $5.9 million negative impact on ASC's EBITDA in 2016.

48.     Third, ASC was notified by GM that ASC's bid to supply GM with the "Gen V+" water pump was unsuccessful.  ASC has a contract for the supply of the "Gen V" water pump for GM, which is used in a significant portion of GM's current production.  The Gen V+ will replace the Gen V beginning in late 2017.  The Gen V contract represents a significant component of ASC's volumes, revenue and contribution to EBITDA.  While ASC expects to continue to supply GM under its existing contract through at least 2017, and expects to continue with lower volumes during the changeover period through to late 2019 (and likely to 2021), the pending loss of such a significant contract will have an adverse impact on ASC.

49.     Finally, Champion has faced pricing pressures combined with operational issues as the Debtors have attempted to mitigate price reductions by maximizing plant capacity through new volume and facility consolidation.  In late 2015, Champion expected additional customer losses, which have been realized in 2016.

50.     ***Restructuring Efforts.***  Following these adverse events in the fourth quarter of 2015, I understand from discussions with management that they determined the Debtors could soon be facing liquidity issues, including issues with respect to their $17.25 million semi-annual

interest payment on the Unsecured Notes due on February 16, 2016. In January 2016, the

Debtors met with representatives of certain of the Debtors' holders of the Unsecured Notes,

which formed an ad hoc group (the "Ad Hoc Group"), to begin discussions concerning a more

appropriate and sustainable capital structure for the Debtors. Also, on February 10, 2016, the

Debtors appointed Alan J. Carr as independent director to each of their respective boards of

directors to facilitate the discussions with the Ad Hoc Group and other key stakeholders.

51.     Although the Debtors had hoped to reach an agreement with the Ad Hoc Group

with regard to a new capital structure, an agreement was not reached by the February 16, 2016

interest payment deadline. As a result, on February 16, 2016, the Debtors announced that they

would be utilizing the 30-day grace period associated with the interest payment. During this

period, and for several weeks thereafter through the Petition Date, the Debtors continued to

engage in discussions with the Ad Hoc Group. These discussions included several diligence

meetings (including on-site tours), sessions to review the Debtors' five year business plans, and

negotiations concerning the contours of a restructuring of the Debtors' balance sheet. In

addition, during this time, the Debtors engaged in active discussions with Credit Suisse and Rank

Group Finance regarding restructuring options and potential proposals. In late May, it became

clear to the Debtors that their key constituencies would be unable to reach agreement on the

terms of a consensual, out-of-court restructuring. In addition, on May 31, 2016, Credit Suisse

provided notice to the Debtors that it may begin exercising remedies as of 4:00 p.m. Eastern

Time on June 1, 2016.

52.     The Debtors' current balance sheet is unsustainable. As of December 31, 2015,

the Debtors' funded-debt obligations were approximately $455 million. The Debtors also have a

current combined annual interest expense of approximately $38 million. Adjusted EBITDA less

capital expenditures for 2016 is forecast at $29.3 million.  Absent a restructuring of the Debtors'

indebtedness, the Debtors are unable to comply with their debt obligations.  Moreover, under the

continuing burden of these interest payments, the Debtors would lack sufficient cash flow to

maintain their business and reinvest capital to take advantage of growth opportunities.  The

Debtors therefore concluded, in their business judgment, that seeking to deleverage their balance

sheet is in the best interests of their stakeholders and, as a result of the prepetition impasse

between certain of their key stakeholders and the notice received from Credit Suisse, filing these

chapter 11 cases was necessary to implement an appropriate restructuring.

53.    Notwithstanding the chapter 11 filings, the Debtors remain in active discussions

with the Ad Hoc Group concerning the terms of a plan of reorganization that will ensure the

Debtors' expeditious emergence from chapter 11 as financially healthy, going concern

businesses.  The Ad Hoc Group has informed the Debtors that it is prepared to continue to work

with the Debtors in an effort to achieve a consensual and successful restructuring.  Indeed, the

Ad Hoc Group has submitted a proposal for debtor-in-possession financing to backstop the

Debtors' reorganization efforts.  Although, as discussed below, the Debtors have not accepted

this proposal, it demonstrates the Ad Hoc Group's desire to see a successful restructuring.  The

Debtors expect to announce in the near term the results of their discussions with the Ad Hoc

Group.  In light of these factors and events, among others, the Debtors have found it necessary to

commence these chapter 11 cases.

### PART III

54.    The Debtors have filed a number of First Day Motions, consisting of

administrative motions and motions relating to the Debtors' business operations.  The Debtors

believe, and I agree, that approval of each First Day Motion is an important element of their

reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with

minimal disruption to their operations.  I have reviewed each of the First Day Motions or had

their contents explained to me, including the exhibits thereto, and believe that the Debtors would

suffer immediate and irreparable harm absent the ability to continue their business operations as

requested in First Day Motions.  Factual information with respect to each First Day Motion is

provided below and in each First Day Motion.  Capitalized terms, to the extent not defined

herein, have the meanings provided in the respective First Day Motions.

## I.      <u>Administrative Motions</u>

### A.      *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* **(the "<u>Joint Administration Motion</u>")**

55.      These chapter 11 cases involve 13 affiliated Debtors.  Many, if not most, of the

motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief

jointly sought by all of the Debtors.  In the Joint Administration Motion, the Debtors are

requesting consolidation for procedural purposes only.  Accordingly, my understanding is that no

party's substantive rights will be adversely impacted if the cases are jointly administered.  Given

the integrated nature of the Debtors' business operations, joint administration of the Debtors'

cases will promote efficiency and ease the administrative burden on this Court and all parties in

interest.

56.      Further, joint administration will significantly reduce the volume of paper that

otherwise would be filed with the office of the Clerk of the Bankruptcy Court (the "<u>Clerk</u>"), will

render the completion of various administrative tasks less costly, and will minimize the number

of unnecessary delays.  Moreover, the joint administration of these chapter 11 cases will simplify

supervision of these cases by the Office of the United States Trustee.  Accordingly, the Debtors

believe, and I agree, that joint administration of these chapter 11 cases is in the best interests of

the Debtors' respective estates, creditors and all other parties in interest.

B.     *Debtors' Motion for an Order Granting Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "<u>Schedules and Statements Motion</u>")

57.     There are approximately 57,000 total creditors in these jointly administered cases. The Debtors' management and employees, together with their outside professionals, have been working diligently to compile the information necessary to produce the Debtors' schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>"). Preparing the Schedules and Statements will require the Debtors' management and employees, along with their outside professionals, to examine extensive books and records as well as complex accounting systems. Completing the Schedules and Statements is a large, time-consuming and resource-draining undertaking given the size and complexity of the Debtors' businesses, particularly when taken together with the stresses of preparing for the filing of these chapter 11 cases and managing the Debtors' continued day-to-day business operations.

58.     Because focusing the attention of key personnel on critical operational and chapter 11-related issues during the early days of these chapter 11 cases will facilitate a smooth transition into chapter 11, I believe that the Debtors' request for a total of 60 days from the Petition Date to file their Schedules and Statements will maximize the value of their estates for the benefit of all parties in interest. Further, my understanding is that an extension will not adversely affect the rights of any parties in interest, as no bar date has yet been set nor do the Debtors anticipate asking the Court to set a bar date in the near term. The Debtors plan to file the Schedules and Statements significantly in advance of any deadline to file proofs of claim in these chapter 11 cases.

59.     The Debtors believe, and I agree, that the extension requested in the Schedules and Statements Motion will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of these

chapter 11 cases.  Accordingly, it is both essential and in the best interests of the Debtors'

respective estates and creditors that an interim order be entered extending the deadline to file the

Schedules and Statements by an additional 30 days, for a total of 60 days from the Petition Date,

without prejudice for the Debtors to request additional time if necessary.

C.    ***Debtors' Application for Appointment of Garden City Group, LLC as Claims and Noticing Agent** Nunc Pro Tunc **to the Petition Date* (the "<u>Claims Agent Application</u>")**

60.    I understand that this Court is authorized to utilize agents and facilities other than

the Clerk for the administration of bankruptcy cases.  I believe that if Garden City Group, LLC is

retained as the claims and noticing agent (the "<u>Claims and Noticing Agent</u>") in these chapter 11

cases, the distribution of notices and the processing of claims will be expedited and the Clerk

will be relieved of the administrative burden of processing what may be an overwhelming

number of claims.  I have also reviewed the Claims and Noticing Agent's engagement letter and

the description of services that the Claims and Noticing Agent has agreed to provide and the

compensation and other terms of the engagement as provided in the application of the Claims

and Noticing Agent.  Based on that review, I believe that the Debtors' estates, creditors, parties

in interest, and the Court will benefit from the Claims and Noticing Agent's experience and cost-

effective methods.  The Debtors believe, and I agree, that the appointment of the Claims and

Noticing Agent is the most effective and efficient manner by which to provide noticing and

claims processing services in the chapter 11 cases and is necessary and in the best interests of the

Debtors and their estates.

D.    ***Debtors' Motion for an Order Authorizing Brian Whittman to Act as Foreign Representative Pursuant to Section 1505 of the Bankruptcy Code* (the "<u>Foreign Representative Motion</u>")**

61.    In connection with these chapter 11 cases, UCI Holdings intends to commence

recognition proceedings in New Zealand.  Pursuant to the Foreign Representative Motion, the

Debtors request entry of an order authorizing Brian Whittman in his capacity as an authorised signatory of Debtor UCI Holdings, to act as the foreign representative of UCI Holdings' estate in any judicial or other proceeding in any foreign country, including New Zealand. Based on my discussions with the Debtors' legal advisors, my understanding is that the relief requested in the Foreign Representative Motion is necessary to protect the Debtors' interests in such countries, including New Zealand, and to ensure an orderly chapter 11 process.

## II.    Motions Relating to Business Operations

**A.**    ***Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition ABL Agent Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* (the "<u>Cash Collateral Motion</u>")**

62.    I believe that the Debtors' continued use of "cash collateral" of the Prepetition ABL Agent ("<u>Cash Collateral</u>") during the pendency of these cases, as requested in the Debtors' Cash Collateral Motion, is essential to preserve and maintain the going-concern value of the Debtors' estates. The Debtors' ability to continue their operations without interruption is essential for the Debtors to maximize the value of their estates for the benefit of all stakeholders and avail themselves of the "breathing room" afforded by a chapter 11 restructuring. Accordingly, the Debtors urgently require Cash Collateral to continue to operate their capital-intensive businesses and to fund the administration of these chapter 11 cases.

63.    The Debtors' proposed use of Cash Collateral is premised upon a 13-week cash-flow forecast, attached to the Cash Collateral Motion as <u>Exhibit B</u> (the "<u>Budget</u>") and discussed more fully in the Cash Collateral Motion, which assumes that the Debtors' receivables factoring

facilities do not continue on a postpetition basis.[39]  In the event this occurs, as reflected in the Budget, the Debtors intend to request the Court's authorization to enter into a debtor-in-possession financing facility to backstop their liquidity needs.  Indeed, the Debtors have received a proposal from the Ad Hoc Group for such a facility and, while the Debtors have not reached agreement with any party with respect to backstop financing, they are confident that they will be able to obtain suitable financing if needed.  Alternatively, in the event that the receivables factoring facilities do continue on a postpetition basis, the Debtors may have sufficient adequate liquidity to fund the duration of these chapter 11 cases.

64.     As of the Petition Date, the Debtors had approximately $31.7 million in cash on hand, all of which constitutes Cash Collateral of the Prepetition ABL Agent.  Absent the relief requested in the Cash Collateral Motion, the Debtors will not have sufficient liquidity to continue to their business operations, fund employee payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other working capital and operational requirements during their restructuring.  All of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.  Thus, without immediate access to Cash Collateral, the Debtors would be forced to idle their manufacturing facilities and take other cost-cutting measures, resulting in the loss of valuable customer accounts and damaging the Debtors' prospects as a going concern.  The Debtors believe, and I agree, that any delay in the Debtors' ability to access Cash Collateral would irreparably harm the Debtors and their estates.

65.     The Prepetition ABL Agent has not consented to the Debtors' use of Cash Collateral.  However, as previously discussed, I believe that the Debtors urgently need to use Cash Collateral continue to fund the continued operation of their businesses.  Failure to obtain

---

[39] Although the Debtors have filed a Factoring Agreements Motion (as defined herein) to continue their factoring facilities, as of the Petition Date, it is uncertain whether these arrangements will in fact continue.

authorization to use Cash Collateral would be fatal to the Debtors and disastrous for their creditors.  Accordingly, to ensure their continued access to the Cash Collateral during these cases, the Debtors propose to provide the Prepetition ABL Agent, for the ratable benefit of the Prepetition ABL Secured Parties (as defined in the Cash Collateral Motion), with adequate protection to the extent of any actual diminution in value of their interest in the Cash Collateral during the pendency of these chapter 11 cases.

66.     Specifically, the Debtors propose to provide the Prepetition ABL Agent with the following primary forms of adequate protection against the postpetition diminution in value of its interest in the Cash Collateral resulting from the Debtors' use of such property: (a) replacement liens on all of the property of the Debtors' estates to the extent of any actual postpetition diminution in value; (b) allowed superpriority administrative expense claims against the Debtors as I understand is provided in section 507(b) of the Bankruptcy Code to the extent of any actual diminution in value; and (c) periodic payments of (i) accrued and unpaid prepetition and postpetition interest, fees and costs due and payable under the Prepetition ABL Documents and (ii) the reasonable and documented fees and expenses payable to the Prepetition ABL Agent under the Prepetition ABL Documents.

67.     Considered in the context of the Debtors' current and projected cash position— and because the Debtors will use the Cash Collateral to preserve the value of the Debtors' businesses as a going concern—the proposed adequate protection is more than sufficient to protect the Prepetition ABL Secured Parties against any actual diminution in value of their interest in the Cash Collateral.  The Prepetition ABL Secured Parties are also adequately protected because, as set forth in the Budget, the Debtors anticipate they will continue to stay within the borrowing base formula required by the Prepetition ABL Credit Agreement through

the end of (and beyond) the interim period.  Thus, under the circumstances of these cases, the

Debtors submit that the adequate protection provided in the Interim Order is fair and reasonable

under the circumstances and is in the best interests of the Debtors, their estates, and all parties in

interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral

Motion should be approved.

> **B.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Cash Management System, Including Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Interdebtor Transactions, and (D) Maintain Existing Check Stock, (II) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis and (III) Granting Related Relief*** (**the "<u>Cash Management Motion</u>"**)

68.     In the ordinary course of business, the Debtors maintain an integrated, centralized

cash management system (the "<u>Cash Management System</u>").  The Debtors use the Cash

Management System to, among other things, collect, concentrate and disburse funds generated

by the Debtors' operations, facilitating the efficient operation of the Debtors' businesses.  The

Cash Management System also enables the Debtors to maintain control over intercompany

obligations.  The Cash Management System is generally similar to the systems commonly

employed by complex businesses comparable to that of the Debtors.

### 1.     The Bank Accounts

69.     The Cash Management System is operated through twenty bank accounts

(collectively, the "<u>Bank Accounts</u>") maintained by the Debtors at eight banking institutions

(collectively, the "<u>Banks</u>").  Specifically, the Cash Management System includes the following

Bank Accounts and Banks: (a) eleven accounts with Bank of America, N.A. ("<u>BofA</u>"); (b) one

account with Bank of America, N.A. Canada Branch ("<u>BofA Canada</u>"); (c) two accounts with

HSBC Bank USA, N.A. ("<u>HSBC Bank USA</u>"); (d) one account with Citizens National Bank of

Albion ("<u>Citizens National</u>"); (e) one account with Credit Suisse Securities (USA) LLC ("<u>Credit</u>

Suisse USA"); (f) one account with Fairfield National Bank ("Fairfield National"); (g) one

account with Rabobank, N.A. ("Rabobank"); and (h) two accounts with The Hongkong and

Shanghai Banking Corporation Limited, New Zealand Branch ("HSBC New Zealand").  A

schedule of the Bank Accounts is attached as Schedule 1 to the proposed interim order approving

the Cash Management Motion.

70.    The Bank Accounts are generally organized as follows:[40]

(a)    "Receivables Accounts" include:

- three zero-balance receivables lockbox accounts with BofA in the names of Debtors Airtex, ASC and Champion, respectively (the "Primary Receivables Accounts");

- one receivables account with BofA Canada in the name of Debtor Champion, denominated in Canadian dollars (the "Champion Canada Account");

- one deposit account with Fairfield National in the name of Debtor Airtex (the "Airtex Deposit Account");

- one deposit account with Citizens National in the name of Debtor Champion (the "Champion Deposit Account");

- one receipts and disbursement account with BofA in the name of Debtor UCI (the "UCI General Account"); and

- one special purpose receipts and disbursement account with HSBC Bank USA in the name of Debtor UCI (the "UCI Special Purpose Account").

(b)    "Concentration Account" includes:

---

[40] The Debtors' foreign non-Debtor subsidiaries with operations in Mexico, Europe and Asia maintain their own cash management operations separate and apart from the domestic Cash Management System.  The foreign non-Debtor subsidiaries' cash management system is operated through approximately thirty-six bank accounts (collectively, the "Foreign Non-Debtor Bank Accounts").  Cash balances in the Foreign Non-Debtor Bank Accounts are managed locally, with oversight from the Debtors' U.S.-based treasury department, which periodically directs the repatriation of excess cash back to the United States.  The Foreign Non-Debtor Bank Accounts do not have automated sweep features, and the foreign non-Debtor subsidiaries only repatriate cash to the Cash Management System if directed by the Debtors to do so.  Moreover, the cash held in the Foreign Non-Debtor Bank Accounts is not subject to the liens of the lenders under the Prepetition ABL Credit Facility.

- one concentration account with BofA in the name of Debtor United Components.

(c)      "<u>Intermediary Account</u>" includes:

- one intermediary funding account with BofA in the name of Debtor United Components.

(d)       "<u>Disbursement Accounts</u>" include:

- five zero-balance disbursement accounts with BofA in the names of Debtors Airtex, ASC, Champion, UCI and United Components, respectively.

(e)      Other miscellaneous accounts include:[41]

- one general account with HSBC New Zealand in the name of Debtor UCI Holdings, denominated in U.S. dollars (the "<u>UCI Holdings USD Account</u>");

- one general account with HSBC New Zealand in the name of Debtor UCI Holdings, denominated in New Zealand dollars (the "<u>UCI Holdings NZD Account</u>," and, together with the UCI Holdings USD Account, the "<u>UCI Holdings Accounts</u>");[42]

- one unused securities account with Credit Suisse USA in the name of Debtor UCI;

- one utilities account with HSBC Bank USA in the name of Debtor United Components (the "<u>Adequate Assurance Account</u>");[43] and

- one special deposits account with Rabobank in the name of Debtor United Components (the "<u>Special Deposits Account</u>").[44]

---

[41] As depicted on the Funds Flow Diagram attached as <u>Schedule 2</u> to the proposed interim order attached to the Cash Management Motion, these miscellaneous accounts are not part of the Debtors' integrated Cash Management System.

[42] The UCI Holdings USD Account currently has a balance of approximately $5,000, and the UCI Holdings NZD Account currently has a balance of approximately $105,000 (NZD).

[43] In order to provide their utility providers with adequate assurance of payment, the Debtors intend to deposit into the Adequate Assurance Account an amount equal to 50% of the Debtors' estimated average monthly cost of utility services, subject to the Court's entry of an order granting the Utilities Motion (as defined herein), filed contemporaneously herewith.

[44] As of the Petition Date, the balance of the Special Deposits Account was approximately $28.5 million.

71.      In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses (collectively, the "Bank Fees").  Historically, the Debtors estimate that they are charged approximately $20,000 in total Bank Fees per month, less total earnings credits of approximately $3,500 per month.  I am informed that approximately $20,000 of accrued but unpaid Bank Fees are outstanding as of the Petition Date (collectively, the "Prepetition Bank Fees").

### 2.      The Flow of Funds Within the Cash Management System

72.      The main components of the Cash Management System are the receipt of funds, the concentration of cash and the disbursement of cash.  A diagram providing an overview of the movement of cash through the Cash Management System is attached as Schedule 2 to the proposed interim order approving the Cash Management Motion.

73.      ***Receipt and Concentration of Cash.***  The Debtors generate revenue primarily through the collection of customer receivables, which generally flow into the following accounts: (a) each of the three Primary Receivables Accounts, as applicable; (b) the Champion Canada Account; (c) the Champion Deposit Account; and (d) the Airtex Deposit Account.  Most of the Debtors' U.S. customer payments, together with wire transfers from factoring counterparties under the Debtors' customer-sponsored factoring programs,[45] are deposited into the appropriate Primary Receivables Account.  Payments remitted to the Debtors by check are received in the lockbox attached to the applicable Primary Receivables Account.  The balances of the Primary Receivables Accounts are automatically swept into the Concentration Account at the close of each business day.

---

[45] Additional details regarding the Debtors' factoring programs are set forth in the Factoring Agreements Motion (as defined herein), filed contemporaneously herewith.

32

74.     Canadian customers of Debtor Champion remit payments to the Champion

Canada Account.  The balance of the Champion Canada Account is manually monitored by

Debtor Champion's U.S.-based accounting department and wired once per week to the Primary

Receivables Account in the name of Debtor Champion.  Debtor Champion's Canadian tax

payments are also made from the Champion Canada Account once per month.  During the two

months before the Petition Date, the average weekly balance of the Champion Canada Account

was approximately $425,000 (CAD).

75.     Debtor Airtex deposits miscellaneous customer payments that are mailed to its

Fairfield, Illinois facility into the Airtex Deposit Account.  Similarly, Debtor Champion deposits

miscellaneous customer payments that are mailed to its Albion, Illinois facility into the

Champion Deposit Account.  The balance of the Airtex Deposit Account and the Champion

Deposit Account are manually monitored by the accounting department of Debtors Airtex and

Champion and wired at the end of each month to the Primary Receivables Account in the names

of Debtors Airtex and Champion, as applicable.

76.     Debtor UCI maintains the UCI General Account and the UCI Special Purpose

Account.  The UCI General Account receives certain periodic deposits, including tax refunds

earmarked for Debtor UCI.  The UCI Special Purpose Account also receives certain periodic

deposits, including loan drawings under the Debtors' Prepetition ABL Credit Facility.

Temporary balances are maintained in each of these accounts before such funds are manually

wired to the Concentration Account.  Both the UCI General Account and the UCI Special

Purpose Account are occasionally used by Debtor UCI to initiate miscellaneous disbursements.[46]

---

[46] In connection with the Debtors' Prepetition ABL Credit Facility, the Debtors granted to the prepetition secured
lenders a security interest in their "Deposit Accounts," which is defined to include all demand deposit accounts and
concentration accounts.  Accordingly, each of the Champion Canada Account, the Airtex Deposit Account, the
Champion Deposit Account, the UCI General Account, the UCI Special Purpose Account and the Concentration

77.    ***Disbursement of Cash.***  Receivables transferred into the Concentration Account are used by the Debtors to satisfy their financial obligations, including, without limitation, vendor payments for products and services, capital expenditures, debt service payments, insurance, payroll and benefits program payments and rent payments.  The Debtors' disbursements are generally made from the respective Disbursement Accounts, which are funded by the Concentration Account, through the Intermediary Account, at the end of each business day.  Disbursements are made by wire transfer, check or ACH transfer.  Disbursements made by wire transfer and check are manually initiated by the Debtors, while ACH transfer disbursements may be initiated either by the Debtors or by certain vendors.

78.    The Debtors use third party administrators to process payroll, workers' compensation and medical plan payments.  The Debtors' payroll obligations are administered by Ceridian Corporation ("Ceridian").  Two days before the Debtors' payroll is due, Ceridian debits the appropriate Disbursement Account for the total amount of the applicable Debtor's payroll obligations, including withholding taxes, employment taxes and other fees.  Ceridian then remits payments to the Debtors' employees via direct deposit and to applicable taxing authorities.

79.    BlueCrossBlueShield of Illinois ("BCBS") and Sedgwick Claims Management Services, Inc. ("Sedgwick") administer the Debtors' medical plan payments and workers' compensation programs, respectively.[47]  BCBS invoices the Debtors on a monthly basis for medical plan payments, and the Debtors maintain a paid-loss deposit fund managed by third party adjuster Sedgwick for the workers' compensation program.  The Debtors satisfy funding obligations for the paid-loss deposit on a semi-monthly basis (or more frequently for large

---

Account are subject to a deposit and control agreement in favor of the prepetition secured lenders.  The UCI Holdings Accounts were also pledged to the prepetition secured lenders under the Prepetition ABL Credit Facility.

[47] In addition, AIG provides coverage for certain of the Debtors' legacy workers' compensation claims.

settlement payments).  The Debtors' medical plan and workers' compensation obligations are

funded from the Disbursement Accounts.[48]

### 3.    Purchase Card Programs

80.    The Debtors also maintain travel and purchase card programs (together, the

"Purchase Card Programs") with HSBC Bank USA and BofA.  The Purchase Card Programs are

secured under the Debtors' Prepetition ABL Credit Facility.  Under the Purchase Card Programs,

the Debtors provide company-sponsored credit cards to eligible employees for authorized travel

(the "Travel Cards") and for other business-related purchases and expenses (the "Purchase

Cards").  As of the Petition Date, the Debtors had issued Travel Cards to 229 employees and

Purchase Cards to 54 employees.  As of the Petition Date, other than potentially de minimis

balances, I have been informed that the Debtors do not believe there are material amounts owed

on the Travel Cards or the Purchase Cards.

### 4.    Interdebtor Transactions

81.    In the normal course of their businesses, the Debtors provide goods and services

to, and engage in intercompany financial transactions with, one another (collectively, the

"Interdebtor Transactions").[49]  The Interdebtor Transactions result in intercompany receivables

and payables in the ordinary course of business (collectively, the "Interdebtor Claims").  The

Interdebtor Transactions include, but are not limited to:

> (a)    Accounts Receivable and Accounts Payable.  The centralized Cash
> Management System is so integrated that substantially all receipts are
> concentrated into, and substantially all disbursements are paid from, the
> Concentration Account in the name of Debtor United Components.
> Moreover, in the ordinary course of business, the Debtors may collect cash

---

[48] Additional details regarding the Debtors' employee wage and benefit obligations are set forth in the Wages
Motion (as defined herein).

[49] More information regarding the Debtors' request for authorization to engage in certain transactions with their non-
Debtor subsidiaries and affiliates is contained in the Affiliate Transactions Motion (as defined herein), filed
contemporaneously herewith.

and disburse funds on behalf of other Debtors.  The Debtors account for this intercompany movement of cash in their intercompany books and records.

(b)     <u>Centrally Billed Expenses</u>.  In the ordinary course of business, the Debtors incur centrally billed expenses, such as insurance premiums and taxes. These charges are allocated among the Debtors and reflected on the Debtors' intercompany accounts.

(c)     <u>Corporate Expense Allocation</u>.  Charges for certain corporate expenses provided to the Debtors are allocated among the Debtors based upon the cost of service provided, directly identifiable costs and other allocation methods, in addition to services fees.

(d)     <u>Advances</u>.  In the ordinary course of business, the Debtors may make advances to one another to fund their respective operations.

82.     The Debtors maintain contemporaneous records of all Interdebtor Transactions and assign costs and revenues associated with all such transactions to the appropriate Debtor entity.  The Debtors routinely review these records and determine the amounts owed among the Debtors based upon the Interdebtor Transactions.  Cash collected by one Debtor and used by another, as well as the provision of goods or services from one Debtor to another, gives rise to an Interdebtor Claim.  After all records have been reviewed and all Interdebtor Transactions accounted for, certain of these Interdebtor Claims are settled in cash, while others are reflected as journal entry receivables and payables, as applicable, in the Debtors' accounting records.

### 5.     Check Stock

83.     As part of the Cash Management System, the Debtors use numerous preprinted business forms (including, without limitation, letterhead, purchase orders, invoices and preprinted checks) in the ordinary course of their businesses.

6.      **The Debtors' Continued Use of the Cash Management System Is Essential to the Debtors' Operational Stability and Restructuring Efforts**

84.      The Cash Management System enables the Debtors to efficiently track and control funds, ensure cash availability and reduce administrative costs. I believe that requiring the Debtors to dismantle the Cash Management System and adopt a new, segmented cash management system would, among other things, impair the Debtors' day-to-day operations and ability to generate timely reports of transactions and balances. By adopting a new cash management system, the Debtors would incur material expenses, create unnecessary administrative burdens on their employees and disrupt relationships with their key customers and suppliers.

85.      In contrast, I believe that maintaining the current Cash Management System will facilitate the Debtors' reorganization efforts by preserving a "business as usual" atmosphere and avoid the costly delays, distraction and unnecessary confusion that would accompany any substantial disruption in the Cash Management System. In my opinion, maintaining their current Cash Management System would also facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts, eliminating administrative inefficiencies and allowing the Debtors' treasury and accounting employees to focus on their daily responsibilities.

86.      I do not believe that any parties in interest will be harmed by maintaining the Cash Management System, including the Bank Accounts. As an initial matter, I understand that the Debtors have implemented appropriate measures to ensure that payments will not be made on account of obligations incurred before the Petition Date (other than the prepetition obligations authorized to be paid by the Court). I also understand that, with the assistance of their professional advisors, the Debtors have implemented protocols prohibiting payments on account

of prepetition debts, including prepetition intercompany debts, without the prior approval of the

Debtors' treasury or accounting departments.  Finally, the Debtors will continue to work closely

with the Banks to ensure that appropriate procedures are in place to prevent checks issued

prepetition from being honored without the Court's approval.

87.     Additionally, I believe that according certain flexibility to the Banks, as requested

in the Cash Management Motion, is reasonable and appropriate because the Banks are not in a

position to independently verify or audit whether the Debtors may pay a particular item in

accordance with a Court order or otherwise.  As a result, my view is that the relief being

requested is necessary in order to induce the Banks to continue providing cash management

services without additional credit exposure.

### 7.      The Debtors Should Be Authorized to Maintain Existing Bank Accounts and Continue to Use Existing Checks

88.     I am informed by the Debtors' legal advisors that the U.S. Trustee's Operating

Guidelines for Chapter 11 Cases (the "U.S. Trustee Guidelines") require debtors in possession to,

among other things, (a) close all existing bank accounts and open one or more accounts

designated as debtor in possession accounts; (b) establish one debtor in possession bank account

for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a

separate debtor in possession account for cash collateral; and (d) obtain checks that bear the

designation "Debtor in Possession" and reference the bankruptcy case number and type of

account on such checks.

89.     The Debtors are requesting a waiver of the requirement of the U.S. Trustee

Guidelines that the Bank Accounts be closed and that new postpetition bank accounts be opened.

If enforced in these cases, I believe that such requirements would cause enormous disruption in

the Debtors' businesses and would impair the Debtors' efforts to successfully reorganize.  As

described in detail above, the Bank Accounts comprise an established Cash Management System that the Debtors must maintain in order to ensure the uninterrupted collection and disbursement of funds in the ordinary course of their businesses.  Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, I believe that the Debtors should be permitted to continue to maintain the Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Otherwise, the process of transitioning the Bank Accounts to new bank accounts will be disruptive, time consuming and expensive.

90.      In addition to mandating the closure of all bank accounts, I understand that the U.S. Trustee Guidelines and the Local Rules require the immediate printing of new checks with the legend "Debtor in Possession" and other information related to the Debtors' cases.  The Debtors issue a large number of checks in the ordinary course of business.  To minimize expenses, the Debtors are requesting that they be authorized to continue using their existing check stock, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession, and without adding the other related information required by the U.S. Trustee Guidelines, provided that the Debtors will obtain new check stock identifying their status as debtors in possession as their existing check stock is depleted.  The Debtors will begin printing "Debtor in Possession" on all check stock that is electronically generated within 15 days of the date of entry of the interim order.

### 8. The Court Should Authorize the Debtors to Continue Conducting the Interdebtor Transactions in the Ordinary Course of Business and Grant Administrative Priority Status to Postpetition Interdebtor Claims

91.      Interdebtor Claims routinely arise in connection with the ongoing operation of the Cash Management System as business is transacted between and among the Debtors.  It is my

understanding that certain of these Interdebtor Claims are regularly settled in cash, while others are reflected as journal entry receivables and payables, as applicable, in the Debtors' accounting records. These regularly occurring Interdebtor Transactions are an essential aspect of the Cash Management System. Even a temporary disruption in the Debtors' ability to continue such Interdebtor Transactions would, in my opinion, impose an insurmountable financial and logistical burden on the Debtors and have a material, negative impact on the value of the Debtors' estates.

92.    To ensure that each Debtor will not, at the expense of its creditors, fund the operations of another Debtor, the Debtors are requesting that all postpetition payments between Debtors on account of an Interdebtor Transaction be accorded administrative expense status. This relief will ensure that each Debtor receiving payments from another Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that such transactions would jeopardize the recoveries available to each Debtor's respective creditors. It is my understanding that the Debtors will continue to maintain current records with respect to all transfers of cash so that all transactions, including Interdebtor Transactions, may be readily ascertained, traced and recorded on applicable intercompany accounts.

C.    ***Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Factoring Their Receivables Under Various Factoring Agreements (the "<u>Factoring Agreements Motion</u>")***

93.    As a condition to conducting business with the Debtors, several of the Debtors' retail customers require extended payment terms that can reach approximately 360 days, resulting in a significant time lapse between when the Debtors deliver and receive payment for their products.

94.     To enable their vendors, including the Debtors, to offer the extended payment terms, certain of the Debtors' customers (each a "Participating Customer," and collectively, the "Participating Customers") arrange for such vendors to enter into agreements with banks under which the banks may purchase the Participating Customer's accounts receivable (the "Receivables") from the vendors without recourse (i.e., the banks' remedy for nonpayment of the Receivables by a Participating Customer comes from the Participating Customer rather than the vendor) under various factoring agreements (collectively, the "Factoring Agreements").  In order to meet the demands of the Participating Customers without compromising their ability to maintain sufficient liquidity, the Debtors, in the ordinary course of their business operations, sell certain Receivables to certain banks that purchase or facilitate the purchase of the Receivables under the Factoring Agreements (each a "Factoring Bank" and collectively, the "Factoring Banks").

95.     As of the Petition Date, the Debtors maintain 38 Factoring Agreements arranged by seven Participating Customers with eight Factoring Banks.  The Debtors believe, and I agree, that the Debtors' participation in the Factoring Agreements is an integral component of their relationship with the Participating Customers, and is necessary to prevent such customers from seeking to discount the Debtors' pricing or considering alternative suppliers.

96.     The Debtors and the Factoring Banks began operating under the first Factoring Agreements in 2004.  Pursuant to the terms of the Factoring Agreements, the Debtors have the option to sell to the Factoring Banks the Receivables due from the Participating Customers.  The relevant Factoring Bank may choose to purchase such Receivables, either on its own behalf or as an agent for a third party, in exchange for an amount equal to the face value of the Receivables, less the applicable negotiated discount rate and certain fees, as may be applicable, charged by the

Factoring Bank (collectively, the "Factoring Fees").  The Factoring Fees charged by the Factoring Banks are based on the credit risk of the applicable Participating Customer.  My understanding is that the Factoring Fees are competitive with those charged for similar transactions in the Debtors' industry.

97.     Following the sale of the Receivables to the Factoring Banks, the Debtors do not furnish any services in respect of the sold Receivables.  Instead, the transactions executed pursuant to the Factoring Agreements are contemplated to be true sales of the Receivables. Accordingly, the Factoring Banks collect the sold Receivables directly from the Participating Customers and, therefore, assume the risk of the Participating Customers not paying the amounts due in respect of such Receivables.  In addition, with the exception of certain customary protections that are provided to the Factoring Banks pursuant to the Factoring Agreements, the Debtors have no obligations with respect to the sold Receivables, and retain no rights or interests in the Receivables.

98.     While the Factoring Agreements explicitly provide for a sale of the Receivables without recourse to the Debtors, the Factoring Agreements also provide certain customary protections to the Factoring Banks, including, under certain circumstances, the grant of a security interest in the Receivables.  In particular, to protect the Factoring Banks against the risk that the sale of certain Receivables will later be deemed a financing arrangement rather than a true sale, the Factoring Agreements generally require the relevant Debtors to grant to the applicable Factoring Bank a security interest in the subject Receivables.[50]  For the avoidance of doubt, however, none of the Debtors, or to my knowledge the Factoring Banks, intend for the transactions executed pursuant to the Factoring Agreements to be, or for any to purpose to be

---

[50] For example, many of the Factoring Agreements provide that if a transaction executed pursuant to a Factoring Agreement is determined to be a loan, then the relevant Debtor shall be deemed to grant to the applicable Factoring Bank a security interest in the subject Receivables.

characterized as, loans from the Factoring Banks to the Debtors. While the Debtors are optimistic that the Factoring Banks will continue to accept the Receivables for factoring during the pendency of these chapter 11 cases, as of the Petition Date, it is uncertain whether these arrangements will in fact continue.

99.     The Debtors generate significant liquidity by factoring the Receivables pursuant to the Factoring Agreements. During the years ended December 31, 2015 and 2014, the Debtors sold approximately $214.0 million and $240.8 million of Receivables, respectively. As of the Petition Date, approximately $33.8 million of Receivables are eligible for sale pursuant to the Factoring Agreements.

100.     The Debtors believe, and I agree, that preservation of the Factoring Agreements and authorization to enter similar agreements on a postpetition basis will promote stability during these chapter 11 cases and facilitate the Debtors' ability to operate normally and without undue disruption. Accordingly, I believe that it is in the best interests of the Debtors and their estates that the relief requested in the Factoring Agreements Motion be granted.

**D.**     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Ordinary Course Affiliate Transactions with Non-Debtor Subsidiaries and Non-Debtor Affiliates and Granting Administrative Priority Status to Postpetition Claims Arising from Such Transactions and (B) Pay Prepetition Trade Payables of Certain Non-Debtor Subsidiaries, and (II) Granting Related Relief* (the "<u>Affiliate Transactions Motion</u>")

101.     As discussed above, the Debtors operate a coordinated global manufacturing operation with plants located in the United States and the Foreign Subsidiary Vendors' plants located in China, Mexico and Europe. In addition, in the ordinary course of business, the Debtors have engaged in Affiliate Transactions with the AH Group, the Foreign Subsidiary Vendors and other non-Debtor affiliates that provide material cost savings to the Debtors, both in terms of general administrative and corporate overhead costs and, more significantly, the

Debtors' production processes.  As a result of these arrangements, both the Debtors and their

non-Debtor affiliates and subsidiaries have been able to maximize efficiencies in their respective

businesses.

102.    Also outlined above, the Affiliate Transactions[51] generally fall into three

categories: Shared Services Arrangements, Filtration Transactions, and Foreign Subsidiary

Vendor Transactions, which are described in greater detail below.[52]

### 1.    Shared Services Arrangements

103.    The Shared Services Arrangements are necessary to facilitate, among other things,

the Debtors' and the AH Group's corporate administrative functions and the continued operation

of their respective businesses.  This includes the Joint Services Agreement (as defined below)

and additional Shared Services Arrangements.  Pursuant to the Shared Services Arrangements,

the Debtors provide unique services and in return receive payment for those services.  Therefore,

continuing to honor these arrangements will bolster the Debtors' liquidity position.

### a.    The Joint Services Agreement

104.    The UCI Group is party to a joint services agreement with AH on behalf of itself

and the AH Group (the "Joint Services Agreement").  Pursuant to the Joint Services Agreement,

the UCI Group and AH Group both agreed to purchase certain administrative services from the

other party.  These services include legal, corporate executive management, human resources,

procurement management, finance, IT management, sales and marketing, integration, non-plant

---

[51] Contemporaneously herewith, the Debtors have filed the Wages Motion (as defined herein) and the Cash Management Motion.  The Wages Motion seeks certain relief related to, among other things, approximately ten of the Debtors' employees who provide shared services to the Debtors and AH Group.  The costs for these shared services are allocated under the Shared Services Arrangements.  The Cash Management Motion seeks, among other things, authority to continue engaging in routine transactions between and among the Debtors and to grant all postpetition payments between the Debtors administrative expense status.  For the avoidance of doubt, the relief requested in the Wages Motion and the Cash Management Motion, respectively, is separate and apart from the relief sought in the Affiliate Transactions Motion.

[52] The Debtors are parties to various letters of support and letters of non-demand with certain of the Foreign Subsidiary Vendors.  The Debtors are not currently requesting authority to assume those letters.

staff operation, use of facilities and services related to filtration operations (including certain finance, technical and administrative services). The Joint Services Agreement contains representations, warranties and indemnity obligations customary for shared services agreements. The Joint Services Agreement automatically renews annually on July 29 unless either party gives written notice no later than 90 days prior to the end of the term. Prior to the Petition Date, AH provided a notice to the Debtors of its termination of the Joint Services Agreement, effective on or about September 3, 2016. The Debtors expressly reserve their rights to contest the validity of the notice AH provided purporting to terminate the Joint Services Agreement pursuant to the terms of that agreement.

105.    Depending upon the type of services provided, fees incurred under the Joint Services Agreement are based on defined methodologies using sales, headcount, usage or relative sales achieved per the annual operating plan between the UCI Group and AH Group. Each month, the respective UCI Group entities and AH Group entities invoice each other for services performed. These invoices are based upon the allocations in each entity's business plan for anticipated services. At the end of each quarter, each respective entity conducts a "true up" of the monthly invoiced estimates to actual services used. Invoices are payable within 60 days; amounts due are netted with any excess paid in cash on a monthly basis.

### b.    Additional Shared Services Arrangements

106.    In addition to the Joint Services Agreement, the Debtors maintain various other Shared Services Arrangements with non-Debtor affiliates in the ordinary course of business, including, but not limited to, the following:

- The Debtors currently lease their corporate headquarter space from their non-Debtor affiliate Pactiv LLC ("Pactiv"). The terms of the lease are set forth in a facility use agreement (the "Office Lease").

- The Debtors' non-Debtor affiliate Reynolds Services Inc. ("Reynolds") provides certain IT services to UCI, AH and certain of their affiliates in connection with day-to-day business operations pursuant to a services agreement (the "IT Services Agreement").[53]

Prior to the Petition Date, Pactiv provided a notice to the Debtors of its termination of the Office Lease, effective on or about September 3, 2016, and Reynolds provided a notice to the Debtors of its termination of the IT Services Agreement, effective on or about May 6, 2017.  The Debtors expressly reserve their rights to contest the validity of the notice Pactiv and Reynolds provided purporting to terminate the Office Lease and the IT Services Agreement pursuant to the terms of those agreements.

107.    The Debtors believe, and I agree, that the Shared Services Arrangements provide increased efficiency and cost-saving measures to the Debtors' daily administrative and corporate responsibilities.  Indeed, an inability to continue performance under the Shared Services Arrangements would severely disrupt the Debtors' business operations and distract the Debtors' personnel from ongoing restructuring efforts.[54]

108.    In addition, prior to the Petition Date, AH provided a notice to the Debtors of discontinuance effective August 1, 2016 of certain services that AH contends are not covered by contract or commitment, including, among other things, all IT services not provided pursuant to the IT Services Agreement, all tax services not otherwise provided pursuant to the Joint Services Agreement, and access to certain support staff and the use of certain premises and equipment. The Debtors expressly reserve their rights to contest the validity of the notice AH provided

---

[53] The Debtors are not currently making any payments with respect to the Office Lease and the IT Services Agreement.

[54] As a New Zealand entity, Debtor UCI Holdings is subject to tax liability owed to the New Zealand Inland Revenue Department.  In the ordinary course of business, Debtor UCI Holdings generally elects to offset such tax liability against tax losses held by its non-Debtor affiliate UCI No. 2.  This election results in an intercompany payable owed by UCI Holdings to UCI No. 2.

purporting to terminate these services, as well as their rights to contend that such services were in fact covered by certain contracts or commitments by AH.

### 2.    Shared Filtration Operations

109.    The Debtors' and AH Group's respective businesses each include the production of vehicle filtration products through the Filtration Transactions, as discussed above.  In addition, on occasion, the Debtors and the AH Group have agreed to joint distribution and supply arrangements with customers.  The Debtors and the AH Group sell products to each other at a cost-plus basis in accordance with typical transfer pricing rules that the Debtors believe reflects a contract manufacturer's arm's length price.  Product purchase orders are entered into between Debtor Champion and the AH Group to document the sale of products between Debtor Champion and the AH Group.  These products are then sold to the Debtors' or AH Groups' customers, respectively.[55]  In addition, as part of the Filtration Transactions, both the AH Group and Champion perform certain services under the Joint Services Agreement in support of their respective filtration businesses.  These services and functions are an integral component of the Filtration Transactions.

110.    Upon information and belief, the Filtration Transactions are a direct result of careful, measured analysis by the Debtors' management focusing on maximizing the productivity and profit potential for the Debtors' filtration business.  The Debtors are able to generate a profit from the Filtration Transactions while simultaneously taking advantage of the unique efficiencies provided by the Filtration Transactions.  Moreover, purchasing products and components from non-affiliated vendors would result in a higher cost and cause severe disruption to the Debtors'

---

[55] In addition to transactions with the AH Group described above, in the ordinary course of business, Debtor Champion sells certain products to its wholly-owned, non-Debtor subsidiary Champion Laboratories (Europe) Limited ("Champion UK"), which is located in Mansfield, England, in exchange for an  intercompany receivable from Champion UK.

business.  In most cases, the Debtors estimate it would take approximately six months to identify

an acceptable replacement supplier.  This delay could result in the Debtors' loss of valuable

customers and revenue, thereby threatening the Debtors' ongoing business operations.[56]

### 3.    Foreign Subsidiary Trade Debt

111.    As previously discussed, the Debtors' businesses are dependent upon the Foreign

Subsidiary Vendors that provide finished products for the Debtors to distribute and sell, as well

as essential parts and components for the Debtors' products, through the Foreign Subsidiary

Vendor Transactions.  The Debtors purchase goods from the Foreign Subsidiary Vendors on a

cost-plus basis in accordance with typical transfer pricing rules.

112.    The Foreign Subsidiary Vendors include the following entities that provide

essential products to the Debtors:

- ASC (Tianjin) Auto Parts Inc.  ASC (Tianjin) Auto Parts Inc. manufactures machine castings that are then sold to the Debtors and used in the manufacturing of the Debtors' products in the North Canton, Ohio facility. These products are then sold by the Debtors to key customers (including significant OEM customers) that rely on such materials for their own products.  ASC (Tianjin) Auto Parts Inc. is the sole supplier to the Debtors of these critical components, and has no unaffiliated, external customers or additional sources of revenue outside of the Foreign Subsidiary Vendor Transactions.

- ASC (Tianjin) Water Pump Co. Ltd.  ASC (Tianjin) Water Pump Co. Ltd. manufactures water pumps for the aftermarket in the United States.  This Foreign Subsidiary Vendor acts as an overflow production site for the Debtors' facility in North Canton, Ohio and is a cost-effective solution for low volume SKUs.  It has no unaffiliated, external customers or additional material sources of revenue.  If the Debtors were to stop conducting business with ASC (Tianjin) Water Pump Co. Ltd., the Debtors would be unable to fulfill customer orders in a timely manner.  Among other things, the Debtors could be subject to financial "fill rate" penalties under various supply agreements with their customers.

---

[56] In the ordinary course of business, the Debtors set off amounts due in connection with all Ordinary Course Transactions, which includes both the Joint Services Agreement and the Filtration Transactions.  After accounting for setoffs, the Debtors owe approximately $3,500,000 to the AH Group in connection with the Filtration Transactions and the Shared Services Arrangements as of the Petition Date.

- <u>Talleres Mecanicos Montserrat, S.A. de C.V. ("TMM").</u>

  - TMM is a Foreign Subsidiary Vendor operating in Mexico that manufactures mechanical water pumps, fuel pumps, fuel pump modules and other components for the Debtors. TMM also markets and sells its own products in Mexico. The finished products and components manufactured by TMM are critical and a cost-effective component of the Debtors' operations. In particular, the Debtors' Airtex business in the United States cannot manufacture all necessary fuel pumps and is dependent on TMM. As a result, losing TMM as a Foreign Subsidiary Vendor would severely disrupt the Debtors' business.

  - Prior to the Petition Date, the Debtors were in the process of transitioning certain fuel pump product lines to TMM's facilities in connection with the closure of the Debtors' Fairfield, Illinois facility. In connection with this transition, the Debtors are in the process of moving certain necessary equipment to TMM, which will be bailed by the Debtors to TMM, for use in production of the Debtors' products (the "<u>TMM Equipment Transactions</u>") and to continue production without interruption. The TMM Equipment Transactions are necessary to transitioning product lines to foreign facilities, resulting in cost savings for the Debtors' operations.[57]

113.    The Debtors believe, and I agree, that the relationships with the Debtors' Foreign Subsidiary Vendors are critical to the businesses of both the Debtors and the Foreign Subsidiary Vendors. Absent the Foreign Subsidiary Vendor Transactions, the Debtors would be unable to fulfill customer orders and maintain business operations. Moreover, as described above, certain of the Foreign Subsidiary Vendors have no unaffiliated, external customers or additional material sources of revenue outside of the Foreign Subsidiary Vendor Transactions. A failure by the Debtors to remain current on outstanding payables to these Foreign Subsidiary Vendors could result in the Foreign Subsidiary Vendors' suspending operations while simultaneously

---

[57] Consistent with their prepetition practices, I am informed that the Debtors will maintain records of all Affiliate Transactions and TMM Equipment Transactions and will trace and account for all Affiliate Transactions and TMM Equipment Transactions on a postpetition basis.

threatening the ability of the Debtors' to maintain current business operations and the Debtors'

overall enterprise value.

114.     After accounting for setoffs, the Debtors owe foreign non-Debtor subsidiaries

approximately $14,000,000 in connection with the Foreign Subsidiary Vendor Transactions as of

the Petition Date (the "Foreign Subsidiary Vendor Claims").  Pursuant to the Affiliate

Transactions Motion, the Debtors are only requesting authority to pay those Foreign Subsidiary

Vendor Claims that I am informed by the Debtors' legal advisors are entitled to administrative

priority pursuant to section 503(b)(9) of the Bankruptcy Code, in an amount not to exceed

$8,000,000.

115.     As discussed above, the Debtors have begun to wind down the Shared Services

Arrangements and the Filtration Transactions with a view toward terminating such arrangements

and transactions in the near term and documenting a smaller group of remaining services with a

transition services agreement.  The Debtors believe, and I agree, that the most fundamental relief

requested in the Affiliate Transaction Motion—i.e., authorization for the Debtors to continue to

conduct the Ordinary Course Transactions and Foreign Subsidiary Vendor Transactions—is

necessary to ensure that the Debtors can continue to effectively operate their businesses and they

complete the wind-down of the Shared Services Arrangements and the Filtration Transactions.

E.     ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay of Related Administrative Obligations, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* (the "Wages Motion")**

116.     The Debtors currently employ approximately 1,800 people[58] in both full- and

---

[58] Approximately ten of the 1,800 current employees are on leave status as of the Petition Date.  Additionally, the Debtors' non-Debtor foreign subsidiaries employ approximately 1,200 individuals abroad.  Because none of these

part-time positions, including engineers, assemblers, production operators, analysts, buyers, sales

managers, electricians, maintenance technicians, inspectors, material finishers, shippers,

warehouse operators, administrative support staff and other personnel (together with certain U.S.

based executive officers, "Employees") at the Debtors' offices, plant facilities, and distribution

centers in Illinois and several other locations across the United States.  Approximately 2.7% of

the Employees are represented by Local Union No. 543 of the International Union, United

Automobile Aerospace and Agricultural Implement Workers of America (the "International

Union UAW") pursuant to a Labor Agreement between Airtex and International Union – UAW

and its Affiliated Local Union No. 543 (the "Airtex CBA").[59]

117.    Approximately ten of the Debtors' Employees are employed by one of the

Debtors but provide services to and perform their duties on behalf of certain non-Debtor

affiliates as well as the employing Debtor (the "Shared Employees").  The Debtors share certain

human resource managers, legal, accounting, and other administrative staff with AH and other

non-Debtor affiliates.  The Shared Employees' compensation and benefits are provided by the

Debtors, and the sharing non-Debtor affiliate compensates the Debtor for the Shared Employees'

services pursuant to a Joint Services Agreement.[60]  Pursuant to the terms of the Joint Services

Agreement, the allocation of wages and benefits for the Shared Employees among the Debtors

and the non-Debtor affiliates is typically based on defined methodologies using sales, headcount,

---

foreign subsidiaries are parties to these chapter 11 cases, unless otherwise noted herein, the description of the Debtors' workforce and benefits programs is limited to their domestic operations.

[59] As described further below, the Debtors are in the process of closing their facility in Fairfield, Illinois. Approximately 48 of the remaining employees at the Fairfield, Illinois facility are employed under the Airtex CBA. The Debtors have consulted with the International Union UAW regarding a transition plan for these employees, including the Fairfield Transition Benefits (defined below).

[60] In addition, the Debtors utilize the services of certain employees of AH and its subsidiaries, and the Debtors similarly compensate AH and its subsidiaries for such services pursuant to the Joint Services Agreement.  For additional information regarding the Joint Services Agreement and the Debtors' shared services arrangement with non-Debtor affiliates, see the Affiliate Transactions Motion, filed contemporaneously herewith.

usage or relative sales per the annual operating plan between the Debtors and their affiliates and AH and its affiliates.

118.     The Debtors supplement their workforce by employing an average of approximately 70 temporary workers and independent contractors, subject to fluctuation throughout the year based on manufacturing demands (the "Supplemental Workers").  The Debtors procure the services of the Supplemental Workers indirectly through third party staffing agencies (the "Staffing Agencies").  The Supplemental Workers generally provide non-skilled labor services, such as packing and moving services.  However, the Debtors currently employ two high-level professionals as independent contractors to provide financial services, including assisting with financial reporting.  The Staffing Agencies pay the wages and benefits of Supplemental Workers directly.

119.     The Debtors also utilize certain sales representatives through third party agencies to sell the Debtors' products in certain foreign and domestic jurisdictions (the "Sales Representatives Brokers").  These Sales Representatives Brokers are not Employees of the Debtors. The Sales Representatives Brokers generally accrue commissions that are calculated based on net billings for orders shipped within each Sales Representatives Broker's specific territory.  The commissions are thereafter generally paid to the Sales Representatives Brokers following shipment of the products.

120.     Through the Wages Motion, the Debtors request authority to pay prepetition amounts related to the Employee Compensation (as defined herein) and continue to pay these amounts on a postpetition basis, in the ordinary course of business.  The Debtors believe, and I agree, that the Employees would suffer hardship without the relief requested in the Wages Motion and, in many instances, financial difficulties, since the monies associated with the

Employee Compensation are needed to enable the Employees to meet their personal obligations. In addition, without the requested relief, in my opinion the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

### 1. Employee Compensation Obligations

121.    In the ordinary course of business, the Debtors incur payroll obligations for their Employees consisting of wages, salaries, and other compensation ("Employee Compensation") in exchange for the services the Employees provide.

### a. Unpaid Compensation

122.    Employees are paid either in arrears or on a current basis.  Moreover, Employees are paid on either a weekly or bi-weekly basis on Fridays.  As discussed above, the Debtors use Ceridian as the third party administrator for the Debtors' payroll.  Ceridian generally debits funds from the Debtors' disbursement account two days prior to the payroll date and generally then electronically transfers the funds via direct deposit to these Employees' accounts ("Direct Deposit").[61]  The Debtors' average gross payroll per month is approximately $7,500,000 in the aggregate for the Employees.  The Debtors estimate that as of the Petition Date, they owe approximately $2,100,000 in prepetition wages and salaries to Employees ("Unpaid Compensation"), substantially all of which the Debtors believe will become due and owing during the first 30 days of these chapter 11 cases.

123.    The Debtors believe, and I agree, that when the Unpaid Compensation is combined with the other Prepetition Employee Obligations that are currently owed to or for the

---

[61] In addition to the Direct Deposit system, approximately 475 employees receive paychecks in lieu of direct deposits.  Amounts for these paychecks are debited by Ceridian from the Debtors' disbursement accounts and the paychecks are issued by Ceridian.

benefit of their Employees, no individual Employee is owed in excess of the $12,850 cap that I am informed is in place under sections 507(a)(4) of the Bankruptcy Code.

### b.      Employee Incentive Plans

124.    In addition to paying wages and salaries, prior to the Petition Date, the Debtors utilized a number of bonus and incentive programs to encourage and incentivize Employees to maximize performance for the benefit of the Debtors' businesses (collectively, the "Employee Incentive Programs").  The Employee Incentive Programs provide substantial value to the Debtors' estates because they align Employee incentives with those of the Debtors.  The relevant Employee Incentive Programs, including the amounts outstanding with respect to such programs as of the Petition Date (the "Prepetition Incentive Obligations"), are described in more detail below.

125.    ***ASC Monthly Incentive Plan.***  The ASC Industries, Inc. Monthly Incentive Plan (the "ASC Monthly Incentive Plan") is a profit-sharing plan for full-time Employees of ASC. Under the ASC Monthly Incentive Plan, eligible Employees may receive an incentive payment in an amount ranging from 0–6 % of their monthly compensation, depending on the designated incentive percentage for the month.  The incentive percentage varies each month, and the monthly incentive payments are discretionary.  On average, approximately 250 Employees participate in the ASC Monthly Incentive Plan, most of whom are non-salaried, hourly employees.  The monthly incentive payment is typically paid out in the second pay period of the following month.  As of the Petition Date, approximately $50,000 is outstanding in connection with the May 2016 payments under the ASC Monthly Incentive Plan.

126.    ***Sales Management Incentive Plan.***  The Debtors maintain a Sales Management Incentive Plan for designated Employees based on the overall performance of the Company (as defined therein) as well as the individual performance of the Employee.  Under the Sales

Management Incentive Plan, eligible Employees may receive an annual incentive award if the Company achieves designated threshold performance targets as determined by the chief financial officer of the Debtors, and the amount of the award depends in part upon the Employee's personal contribution and individual target percentage.  Awards are determined on an annual basis, and are paid to eligible Employees in late February or March of the following year after the annual financial results have been finalized and confirmed.  Currently, three eligible Employees participate in the Sales Management Incentive Plan.  No payments are currently due under the Sales Management Incentive Plan.

127.    ***Management Incentive Plan.***  The Debtors maintain a Management Incentive Plan for eligible Employees based on overall performance of the Company (as defined therein).  Awards are determined on an annual basis and are paid to eligible Employees in late February or March of the following year after annual financial results have been finalized and confirmed.  Currently, approximately 230 Employees participate in the Management Incentive Plan.  No payments are currently due under the Management Incentive Plan.

128.    ***Retention Agreements.***  In May 2016, the Debtors entered into retention agreements ("Retention Agreements") with 16 key employees in order to help stabilize the business as negotiations with the Ad Hoc Group continued regarding an out-of-court restructuring.  Under the Retention Agreements, the employees were paid a lump sum in exchange for entering into an agreement to repay the amount if they resigned before December 31, 2016.  In addition the Company committed to pay the individuals a second installment at December 31, 2016.  The cost of the entire program was approximately $1.1 million.[62]

---

[62] The Debtors are not seeking any relief related to the Retention Agreements at this time.  The Debtors anticipate seeking relief from the Court to implement the second installment payment by separate motion at a later date.

129.   ***Sales Commission Incentive Plans.***   The Debtors further maintain sales commission incentive plans for the following categories of Employees: (i) division managers, (ii) heavy duty group managers, and (iii) regional managers.  These incentive plans include (i) the FRAM Division Manager Incentive Plan, (ii) the FRAM Heavy Duty Group Manager Plan, and (iii) the FRAM Regional Manager Incentive Plan (collectively, the "Sales Commission Incentive Plans").[63]   In each of these Sales Commission Incentive Plans, eligible Employees receive quarterly incentive payments equal to a designated percentage of sales dollars ("Quarterly Commissions").  The Quarterly Commissions are generally paid in the month following the quarter in which they are earned.  There are approximately 16 eligible Employees under the FRAM Sales Commission Incentive Plans.  No payments are currently due under the Sales Commission Incentive Plans.

### 2.      Withholding and Deduction Obligations

130.   The Debtors are required by law to withhold from Employees' wages, salaries and other compensation certain amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate taxing authority (the "Withholdings").  Further, the Debtors must match from their own funds Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withholdings, the "Payroll Taxes").  The Payroll Taxes total approximately $2,300,000 per month.  Ceridian debits the Debtors' account(s) for the total amount of Payroll Taxes due two days prior to the payroll date, and then remits the Payroll Taxes to the applicable taxing authorities on behalf of the Debtors by Ceridian on the applicable due dates.

---

[63] The Sales Commission Incentive Plans retain the "FRAM" title due to the shared services between the Debtors and the FRAM Group.

131.     In addition to the Payroll Taxes, the Debtors routinely deduct certain amounts (the "<u>Deductions</u>") from Employees' paychecks each pay period for (a) child support and other garnishments, (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefit Programs (defined and discussed in more detail below), and (c) union dues and related contributions.  The Debtors, through Ceridian, forward the Deductions to the appropriate recipients.  On average, the Debtors deduct and forward approximately $900,000 in the aggregate from the Employees' paychecks per month.

132.     Due to the commencement of these chapter 11 cases, certain Payroll Taxes and Deductions may not have been remitted or forwarded to the appropriate recipient before the Petition Date.  The Debtors request authority to process, or direct Ceridian to process, any unpaid Payroll Taxes or Deductions as of the Petition Date, and request authority to continue to honor and process, or direct Ceridian to continue to process, Payroll Taxes and Deductions on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

### 3.     Reimbursable Business Expenses

133.     At any given time, the Debtors may have obligations to certain Employees for the reimbursement of certain reasonable and customary expenses (the "<u>Reimbursable Expenses</u>") incurred on behalf of the Debtors in the scope of the Employees' employment.  These Reimbursable Expenses include expenses for travel such as airfare, rental cars or mileage reimbursement, hotels and meals, and other business-related expenses paid directly by Employees.

134.     Employees submit travel expense reports and other reimbursement requests through the Concur system.  As of the Petition Date, the Debtors believe that the Reimbursable Expenses are relatively current.  The Debtors have in place certain corporate control measures to ensure that only legitimate business-related expenses are charged to the Debtors through Concur

or the Company Credit Card Accounts.  All expense reports must be reviewed and approved by the Employee's supervisor or another authorized member of management prior to reimbursement.  Supervisory review and approval is the primary control regarding determination of whether expenses are acceptable for reimbursement.  The Debtors' accounting department also verifies that reports are properly approved in accordance with the applicable Debtor's policy prior to reimbursement.

### 4.    Supplemental Worker Obligations

135.    Payments to the Supplemental Workers vary according to the terms of the Debtors' contracts with the appropriate Staffing Agencies.  All Supplemental Workers are paid by the respective Staffing Agencies.  Based on an average outstanding monthly balance, the Debtors believe that (i) their total accrued and unpaid prepetition obligations to the Staffing Agencies for services provided by the Supplemental Workers as of the Petition Date do not exceed $300,000 and (ii) no one Supplemental Worker is owed in excess of the $12,850 cap for compensation that I understand is in place under section 507(a)(4) of the Bankruptcy Code.

### 5.    Sales Representative Brokers

136.    Payments to the Sales Representatives Brokers consist of commissions paid following shipment of the products with the Sales Representatives Brokers' specified sales territory.  Based on an average outstanding monthly balance, the Debtors believe that (i) their total accrued and unpaid prepetition obligations to the Sales Representatives Brokers for commissions of the Petition Date do not exceed $250,000 (the "Sales Representatives Brokers Obligations").

### 6.    Severance Obligations

137.    In the normal course of business, the Debtors have typically provided severance benefits to salaried Employees that have been terminated by the Debtors without cause (the

"Severance Program").  Specifically, (i) salaried Employees receive four weeks' base salary plus

two weeks' base salary for each year of service, and (ii) salaried non-exempt Employees receive

two weeks' base salary plus one week base salary for each year of service, in each case up to a

maximum of 26 weeks base salary.  The Severance Program is intended to compensate

Employees for the financial disruption following termination of employment.  Certain of the

Debtors' "insiders" (as I am informed that term is defined by section 101(31) of the Bankruptcy

Code) are eligible for and can participate in the Severance Program; however, by the Wages

Motion the Debtors do not seek authority to make severance payments to insiders that fall

outside the limits that I am informed are permitted by section 503(c)(2) of the Bankruptcy Code.

As of the Petition Date, the Debtors estimate that approximately 115 former Employees (the

"Severed Employees"), which includes certain former Employees that may be classified as

"insiders" (but not those insiders who fall outside the limits permitted by section 503(c)(2) of the

Bankruptcy Code), remain entitled to receive continued severance benefits pursuant to the

Severance Program, with remaining payments and benefits totaling approximately $500,000.

138.    In connection with the planned closing of the Debtors' Fairfield, Illinois facility,

the Debtors are providing severance benefits (the "Fairfield Transition Payments") to non-insider

employees at the Debtors' Fairfield, Illinois facility.  Pursuant to the terms of an agreement

reached with the International Union – UAW and its Affiliated Local Union No. 543 in respect

of the Airtex CBA, the Debtors are providing the Fairfield Transition Payments to union

employees in the form of lump sum payments and additional benefits based on such employees'

seniority.  In the past ninety days, approximately 81 union employees have received Fairfield

Transition Payments in connection with the planned closing of the Debtors' Fairfield, Illinois

facility.  In my opinion, payment of the Fairfield Transition Payments is critical to the Debtors'

ongoing efforts to efficiently shut down the Fairfield, Illinois facility.  I believe that a failure to timely pay the Fairfield Transition Payments would significantly impact the morale of the remaining Employees at the Fairfield, Illinois facility, remove the incentive of such Employees to continue working at the facility prior to shutdown, and result in the Debtors being unable to retain the necessary number of Employees to effectively shut down the facility.  A failure to timely and efficiently close the facility would significantly disrupt the Debtors' business, distract the Debtors' personnel from ongoing restructuring efforts, and result in substantial costs to the Debtors' estates in an amount substantially larger than the Fairfield Transition Payments.  As of the Petition Date, the Debtors believe that approximately $40,000 on account of ten Employees will become due in connection with the Fairfield Transition Payments within the first thirty days of the case.

### F.    Employee Benefit Obligations and Related Obligations

139.    In addition to the Employee Compensation discussed above, the Debtors offer Employees a number of insurance and other benefits programs (collectively, the "Employee Benefit Programs"), including medical, prescription drug, dental, and vision plans, employee assistance plans, life insurance, disability coverage, workers' compensation, pension plans, retirement savings plans, and other employee benefits described in more detail below.  In connection with administering the Employee Benefit Programs, the Debtors utilize the services of Lockton Benefit Group ("Lockton") and Morneau Shepell as benefits administrator.  Lockton provides a variety of services for the Debtors, including serving as a broker and benefits consultant, negotiating new benefits packages as needed, providing market research data on benefit trends, and preparing incurred but not reported reports on an as-requested basis.  In connection with such services, Lockton is paid an annual fee, which is billed to the Debtors on a quarterly basis, as well as additional amounts on account of miscellaneous tasks performed for

the Debtors on an as-needed basis.  The second quarter 2016 payment was paid by the Debtors in

May 2016.  As of the Petition Date, no amounts are currently owed to Lockton on account of

prepetition services.  Morneau Shepell provides administrative services in connection with the

Employee Benefit Programs, including data file transfer services to benefits vendors and services

with respect to the annual  benefits open enrollment process.  They charge an administrative fee

of $5.90 per employee per month.  As of the Petition Date, the Debtors do not owe any amounts

to Morneau Shepell in connection with services provided.

### 1.      Health Benefits

140.    The Debtors offer health and welfare benefit plans (collectively, the "<u>Health</u>

<u>Plans</u>") for non-union and union-represented Employees, including coverage for medical,

prescription drug, dental, vision, and employee assistance programs and incur obligations to

maintain such plans (collectively, the "<u>Health Plan Obligations</u>").  As part of the Health Plans,

the Debtors also subsidize or continue to provide certain benefits under the Consolidated

Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA</u>") to certain former Employees (or their

survivors) after their termination, retirement, or disability leave.  The Health Plans are generally

described below.

141.    Certain of the Health Plans are self-funded by the Debtors and administered by

third party administrators.  The Employees contribute certain premiums to these Health Plans

through the Deductions, which premiums are contributed to the Debtors' designated accounts.

The Debtors additionally make contributions to these designated accounts, and funds in the

account are used to reimburse the third party administrators for claims made under the self-

funded Health Plans.  The funds in these designated accounts are appropriately marked and

recorded in the Debtors' books and records for such purposes.  To minimize the Debtors'

liability in the event of high reimbursement costs for individuals under the medical and

prescription drug programs, the Debtors maintain a stop-loss insurance policy though Voya

Financial.  Specifically, the stop-loss insurance policy covers reimbursement claims for

individuals in excess of $225,000 per 24-month period.

142.    ***Medical Plans.***  The Debtors primarily offer two medical plans to eligible salaried

or hourly workers that are administered by BCBS.  The two plans are the BCBS PPO Plan (the

"PPO Plan") and the BCBS BlueEdge Plan (the "BlueEdge Plan").  Both the PPO Plan and the

Blue Edge Plan offer comprehensive medical and preventive care coverage, but the Employee's

premium payment, deductibles, co-pays, and out-of-pocket costs vary depending on which plan

the Employee selects and whether the Employee has dependents covered by the applicable

plan.[64]  The BlueEdge Plan includes a Health Reimbursement Account, funded by the Debtors,

which provides $750 for an individual electing employee-only coverage and $1,500 for an

Employee with dependents that the Employee may apply towards the deductible and out-of-

pocket expenses.  BCBS administers the benefits for the medical plans, processes claims, and

submits invoices for reimbursements on a monthly basis.[65]  BCBS charges a  monthly

administrative fee for each covered Employee, and further charges an annual administration fee

of $18,500.  In 2015, the Debtors paid approximately $17,700,000 pursuant to the BCBS medical

plans.  As of the Petition Date, the Debtors estimate the amount of accrued and outstanding

prepetition obligations with respect to the BCBS medical plans to be approximately $2,400,000.

143.    The Debtors further provide prescription drug coverage to Employees

participating in the PPO Plan or BlueEdge Plan through a plan administered by Express Scripts

---

[64] Beginning in 2016, the Debtors established a Tobacco Cessation Program that offers non-tobacco user health insurance premium rates to Employees that use tobacco if such Employees participate in the Alere Quit For Life tobacco cessation program.

[65] The BCBS PPO and BlueEdge Plans are administered by a central benefits team on behalf of the Debtors and the FRAM Group.  Payments/reimbursements under these plans are made directly by United Components, Inc. and then allocated back to the respective UCI employing entities.

("ESI").  ESI processes claims relating to prescription drug coverage, and submits reimbursement invoices on a weekly basis.  ESI additionally charges certain administrative fees per participant and a consulting fee for their services. In 2015, the Debtors paid approximately $2,600,000 in connection with the ESI plan.  As of the Petition Date, no amounts are outstanding in connection with the ESI Plan.

144.    In addition to the two BCBS plans, Employees of ASC located at the North Canton, Ohio facility may also elect to participate in one of two medical insurance plans insured and administered through SummaCare (the "SummaCare Plans").  The SummaCare Plans differ with respect to the Employee's premium payments, deductibles, co-pays, and out-of-pocket maximums.[66]  If an Employee elects one of the SummaCare Plans, the Employee's prescription drug coverage will also be provided by SummaCare.  Under the insured SummaCare Plans, ASC pays monthly premiums for each covered Employee (combined with the portion of the premium funded by the Employee).  On average, the Debtors pay approximately $155,000 per month in connection with the SummaCare Plans.  As of the Petition Date, no amounts are outstanding in connection with the SummaCare Plans.

145.    ***Dental Plan.***  The Debtors provide dental benefits to Employees through a self-funded plan administered through Delta Dental of Illinois ("Delta Dental").  The Delta Dental plan generally covers diagnostic and preventative dental services, and partially covers restorative services, and orthodontics for children.  The Delta Dental plan is funded in part by premium deductions from Employees' paychecks, and the remainder is funded by the Debtors.  Employee premiums vary based on the number of dependents covered by the Employee's plan.  Delta Dental submits reimbursement invoices to the Debtors on a monthly basis for the reimbursement

---

[66] ASC also offers the Tobacco Cessation Program through SummaCare.

of claims paid under the Delta Dental plan and charges a monthly administrative fee of approximately $2.07 per enrolled employee per month.[67]   Reimbursement is due within 30 days of the invoice.  In 2015, the Debtors paid approximately $725,000 pursuant to the Delta Dental plan.  As of the Petition Date, no amounts are outstanding in connection with the Delta Dental plan.

146.   *Vision Plan.*  The Debtors provide vision benefits to Employees and their dependents through a plan insured and administered through Vision Service Plan of Illinois, NFP.  The vision plan generally provides benefits for annual eye examinations and corrective lenses for covered Employees and their dependents.  The vision plan is funded in full by premium deductions from Employees' paychecks.  Employee premiums vary based on the number of dependents covered by the Employee's plan.  In 2015, the Debtors paid approximately $195,000 on behalf of the Employees in premiums pursuant to the vision plan.  As of the Petition Date, no amounts are outstanding in connection with the vision plan.

147.   *Employee Assistance Program.*  The Debtors provide certain guidance and counseling benefits to Employees and their dependents through an employee assistance program administered by Compsych.  Through this program, Employees can obtain confidential support for issues including family and relationship issues, parenting skills, alcohol and drug abuse, anger management, stress, and grief and loss.  The Debtors provide their Employees with up to three counseling sessions, 24-hour access to clinicians, and online access to guidance resources.  These services are provided at no cost as part of the Debtors' life insurance programs provided by Voya.

---

[67] Overall, the Debtors contribute approximately $14 per employee per month for the Dental Plan.  The difference between the $14 total charge and $2.07 administrative fee is applied to claims.

148.    ***Flexible Spending Accounts.***  The Debtors offer Employees the ability to contribute to Health Care and Dependent Care Flexible Savings Accounts ("FSAs") administered through WageWorks.  The health care FSA allows Employees to contribute up to $2,550 of their compensation per year on a pre-tax basis to be applied to certain eligible expenses.  The dependent care FSA permits Employees to contribute up to $5,000 of their compensation (per household) per year on a pre-tax basis depending on the Employee's tax status to be applied to eligible child or adult day care expenses.  Employees cannot roll over their FSA balances and must spend funds in such accounts or lose them at the end of the year.  The Debtors deduct approximately $195,000 per year from Employees' paychecks on account of the FSAs.  The Debtors additionally pay WageWorks a monthly service fee of approximately $420 to administer the FSAs.[68]  As of the Petition Date, no amounts are outstanding in connection with the FSAs.

149.    ***COBRA.***  The Debtors provide for the continuation of healthcare benefits to former Employees through a plan administered by WageWorks.  Pursuant to this agreement, the Debtors pay WageWorks certain monthly service and other administrative fees per participant.  There are approximately 21 former Employees (or their survivors) covered under the Debtors' COBRA plan with WageWorks.  The Debtors pay approximately $1,000 per month to WageWorks on account of COBRA obligations.  As of the Petition Date, no amounts are due and owing to WageWorks in connection with this program.

## 2.    Disability Programs, Workers' Compensation, and Other Insurance Programs

150.    ***Short-Term Disability Plan.***  The Debtors provide all full-time Employees with a short-term disability plan (the "Short-Term Disability Plan") administered by CIGNA to protect against loss of income for short-term disabilities.  Employees are able to obtain short-term

---

[68] The monthly administrative fee is $2.75 per participant.

disability benefits for a period of 26 weeks following an accident or personal illness (although there is a waiting period for illnesses).  Under the Short-Term Disability Plan for salaried and non-union Employees, Employees are provided 100% of their salary or base hourly rate (excluding overtime, bonus or commission pay) for up to six weeks, and then receive 60% of such base pay for the remaining 20 weeks.  Under the Short-Term Disability Plan for Airtex Union Employees, the Employees are provided with $285 per week.  The Short-Term Disability Plans are self-funded by the Debtors, with the exception of plans for certain hourly non-union Employees at Champion and hourly union Employees at Airtex, which are fully insured.  Similar to the self-funded Health Plans, the Debtors hold funds in a designated account that is used to reimburse CIGNA for claims paid pursuant to the self-funded Short-Term Disability Plans.  The Debtors' total monthly cost for the Short-Term Disability Plan averages approximately $30,000 per month.

151.   ***Long-Term Disability Plan.***  The Debtors provide all salaried Employees with a long-term disability Plan (the "Long-Term Disability Plan") administered by CIGNA to protect against loss of income for long-term disabilities.  The Long-Term Disability Plan applies after 180 days, and provides Employees who are disabled before the age of sixty with benefits of 60% of their base pay (up to $10,000 per month) to age 65 or normal Social Security retirement age. The Long-Term Disability Plan is fully insured.  The Debtors' total monthly cost for the Long-Term Disability Plan averages approximately $7,000 per month.  As of the Petition Date, no amounts are outstanding in connection with both the Long-Term Disability Plan and the Short-Term Disability Plan.

152.   ***Workers' Compensation.***  Under applicable state law, the Debtors are required to maintain workers' compensation insurance programs to provide the Employees with workers'

compensation insurance coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"), and to satisfy the Debtors' obligations arising under or related to these programs (the "Workers' Compensation Obligations").  The Debtors do not operate under any self-qualified or self-insured workers' compensation programs.[69]  Rather, the Debtors satisfy their Workers' Compensation Obligations through insurance policies with Travelers Property Casualty Company of America[70] (the "Workers' Compensation Insurance"), and such obligations are secured by letters of credit.  The insurance policies are renewable on an annual basis, and the next renewal date is June 30, 2016.  Premiums owed under the Workers' Compensation Insurance are paid in 10-month installments.  Under the Workers' Compensation Insurance, the Debtors have a deductible of $500,000 per loss (including any defense costs).  The Debtors additionally maintain a paid-loss deposit fund managed by third party adjuster Sedgwick.  Sedgwick adjusts claims asserted under the Workers' Compensation Program and makes necessary payments from the paid-loss deposit fund.   The Debtors satisfy funding obligations for the paid-loss deposit fund relating to the Workers' Compensation Obligations on a semi-monthly basis.  From time to time, Sedgwick may also request additional deposit funds to satisfy larger claims.  As of the Petition Date, the Debtors had approximately $2,700,000 in unfunded Workers' Compensation Obligations.  The average weekly cost of Workers' Compensation Obligations paid by the Debtors is approximately $18,100.

153.    ***Life and Accidental Death and Dismemberment Insurance.***  The Debtors provide basic life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") for all full-time Employees and provide Employees with an option to

---

[69] In Ohio, the Debtors pay a state-mandated premiums for workers' compensation and are part of a rating program. The workers' compensation claims asserted against the Debtors in Ohio are managed by Sedgwick.

[70] In addition, AIG provides coverage for certain of the Debtors' legacy workers' compensation claim.

purchase supplemental life and accidental death and dismemberment coverage for themselves

and for dependents (the "Supplemental Life and AD&D Insurance," and with the Basic Life and

AD&D Insurance, the "Life/AD&D Insurance").  The Life/AD&D Insurance is administered by

Voya Financial.  The Basic Life and AD&D Insurance provides Employees with coverage up to

a maximum of $750,000, and the Supplemental Life and AD&D Insurance provides Employees

with up to $1,500,000 for themselves and up to $250,000 for a spouse and up to $20,000 for each

covered child.  The Debtors' total monthly cost with respect to the Basic Life and AD&D

Insurance is $22,000.  As of the Petition Date, no amounts are currently outstanding in

connection with the Basic Life and AD&D Insurance.  The Debtors do not owe any amounts on

account of the Supplemental Life AD&D Insurance, which is purchased through Deductions by

the Employees.

154.    ***Retiree Benefit Programs.***  The Debtors continue to make available certain

benefit programs to certain retired Employees (the "Retired Employees").  Specifically, under

certain circumstances, the Retired Employees are eligible for the medical, dental, and/or basic

life insurance coverage described above (the "Retiree Benefits").  The medical and dental

coverage for the eligible Retired Employees generally ends when the retired Employee reaches

age 65 or becomes eligible for Medicare.  The Debtors' obligations on account of the Retiree

Benefits total approximately $104,000 per month.

### 3.    Vacation and Leave Policies

155.    Pursuant to the Debtors' vacation policies, eligible Employees are paid their

regularly scheduled full-time or part-time wages for each vacation day up to the maximum

number of days accrued based on years of service.  For Employees terminating their employment

with the Debtors, accrued and unused vacation days are monetized and paid out upon

termination. Unused vacation time generally may not be carried over from year to year.[71]

156.    The Debtors have a leave policy in place that covers all full-time and regular part-

time Employees for the following categories of leave: (i) Family and Medical Leave Act, (ii)

Victims' Economic Security Act, (iii) unpaid personal leave, (iv) military leave, and (v) civic

duty leave for jury duty, appearing as a witness in litigation, or voting. The compensation and

benefits available to Employees taking a leave of absence vary based on the type of leave. There

are currently ten Employees that are on leave.

157.    The Debtors estimate that their average monthly obligation is approximately

$280,000 in connection with accrued vacation and leave obligations for Employees. However,

because vacation days are typically not monetized until termination, the Debtors do not believe

they owe amounts on account of accrued but unpaid vacation obligations as of the Petition Date.

### 4.    Employee Savings and Retirement Plans

158.    ***Pension Plans.*** Certain of the Debtors' Employees and Retired Employees

participate in three single-employer defined benefit pension plans: the Pension Plan for

Employees of Airtex Products, LP (the "Airtex Plan"), the Champion Laboratories Pension Plan

(the "Champion Plan") and the Neapco Inc. Employees' Pension Plan (the "Neapco Plan"),

which comprise the Debtors' collective Pension Obligations.

159.    The Airtex Plan is a single-employer defined benefit pension plan originally

established by UIS, Inc. in 1965. Sponsorship of the Airtex Plan was transferred to United

Components Inc. in 2003. Entry into the Airtex Plan was frozen for non-union Employees in

2004, and was frozen for union Employees in 2007. After such dates, no Employees or former

---

[71] Under the Airtex CBA, union-represented Employees have an option to monetize vacation days under certain circumstances. In addition, certain non-union Employees at Airtex and Champion are also eligible to monetize their vacation days, with no carryover from year to year.

Employees were able to become active participants under the Airtex Plan.  Further, the accrued benefits under the Airtex Plan were frozen effective March 14, 2012 for non-union participants, and no additional benefits have accrued for such participants after such date.  There are currently approximately 1,388 participants in the Airtex Plan.  For the plan year 2015, the Debtors contributed approximately $1,022,000 to the Airtex Plan.[72]

160.     The Champion Plan is a single-employer defined benefit pension plan originally established by Pyroil Company in 1972.  Sponsorship of the Champion Plan was transferred to United Components Inc. in 2003.  Entry into the Champion Plan was frozen in 2004, and after such date no Employees or former Employees were able to become active participants under the Champion Plan.  Further, the accrued benefits under the Champion Plan were frozen in 2012, and no additional benefits have accrued for the participants after such date.  There are currently approximately 3,055 participants in the Champion Plan.  For the plan year 2015, the Debtors did not contribute to the Champion Plan.

161.     The Neapco Plan resulted from the 2008 merger of union and non-union pension plans established by Neapco, Inc., which is now known as UCI Pennsylvania Inc., one of the Debtors in these chapter 11 cases.  Entry into the Neapco Plan was frozen for non-union Employees in 2004, and was frozen for union Employees in 2005.  The accrued benefits under the Neapco Plan were frozen in 2006, and no additional benefits have accrued for the participants after such date.  There are currently approximately 649 former employees in the Neapco Plan; there are no active participants in the Plan.  For the plan year 2015, the Debtors contributed approximately $393,000 to the Neapco Plan.

---

[72] The Airtex Plan covers the union Employees subject to the Airtex CBA.

162.    The Airtex Plan, Champion Plan, and Neapco Plan are managed by Xerox HR

Solutions LLC ("Xerox").  The Debtors pay approximately $23,400 per month in administrative

fees in connection with the Plans.

163.    ***Employee Savings 401(k) Plan.***  All of the Debtors' Employees may enroll in a

savings plan through the UCI-FRAM Group Employee 401(k) Saving Plan (the "401(k) Plan"),

through which Employees may contribute amounts to the 401(k) Plan up to the annual Internal

Revenue Service ("IRS") limits for contributions and eligible compensation (the "Employee

401(k) Contributions").[73]  Pursuant to the terms of the 401(k) Plan, unless an Employee elects

not to contribute or elects a different contribution percentage, Employee 401(k) Contributions

are automatically set at 5% of a non-union Employee's compensation and 2% of a union

Employee's compensation (subject to applicable IRS limitations).  In addition, the Debtors make

matching contributions in amount equal to the Employee's contributions (the "Matching

Contributions"), with a maximum Matching Contribution of up to 5% of compensation for non-

union Employees, and up to 1% of compensation for union Employees.  Employee 401(k)

Contributions and the Matching Contributions are made each payroll period and are processed by

Ceridian.  At the end of the calendar year, the Debtors make additional contributions to the

401(k) Plan for non-union Employees in an amount equal to 2% of the Employee's annual

compensation, and additional contributions for union Employees in an amount equal to $350.

164.    Approximately 1,800 current Employees participate in the 401(k) Plan.  Each

month the Debtors deduct and withhold approximately $490,000 in Employee Contributions for

the 401(k) Plan.  Further, the aggregate amount of Matching Contributions made by the Debtors

---

[73] The Debtors previously maintained the following savings plan which were merged into the 401(k) Plan: (i) the Champion Laboratories, Inc. Employees' Savings Plan (in 2005), (ii) the Airtex Products UAW Local 543 401(k) Plan (in 2011), (iii) the ASC Industries, Inc. 401(k) Profit Sharing Plan (in 2013), and (iv) the UCI Retirement Savings Plan (in 2013).

on a monthly basis is $309,000.  As of the Petition Date, no amounts were outstanding in

connection with the Matching Contributions.

### 5.      Other Benefit Programs

165.    The Debtors also provide the following additional Employee Compensation and

Benefits to certain eligible Employees:

- Relocation Benefits.  The Debtors offer relocation benefits to eligible Employees who relocate further than 50 miles at the request of the Debtors and in furtherance of the Debtors' business needs.  The Debtors have contracted with American International Relocation Solutions to assist Employees with relocation, and provide a relocation allowance equal to one month of the Employee's salary up to a maximum of $10,000, as well as reimbursement for a home finding trip and temporary living arrangements.

- Vehicle Policy.  The Debtors provide company vehicles to eligible Employees who drive more than 13,000 miles annually for work required by the Debtors. The Debtors currently have 30 leased company vehicles provided to Employees, predominately in field sales positions.  The average monthly cost of the vehicle policy is $20,000.

- Mobile Device Policy.  The Debtors additionally provide mobile devices for certain categories of Employees, and provide monthly reimbursement for personal mobile devices and service for certain other categories of Employees, depending on the extent to which the Employee's position requires frequent travel and communication outside of core business hours. The Debtors provide mobile devices for approximately 135 Employees, and provide reimbursements for approximately 31 additional Employees.

- Tuition and Education Benefits.  In the past, the Debtors have provided tuition or educational assistance to certain Employees, as determined on a case-by-case basis.

166.    As of the Petition Date, the Debtors there are no amounts outstanding in

connection with these four categories of Employee Compensation and Benefit Programs.

### G.      *Debtors' Motion for Entry of an Order Authorizing (I) Debtors to Pay Certain Prepetition Taxes and (II) Financial Institutions to Honor and Process Related Checks and Transfers* (the "Tax Motion")

167.    Historically, the Debtors have generally remitted and paid sales and use, excise,

franchise, and property taxes, U.S. customs duties and fees, licensing and reporting fees, and

other similar charges and assessments (collectively, the "Taxes") to the relevant federal, state, and local taxing authorities (collectively, the "Governmental Authorities").  Approximately $2,260,000 in Taxes that have accrued prior to the Petition Date are currently outstanding or will become due and payable following the Petition Date.

### 1.    Sales and Use Taxes

168.    In the ordinary course of their businesses, the Debtors collect and remit sales and use taxes to various state taxing authorities in connection with the operation of the Debtors' businesses and sale and distribution of products.  The Debtors further incur use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided.  In this circumstance, the Debtors, as purchasers, must self-assess and pay the use taxes, when applicable, to the appropriate Governmental Authority.  As of the Petition Date, approximately $20,000 in sales and use taxes have accrued and remain unpaid for the prepetition period.

### 2.    Franchise Taxes

169.    The Debtors also pay certain franchise taxes to various state taxing authorities in connection with operating in such states.  The Debtors generally pay franchise taxes on a quarterly basis to the appropriate Governmental Authority.  As of the Petition Date, approximately $40,000 in franchise taxes have accrued and remain unpaid.

### 3.    Real and Personal Property Taxes

170.    Where the Debtors have operations and real and personal property, the Debtors are subject to property tax levied by state and local governments.  In order to avoid the imposition of statutory liens on their properties, the Debtors typically pay real and personal property taxes in the ordinary course of business as such taxes are invoiced, which is typically

for the prior year, quarter, or semi-annual period.  As of the Petition Date, approximately

$1,200,000 in real and personal property taxes have accrued and remain unpaid.

### 4.    U.S. Customs and Border Protection Duties and Fees

171.    In the ordinary course of business, the Debtors import goods from their non-

Debtor affiliates located in China, Mexico and Europe.  As a result, the Debtors incur customs

duties and fees and remit them to federal authorities.  As of the Petition Date, approximately

$1,000,000 in duties and fees have accrued and remain unpaid.[74]

172.    The Debtors believe, and I agree, that the Debtors' ability to pay prepetition

Taxes is critical to their continued and uninterrupted operations and would ultimately preserve

the resources of the Debtors' estates and going-concern values.  It is my understanding from

various members of the Debtors' tax department and legal advisors that the failure to pay

prepetition Taxes could materially and adversely affect the Debtors' business operations in a

number of ways.  Among other things, I understand that the failure to timely pay prepetition

taxes would require the Debtors to spend time and money to resolve whether (i) the obligations

are entitled to priority status under the Bankruptcy Code; (ii) the obligations are secured by liens

on the Debtors' real and personal property, thus entitling the relevant governmental authorities to

a secured claim against property of the relevant Debtor's estate; and (iii) the obligations are

subject to so-called "trust fund" taxes that the Debtors are required to collect from third parties

and hold in trust for the benefit of the relevant taxing authorities.

173.    In addition, I am informed by the Debtors' legal advisors that some states may

hold responsible officers personally liable in various circumstances for unpaid prepetition sales

and use taxes.  To the extent that any such "trust fund" taxes remain unpaid by any of the

---

[74] In the ordinary course of business, the Debtors also incur excise taxes in connection with their utility usage, which is typically paid on a monthly basis.  As of the Petition Date, no excise taxes have accrued and remain unpaid.

Debtors, I understand that their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases. The Debtors believe, and I agree, that the possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their efforts to implement a successful reorganization strategy, to the detriment of all parties in interest. Accordingly, I believe that the relief requested in the Tax Motion is necessary to prevent immediate and irreparable harm to the Debtors' estates.

**H.** ***Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "__Utilities Motion__")**

174.    To operate their businesses and manage their properties, including their manufacturing facilities, the Debtors incur utility expenses for gas, electricity, water, waste removal, telephone service, and other similar utility services (collectively, the "__Utility Services__"). These services are provided by approximately 28 of the Debtors' utility providers (collectively, the "__Utility Providers__"). The Debtors spend approximately $600,000 each month on Utility Services.

175.    In my opinion, uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, to the success of the Debtors' reorganization efforts. The Debtors operate plants and a loadout facility that depend on the reliable delivery of power and other Utility Services. Should any Utility Provider refuse or discontinue service even for a brief period, the Debtors' operations could be severely disrupted. The Debtors believe, and I agree, that such a disruption would impact the Debtors' business operations and revenue, causing immediate and irreparable harm to the Debtors' estates, and could jeopardize the Debtors' reorganization efforts. As a result, it is my belief that the relief requested in the Utilities Motion is critical for the continued, uninterrupted provision of Utility Services to the Debtors.

I. ***Debtors' Motion for Entry of an Order Authorizing (I) Debtors to Maintain Customer Programs and Honor Related Prepetition Obligations and (II) Financial Institutions to Honor and Process Related Checks and Transfers* (the "Customer Programs Motion")**

176.     In the ordinary course of their businesses, the Debtors maintain and administer customer-related programs, practices and policies (collectively, the "Customer Programs").  The viability and success of the Debtors' businesses depends on fostering the loyalty of their various customers.

177.     The Debtors implement the Customer Programs to encourage customers to increase their purchasing frequency and volume, resulting in larger net revenues for the Debtors. The Debtors seek to continue the Customer Programs because they have produced positive results in the past and are responsible for generating valuable goodwill, repeat business and increased revenue.  The Debtors' Customer Programs include, but are not limited to, the following programs:

### 1.     Warranty Program

178.     Consistent with common industry practice, the Debtors provide most of their customers with warranties on their supply of various automotive parts (the "Warranty Program"). The Warranty Program subjects the Debtors to standard terms and conditions in warranty clauses that include workmanship of the Debtors' products.  To the extent that customers identify workmanship issues with the Debtors' products or any other claims for coverage under the Debtors' warranties, the Debtors may be held liable to remedy such defects or reimburse the customer per the warranty terms.  As of the Petition Date, the Debtors had approximately $10 million in reserves on their balance sheets related to potential obligations under their Warranty Program.

### 2.    Rebates, Discounts and Allowances Program

179.    The Debtors maintain a program that includes rebates, discounts and allowances (the "Rebates, Discounts and Allowances Program").  The Rebates, Discounts and Allowances Program incentivizes the majority of supplier contracts and coordinated customer purchasing. For example, a certain subset of the Debtors' customers are part of a buying group that purchases from the Debtors as a preferred vendor, and in return the buying group, and in some cases also the end customers, receive rebates.  In addition, the Debtors provide various allowances, as well as certain discounts and other incentives in many of their customer agreements.  By way of example, these may include sale discounts, marketing allowances, return allowances, and performance incentives.  The Debtors' ability to continue such customary practices as well as honor such obligations with respect to their products in the ordinary course of business is necessary for the Debtors to retain their customer base and reputation for reliability.  As of the Petition Date, the Debtors estimate that approximately $9 million remains outstanding on account of their obligations in connection with the Rebates, Discounts and Allowances Program.

### 3.    Volume Incentives Program

180.    The Debtors customarily provide certain of their retail customers and aftermarket installers discounts and other incentives that are tied to the amount of products purchased (the "Volume Incentives Program").  Notably, sales to retailers represent a significant amount of the Debtors' net sales.  Larger retailers in the automotive parts market are generally accustomed to receiving such incentives, which leads to its continuation as an essential element of the Debtors' retention of their customer base and opportunity for future sales growth.  Without the Volume Incentives Program, suppliers with limited consumer brands are particularly vulnerable in current market conditions, as larger retailers can easily find replacement products elsewhere.

### 4.    In-Store Marketing Program

181.    The Debtors also maintain an in-store marketing program (the "In-Store Marketing Program") that is similarly designed to increase volume sales of several of their products.  The program includes interactive product displays and promotions for their retail customers.  As of the Petition Date, the Debtors estimate that approximately $300,000 remains outstanding on account of their obligations in connection with the In-Store Marketing Program.

### 5.    Continuation of the Customer Programs Is Necessary for the Debtors' Reorganization

182.    The Debtors believe, and I agree, that continuing the Customer Programs without interruption, as well as paying the prepetition obligations to customers arising under the Customer Programs in the ordinary course of business and in a manner consistent with the Debtors' past practices (collectively, the "Prepetition Customer Obligations"), is critical to the Debtors' successful reorganization; failure to maintain any of these programs would cause irreparable damage to the Debtors' reorganization efforts.  I believe that the grant of requested relief in the Customer Programs Motion will facilitate a smooth transition into chapter 11 and advance the restructuring of the Debtors' businesses, both in terms of profitability and the engendering of goodwill with essential customers, especially at this critical time early in these chapter 11 cases.  The Debtors believe, and I agree, that the cost of maintaining the Customer Programs and honoring the Prepetition Customer Obligations will be more than offset by the revenue generated if the Customer Programs remain in place.

**J.**     ***Debtors' Motion for Entry of an Order Authorizing Debtors to Pay (I) Certain Prepetition Charges for Shippers, Warehousemen and Other Lien Claimants and (II) Granting Related Relief* (the "<u>Shippers and Lien Claimants Motion</u>")**

183.     In their day-to-day operations, the Debtors use and make payments to Shippers, Warehousemen, and Other Lien Claimants (each as defined below and, collectively, the "<u>Lien Claimants</u>") to facilitate the movement and distribution of their goods.

### 1.     Shippers and Warehousemen

184.     In operating their businesses, the Debtors use and make payments to domestic and foreign commercial common carriers, movers, shippers, freight forwarders and consolidators, delivery services, and other third party service providers (collectively, the "<u>Shippers</u>") to ship, transport, store, and otherwise facilitate the movement of goods through established national and international distribution networks, as well as third party warehouses (collectively, the "<u>Warehousemen</u>") to store goods in transit (such payments, the "<u>Shipping and Warehousing Charges</u>").

185.     The services provided by the Shippers and Warehousemen are critical to the Debtors' day-to-day operations.  The Debtors' industry is shipping-intensive, and the Debtors rely on frequent, often daily, shipments of goods.  Any disruption to the Debtors' acquisition of these goods from Shippers or Warehousemen could result in a slow-down or shut-down of the supply chain at the Debtors' various facilities, adversely impacting customers to the detriment of all parties in interest.  This effect is exacerbated by the fact that the Debtors typically maintain a limited inventory for certain key components on-site through the use of a calculated buffer system.  Use of these production methods means that the Debtors maintain little or no inventory on site of certain components necessary to manufacture the Debtors' products, which I believe could further threaten the Debtors' operations in the event that the Shippers or Warehousemen stopped providing services to the Debtors.

186.    Moreover, the Debtors rely heavily on timely deliveries, consistent with their contractual obligations, in order to avoid financial penalties and potential loss of business from their major customers.  Specifically, many of the Debtors' major customers have contractual fill levels that the Debtors must satisfy or risk incurring a financial penalty pursuant to the terms of the Debtors' respective agreements with their customers.  Any failure to meet the fill rate requirements likely would jeopardize the contracts of the Debtor's customers and, ultimately, future sales by the Debtors to their customers.  In addition to these fill rate penalties, the Debtors' inability to fulfill customer commitments could lead to additional, larger penalties in connection with a customer's inability to manufacture products.

187.    Accordingly, to meet their delivery deadlines and maintain uninterrupted operations, the Debtors have implemented an efficient system for the receipt of materials and the delivery of finished goods to their customers.  This system relies heavily on third parties, including Shippers and Warehousemen.  At any given time, there are countless shipments of goods en route to and from various locations within the Debtors' distribution and supply networks.  These frequent deliveries are necessary because, as noted above, the Debtors typically keep only limited amounts of inventory on hand.  Therefore, certain Shippers and Warehousemen currently possess various goods, including raw materials and components, that are vital to the Debtors' operations.

188.    Following the commencement of these chapter 11 cases, certain Shippers and Warehousemen that hold goods for delivery to or from the Debtors may refuse to release the goods pending receipt of payment for their prepetition services.  My understanding is that, under some state laws, a Shipper or Warehouseman may have a lien on the goods in its possession to

secure the charges or expenses incurred for the transportation or storage of goods.[75]
Additionally, I have been informed by the Debtors' legal advisors that, pursuant to section 363(e)
of the Bankruptcy Code, as bailees the Shippers and Warehousemen may be entitled to adequate
protection as holders of possessory liens.

189.    The Debtors rely heavily on the Shippers and Warehousemen, many of which
currently hold property of the Debtors, to expeditiously transport their goods.  Additionally,
because certain of the Debtors rely heavily on constant international shipments for certain
products necessary to conduct their businesses, consistent delivery by the Shippers and
Warehousemen is crucial.  It is thus imperative that the Debtors be authorized to pay any
Shipping and Warehousing Charges, whether they arose prior to or after the Petition Date, that
the Debtors determine in their business judgment are necessary to ensure the uninterrupted
shipment and delivery of the goods.  The Debtors estimate that approximately $2,600,000 in
prepetition amounts are owed in connection with Shipping and Warehousing Charges as of the
Petition Date.

## 2.    Other Lien Claimants

190.    In addition to Shippers and Warehousemen, the Debtors also routinely transact
business with a number of other third parties (the "Other Lien Claimants") that I understand may
be able to assert liens against the Debtors and their property if the Debtors fail to pay for the
goods or services rendered (the "Statutory Liens").  The Other Lien Claimants perform a number
of services for the Debtors, including manufacturing parts necessary for the Debtors' goods and
rendering essential services related to the Debtors' manufacturing facilities, such as machine
repair and maintenance, that are integral to the Debtors' manufacturing processes and are critical

---

[75] The Debtors do not concede that any liens described in the Shippers and Lien Claimants Motion, including
contractual liens, mechanics' liens, and statutory liens, are valid and expressly reserve the right to contest the extent,
validity, perfection or possible avoidance of all such liens.

to the Debtors' ongoing business operations and successful reorganization. As described in further detail below, the Other Lien Claimants provide valuable services to the Debtors and also currently hold goods, including equipment, that are necessary to the Debtors' continued operations. The Debtors estimate that approximately $4,700,000 in prepetition amounts are owed to Other Lien Claimants as of the Petition Date.

### a.    Tooling Users

191.    The Debtors deploy various tooling to third party vendors (collectively, the "Tooling Users") that manufacture parts or components for fuel pumps with such tooling, and the Debtors then incorporate such parts and components into their products. The Tooling Users are typically subject to formal or informal bailment agreements with the Debtors governing the use of the Debtors' equipment. The Debtors estimate that the Tooling Users are currently in possession of at least $12,000,000 in critical equipment of the Debtors that is necessary to manufacture certain components. My understanding is that state law may provide the Tooling Users with Statutory Liens on the relevant tooling relating to unpaid amounts for goods produced by the Tooling Users with the relevant tooling, or for services or maintenance performed on such tooling.

192.    The Debtors believe, and I agree, that it is vital that the Debtors be authorized to pay such Tooling Users in the ordinary course of business to the extent that a Tooling User has asserted (or, in the Debtors' estimation, has the ability to assert) a Statutory Lien against any of the Debtors' equipment.

### b.    Equipment Manufacturers

193.    In the ordinary course of their businesses, the Debtors are required to contract with third party equipment manufacturers (the "Equipment Manufacturers") to make specialized equipment and parts needed to support production of the Debtors' various products. The Debtors

require the Equipment Manufacturers' services when, for example, the Debtors need to expand

production to support key customers or need to replace existing equipment to improve the

operating efficiency on existing business.

194.    Typically the Equipment Manufacturers are paid at intervals based upon progress

or milestones relative to the completion of the item(s) they are manufacturing.  To the extent that

the Debtors are unable to fulfill their payment obligations to the Equipment Manufacturers, the

Equipment Manufacturers may choose to assert liens against the partially and/or fully

constructed equipment in their possession. Such actions could severely hinder the Debtors'

ability to fulfill production obligations to their customers on both existing and new programs

### c.        Lien Claimants Performing Maintenance at the Debtors' Facilities

195.    At any given time, any number of third party Other Lien Claimants may be

rendering services at any of the Debtors' manufacturing and distribution and warehouse

facilities.  My understanding is that to the extent that such Other Lien Claimants render services

related to either the Debtors' property or property of the Debtors' customers, they may have the

right to assert and perfect Statutory Liens under applicable state law.  In either event, any such

Statutory Liens would have to be settled by the Debtors or their customers (and in the case of the

Debtors' customers, such costs likely would ultimately be borne by the Debtors in the form of

such customer withholding from or offsetting against future receivables).  Furthermore, the

Debtors believe, and I agree, that the attachment of Statutory Liens could cause great concern to

the Debtors' customers and would unduly strain customer relations.

196.    The Lien Claimants are vital to the Debtors' continued operations.  Accordingly,

the Debtors believe, and I agree, that continued access to the goods and services provided by the

Lien Claimants on customary trade terms is necessary to the Debtors' continued operations and

successful reorganization.  Indeed, I believe that the failure to satisfy the claims of the Lien

Claimants could have a material adverse effect on the Debtors' day-to-day business operations

and relationships with their subscribers, as well as their reorganization efforts.  If the Debtors

were unable to access the goods held by the Lien Claimants and the services provided by the

Lien Claimants, the Debtors believe, and I agree, that they would be unable to fulfill customer

orders, resulting in a sharp decline in revenue and derailing these chapter 11 cases.  The Lien

Claimants, like other important vendors and suppliers, are critical to the success of the Debtors'

supply chain, and it is my opinion that any disruption in delivery or storage of the Debtors'

products or their customers' products has the ability to significantly impact the Debtors'

businesses.  Put simply, if the Debtors' operations are interrupted, they will not be able to meet

the needs of their customers.  The prompt payment to the Lien Claimants, and satisfaction of any

liens asserted against the Debtors' property or the customers' property is thus crucial for the

orderly and efficient operation of the Debtors' businesses.

197.    Further, as noted above, my understanding is that if amounts owed to the Other

Lien Claimants are not paid, the Other Lien Claimants may be able to assert Statutory Liens

against the Debtors' relevant manufacturing locations or the Debtors' goods or equipment,

notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.  As a result,

certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including

delivering certain goods and performing servicing obligations in connection with the Debtors'

manufacturing facilities, unless their claims are paid in full.  To the extent that any Other Lien

Claimant has perfected a lien on any of the Debtors' property (or the customers' property) or, in

the Debtors' estimation, could assert and perfect a lien on any such property, the Debtors believe,

and I agree, that it is imperative that the Debtors be authorized to immediately pay such Other

Lien Claimants regardless of whether their claims have arisen prior to or after the Petition Date

to secure not only the release of any such lien but also the Debtors' continued uninterrupted

access to the goods and services provided by the Other Lien Claimants.  The Debtors anticipate

paying the prepetition claims of the Other Lien Claimants only when they believe, in their

business judgment, that the benefits of making such payments would exceed the costs, delays,

and disruption associated with bringing an action to compel the turnover of such goods.

> **K.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Critical Vendors, (II) Approving and Authorizing Procedures Related Thereto, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Related Relief* (the "<u>Critical Vendors Motion</u>")**

198.    In the ordinary course of their businesses, the Debtors purchase essential goods

and services from certain vendors and suppliers that are unaffiliated with the Debtors without

which the Debtors could not operate (collectively, the "<u>Critical Vendors</u>").  These Critical

Vendors are essential to maintaining supply chain continuity, delivering product in a timely

manner to customers and, ultimately, maintaining customer satisfaction.

199.    Pursuant to the Critical Vendors Motion, the Debtors are requesting essential

vendor relief that is necessary for several reasons.  First, because the Debtors single-source many

important facets of their supply chain, quickly identifying alternatives and replacing a Critical

Vendor is not a practical option for the Debtors at this critical juncture of their restructuring.

Second, as discussed in more detail above, the Debtors maintain limited inventory for certain key

components on site through use of a calculated buffer system, which means that any supply

disruption could lead to fill rate and other potentially larger customer penalties.

200.    Third, certain of the Debtors' suppliers are customer-required suppliers, meaning

that the Debtors are directed by their customers to utilize the component parts of such suppliers.

The Debtors have no discretion to switch to alternative suppliers and, if they attempted to do so,

the Debtors' relationships with their major customers could be placed in serious jeopardy.  Also, the Debtors utilize certain key suppliers that provide components already qualified (including safety and technical performance) by some of the Debtors' material customers.  Replacement of these key customers would require up to a nine month requalification process with these key customers and potentially result in higher costs.

201.     Because the Debtors will benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoiding the severe disruption to the Debtors' supply chain that would occur if the Debtor were to lose certain vendors, it is prudent for the Debtors, at their discretion, to pay selected Critical Vendors some or all of their prepetition claims (collectively, the "Critical Vendor Claims") (including Critical Vendors with claims under section 503(b)(9) of the Bankruptcy Code).  Consistent with these needs, and to ensure that the Debtors' liquidity is preserved as they transition their supply chain into chapter 11, the Debtors seek authority to implement procedures that will both assist them in securing favorable terms and in dealing with any vendors that may repudiate or otherwise refuse to honor existing contractual obligations to the Debtors.

### 1.     Identification of Critical Vendors

202.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  Toward that end, the Debtors have carefully estimated all potential vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that the ability to satisfy Critical Vendor Claims is absolutely necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtors.  To be clear, the Debtors are aware of the need to seek relief only for those vendors truly critical to the Debtors' ongoing operations.

203.    The Debtors have spent significant time reviewing and analyzing their books and records to identify truly critical suppliers of goods and services.  I understand that the Debtors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole source or limited source suppliers, without which the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) whether a supplier is a "customer-required supplier" where the Debtors are required by their customers to utilize the component parts of such supplier, (d) which suppliers would be prohibitively expensive to replace, (e) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, and (f) the extent to which suppliers may have an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code.  After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.

204.    I have learned that the Debtors began the process by identifying over 1,000 vendors that had received payment from the Debtors in fiscal year 2015.  Of those vendors, the Debtors identified a small percentage of the Debtors' total vendors that comprises the select group of Critical Vendors.  The Debtors estimate that they will be required to pay approximately $9,000,000 of Critical Vendor Claims during the interim period prior to a final hearing on the Critical Vendors Motion.

205.    As discussed in further detail below, I believe that the Critical Vendors are so essential to the Debtors' supply chain that the lack of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the

Debtors' businesses, goodwill and market share. The Debtors believe, and I agree, that such irreparable harm to the Debtors and the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendor Claims.

### 2. Description of the Critical Vendors

206. The Debtors' Critical Vendors include (i) customer-required suppliers; (ii) metal suppliers; (iii) other component suppliers; (iv) chemical suppliers; (v) supply chain management providers; and (vi) packaging suppliers.

207. ***Customer-Required Suppliers.*** Certain of the Debtors' largest customers have required suppliers of components that are contained in the Debtors' products sold to those customers. Losing these required suppliers would immediately put the Debtors' relationships with their key customers in serious jeopardy. At a minimum, finding replacement suppliers would necessitate a lengthy process of approval from the Debtors' key customers, thereby threatening the Debtors' revenues from such customers in the interim and subjecting the Debtors to potential fill rate penalties and additional penalties resulting from a customer's inability to maintain operations and fulfill its own orders. Ultimately, it is possible that the Debtors' key customers would find an alternative supplier to the detriment of the Debtors and the Debtors' stakeholders.

208. ***Metal and Media Suppliers.*** The Debtors' products require large supplies of metals and media of varying grades. In the ordinary course of business, the Debtors purchase large quantities of metals, such as tin and steel, to assemble products such as oil filters that are then sold to customers. The Debtors also purchase several grades of media that are difficult to source absent a lengthy testing and certification process. These metals and media are necessary to the functionality of the Debtors' supply chain, and it is imperative that the Debtors maintain a continuous supply of such materials in order to maintain normal business operations. In

addition, these metals and media must be of a sufficient quality and specification to be used in the Debtors' products.  I believe that if one of the Debtors' metal or media suppliers were to stop doing business with the Debtors, the Debtors would suffer from severe supply chain disruption and customers would be delayed in receiving finished products.  Moreover, even if the Debtors were able to find replacement vendors for these metals and media, the metals or media from the replacement vendors would be required to meet certain specifications and quality for use in the Debtors' products.  If these metals and media vendors were to stop conducting business with the Debtors, it could take the Debtors approximately six months to find adequate replacements and transition effectively.  For certain metals and media, there are only a select group of suppliers that could provide metals of sufficient quality for the Debtors' products.  As a result, a replacement vendor would be able to exert significant leverage over the Debtors in pricing negotiations, with the Debtors' likely being forced to agree to unfavorable terms that would negatively impact their liquidity.  Given the importance of the metals and media to the Debtors' products, such a disruption could result in key customers severing ties with the Debtors altogether.

209.    ***Other Component Suppliers.***  Certain of the Debtors' vendors provide mechanical, electrical, and rubber components that are vital to the Debtors' products.  From these suppliers, the Debtors have identified certain Critical Vendors that provide the Debtors with specialized, necessary components that would require a substantial amount of time for the Debtors to replace.  In addition, certain suppliers provide high quality grades of components that are sold by a limited number of suppliers.  After identifying replacement suppliers that could provide sufficient volume of components of an acceptable grade, if such suppliers exist, it would take up to nine months to transition and would likely result in higher costs to the Debtors.

Losing these Critical Vendors, in my opinion, would disrupt the Debtors' supply chain and

increase costs in the short term, resulting in a substantial negative impact on the Debtors'

revenues and enterprise value to the detriment of all parties in interest.

210.    *Chemical Suppliers.*  As part of the Debtors' production process, the Debtors use

certain specialized adhesives to bind and/or seal certain components.  Many of these chemicals

have a limited number of suppliers due to their highly specialized nature.  As a result, it would

take approximately six months to find replacement vendors for certain of these adhesives.  Given

the time necessary to transition to new suppliers, I believe that losing certain key vendors of their

adhesives would severely disrupt the Debtors' production process and have a negative impact on

operations and revenues.

211.    *Finished Products Suppliers.*  The Debtors' business operations include

purchasing aftermarket products from certain suppliers, which are then sold to the Debtors'

existing customers.  Although these finished products are generally low cost, such suppliers are

critical to the Debtors' operations for a few reasons.  First, it would take the Debtors

approximately three to six months to identify alternative finished goods suppliers that could

provide such finished goods at sufficient quality and specification.  Moreover, to the extent the

Debtors could produce certain of the finished products on their own, it would take up to six

months, and significant cost, to fully transition production to the Debtors' facilities.  The Debtors

believe, and I agree, that if such vendors ceased doing business with the Debtors, major

customers would seek alternate sources for such finished products, resulting in lost sales to the

Debtors and damaging relationships with valuable customers.  Further, many of these key

customers that purchase finished products from the Debtors also purchase the Debtors' products

and require a "full line" of products from their vendors.  Consequently, I believe that a loss of

finished product business would result in the Debtors losing all of the business from significant

customers, further damaging the Debtors' business operations and significantly impacting the

Debtors' revenues.

212.    ***Packaging Suppliers.***  The Debtors use personalized packaging when shipping

products that include company-owned logos.  In the event that vendors supplying such packaging

refused to continue doing business with the Debtors, it could take approximately three months

before a replacement supplier could provide the necessary design and begin production.  I

believe that during those three months, the Debtors' business operations would be severely

disrupted.  In my opinion, identifying and transitioning to new suppliers would serve as an

unnecessary distraction to the Debtors' ongoing restructuring efforts and continued business

operations while simultaneously subjecting them to more expensive trade terms without

providing any additional benefit to the estate.

### 3.    The Relief Requested Is Specifically Designed to Facilitate Operational Continuity

213.    As detailed above, the Debtors believe, and I agree, that they will suffer

irreparable harm if the Critical Vendors do not continue to provide essential goods and services.

The Debtors cannot take the material risk that the Critical Vendors will refuse to perform

postpetition if their prepetition claims are not paid.  While the Debtors have historically enjoyed

productive working relationships with the Critical Vendors, the limited number of vendors that

can supply the Debtors with the quantity and quality of goods and services that meets their

operational needs provides such vendors with considerable bargaining power in the event of the

Debtors' non-payment.  At this critical time following the filing of the chapter 11 cases, the loss

of such vendors will significantly impair the Debtors' ability to maximize value for the benefit of

all stakeholders.

214.    I have been informed that the Debtors intend to use the flexibility afforded by the relief requested in the Critical Vendors Motion to limit amounts paid on prepetition balances while ensuring the uninterrupted supply of critical goods and services on the best available terms.  There is very real risk that certain Critical Vendors will not continue to work with the Debtors in the absence of being made whole on some or all of their outstanding prepetition balances, and the Debtors cannot afford to take this risk.  The Debtors have every intention of using the relief requested in the Critical Vendors Motion to recoup working capital, prevent disruption to the single-source and just-in-time facets of their supply chains, and maximize earnings, which will benefit all creditors of the Debtors' estates.

### 4.    Payment of Critical Vendor Claims Is Necessary to the Debtors' Reorganization

215.    The Debtors believe, and I agree, that the Critical Vendors are so critical to the Debtors' businesses that the lack of each of their particular goods or services, even for a short duration, would damage the Debtors' supply chain, disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.  This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors.

216.    Furthermore, if the relief sought in the Critical Vendors Motion is not granted, Critical Vendors will have no incentive to continue to finance the Debtors on the terms that were most favorable to the Debtors and in effect within the twelve months prior to the Petition Date (the "Customary Trade Terms").  The Customary Trade Terms are vitally important to the Debtors' profitability and overall business.  I understand that the Debtors' historical practice has been to pursue the lowest landed price as a priority from suppliers and, if possible, locking this price in through agreements with vendors.  The Debtors have also been able to obtain other

favorable trade terms from their vendors, including extended payment terms, restrictions on excess inventory, and rebate programs.

217.    The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have struggled to obtain over the years, is clearly advantageous to the Debtors. It allows the Debtors to maintain and enhance necessary liquidity and focus on returning to profitability.  The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms will enable them to stabilize business operations at this critical time, maintain their competitiveness, and maximize the value of their businesses for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation in deliveries of goods or the provision of essential services, could spell disaster for the Debtors' restructuring efforts.  Any event affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their successful reorganization.

218.    The relief requested in the Critical Vendors Motion is specifically designed to only pay those Critical Vendor Claims where nonpayment of such claims would lead to the interruption of the delivery of goods and services or otherwise disrupt the Debtors' ongoing operations.  Overall, the Debtors believe, and I agree, that the sums involved are insignificant compared to the irreparable harm that the Debtors would suffer if relationships with the Critical Vendors were terminated.

**L.**      ***Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Pay Prepetition Obligations Owed to Foreign Vendors and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* (the "<u>Foreign Vendors Motion</u>")**

219.    In the ordinary course of business, the Debtors incur various obligations to numerous foreign vendors, suppliers and other entities (collectively, the "<u>Foreign Vendors</u>").

The Debtors rely on the Foreign Vendors, which are primarily located in Asia, Mexico and Europe, to grant or supply various goods that are crucial to the Debtors' ongoing manufacturing operations in the United States, including, without limitation, the following:

220.   ***Component Suppliers.***   Certain of the Foreign Vendors provide mechanical and electrical components such as filters, castings and cartridges that meet the required specifications of certain of the Debtors' customers.   The components supplied by these Foreign Vendors provide significant cost savings to the Debtors and, in certain circumstances, are not readily available from other suppliers.   Moreover, in certain instances, the Foreign Vendors sole source critical components for the Debtors.   Replacing these suppliers would require a significant amount of time in the event the Foreign Vendors stopped doing business with the Debtors.

221.   ***Finished Product Suppliers.***   The Debtors' business operations include purchasing aftermarket products from certain overseas suppliers which are then sold to the Debtors' existing customers.   As of the Petition Date, the majority of the Debtors' finished product suppliers are located overseas, primarily in Mexico and Asia.   Based on volume of supply, a loss of one or several of these Foreign Vendors would have the potential for supply chain disruption and customer delay.   Many customers purchasing finished products from the Debtors also purchase the Debtors' products, and a loss of finished product business could result in a competitor obtaining additional business from the Debtors' customers, thereby damaging the Debtors' business operations.

222.   ***Customer-Required Suppliers.***   Certain of the Debtors' largest customers require the Debtors to use specific suppliers of the components used by the Debtors to manufacture the products the Debtors sell to such customers.   Certain of these suppliers are Foreign Vendors that supply a significant volume of product in connection with the customers' orders.   Losing these

required suppliers could immediately put the Debtors' relationships with their key and largest customers in serious jeopardy.

223. ***Payment of Foreign Vendors Is Necessary to the Debtors' Businesses***.  I am informed that the Debtors are making every effort to avoid interruptions in their supply chain and the adverse effects that even a temporary disruption in the supply chain could have on their businesses.  Any such short-term disruption would generate operational instability, resulting in delays fulfilling customer orders and jeopardizing many of the Debtors' key customer relationships.  Because of the nature of the Debtors' businesses, many of the Foreign Vendors could make credible, actionable threats that, unless paid on account of the Debtors' prepetition debt, the Foreign Vendors will cut off the Debtors' supply of specialized goods necessary to maintain their businesses.  To preserve the value of the Debtors' estates as a going concern, the Debtors must have the ability to fund the Foreign Vendors on an uninterrupted basis.

224. Most of the Foreign Vendors have little or no connection to the United States. My understanding is that the Foreign Vendors may therefore argue that they are not subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations.  Because the Foreign Vendors may lack minimum contacts with the United States, the Debtors believe, and I agree, that there is a material risk that the Foreign Vendors holding related prepetition claims (the "Foreign Vendor Claims") against the Debtors may consider themselves to be beyond the jurisdiction of this Court and engage in conduct that disrupts the Debtors' operations.  Although the Debtors would vigorously dispute any such contention, the Foreign Vendors could stop shipping goods to the Debtors on a timely basis or otherwise cease doing business with the Debtors.

225.     My understanding is that there is also a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover prepetition amounts owed to them.  If the Foreign Vendors were successful in obtaining judgments against the Debtors, the Foreign Vendors could seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withholding vital supplies from the Debtors.  I believe that the Debtors would have no practical ability to remedy this situation (absent payment of amounts sought) and their business operations would be irreparably harmed to the detriment of their estates and their creditors.

226.     Due to the highly specialized nature of the products provided by the Debtors to many of their customers, it is my opinion that finding replacement suppliers for the Foreign Vendors could be a vigorous process that would last many months.  Indeed, certain key supplies for the Debtors' products are sole-sourced by the Foreign Vendors.  Further, certain Foreign Vendors have already been qualified both by the Debtors and many of the Debtors' key customers to supply materials that satisfy the internal specifications required to manufacture the Debtors' products.   Failure to maintain a productive relationship with these Foreign Vendors could therefore devastate the Debtors' businesses as well as significantly disrupt the businesses of their customers and other suppliers.

227.     As detailed above, payment of the Foreign Vendor Claims is also necessary because of the Debtors' use of a calculated buffer system, as any disruption of supply from the Foreign Vendors may compromise the Debtors' ability to fulfill commitments to their customers.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated:  June 2, 2016                        Respectfully submitted,
Wilmington, Delaware

_____
Brian Whittman
Chief Restructuring Officer
UCI International, LLC

*Signature Page to Declaration of Brian Whittman*

## Exhibit A

**Organizational Chart**

# UCI Group

