## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UCI INTERNATIONAL, LLC, <u>et al.</u>,[1] | Case No. 16-11354 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Plan Objection Deadline: Nov. 28, 2016 at 4:00 p.m. (ET)** |

### NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE** that, on October 14, 2016, the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") entered an order [D.I. 728] (the "<u>Disclosure Statement Order</u>"): (a) authorizing UCI International, LLC and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"), to solicit acceptances for the *Joint Plan of Reorganization for UCI International, LLC and Its Debtor Affiliates Proposed by the Debtors, the Ad Hoc Committee of Senior Noteholders and the Official Committee of Unsecured Creditors* [D.I. 821] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>");[2] (b) approving the *Disclosure Statement for the Joint Plan of Reorganization for UCI International, LLC and Its Debtor Affiliates Proposed by the Debtors, the Ad Hoc Committee of Senior Noteholders and the Official Committee of Unsecured Creditors* [D.I. 822] (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE** that as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors hereby file the Plan Supplement, which consists of the following documents (each as defined in the Plan), as may be amended, modified or supplemented by the Debtors:

| | |
|---|---|
| <u>Exhibit 1.24</u> | By-Laws of Reorganized UCI |
| <u>Exhibit 1.26</u> | Certificate of Incorporation of Reorganized UCI |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: UCI International, LLC (0186); Airtex Industries, LLC (0830); Airtex Products, LP (0933); ASC Holdco, Inc. (9758); ASC Industries, Inc. (7793); Champion Laboratories, Inc. (5645); UCI Acquisition Holdings (No. 1) Corp (5732); UCI Acquisition Holdings (No. 3) Corp (8277); UCI Acquisition Holdings (No. 4) LLC (8447); UCI-Airtex Holdings, Inc. (5425); UCI Holdings Limited (N/A); UCI Pennsylvania, Inc. (1527); and United Components, LLC (9857). The mailing address for each Debtor is 2201 Waukegan Road, Suite 140, Bannockburn, Illinois 60015.

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning as set forth in the Plan.

| Exhibit 1.61 | Terms of Intercreditor Agreement |
|---|---|
| Exhibit 1.78 | Terms of New First Lien Credit Agreement |
| Exhibit 1.81 | Terms of New Second Lien Credit Agreement |
| Exhibit 1.102 | Preserved Causes of Action |
| Exhibit 1.122 | Terms of Second Lien Rights Offering Facility Agreement |
| Exhibit 1.132 | Shareholders Agreement |
| Exhibit 5.6.2 | Rank Contribution Election Releases |
| Exhibit 5.10.2 | Directors and Officers of Reorganized UCI |
| Exhibit 5.10.3 | Directors and Managers or Officers of Reorganized Debtors Other Than Reorganized UCI |
| Exhibit 6.1.1 | Rejected Executory Contract and Unexpired Lease List |
| Exhibit 6.1.2 | Assumed Executory Contract and Unexpired Lease List |
| Exhibit 6.5 | Terms of Management Equity Incentive Plan |

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is **November 28, 2016 at 4:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

| The Debtors |
|---|
| UCI International, LLC<br>Attn: Keith A. Zar, General Counsel<br>2201 Waukegan Road, Suite 140<br>Bannockburn, Illinois 60015 |

| Co-Counsel to the Debtors | |
|---|---|
| Larry J. Nyhan<br>Jessica C.K. Boelter<br>Kerriann S. Mills<br>Geoffrey M. King<br>**SIDLEY AUSTIN LLP**<br>One South Dearborn Street<br>Chicago, Illinois 60603 | Robert S. Brady (No. 2847)<br>Edmon L. Morton (No. 3856)<br>Ashley E. Jacobs (No. 5635)<br>Elizabeth S. Justison (No. 5911)<br>**YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801 |

01:21244147.2

| U.S. Trustee | |
|---|---|
| Richard L. Schepacarter<br>**OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE**<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801 | |
| **Counsel to the Plan Sponsors** | |
| Matthew A. Feldman<br>Paul V. Shalhoub<br>Daniel Forman<br>**WILLKIE FARR & GALLAGHER LLP**<br>787 Seventh Avenue<br>New York, New York 10019-6099 | Robert J. Dehney (No. 3578)<br>Eric D. Schwartz (No. 3134)<br>Matthew B. Harvey (No. 5186)<br>**MORRIS NICHOLS ARSHT & TUNNELL LLP**<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347 |
| **Counsel to the Official Committee of Unsecured Creditors** | |
| Lorenzo Marinuzzi<br>Jonathan I. Levine<br>Jennifer L. Marines<br>Erica J. Richards<br>**MORRISON & FOERSTER LLP**<br>250 West 55th Street<br>New York, New York 10019-9601 | Norman L. Pernick (No. 2990)<br>Patrick J. Reilley (No. 4451)<br>**COLE SCHOTZ P.C.**<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801 |

 **PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights to amend, modify, or further supplement the Plan Supplement and the documents attached hereto.

 **PLEASE TAKE FURTHER NOTICE** that if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Garden City Group, LLC, ("GCG") the voting and solicitation agent retained by the Debtors in the chapter 11 cases (the "Voting and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 907-3238; (b) visiting the Debtors' restructuring website at: http://cases.gardencitygroup.com/uci; (c) writing to the Voting and Solicitation Agent, Attn: UCI International LLC, *et al.*, c/o GCG, P.O. Box 10278, Dublin, OH 43017-5778; and/or (d) emailing the Voting and Solicitation Agent at UCIinfo@gardencitygroup.com.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov.

---

**ARTICLE X** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **SECTION 10.4 CONTAINS A THIRD PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE VOTING AND SOLICITATION AGENT.**

---

01:21244147.2

Dated:  November 18, 2016
Wilmington, Delaware

SIDLEY AUSTIN LLP

Larry J. Nyhan
Jessica C.K. Boelter
Kerriann S. Mills
Geoffrey M. King
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Ashley E. Jacobs

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ashley E. Jacobs (No. 5635)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND DEBTORS
IN POSSESSION

01:21244147.2

**Exhibit 1.24**
**By-Laws of Reorganized UCI**

BY-LAWS

Of

NEW UCI INC.

(A Delaware Corporation)

_____

**THIS DOCUMENT IS A DRAFT FORM PREPARED BY PROFESSIONALS OF THE PLAN SPONSORS.  THE DOCUMENT REMAINS SUBJECT TO ONGOING DISCUSSION AND CONFIRMATION BY THE PLAN PROPONENTS OF CERTAIN TERMS, REQUIREMENTS AND MECHANICS.**

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ............................................................................................... 1

ARTICLE 2 STOCKHOLDERS ........................................................................................ 3

ARTICLE 3 DIRECTORS ................................................................................................. 8

ARTICLE 4 COMMITTEES OF THE BOARD .............................................................. 10

ARTICLE 5 OFFICERS ................................................................................................... 11

ARTICLE 6 INDEMNIFICATION .................................................................................. 13

ARTICLE 7 GENERAL PROVISIONS .......................................................................... 15

01:21244212.1

## ARTICLE 1

### DEFINITIONS

As used in these By-laws, unless the context otherwise requires, the term:

1.1     "Affiliate" shall mean, as to any specified Person, any other Person or entity who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified Person and includes each executive officer or director, general partner or member of such other Person (including any investment funds that are directly or indirectly managed or advised by such other Person or by a common manager or advisor with such specified Person).   As used in this definition, and elsewhere herein in relation to control of Affiliates, the term "control" means the possession, directly or indirectly, of the power to substantially direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as director or manager, as trustee or executor, by contract or credit arrangement or otherwise.

1.2     "Assistant Secretary" means an Assistant Secretary of the Corporation.

1.3     "Assistant Treasurer" means an Assistant Treasurer of the Corporation.

1.4     "BlackRock" shall mean funds and accounts under management by BlackRock Financial Management, Inc., BlackRock Advisors, LLC and BlackRock Institutional Trust Company, N.A.

1.5     "BlackRock Director" shall mean a director nominated and elected by the BlackRock Security Holder Group.

1.6     "BlackRock Security Holder Group" shall mean BlackRock, together with its Affiliates.

1.7     "BlackRock Security Holder Group Majority" shall mean the Stockholders of the BlackRock Security Holder Group that beneficially own at least a majority of the outstanding Common Stock (on a Fully Diluted Basis) beneficially owned by the BlackRock Security Holder Group.

1.8     "Board" means the Board of Directors of the Corporation.

1.9     "By-laws" means these By-laws of the Corporation, as amended from time to time.

1.10    "Certificate of Incorporation" means the Certificate of Incorporation of the Corporation, as amended from time to time.

1.11    "Chairman" means the Chairman of the Board of Directors of the Corporation.

1.12    "Chief Executive Officer" means the chief executive officer of the Corporation.

1.13    "Common Stock" means the common stock of the Corporation.

1.14    "Common Stock Equivalents" means any stock, warrants, rights calls, options or other securities exchangeable or exercisable for, or convertible into, directly or indirectly, Common Stock.

1.15    "Corporation" means [New UCI Inc.]

1.16    "CSAM" shall mean [Credit Suisse Asset Management, LLC]

1.17    "CSAM Director" shall mean a director nominated and elected by the CSAM Security Holder Group.

1.18    "CSAM Security Holder Group" shall mean CSAM, together with its Affiliates.

1.19    "CSAM Security Holder Group Majority" shall mean the Stockholders of the CSAM Security Holder Group that beneficially own at least a majority of the outstanding Common Stock (on a Fully Diluted Basis) beneficially owned by the CSAM Security Holder Group.

1.20    "DGCL" shall mean the Delaware General Corporation Law.

1.21    "Directors" means the directors of the Corporation.

1.22    "Effective Date" has the meaning given in the Plan.

1.23    "Fully Diluted Basis" shall mean all outstanding Common Stock, assuming the conversion, exercise or exchange, as applicable, of all Common Stock Equivalents into Common Stock, in all cases using the treasury method.

1.24    "JPM" shall mean [J.P. Morgan Investment Management Inc.]

1.25    "JPM Director" shall mean a director nominated and elected by the JPM Security Holder Group.

1.26    "JPM Security Holder Group" shall mean JPM, together with its Affiliates.

1.27    "JPM Security Holder Group Majority" shall mean the Stockholders of the JPM Security Holder Group that beneficially own at least a majority

of the outstanding Common Stock (on a Fully Diluted Basis) beneficially owned by the JPM Security Holder Group.

1.28    "law" means any U.S. or non-U.S., federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a governmental authority (including any department, court, agency or official, or non-governmental self-regulatory organization, agency or authority and any political subdivision or instrumentality thereof).

1.29    "Office of the Corporation" means the executive office of the Corporation, anything in Section 131 of the DGCL to the contrary notwithstanding.

1.30    "Plan" means the Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated as of October 13, 2016, filed in re: UCI International, LLC, et al., case no. 16-11354 (MFW) (jointly administered), in the United States Bankruptcy Court for the District of Delaware

1.31    "Secretary" means the Secretary of the Corporation.

1.32    "Stockholders" mean the holders of Common Stock and Common Stock Equivalents.

1.33    "Stockholders Agreement" means the Stockholders and Registration Rights Agreement of the Corporation, dated as of the Effective Date, as amended from time to time.

1.34    "Treasurer" means the Treasurer of the Corporation.

1.35    "Vice President" means a Vice President of the Corporation.


ARTICLE 2

STOCKHOLDERS

2.1    Place of Meetings.  Meetings of Stockholders may be held at such place or solely by means of remote communication or otherwise, as may be designated by the Board from time to time in accordance with the Stockholders Agreement.

2.2    Annual Meeting.  A meeting of Stockholders for the election of Directors and other business shall be held annually at such date and time as may be designated by the Board from time to time.

2.3    Special Meetings.  Special meetings of Stockholders may be called at any time by the Board and may not be called by any other person or persons.  Business transacted at any special meeting of Stockholders shall be limited to the purposes stated in the notice pursuant to which the Board calls any such meeting.

2.4     Record Date.  (A) For the purpose of determining the Stockholders entitled to notice of or to vote at any meeting of Stockholders or any adjournment thereof, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than 60 or less than ten days before the date of such meeting.  For the purposes of determining the Stockholders entitled to express consent to corporate action in writing without a meeting, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ten days after the date on which the record date was fixed by the Board.  For the purposes of determining the Stockholders entitled to (i) receive payment of any dividend or other distribution or allotment of any rights, (ii) exercise any rights in respect of any change, conversion or exchange of stock or (iii) take any other lawful action, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than 60 days prior to such action.

(B)     If no such record date is fixed:

(i)     The record date for determining Stockholders entitled to notice of or to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held;

(ii)     The record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting (unless otherwise provided in the Certificate of Incorporation), when no prior action by the Board is required by applicable law, shall be the first day on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law; and when prior action by the Board is required by applicable law, the record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting shall be at the close of business on the date on which the Board takes such prior action; and

(iii)     When a determination of Stockholders of record entitled to notice of or to vote at any meeting of Stockholders has been made as provided in this Section 2.4, such determination shall apply to any adjournment thereof unless the Board fixes a new record date for the adjourned meeting.

2.5     Notice of Meetings of Stockholders.   Whenever under the provisions of applicable law, the Stockholders Agreement, the Certificate of Incorporation or these By-laws, Stockholders are required or permitted to take any action at a meeting, notice shall be given stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a

special meeting, the purposes for which the meeting is called.  Unless otherwise provided by these By-laws or applicable law, notice of any meeting shall be given, not less than ten nor more than 60 days before the date of the meeting, to each Stockholder entitled to vote at such meeting.  If mailed, such notice shall be deemed to be given when deposited in the U.S. mail, with postage prepaid, directed to the Stockholder at his or her address as it appears on the records of the Corporation.  An affidavit of the Secretary, an Assistant Secretary or the transfer agent of the Corporation that the notice required by this Section 2.5 has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.  If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  Any business that might have been transacted at the meeting as originally called may be transacted at the adjourned meeting.  If, however, the adjournment is for more than 30 days or, if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting.

        2.6    <u>Waivers of Notice</u>.  Whenever the giving of any notice to Stockholders is required by applicable law, the Certificate of Incorporation or these By-laws, a waiver thereof, given by the person entitled to said notice, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice.  Attendance by a Stockholder at a meeting shall constitute a waiver of notice of such meeting except when the Stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.  Neither the business to be transacted at, nor the purposes of, any regular or special meeting of the Stockholders need be specified in any waiver of notice.

        2.7    <u>List of Stockholders</u>.  The Secretary shall prepare and make, at least ten days before every meeting of Stockholders, a complete, alphabetical list of the Stockholders entitled to vote at the meeting, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder.

        2.8    <u>Quorum of Stockholders; Adjournment</u>.  Except as otherwise provided by these By-laws, at each meeting of Stockholders, the presence in person or by proxy of the holders of a majority of the voting power of all outstanding shares of stock entitled to vote at the meeting of Stockholders, shall constitute a quorum for the transaction of any business at such meeting.  In the absence of a quorum, the holders of a majority in voting power of the shares of stock present in person or represented by proxy at any meeting of Stockholders, including an adjourned meeting, may adjourn such meeting to another time and place.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of Directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; <u>provided</u>, <u>however</u>, that the foregoing shall not limit the right of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

2.9     <u>Voting; Proxies</u>.  At any meeting of Stockholders, all matters other than the election of directors, except as otherwise provided by the Certificate of Incorporation, the Stockholders Agreement, these By-laws or any applicable law, shall be decided by the affirmative vote of a majority in voting power of shares of stock present in person or represented by proxy and entitled to vote thereon.   At all meetings of Stockholders for the election of Directors, a plurality of the votes cast shall be sufficient to elect.  Each Stockholder entitled to vote at a meeting of Stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such Stockholder by proxy but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A Stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or by delivering a new proxy bearing a later date.

2.10     <u>Voting Procedures and Inspectors at Meetings of Stockholders</u>. The Board, in advance of any meeting of Stockholders, may appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting and make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting, the person presiding at the meeting may appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.   The inspectors shall (A) ascertain the number of shares outstanding and the voting power of each, (B) determine the shares represented at the meeting and the validity of proxies and ballots, (C) count all votes and ballots, (D) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (E) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board, the date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting shall be determined by the person presiding at the meeting and shall be announced at the meeting.  No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a Stockholder shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for office at an election may serve as an inspector at such election.

2.11     <u>Conduct of Meetings; Adjournment</u>.  The Board may adopt such rules and procedures for the conduct of Stockholder meetings as it deems appropriate.  At each meeting of Stockholders, the Chief Executive Officer or, in the absence of the Chief Executive Officer, the Chairman or, if there is no Chairman or if there be one and the

Chairman is absent, the President or, if there is no President or if there be one and the President is absent, a Vice President and, in case more than one Vice President shall be present, that Vice President designated by the Board (or in the absence of any such designation, the most senior Vice President present), shall preside over the meeting. Except to the extent inconsistent with the rules and procedures as adopted by the Board, the person presiding over the meeting of Stockholders shall have the right and authority to convene, adjourn and reconvene the meeting from time to time, to prescribe such additional rules and procedures and to do all such acts as, in the judgment of such person, are appropriate for the proper conduct of the meeting.  Such rules and procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, (A) the establishment of an agenda or order of business for the meeting, (B) rules and procedures for maintaining order at the meeting and the safety of those present, (C) limitations on attendance at or participation in the meeting to Stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the person presiding over the meeting shall determine, (D) restrictions on entry to the meeting after the time fixed for the commencement thereof and (E) limitations on the time allotted to questions or comments by participants.  The person presiding over any meeting of Stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, may determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine, he or she shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of Stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The Secretary or, in his or her absence, one of the Assistant Secretaries, shall act as secretary of the meeting.  If none of the officers above designated to act as the person presiding over the meeting or as secretary of the meeting shall be present, a person presiding over the meeting or a secretary of the meeting, as the case may be, shall be designated by the Board and, if the Board has not so acted, in the case of the designation of a person to act as secretary of the meeting, designated by the person presiding over the meeting.

2.12   Order of Business.   The order of business at all meetings of Stockholders shall be as determined by the person presiding over the meeting.

2.13   Written Consent of Stockholders Without a Meeting. Any action to be taken at any annual or special meeting of Stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered (by hand or by certified or registered mail, return receipt requested) to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of Stockholders are recorded.  Every written consent shall bear the date of signature of each Stockholder who signs the consent, and

no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this Section 2.13, written consents signed by a sufficient number of holders to take action are delivered to the Corporation as aforesaid.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by applicable law, be given to those Stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

## ARTICLE 3

## DIRECTORS

3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board. The Board may adopt such rules and procedures, not inconsistent with the Stockholders Agreement, the Certificate of Incorporation, these By-laws or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

3.2    Number; Term of Office.

3.2.1    The Corporation shall be managed by or under the direction of a Board of one or more Directors, the number thereof to be determined from time to time by resolution of the Board, subject to the applicable provisions of the Stockholders Agreement.

3.2.2    The Board shall initially consist of five Directors, who are initially designated in the Stockholders Agreement.  From and after the Effective Date, the members of the Board shall be nominated and elected as set forth in the Stockholders Agreement.

3.2.3    Each Director shall hold office for a term expiring not later than the close of the first annual meeting of Stockholders following such Director's election or until the director's earlier death, resignation, disqualification or removal.

3.3    Vacancies and Newly Created Directorships.  In the event that any Director shall cease to serve in such capacity or a directorship results from an increase in the authorized number of Directors, the vacancies resulting thereby shall be filled as set forth in the Stockholders Agreement.

3.4    Resignation.  Any Director may resign at any time by notice given in writing or by electronic transmission to the Corporation.  Such resignation shall take effect at the date of receipt of such notice or at such later time as is therein specified.

3.5    <u>Regular Meetings</u>.  Regular meetings of the Board may be held without notice at such times and at such places as may be determined from time to time by the Board or its Chairman.

3.6    <u>Special Meetings</u>.  Special meetings of the Board may be held at such times and at such places as may be determined by the Chairman or the Chief Executive Officer on at least 24 hours' notice to each Director given by one of the means specified in Section 3.9 hereof other than by mail or on at least three days' notice if given by mail.  Special meetings shall be called by the Chairman, Chief Executive Officer or Secretary in like manner and on like notice on the written request of any two or more Directors.

3.7    <u>Telephone Meetings</u>.  Board or Board committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation by a Director in a meeting pursuant to this Section 3.7 shall constitute presence in person at such meeting.

3.8    <u>Adjourned Meetings</u>.  A majority of the Directors present at any meeting of the Board, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place.  At least 24 hours' notice of any adjourned meeting of the Board shall be given to each Director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.9 hereof other than by mail, or at least three days' notice if by mail.  Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

3.9    <u>Notice Procedure</u>.  Subject to Sections 3.6 and 3.10 hereof, whenever notice is required to be given to any Director by applicable law, the Stockholders Agreement, the Certificate of Incorporation or these By-laws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such Director at such Director's address as it appears on the records of the Corporation, telegram, telecopy or by other means of electronic transmission.

3.10    <u>Waiver of Notice</u>.  Whenever the giving of any notice to Directors is required by applicable law, the Certificate of Incorporation or these By-laws, a waiver thereof, given by the Director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice.  Attendance by a Director at a meeting shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special Board or committee meeting need be specified in any waiver of notice.

3.11    <u>Organization</u>.  At each meeting of the Board, the Chairman or, in his or her absence, another Director selected by the Board shall preside.  The Secretary shall act as secretary at each meeting of the Board.  If the Secretary is absent from any

meeting of the Board, an Assistant Secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all Assistant Secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

3.12    Quorum of Directors.    The presence of a majority of the Board shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board.

3.13    Action by Majority Vote.    Except as otherwise expressly required by the Stockholders Agreement, these By-laws or the Certificate of Incorporation, the vote of a majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board.

3.14    Action Without Meeting.    Unless otherwise restricted by these By-laws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all Directors or members of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board or committee.

3.15    Chairman.    The Board, may, in its discretion, select a chairman (the "Chairman") from among the directors, to preside at all meetings of the Board and exercise such powers and perform such other duties as shall be determined from time to time by the Board.

ARTICLE 4

COMMITTEES OF THE BOARD

The Board may designate one or more committees, each committee to consist of one or more of the Directors of the Corporation.  The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.  If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may, by a unanimous vote, appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation.  Unless the Board provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee.  Each committee shall keep regular minutes of its meetings.  Unless the Board provides otherwise, each committee designated by the

Board may make, alter and repeal rules and procedures for the conduct of its business.  In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business pursuant to ARTICLE 3.

ARTICLE 5

OFFICERS

5.1     Positions; Election.   The officers of the Corporation shall be a Chief Executive Officer, a Secretary, a Treasurer and any other officers as the Board may elect from time to time, who shall exercise such powers and perform such duties as shall be determined by the Board from time to time.  Any number of offices may be held by the same person.

5.2     Term of Office.   Each officer of the Corporation shall hold office until such officer's successor is elected and qualifies or until such officer's earlier death, resignation or removal.  Any officer may resign at any time upon written notice to the Corporation.  Such resignation shall take effect at the date of receipt of such notice or at such later time as is therein specified.  The resignation of an officer shall be without prejudice to the contract rights of the Corporation, if any.  Any officer may be removed at any time with or without cause by the Board.  Any vacancy occurring in any office of the Corporation may be filled by the Board.  The election or appointment of an officer shall not of itself create contract rights.

5.3     Chief Executive Officer.   The Chief Executive Officer shall have general supervision over the business of the Corporation and other duties incident to the office of the Chief Executive Officer, and any other duties as may from time to time be assigned to the Chief Executive Officer by the Board and subject to the control of the Board in each case.  The Chief Executive Officer may sign and execute in the name of the Corporation deeds, mortgages, bonds, contracts and other instruments, except in cases in which the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Corporation, or shall be required by applicable law otherwise to be signed or executed.

5.4     President.   Subject to Section 5.4, the President shall have general supervision over the business of the Corporation and other duties incident to the office of the President, and any other duties as may from time to time be assigned to the President by the Board or Chief Executive Officer and subject to the control of the Board in each case.   The President may sign and execute in the name of the Corporation deeds, mortgages, bonds, contracts and other instruments, except in cases in which the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Corporation, or shall be required by applicable law otherwise to be signed or executed.

5.5     Vice Presidents.   Vice Presidents shall have the duties incident to the office of Vice President and any other duties that may from time to time be assigned

to the Vice President by the Chief Executive Officer, the President or the Board.  Any Vice President may sign and execute in the name of the Corporation deeds, mortgages, bonds, contracts or other instruments, except in cases in which the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Corporation, or shall be required by applicable law otherwise to be signed or executed.

5.6    Secretary.  The Secretary shall attend all meetings of the Board and of the Stockholders, record all the proceedings of the meetings of the Board and of the Stockholders in a book to be kept for that purpose and perform like duties for committees of the Board, when required.  The Secretary shall give, or cause to be given, notice of all special meetings of the Board and of the Stockholders and perform such other duties as may be prescribed by the Board or by the Chief Executive Officer or the President. The Secretary or an Assistant Secretary may also attest all instruments signed by the Chief Executive Officer, the President or any Vice President.  The Secretary shall have charge of all the books, records and papers of the Corporation relating to its organization and management, see that the reports, statements and other documents required by applicable law are properly kept and filed and, in general, perform all duties incident to the office of Secretary of a corporation and such other duties as may from time to time be assigned to the Secretary by the Board, the Chief Executive Officer or President.

5.7    Treasurer.  The Treasurer shall have charge and custody of, and be responsible for, all funds, securities and notes of the Corporation, receive and give receipts for moneys due and payable to the Corporation from any sources whatsoever; deposit all such moneys and valuable effects in the name and to the credit of the Corporation in such depositaries as may be designated by the Board, against proper vouchers, cause such funds to be disbursed by checks or drafts on the authorized depositaries of the Corporation signed in such manner as shall be determined by the Board and be responsible for the accuracy of the amounts of all moneys so disbursed, regularly enter or cause to be entered in books or other records maintained for the purpose full and adequate account of all moneys received or paid for the account of the Corporation, have the right to require from time to time reports or statements giving such information as the Treasurer may desire with respect to any and all financial transactions of the Corporation from the officers or agents transacting the same, render to the Chief Executive Officer or the Board, whenever the Chief Executive Officer or the Board shall require the Treasurer so to do, an account of the financial condition of the Corporation and of all financial transactions of the Corporation, disburse the funds of the Corporation as ordered by the Board and, in general, perform all duties incident to the office of Treasurer of a corporation and such other duties as may from time to time be assigned to the Treasurer by the Board or the Chief Executive Officer or President.

5.8    Assistant Secretaries and Assistant Treasurers.    Assistant Secretaries and Assistant Treasurers shall perform such duties as shall be assigned to them by the Secretary or by the Treasurer, respectively, or by the Board or the Chief Executive Officer or President.

## ARTICLE 6

## INDEMNIFICATION

6.1     Right to Indemnification.   The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation (or an employee of the Corporation identified by the Board as a Covered Person (a "Covered Employee") or, while a director or officer of the Corporation or a Covered Employee, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity (an "Other Entity"), including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, the Corporation shall be required to indemnify a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board.

6.2     Prepayment of Expenses.   The Corporation shall pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this ARTICLE 6 or otherwise.

6.3     Claims.   Notwithstanding the last sentence of Section 6.1, if a claim for indemnification or advancement of expenses under this ARTICLE 6 is not paid in full within thirty (30) days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

6.4     Nonexclusivity of Rights.   The rights conferred on any Covered Person by this ARTICLE 6 shall not be exclusive of any other rights that such Covered Person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation or the By-laws, agreement, vote of stockholders or disinterested directors or otherwise.

6.5     Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of an Other Entity shall be reduced by any amount such Covered Person actually collects as indemnification or advancement of expenses from such Other Entity; provided that, for the avoidance of doubt, no Covered Person shall be required to seek indemnification or advancement of expenses from such Other Entity as a condition to the receipt of indemnification or advancement of expenses under this ARTICLE 6.

6.6     Insurance.  The Board may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance:  (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers, agents and employees under the provisions of this ARTICLE 6; and (b) to indemnify or insure directors, officers, agents and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this ARTICLE 6.

6.7     Amendment or Repeal.   The rights to indemnification and advancement of expenses conferred upon any Covered Person pursuant to this ARTICLE 6 shall be contract rights, shall vest when such person becomes a Covered Person, and shall continue as vested contract rights even if such person ceases to be a Covered Person.   Any amendment, repeal or modification of, or adoption of any provision inconsistent with, this ARTICLE 6 (or any provision hereof) shall not adversely affect any right to indemnification or advancement of expenses granted to any person pursuant hereto with respect to any act or omission of such person occurring prior to the time of such amendment, repeal, modification or adoption (regardless of whether the Proceeding relating to such acts or omissions, or any Proceeding relating to such person's rights to indemnification or to advancement of expenses, is commenced before or after the time of such amendment, repeal, modification or adoption), and any such amendment, repeal, modification or adoption that would adversely affect such person's rights to indemnification or advancement of expenses hereunder shall be ineffective as to such person, except with respect to any threatened, pending or completed Proceeding that relates to or arises from (and only to the extent such Proceeding relates to or arises from) any act or omission of such person occurring after the effective time of such amendment, repeal, modification or adoption.  The rights provided hereunder shall inure to the benefit of any Covered Person and such person's heirs, executors and administrators.

6.8     Other Indemnification and Prepayment of Expenses.   This ARTICLE 6 shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

ARTICLE 7

GENERAL PROVISIONS

7.1    Certificates Representing Shares.  The shares of stock of the Corporation shall be represented by certificates or all of such shares shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock, or a combination of both.  If shares are represented by certificates (if any) such certificates shall be in the form approved by the Board. The certificates representing shares of stock of each class shall be signed by, or in the name of, the Corporation by the Chairman, the Chief Executive Officer or any Vice President, and by the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer. Any or all such signatures may be facsimiles. Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

7.2    Transfer and Registry Agents.  The Corporation may from time to time maintain one or more transfer offices or agents and registry offices or agents at such place or places as may be determined from time to time by the Board.

7.3    Lost, Stolen or Destroyed Certificates.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate or his legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

7.4    Form of Records.  Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be maintained on any information storage device or method; provided that the records so kept can be converted into clearly legible paper form within a reasonable time.  The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

7.5    Fiscal Year.  The fiscal year of the Corporation shall be determined by the Board.

7.6    Amendments.  These By-laws may be amended or repealed and new By-laws may be adopted by the Board, but the Stockholders may make additional By-laws and may alter and repeal any By-laws whether such By-laws were originally adopted by them or otherwise.

   7.7 <u>Conflict with Applicable Law or Certificate of Incorporation</u>. These By-laws are adopted subject to any applicable law, the Certificate of Incorporation and the Stockholders Agreement.  Whenever these By-laws may conflict with any applicable law, the Certificate of Incorporation or the Stockholders Agreement, such conflict shall be resolved in favor of such laws or the Certificate of Incorporation or the Stockholders Agreement.

Dated:  [●], 2016

**Exhibit 1.26**
**<u>Certificate of Incorporation of Reorganized UCI</u>**

**THIS DOCUMENT IS A DRAFT FORM PREPARED BY PROFESSIONALS OF THE PLAN SPONSORS.  THE DOCUMENT REMAINS SUBJECT TO ONGOING DISCUSSION AND CONFIRMATION BY THE PLAN PROPONENTS OF CERTAIN TERMS, REQUIREMENTS AND MECHANICS.**

CERTIFICATE OF INCORPORATION

of

**NEW UCI INC.**

**ARTICLE I.**

**NAME**

The name of the corporation (the "Corporation") is "New UCI Inc."

**ARTICLE II.**

**ADDRESS; REGISTERED OFFICE AND AGENT**

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street in the City of Wilmington, County of New Castle, 19801.  The name of its registered agent at such address is The Corporation Trust Company.

**ARTICLE III.**

**PURPOSES**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the provisions of the General Corporation Law of the State of Delaware (the "DGCL").

**ARTICLE IV.**

**CAPITAL STOCK**

4.1     General.  The total number of shares of all classes of capital stock which the Corporation shall have the authority to issue is [20,000,000] shares.  All shares shall be common stock (par value $[●] per share) (the "Common Stock") and are to be of one class.

4.2     Any Transfer (as defined herein) of a share or shares of Common Stock or of any option, warrant or other right to purchase or otherwise acquire any share or shares of any class of equity securities of the Corporation, shall be null and void unless the securityholder proposing any such transfer notifies the board of directors of the

01:21244204.1

Corporation (the "Board of Directors") of any such proposed transfer and the Board of Directors reasonably determines that such transfer would not result in the Corporation being subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or any successor Federal statute, and the rules and regulations of the SEC promulgated thereunder.  As used herein, "Transfer" means (with its cognates having corresponding meanings), with respect to any share or shares of Common Stock or of any option, warrant or other right to purchase or otherwise acquire any share or shares of any class of equity securities of the Corporation, any direct or indirect assignment, sale, exchange, transfer, tender or other disposition of any such share or shares of any class of equity securities or any interest therein, whether voluntary or involuntary, by operation of law or otherwise (and includes any sale or other disposition in any one transaction or series of transactions and the grant or transfer or an option or derivative security covering such share or shares of equity securities of the Corporation), and any agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

      4.3    Voting.   To the extent required by section 1123(a)(6) of the Bankruptcy Code, no nonvoting equity securities of the Corporation shall be issued.  This provision shall have no further force and effect beyond that required by section 1123(a)(6) of the Bankruptcy Code and is applicable only for so long as such section is in effect and applicable to the Corporation.  At each annual or special meeting of stockholders, each holder of Common Stock shall be entitled to one (1) vote in person or by proxy for each share of Common Stock outstanding in such holder's name on the stock transfer records of the Corporation in connection with the election of directors and all other actions submitted to a vote of stockholders.

      4.4    Dividends.  Dividends may be declared and paid to the holders of Common Stock in cash, property, or other securities of the Corporation from funds legally available therefor.  If and when dividends on Common Stock are declared payable from time to time by the Board of Directors, whether payable in cash, in property or in shares of stock of the Corporation, the holders of Common Stock shall be entitled to share equally, *pro rata* based on the number of shares of Common Stock held by each such holder, in such dividends.

      4.5    Liquidation, Dissolution or Winding Up.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the then remaining assets of the Corporation available for distribution to its stockholders shall be distributed among the holders of Common Stock, *pro rata* based on the number of shares of Common Stock held by each such holder.

      4.6    The Common Stock and any and each equity security within the meaning of section 101(16) of the Bankruptcy Code and any other instrument evidencing an ownership interest in the Corporation, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest and any and all other securities in the Corporation, whether issued, acquired or transferred as of the date hereof or subsequent to the date hereof shall be subject to the terms of that certain Stockholders and Registration Rights Agreement (the "Stockholders Agreement") of the Corporation dated as of the Effective Date of (and as such term is

- 2 -

defined in) the Plan, as the same may be amended or modified, from time to time, prior to the termination of such Stockholders Agreement, in accordance with its terms.

## ARTICLE V.

## LIMITATION OF LIABILITY

5.1     To the fullest extent permitted under the DGCL no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

5.2     Any amendment, repeal or modification of the foregoing provision shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, repeal or modification.

## ARTICLE VI.

## INDEMNIFICATION

6.1     Right to Indemnification.  The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation (or an employee of the Corporation identified by the Board of Directors as a Covered Person (a "Covered Employee") or, while a director or officer of the Corporation or a Covered Employee, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity (an "Other Entity"), including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person.  Notwithstanding the preceding sentence, the Corporation shall be required to indemnify a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors.

6.2     Prepayment of Expenses.  The Corporation shall pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this ARTICLE VI or otherwise.

6.3     Claims.  Notwithstanding the last sentence of Section 6.1, if a claim for indemnification or advancement of expenses under this ARTICLE VI is not

paid in full within thirty (30) days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

6.4     Nonexclusivity of Rights.  The rights conferred on any Covered Person by this ARTICLE VI shall not be exclusive of any other rights that such Covered Person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation or the by-laws of the Corporation (the "Bylaws"), agreement, vote of stockholders or disinterested directors or otherwise.

6.5     Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of an Other Entity shall be reduced by any amount such Covered Person actually collects as indemnification or advancement of expenses from such Other Entity; provided that, for the avoidance of doubt, no Covered Person shall be required to seek indemnification or advancement of expenses from such Other Entity as a condition to the receipt of indemnification or advancement of expenses under this ARTICLE VI.

6.6     Insurance.  The Board may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance:  (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers, agents and employees under the provisions of this ARTICLE VI; and (b) to indemnify or insure directors, officers, agents and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this ARTICLE VI.

6.7     Amendment or Repeal.  The rights to indemnification and advancement of expenses conferred upon any Covered Person pursuant to this ARTICLE VI shall be contract rights, shall vest when such person becomes a Covered Person, and shall continue as vested contract rights even if such person ceases to be a Covered Person.  Any amendment, repeal or modification of, or adoption of any provision inconsistent with, this ARTICLE VI (or any provision hereof) shall not adversely affect any right to indemnification or advancement of expenses granted to any person pursuant hereto with respect to any act or omission of such person occurring prior to the time of such amendment, repeal, modification or adoption (regardless of whether the Proceeding relating to such acts or omissions, or any Proceeding relating to such person's rights to indemnification or to advancement of expenses, is commenced before or after the time of such amendment, repeal, modification or adoption), and any such amendment, repeal, modification or adoption that would adversely affect such person's rights to indemnification or advancement of expenses hereunder shall be ineffective as to such person, except with respect to any threatened, pending or completed Proceeding that relates to or arises from (and only to the extent such Proceeding relates to or arises from)

- 4 -

any act or omission of such person occurring after the effective time of such amendment, repeal, modification or adoption.  The rights provided hereunder shall inure to the benefit of any Covered Person and such person's heirs, executors and administrators.

6.8     Other Indemnification and Prepayment of Expenses.     This ARTICLE VI shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

## ARTICLE VII.

## NUMBER OF DIRECTORS

Subject to any additional vote required by this Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws.

## ARTICLE IV

## ELECTIONS OF DIRECTORS

Elections of directors need not be by written ballot unless the Bylaws shall so provide.

## ARTICLE V

## MEETINGS OF STOCKHOLDERS

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide.  The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.  Except as otherwise required by law, special meetings of stockholders of the Corporation may be called only by the Board of Directors and any other power of stockholders to call a special meeting is specifically denied.  No business other than that stated in the notice of a special meeting of stockholders shall be transacted at such special meeting.

## ARTICLE VIII.

## ADOPTION, AMENDMENT AND/OR REPEAL OF BY-LAWS

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors is expressly authorized to make, alter and repeal the By-laws, subject to the power of the stockholders of the Corporation to alter or repeal any By-law whether adopted by them or otherwise.

- 5 -

## ARTICLE IX.

## GENERAL CORPORATION LAW SECTION 203

The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law.  This provision of the Certificate of Incorporation shall not be amended by the Board of Directors except to the extent permitted by the DGCL.

## ARTICLE X.

## CORPORATE OPPORTUNITY

The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "Excluded Opportunity" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any Principal Stockholder or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the "Covered Persons"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

As used herein, "Principal Stockholder" means any investment fund, vehicle or account which is managed by any Major Holder or any Initial Major Holder (each as defined in the Stockholders Agreement of the Corporation, dated as of [●] (the "Stockholders Agreement")) or an affiliate thereof or in respect of which any Major Holder or any Initial Major Holder (each as defined in the Stockholders Agreement) or an affiliate thereof has investment discretion.

## ARTICLE XI.

## CERTIFICATE AMENDMENTS

Subject to the provisions of the Stockholders Agreement, the Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by applicable law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this article.

- 6 -

01:21244204.1

## ARTICLE XII.

## CHOICE OF FORUM

Unless (a) the Corporation (through approval of the Board) consents in writing to the selection of an alternative forum, (b) the Court of Chancery of the State of Delaware concludes that an indispensible party named as a defendant therein is not subject to the jurisdiction of the Delaware courts, (c) the Corporation elects to bring an action in the United States Bankruptcy Court for the District of Delaware in accordance with the Stockholders Agreement or (d) a federal court has assumed exclusive jurisdiction of a proceeding, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, (iv) any action to interpret, apply, enforce or determine the validity of this Certificate of Incorporation, the Bylaws or the Stockholders Agreement, or (v) any action asserting a claim governed by the internal affairs doctrine.

[Signature Page Follows]

01:21244204.1

IN WITNESS WHEREOF, I, [_____], of NEW UCI INC., have executed this Certificate of Incorporation as of the ___th day of [●], 2016, and DO HEREBY CERTIFY under the penalties of perjury that the facts stated in this Certificate of Incorporation are true.


_____

Name:
Title:

**Exhibit 1.61**
**Terms of Intercreditor Agreement**

The principal terms of an intercreditor agreement by and between the New First Lien Agent and the New Second Lien Rights Offering Facility Agent (or trustee) will be negotiated by the parties thereto, and shall be in form and substance acceptable to the Debtors and the Plan Sponsors.

**Exhibit 1.78**
**Terms of New First Lien Credit Agreement**

## Summary of Exit Financing Terms: ABL Facility

MOELIS & COMPANY

| | |
|---|---|
| **Borrower:** | UCI International, LLC, or its successor by merger (the "Borrower") |
| **Guarantors** | Any and all existing or future direct or indirect subsidiaries of the Borrower (the "Guarantors") |
| **Facility:** | $120 million senior secured asset-based revolving credit facility (the "ABL Facility") |
| **Interest / Fees:** | L + 150 – 225bps<br>Upfront closing fee of 50bps of the ABL Facility<br>Unused facility fee of 25bps per annum initially, subject to grid ranging from 25 – 37.5bps, based on usage |
| **Maturity:** | 5 years |
| **Prepayment Option:** | Pre-payable at the Borrower's option without premium at anytime |
| **Use of Proceeds:** | To (i) refinance Borrower's existing indebtedness, (ii) fund certain fees and expenses associated with the ABL Facility, (iii) fund the costs related to the Borrower's emergence and (iv) finance the ongoing general corporate needs of Borrower |
| **Letters of Credit:** | Under the ABL Facility, Borrower would be entitled to request that the agent issue letters of credit ("Letters of Credit") in an aggregate amount not to exceed $15 – 20 million at any one time outstanding |
| **Security:** | First priority perfected lien on the Borrower's accounts receivable ("AR"), inventory, M&E and real estate |
| **Cash Dominion:** | Springing when excess availability falls beneath 15% of the Line Cap |
| **Borrowing Base Availability:** | Availability under the ABL Facility will be subject to a "Borrowing Base" or "Line Cap" formula as well as based on advance rates, as outlined below:<br><br>▪ Borrowing base formula of (A) 85% of the amount of Borrower's eligible accounts receivable (net of any prepayments) less than 90 days past due; plus (B) The lowest of (i) 65% of the value of eligible inventory, (ii) 85% times the net orderly liquidation value of Borrower's eligible inventory and (iii) a to be determined inventory sub-limit; less (C) customary reserves<br><br>▪ FILO advance rate of 5% of AR and inventory<br><br>▪ Advance rate of 85% of the net orderly liquidation value of appraised M&E<br><br>▪ Advance rate of 60% of the fair market value of real estate |
| **Reporting Requirements:** | Usual and customary for transactions of this type, including:<br>▪ Monthly financial statements<br>▪ Monthly borrowing base certificates |
| **Financial Covenants:** | ▪ Springing minimum FCCR of 1.1x tested when excess availability is less than 15% of the then existing Line Cap at any time |

# Summary of Exit Financing Terms: ABL Facility (Cont'd)

MOELIS & COMPANY

| | |
|---|---|
| **Affirmative and Negative Covenants:** | Usual and customary for transactions of this type, including:<br>▪ Compliance with laws, payments of taxes and material obligations<br>▪ Maintenance of insurance<br>▪ Preservation of existence and material licenses<br>▪ Maintenance of properties<br>▪ Maintenance of books and records<br>▪ Limitations on debt, liens, and capital expenditures<br>▪ Limitations on dividends<br>▪ Limitations on repayments and repurchases of other debt |
| **Conditions Precedent to Closing:** | Usual and customary for transactions of this type, including:<br>▪ Receipt and satisfactory review of final financial model<br>▪ Field exam<br>▪ Real Estate appraisals<br>▪ Documentation |
| **Required Availability at Close:** | $20 million |
| **Governing Law:** | State of New York |

**Exhibit 1.81**
**Terms of New Second Lien Credit Agreement**

In accordance with Section 5.4 of the Plan, the Debtors commenced the Rights Offering on October 26, 2016, pursuant to the terms of the Rights Offering Procedures.  The proceeds of the Rights Offering will be used to fund the Second Lien Rights Offering Facility, the proposed terms of which are set forth in Exhibit 1.122. Accordingly, pursuant to Section 5.5 of the Plan, the Debtors and Plan Sponsors have not elected for the Reorganized Debtors to enter into the New Second Lien Credit Agreement at this time.

**Exhibit 1.102**
**Preserved Causes of Action**

As set forth in the *Notice of Rank Contribution Election Pursuant to Joint Plan of Reorganization for UCI International, LLC and its Debtor Affiliates Proposed by the Debtors, the Ad Hoc Committee of Senior Noteholders and the Official Committee of Unsecured Creditors* [D.I. 875] (the "Rank Contribution Election Notice"), Rank, on behalf of itself and each other member of the Rank Group, has elected to make and is deemed to have made the Rank Contribution Election pursuant to the terms of the Plan and through a global settlement (the "Global Settlement") among the Debtors, Plan Sponsors, Rank and certain members of the Rank Group, the Creditors' Committee, and the Pension Benefit Guaranty Corporation ("PBGC"). The Global Settlement is embodied in two separate settlement agreements.  On November 9, 2016, the Debtors filed the *Debtors' Motion to Approve (I) Global Settlement Among the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of Noteholders, and Rank Group and (II) the PBGC Settlement Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019* [D.I. 876] (the "Settlement Motion") seeking authority to enter into the Global Settlement.

Subject to (i) the approval of the Settlement Motion, there are no "Preserved Causes of Action" under the Plan, and each member of the Rank Group and each of their Related Persons (including any former directors or officers of any of the Debtors that are or were Related Persons of the Rank Group) shall constitute "Released Parties" under the Plan and shall receive releases under the Plan to the extent permitted by applicable law, which releases will be in addition to any releases contained in the Global Settlement.

For further information, please see the Rank Contribution Election Notice and the Settlement Motion.

**Exhibit 1.122**
**Terms of Second Lien Rights Offering Facility Agreement**

UCI INTERNATIONAL, LLC,[1]

as Issuer

and the Guarantors from time to time party hereto

[  ]% Senior Secured Notes due [  ]

_____

INDENTURE

Dated as of [  ]

_____

[  ],
as Trustee, Collateral Agent, Paying Agent, Transfer Agent and Registrar

**THIS DOCUMENT IS A DRAFT FORM PREPARED BY PROFESSIONALS OF THE PLAN SPONSORS.  THE DOCUMENT REMAINS SUBJECT TO ONGOING DISCUSSION AND CONFIRMATION BY THE PLAN PROPONENTS OF CERTAIN COVENANTS, REQUIREMENTS AND MECHANICS CONSISTENT WITH THE DEBTORS' NEW FIRST LIEN EXIT FACILITY.**

---

[1] NTD: Subject to review of final post-emergence structure chart. All baskets, covenants and thresholds and defined terms used to calculate such amounts to be consistent with the New First Lien Credit Agreement, with a 15% cushion.

**Trust Indenture Act Cross Reference Table\*\***

This Cross Reference Sheet shows the location in the Indenture of the provisions inserted pursuant to Sections 310-318(a), inclusive, of the Trust Indenture Act of 1939.

| TIA Section | | Notes Indenture Section |
|---|---|---|
| 310(a)(1) | | 7.09 |
| (a)(2) | | 7.09 |
| (a)(3) | | N.A. |
| (a)(4) | | N.A. |
| (a)(5) | | 7.09 |
| (b) | | 7.07; 7.09 |
| 311(a) | | N.A. |
| (b) | | N.A. |
| 312(a) | | 2.06 |
| (b) | | N.A. |
| (c) | | N.A. |
| 313(a) | | N.A. |
| (b)(1) | | N.A. |
| (b)(2) | | N.A. |
| (c) | | 11.01 |
| (d) | | N.A. |
| 314(a) | | 4.02; |
| (b) | | N.A. |
| (c)(1) | | 11.02 |
| (c)(2) | | 11.02 |
| (c)(3) | | N.A. |
| (d) | | N.A. |
| (e) | | 11.03 |
| (f) | | 4.08 |
| 315(a) | | 7.01 |
| (b) | | 7.05; 11.01 |
| (c) | | 7.01 |
| (d) | | 7.01 |
| (e) | | 6.11 |
| 316(a)(1)(A) | | 6.05 |
| (a)(1)(B) | | 6.04 |
| (a)(2) | | N.A. |
| (b) | | 6.07 |
| (c) | | 9.03 |
| 317(a)(1) | | 6.08 |
| (a)(2) | | 6.09 |
| (b) | | 2.05 |
| 318(a) | | N.A. |

N.A. means Not Applicable.

\*\*Note: This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

i

01:21244188.1

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions and Incorporation by Reference

SECTION 1.01  Definitions ..................................................................................1
SECTION 1.02  Other Definitions ........................................................................30
SECTION 1.03  Rules of Construction ..................................................................31

## ARTICLE II

### The Notes

SECTION 2.01  Amount of Notes..........................................................................32
SECTION 2.02  Form and Dating .........................................................................33
SECTION 2.03  Execution and Authentication.....................................................34
SECTION 2.04  Registrar and Paying Agent ........................................................34
SECTION 2.05  Paying Agent to Hold Money ......................................................35
SECTION 2.06  Holder Lists.................................................................................35
SECTION 2.07  Transfer and Exchange ...............................................................35
SECTION 2.08  Replacement Notes ......................................................................36
SECTION 2.09  Outstanding Notes........................................................................36
SECTION 2.10  Temporary Notes .........................................................................36
SECTION 2.11  Cancellation .................................................................................37
SECTION 2.12  Defaulted Interest.........................................................................37
SECTION 2.13  CUSIPs, Common Codes, ISINs, etc..........................................37
SECTION 2.14  Calculation of Principal Amount of Notes ..................................37
SECTION 2.15  Currency........................................................................................37

## ARTICLE III

### Redemption

SECTION 3.01  Redemption....................................................................................38
SECTION 3.02  Applicability of Article..................................................................38
SECTION 3.03  Notices to Trustee .........................................................................38
SECTION 3.04  Selection of Notes to Be Redeemed .............................................38
SECTION 3.05  Notice of Optional Redemption....................................................39
SECTION 3.06  Effect of Notice of Redemption....................................................40
SECTION 3.07  Deposit of Redemption Price ........................................................40
SECTION 3.08  Notes Redeemed in Part................................................................40
SECTION 3.09  Mandatory Redemption .................................................................41

## ARTICLE IV

### Covenants

SECTION 4.01    Payment of Notes...................................................................................41
SECTION 4.02    Reports and Other Information.............................................................41
SECTION 4.03    Limitation on Incurrence of Indebtedness and Issuance of
Disqualified Stock and Preferred Stock...............................................43
SECTION 4.04    Limitation on Restricted Payments.......................................................49
SECTION 4.05    Dividend and Other Payment Restrictions Affecting Subsidiaries........54
SECTION 4.06    Asset Sales............................................................................................56
SECTION 4.07    Transactions with Affiliates..................................................................59
SECTION 4.08    Change of Control.................................................................................61
SECTION 4.09    Compliance Certificate.........................................................................63
SECTION 4.10    Further Instruments and Acts................................................................64
SECTION 4.11    Future Guarantors ................................................................................64
SECTION 4.12    Liens.....................................................................................................65
SECTION 4.13    Maintenance of Office or Agency ........................................................65
SECTION 4.14    Taxes....................................................................................................66
SECTION 4.15    Suspension/Fall-Away of Covenants on Achievement of
Investment Grade Status.......................................................................66

## ARTICLE V

### Successor Company

SECTION 5.01    When the Issuer, the Company or a Guarantor May Merge or
Transfer Assets ....................................................................................67

## ARTICLE VI

### Defaults and Remedies

SECTION 6.01    Events of Default ..................................................................................70
SECTION 6.02    Acceleration..........................................................................................72
SECTION 6.03    Other Remedies.....................................................................................73
SECTION 6.04    Waiver of Past Defaults ........................................................................73
SECTION 6.05    Control by Majority...............................................................................73
SECTION 6.06    Limitation on Suits................................................................................73
SECTION 6.07    Rights of the Holders to Receive Payment ...........................................74
SECTION 6.08    Collection Suit by Trustee .....................................................................74
SECTION 6.09    Trustee May File Proofs of Claim .........................................................74
SECTION 6.10    Priorities...............................................................................................75
SECTION 6.11    Undertaking for Costs...........................................................................75
SECTION 6.12    Waiver of Stay or Extension Laws ........................................................75
SECTION 6.13    Direction to Agents...............................................................................75

## ARTICLE VII

### Trustee

SECTION 7.01    Duties of Trustee ................................................................75
SECTION 7.02    Rights of Trustee ................................................................76
SECTION 7.03    Individual Rights of Trustee ...............................................79
SECTION 7.04    Trustee's Disclaimer ...........................................................79
SECTION 7.05    Notice of Defaults ..............................................................79
SECTION 7.06    Compensation and Indemnity ............................................79
SECTION 7.07    Replacement of Trustee or Agent ......................................80
SECTION 7.08    Successor Trustee by Merger ..............................................81
SECTION 7.09    Eligibility; Disqualification ...............................................81

## ARTICLE VIII

### Discharge of Indenture; Defeasance

SECTION 8.01    Discharge of Liability on Notes; Defeasance ......................82
SECTION 8.02    Conditions to Defeasance ...................................................83
SECTION 8.03    Application of Trust Money ................................................84
SECTION 8.04    Repayment to the Issuer .....................................................84
SECTION 8.05    Reinstatement .....................................................................84

## ARTICLE IX

### Amendments and Waivers

SECTION 9.01    Without Consent of the Holders .........................................84
SECTION 9.02    With Consent of the Holders ..............................................85
SECTION 9.03    Revocation and Effect of Consents and Waivers.................86
SECTION 9.04    Notation on or Exchange of Notes......................................87
SECTION 9.05    Trustee to Sign Amendments..............................................87
SECTION 9.06    Payment for Consent...........................................................87
SECTION 9.07    Compliance with the Trust Indenture Act............................87

## ARTICLE X

### Guarantees

SECTION 10.01    Guarantees .........................................................................87
SECTION 10.02    Limitation on Liability.......................................................89
SECTION 10.03    Successors and Assigns ......................................................89
SECTION 10.04    No Waiver...........................................................................89
SECTION 10.05    Modification.......................................................................89
SECTION 10.06    Release of Guarantor .........................................................89
SECTION 10.07    Contribution .......................................................................90

SECTION 10.08        Withholding Taxes ........................................................................90

## ARTICLE XI

### Collateral and Security

SECTION 11.01        The Collateral .................................................................................92
SECTION 11.02        Impairment of Security Interest ...................................................93
SECTION 11.03        Release of Liens on the Collateral ................................................93
SECTION 11.04        Authorization of Actions to be Taken by the Trustee or the
                     Collateral Agent Under the Security Documents ........................94
SECTION 11.05        Collateral Accounts .......................................................................96
SECTION 11.06        Control Agreements .......................................................................96
SECTION 11.07        Information Regarding Collateral ..................................................96

## ARTICLE XII

### Miscellaneous

SECTION 12.01        Notices ...........................................................................................97
SECTION 12.02        Certificate and Opinion as to Conditions Precedent ...................98
SECTION 12.03        Statements Required in Certificate or Opinion............................98
SECTION 12.04        When Notes Disregarded ...............................................................99
SECTION 12.05        Rules by Trustee, Paying Agent and Registrar ............................99
SECTION 12.06        Legal Holidays ...............................................................................99
SECTION 12.07        GOVERNING LAW .......................................................................99
SECTION 12.08        Consent to Jurisdiction and Service ..............................................99
SECTION 12.09        No Recourse Against Others...........................................................99
SECTION 12.10        Successors .....................................................................................100
SECTION 12.11        Multiple Originals.........................................................................100
SECTION 12.12        Table of Contents; Headings.........................................................100
SECTION 12.13        Indenture Controls ........................................................................100
SECTION 12.14        Severability ...................................................................................100
SECTION 12.15        Place of Performance ....................................................................100

v

Appendix A –    Provisions Relating to Notes

EXHIBIT INDEX

Exhibit A        —        Form of Note

Exhibit B        —        Form of Indenture Supplement to Add Subsidiary Guarantors

Exhibit C        —        Form of Security Agreement

Exhibit D        —        Form of Mortgage

01:21244188.1

INDENTURE dated as of [   ] (as amended, supplemented or otherwise modified from time to time, this "*Indenture*") among UCI INTERNATIONAL, LLC, a Delaware limited liability company (the "*Issuer*"), the Guarantors from time to time party hereto, and [     ], as trustee (the "*Trustee*"), paying agent, registrar, transfer agent and as collateral agent (in such capacity, the "*Collateral Agent*").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of (a) $[35.0] million aggregate principal amount of the [  ]% Senior Secured Notes due [  ] (the "*Original Notes*") issued on the date hereof and (b) if and when issued, an unlimited principal amount of additional [  ]% Senior Secured Notes due [  ] issued under this Indenture subsequent to the Issue Date, in each case subject to Section 2.01 (the "*Additional Notes*", and together with the Initial Notes, the "*Notes*").

ARTICLE I

Definitions and Incorporation by Reference

SECTION 1.01                    Definitions.

"*Acquired Indebtedness*" means, with respect to any specified Person:

(1)       Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person (including, for the avoidance of doubt, Indebtedness Incurred by such other Person in connection with, or in contemplation of, such other Person merging, consolidating or amalgamating with or into or becoming a Restricted Subsidiary of such specified Person); and

(2)       Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar, Paying Agent, Transfer Agent or Collateral Agent.

"*Applicable Premium*" means, with respect to any Note at any redemption date, the greater of (i) 1.00% of the principal amount of such Note and (ii) the excess, if any, of (A) the present value at such redemption date of (1) the redemption price of such Note on [  ] (such redemption price being described in Section 5 of the Form of Note, exclusive of any accrued interest and additional interest, if any) plus (2) all required remaining scheduled interest payments due on such Note through [  ] (excluding accrued but unpaid interest and additional interest, if any, to the redemption date), computed using a discount rate equal to the Treasury Rate at the redemption date plus 50 basis points over (B) the principal amount of such Note on such redemption date.

"*Asset Sale*" means:

(1)       the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback Transaction) outside the

1

ordinary course of business of the Company or any Restricted Subsidiary (each referred to in this definition as a "disposition"); or

(2)     the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or a Restricted Subsidiary and other than the issuance of Preferred Stock of a Restricted Subsidiary issued in compliance with Section 4.03) (whether in a single transaction or a series of related transactions),

in each case other than:

(a)     a disposition of cash, Cash Equivalents or Investment Grade Securities or obsolete, surplus or worn-out property or equipment in the ordinary course of business;

(b)     transactions permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

(c)     any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

(d)     any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than $5.0 million;

(e)     any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary to the Company or a Restricted Subsidiary or by the Company to a Restricted Subsidiary;

(f)     any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater Fair Market Value or, as determined in good faith by senior management or the Board of Directors of the Company, to be of comparable or greater usefulness to the business of the Company and the Restricted Subsidiaries as a whole;

(g)     foreclosure, exercise of termination rights or any similar action with respect to any property or any other asset of the Company or any Restricted Subsidiaries;

(h)     any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i)     the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j)     any sale of inventory, trading stock or other assets in the ordinary course of business;

(k)     any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l)     an issuance of Capital Stock pursuant to an equity incentive or compensation plan approved by the Board of Directors;

2

(m)      dispositions consisting of the granting of Permitted Liens;

(n)      dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(o)      any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition, to the extent not prohibited by this Indenture;

(p)      any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(q)      [reserved];

(r)      the sale of any property in a Sale/Leaseback Transaction not prohibited by this Indenture with respect to any assets built or acquired by the Company or any Restricted Subsidiary after the Issue Date;

(s)      in the ordinary course of business, any lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater Fair Market Value or, as determined in good faith by senior management or the Board of Directors of the Company, to be of comparable or greater usefulness to the business of the Company and the Restricted Subsidiaries as a whole; provided that any cash or Cash Equivalents received must be applied in accordance with Section 4.06; and

(t)      sales or other dispositions of Equity Interests in joint ventures in existence on the Issue Date.

"*Bank Indebtedness*" means any and all amounts payable under or in respect of any Credit Agreement and the Other Credit Agreement Documents, in each case as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time, (including after termination of such Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"*Bankruptcy Code*" means title 11 of the United States Code, as in effect from time to time.

"*Board of Directors*" means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

"*Capital Stock*" means:

3

(1)        in the case of a corporation, corporate stock or shares;

(2)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Equivalents*" means:

(1)        US dollars, pounds sterling, euro, the national currency of any member state in the European Union or, in the case of any Restricted Subsidiary that is not organized or existing under the laws of the United States, any member state of the European Union or any state or territory thereof, such local currencies held by it from time to time in the ordinary course of business;

(2)        securities issued or directly and fully guaranteed or insured by the US, U.K., Canadian, Swiss or Japanese government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)        repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)        commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)        readily marketable direct obligations issued by any state of the United States of America, any province of Canada, any member of the European Monetary Union, the United Kingdom, Switzerland or Norway or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency), in each case with maturities not exceeding two years from the date of acquisition;

(7)        Indebtedness issued by Persons (other than the Company or any of its Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's in each case with maturities not exceeding two years from the date of acquisition;

4

01:21244188.1

(8)      for the purpose of paragraph (a) of the definition of "Asset Sale," any marketable securities of third parties owned by the Company or the Restricted Subsidiaries on the Issue Date;

(9)      interest in investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above; and

(10)     instruments equivalent to those referred to in clauses (1) through (8) above denominated in euro or any other foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction.

"*Change of Control*"[2] means the occurrence of any of the following events:

(1)      the sale, lease or transfer, in one or a series of transactions, of all or Substantially All the assets of the Company and its Subsidiaries, taken as a whole, to a Person other than, directly or indirectly, any of the Permitted Holders;

(2)      the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of the Company; or

(3)      the Company ceases to own, directly or indirectly, 100% of the Capital Stock of the Issuer, other than directors' qualifying shares or other de minimis shareholdings required by law.

"*Chapter 11 Cases*" means the proceedings of Issuer and certain of its Affiliates under chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all property and assets, whether now owned or hereafter acquired, in which Liens are, from time to time, granted or purported or required to be granted, to secure the Notes pursuant to the Security Documents, subject to the Intercreditor Agreement.

"*Collateral Account*" means one or more segregated accounts pledged under the Security Documents that is under the sole control of the First Lien Agent or Collateral Agent, as the case may be, and is free from all other Liens (other than Permitted Liens) junior to the Liens granted to the Collateral Agent and Liens securing the obligations under the Credit Agreement and the Other Credit Agreement Documents, as further specified in Section 11.05.

"*Collateral Agent*" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

---

[2] NTD: To discuss ability to trade equity without tripping a Change of Control.

"*Consolidated Interest Expense*" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Income (including amortization of original issue discount and bond premium, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations (provided, however, that if Hedging Obligations result in net benefits received by such Person, such benefits shall be credited to reduce Consolidated Interest Expense to the extent paid in cash unless, pursuant to GAAP, such net benefits are otherwise reflected in Consolidated Net Income) and excluding amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge commitment or other financing fees); plus

(2)    consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; plus

(3)    [reserved]; minus

(4)    interest income for such period.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis; provided, however, that, without duplication:

(1)    any net after-tax extraordinary, nonrecurring or unusual gains or losses or income, expenses or charges (less all fees and expenses relating thereto) including severance expenses, relocation costs and expenses and expenses or charges related to any Equity Offering, Permitted Investment, acquisition (including integration costs) or Indebtedness permitted to be Incurred by this Indenture (in each case, whether or not successful), in each case shall be excluded;

(2)    [reserved];

(3)    the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(4)    any net after-tax effect of income or loss from discontinued operations and any net after-tax gains or losses on disposal of discontinued operations shall be excluded;

(5)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Board of Directors of the Company) shall be excluded;

(6)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness or Hedging Obligations or other derivative instruments shall be excluded;

(7)    the Net Income for such period of any Person that is not a Subsidiary of such Person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period;

6

(8)      solely for the purpose of determining the amount available for Restricted Payments under clause (1) of the definition of Cumulative Credit, the Net Income for such period of any Restricted Subsidiary (other than the Issuer or any Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived or are permitted under Section 4.05; provided, however, that the Consolidated Net Income of such Person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9)      an amount equal to the amount of Tax Distributions actually made to any parent of such Person in respect of such period in accordance with Section 4.04(b)(xii) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10)      any non-cash impairment charges or asset write-offs, and the amortization of intangibles arising in each case pursuant to GAAP shall be excluded;

(11)      any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, grants and sales of stock, stock appreciation or similar rights, stock options or other rights to officers, directors and employees shall be excluded;

(12)      any (a) one-time non-cash compensation charges, (b) the costs and expenses after the Issue Date related to employment of terminated employees, (c) [reserved] or (d) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Issue Date of officers, directors and employees, in each case of such Person or any of its Restricted Subsidiaries, shall be excluded;

(13)      [reserved];

(14)      solely for purposes of calculating EBITDA, (a) the Net Income of any Person and its Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-wholly owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

(15)      (a) (i) the non-cash portion of "straight-line" rent expense shall be excluded and (ii) the cash portion of "straight-line" rent expense that exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP shall be excluded;

(16)      unrealized gains and losses relating to hedging transactions and mark-to-market of Indebtedness denominated in foreign currencies resulting from the applications of the applicable standard under GAAP shall be excluded; and

(17)     solely for the purpose of calculating Restricted Payments, the difference, if positive, of the Consolidated Taxes of the Company calculated in accordance with GAAP and the actual Consolidated Taxes paid in cash by the Company during any Reference Period shall be included.

*Notwithstanding* the foregoing, for the purpose of <u>Section 4.04</u> only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under <u>Section 4.04</u> pursuant to clauses (5) and (6) of the definition of Cumulative Credit.

"*Consolidated Non-cash Charges*" means, with respect to any Person for any period, the aggregate depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, but excluding any such charge which consists of or requires an accrual of, or cash reserve for, anticipated cash charges for any future period.

"*Consolidated Taxes*" means with respect to any Person for any period, provision for taxes based on income, profits or capital, including, without limitation, national, state, franchise and similar taxes and any Tax Distributions taken into account in calculating Consolidated Net Income.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

       (a)     for the purchase or payment of any such primary obligation, or

       (b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Corporate Trust Office*" means the corporate trust office of the Trustee, which on the date hereof is located at [_].

"*Credit Agreement*" means the (i) First Lien Credit Agreement and (ii) whether or not the instruments referred to in clause (i) remain outstanding, if designated by the Company to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different

8

borrowers or issuer and, in each case, as amended or supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

"*Credit Agreement Documents*" means the collective reference to the collective reference to the Credit Agreement, any notes issued pursuant thereto and the guarantees thereof and any security or collateral documents entered into in relation thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time.

"*Currency Agreement*" means, in respect of a Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"*Default*" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"*Designated Non-cash Consideration*" means the Fair Market Value of non-cash consideration received by the Company or one of the Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Company or any direct or indirect parent of the Company (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officers' Certificate, on the issuance date thereof.

"*Disinterested Directors*" means, with respect to any Affiliate Transaction, one or more members of the Board of Directors of the Company or any parent company of the Company having no material direct or indirect financial interest in or with respect to such Affiliate Transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding of Equity Interests of the Company or any parent company of the Company or any options, warrants or other rights in respect of such Equity Interests.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)    matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale; provided that the relevant asset sale or change of control provisions, taken as a whole, are not materially more disadvantageous to the holders of the Notes than is customary in comparable transactions);

(4)    is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person; or

(5)    is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale), in each case prior to 91 days after the maturity date of the Notes or the date the Notes are no longer outstanding; provided, however, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; provided,

9

further, however, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; provided, further, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"*Domestic Subsidiary*" means, with respect to any Person, any Subsidiary of such Person that is incorporated or organized under the laws of the United States of America or any state thereof or the District of Columbia.

"*EBITDA*"[3] means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Income:

(1)    Consolidated Taxes, to the extent the same was deducted (and not added back) in calculating Consolidated Net Income; plus

(6)    Consolidated Interest Expense, to the extent the same was deducted (and not added back) in calculating Consolidated Net Income; plus

(7)    Consolidated Non-cash Charges, to the extent the same was deducted (and not added back) in calculating Consolidated Net Income; plus

(8)    business optimization expenses and other restructuring charges (including in respect of the Issuer's and its Affiliates Chapter 11 Cases), expenses or reserves; provided that, with respect to each business optimization expense or other restructuring charge, expense or reserve, the Company shall have delivered to the Trustee an Officers' Certificate specifying and quantifying such expense, charge or reserve and stating that such expense, charge or reserve is a business optimization expense or other restructuring charge or reserve, as the case may be; plus

(9)    [reserved]; plus

(10)    non-cash items increasing Consolidated Net Income for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period).

"*Emergence Date Holders*" means [insert name of the funds who will own the Company on the emergence date].

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any public or private sale after the Issue Date of ordinary shares or Preferred Stock of the Company or any direct or indirect parent of the Company (other than Disqualified Stock), other than:

---

[3] For certain periods prior to the closing date, EBITDA numbers may be stipulated (to be mutually agreed).

10

(1)     public offerings registered on Form S-8;

(2)     issuances to any Subsidiary of the Company; and

(3)     any such public or private sale that constitutes an Excluded Contribution.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Asset*" is defined in the Security Documents.

"*Excluded Contributions*" means the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Company) received by the Company, after the Issue Date from:

(1)     contributions to its common equity capital; or

(2)     the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company, in each case designated as Excluded Contributions pursuant to an Officers' Certificate executed by an Officer of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"*Fair Market Value*" means, with respect to any asset or property, the price that could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined in good faith by the Company except as otherwise provided in this Indenture).

"*Financial Assistance Restricted Subsidiary*" means any Restricted Subsidiary that is prevented from being a Guarantor due to applicable financial assistance laws; provided, however, that such Restricted Subsidiary shall become a Guarantor upon or as soon as reasonably practical after (but not later than 90 days after (subject to the expiration of applicable waiting periods and compliance with applicable laws)) such financial assistance laws no longer prevent such Restricted Subsidiary from being a Guarantor if it would otherwise be required to be a Guarantor pursuant to Section 4.11.

"*First Lien Agent*" means the administrative agent and/or collateral agent under the First Lien Credit Agreement.

"*First Lien Credit Agreement*" means [New First Lien ABL Credit Agreement].

"*First Lien Obligations*" means (i) all Secured Indebtedness secured by a Lien that has equal priority with, ranks pari passu with, or is otherwise on parity with, or ranks prior to, ahead of, or otherwise senior to, the Lien in respect of the First Lien Credit Agreement, (ii) all other Obligations (not constituting Indebtedness) of the Company and its Restricted Subsidiaries under the agreements governing such Secured Indebtedness described in clause (i) to this definition and (iii) all other Obligations of the Company or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of cash management services, in each case owing to a Person that is a holder of Indebtedness described in clause (i) or Obligations described in clause (ii) or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services.

11

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Company or any Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period; provided, however, that the pro forma calculation of Consolidated Interest Expense shall not give effect to (a) any Indebtedness, Disqualified Stock or Preferred Stock Incurred or issued on the date of determination pursuant to <u>Section 4.03(b)</u> and (b) the repayment, repurchase or redemption of any Indebtedness, Disqualified Stock or Preferred Stock to the extent such repayment, repurchase or redemption results from the proceeds of Indebtedness, Disqualified Stock or Preferred Stock Incurred or issued pursuant to <u>Section 4.03(b)</u>.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations and consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of the Restricted Subsidiaries has determined to make or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date (each, for purposes of this definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations and consolidations, discontinued operations and operational changes (and the change of any associated Fixed Charges (calculated in accordance with the proviso in the prior paragraph) and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officers' Certificate, to reflect operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such

12

Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

"*Fixed Charges*" means, with respect to any Person for any period, the sum, without duplication, of:

(1)      Consolidated Interest Expense of such Person for such period; and

(2)      all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"*Foreign Subsidiary*" means, with respect to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect as of the Issue Date (such principles being referred to as "U.S. GAAP" for purposes of this definition only), [except with respect to any reports or financial information required to be delivered pursuant to Section 4.02, which shall be prepared in accordance with GAAP as in effect on the date thereof]; provided that, at any time after adoption of IFRS by the Company and the Issuer for their financial statements and reports for all financial reporting purposes, the Company and the Issuer may elect to apply IFRS for all purposes of this Indenture, and, upon such election (the "IFRS Election"), references in this Indenture to GAAP shall be construed to mean IFRS as in effect on the Issue Date; provided that (1) the IFRS Election, once made, shall be irrevocable except as set forth below (and shall only be made once), (2) all financial statements and reports required to be provided after the IFRS Election pursuant to this Indenture shall be prepared on the basis of IFRS, (3) from and after the IFRS Election, all ratios, computations and other determinations based on GAAP contained in this Indenture shall be computed in conformity with IFRS with retroactive effect being given thereto assuming that the IFRS Election had been made on the Issue Date, (4) the IFRS Election shall not have the effect of rendering invalid any payment or Investment made prior to the date of the IFRS Election pursuant to Section 4.04 or any Incurrence of Indebtedness incurred prior to the date of such election pursuant to Section 4.03 (or any other action conditioned on the Company and its Restricted Subsidiaries having been able to Incur $1.00 of additional Indebtedness) if such payment, Investment, Incurrence or other action was valid under this Indenture on the date made, Incurred or taken, as the case may be and (5) all accounting terms and references in this Indenture to accounting standards shall be deemed to be references to the most comparable terms or standards under IFRS.

Notwithstanding the foregoing, if, following the IFRS Election, the Company and the Issuer adopt U.S. GAAP for their financial statements and reports for all financial reporting purposes in connection with an initial public offering of the Issuer's or any of its direct or indirect parents' common stock pursuant to an effective registration under the Securities Act covering the offer and sale of the Issuer's or any of its direct or indirect parents' common stock, the Company and the Issuer may elect to again apply U.S. GAAP for all purposes of this Indenture, and, upon such election (the "*GAAP Election*"), references in this Indenture to GAAP shall be again construed to mean U.S. GAAP as in effect on the Issue Date; provided that (1) upon subsequently reporting their fiscal year results on the basis of U.S. GAAP, the Company and the Issuer shall restate their financial statements on the basis of U.S.

13

GAAP for the fiscal year ending immediately prior to the fiscal year after the GAAP Election, (2) the GAAP Election, once made, shall be irrevocable except as set forth below (and shall only be made once); provided, however, that, in the event the Company and the Issuer have made a GAAP Election and are thereafter required by applicable law to apply IFRS in lieu of U.S. GAAP (any such change, a "*Required Change*"), they shall be entitled to apply IFRS (it being understood and agreed that, upon subsequently reporting their fiscal year results on the basis of IFRS, the Company and the Issuer shall restate their financial statements on the basis of IFRS for the fiscal year ending immediately prior to the fiscal year after such Required Change and references in this Indenture to GAAP shall be construed to mean IFRS as in effect on the Issue Date), (3) all financial statements and reports required to be provided after the GAAP Election pursuant to this Indenture shall be prepared on the basis of U.S. GAAP, (4) from and after the GAAP Election, all ratios, computations and other determinations based on GAAP contained in this Indenture shall be computed in conformity with U.S. GAAP with retroactive effect being given thereto assuming that the GAAP Election had been made on the Issue Date and (5) the GAAP Election shall not have the effect of rendering invalid any payment or Investment made prior to the date of such election pursuant to Section 4.04 or any Incurrence of Indebtedness incurred prior to the date of such election pursuant to Section 4.03 (or any other action conditioned on the Company and its Restricted Subsidiaries having been able to Incur $1.00 of additional Indebtedness) if such payment, Investment, Incurrence or other action was valid under this Indenture on the date made, Incurred or taken, as the case may be.

The Company and the Issuer shall give notice of any IFRS Election or GAAP Election to the Trustee and the Holders within 15 days of such election. For the avoidance of doubt, solely making an IFRS Election or GAAP Election (without any other action) will not be treated as an Incurrence of Indebtedness.

"*Guarantee*" means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Person in accordance with the provisions of this Indenture.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantors*" means (x) the Company and the Restricted Subsidiaries (other than the Issuer) that executes this Indenture as Guarantors on the Issue date and (y) any Person that subsequently becomes a Guarantor in accordance with the terms of this Indenture; provided, however, that upon the release or discharge of such Person from its Guarantee in accordance with this Indenture, such Person shall cease to be a Guarantor.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under:

(1)    currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2)    other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"*holder*", "*Holder*" or "*noteholder*" means the Person in whose name a Note is registered on the Registrar's books.

"*IFRS*" means the International Financial Reporting Standards as issued by the International Accounting Standards Board.

"*including*" means including without limitation.

"*Incur*" means issue, assume, guarantee, incur or otherwise become directly or indirectly liable contingently or otherwise for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"*Indebtedness*" means, with respect to any Person (without duplication):

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), (d) in respect of Capitalized Lease Obligations or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness of such other Person.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of the Issue Date by and among the Company, the Subsidiary Guarantors, the First Lien Agent, the Collateral Agent and the Trustee, as such agreement may be amended, modified or supplemented from time to time.

"*Independent Financial Advisor*" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means [BlackRock Advisors, LLC, J.P. Morgan Investment Management, Inc. and Credit Suisse Asset Management, LLC (U.S.)].

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1)    securities issued or directly and fully guaranteed or insured by the US, U.K., Canadian, Swiss or Japanese government or any member state of the European Monetary Union or any agency or instrumentality thereof (other than Cash Equivalents);

(2)    securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's or BBB- (or equivalent) by S&P, or an equivalent rating by any other Rating Agency, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries;

(3)    investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4)    corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers in the ordinary course of business and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1)    "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

          (a)    the Company's "Investment" in such Subsidiary at the time of such redesignation; less

          (b)    the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"*Issue Date*" means [  ], the date on which the Notes are originally issued.

"*Issuer*" means the party named as such in this Indenture.

16

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement or any lease in the nature thereof); provided that in no event shall an operating lease be deemed to constitute a Lien.

"*Management Group*" means the group consisting of the directors, executive officers and other management personnel of the Company or any direct or indirect parent of the Company on the Issue Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Company or any direct or indirect parent of the Company was approved by a vote of a majority of the directors of the Company or any direct or indirect parent of the Company, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved and (2) executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Company or any direct or indirect parent of the Company.

"*Material Real Property*" means, on any date, any real property owned (but excluding leases) by the Issuer or any Guarantor with a fair market value as of such date in excess of $1.0 million.

"*Moody's*" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"*Net Income*" means, with respect to any Person, the Net Income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to <u>Section 4.06(b)(i)</u>) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Note Documents*" means (a) the Notes, the Guarantees, the Security Documents and this Indenture and (b) any other related document or instrument executed and delivered pursuant to any Note Document described in clause (a) evidencing or governing any Obligations thereunder.

17

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; provided that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"*Obligor*" means the Company, the Issuer or a Guarantor.

"*Officer*" of any Person means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person or any other person that the board of directors of such person shall designate for such purpose.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by two Officers of the Company or of a Subsidiary or parent of the Company that is designated by the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer, the principal accounting officer or similar position of the Company or such Subsidiary or parent that meets the requirements set forth in this Indenture and is in form and substance satisfactory to the Trustee.

"*Opinion of Counsel*" means a written opinion addressed to the Trustee from legal counsel in form and substance satisfactory to the Trustee. The counsel may be an employee of or counsel to the Company.

"*Permitted Holders*" means, at any time, each of (i) the Emergence Date Holders[4], (ii) the Management Group and (iii) any Person acting in the capacity of an underwriter in connection with a public or private offering of Capital Stock of the Company or any of its Affiliates. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"*Permitted Investments*" means:

(1)     any Investment in the Company or any Restricted Subsidiary;

(2)     any Investment in Cash Equivalents or Investment Grade Securities;

(3)     any Investment by the Company or any Restricted Subsidiary in a Person, including in the Equity Interests of such Person, if as a result of such Investment (a) such Person becomes a Restricted Subsidiary or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or Substantially All of its assets to, or is liquidated into, the Company or a Restricted Subsidiary;

(4)     any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the

_____

[4] NTD: To discuss changes to permit equity trading.

Issue Date; provided that the amount of any such Investment only may be increased as required by the terms of such Investment as in existence on the Issue Date;

(6)     advances to officers, directors or employees, taken together with all other advances made pursuant to this clause (6), not to exceed the greater of $[  ] million and [  ]% of Total Assets (determined at the time of such advances);

(7)     any Investment acquired by the Company or any of the Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, (b) as a result of a foreclosure by the Company or any Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default, (c) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates or (d) in settlement of debts created in the ordinary course of business;

(8)     Hedging Obligations permitted under Section 4.03(b)(x);

(9)     any Investment by the Company or any Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of $[  ] million or [  ]% of Total Assets (determined at the time of such Investment and with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); provided, however, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10)     additional Investments by the Company or any Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding (after giving effect to the sale or other transfer of an Unrestricted Subsidiary to the extent the proceeds of such sale received by the Company and the Restricted Subsidiaries consists of cash and Cash Equivalents), not to exceed the greater of $[  ] million and [  ]% of Total Assets (determined at the time of such Investment and with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); provided, however, that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11)     loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such person's purchase of Equity Interests of the Company or any direct or indirect parent of the Company;

(12)     Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; provided, however,

that such Equity Interests will not increase the amount available for Restricted Payments under clauses (2) and (3) of the definition of Cumulative Credit;

(13)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 4.07(c) (except transactions described in clauses (ii), (vi), (vii) and (xi)(B) of Section 4.07(c));

(14)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15)    guarantees issued in accordance with Section 4.03 and Section 4.11;

(16)    Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(17)    [reserved];

(18)    any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(19)    [reserved];

(20)    Investments of a Restricted Subsidiary acquired after the Issue Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(21)    guarantees by the Company or any Restricted Subsidiaries of operating leases (other than Capitalized Lease Obligations), trademarks, licenses, purchase agreements or of other obligations that do not constitute Indebtedness, in each case entered into by the Company or any Restricted Subsidiary in the ordinary course of business consistent with past practice;

(22)    pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) that are otherwise a Permitted Lien or made in connection with a Permitted Lien; and

(23)    any Indebtedness permitted under Section 4.03(b)(xxv).

        "*Permitted Liens*" means, with respect to any Person:

(1)    pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or US government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

20

(2)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue by more than 60 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)     Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for non-payment or which are being contested in good faith by appropriate proceedings and for which there are adequate reserves set aside in accordance with GAAP or the non-payment of which in the aggregate would not reasonably be expected to have a material adverse effect on the Company and the Restricted Subsidiaries taken as a whole;

(4)     Liens (i) required by any regulatory or government authority or (ii) in favor of the Company of performance and surety bonds or bid bonds or letters of credit or completion guarantees issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties Incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and which do not in the aggregate materially impair the operation of the business of such Person;

(6)     (i) Liens securing an aggregate principal amount of Indebtedness not to exceed the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Leverage Ratio of the Company to exceed [ ] to 1.00, and Liens securing guarantees of such Indebtedness; (ii) Liens securing Indebtedness Incurred pursuant to <u>Section 4.03(b)(i)</u> and Liens securing guarantees of such Indebtedness; (iii) Liens securing Indebtedness Incurred pursuant to <u>Section 4.03(b)(iv)</u> and Liens securing guarantees of such Indebtedness; provided, however, with respect to Liens permitted by this clause (iii), such Lien shall be limited to the assets being financed and assets and property affixed or appurtenant thereto and (iv) Liens securing Indebtedness Incurred pursuant to <u>Section 4.03(b)(xxvi)</u>;

(7)     Liens existing on the Issue Date (other than Liens described in clause (6));

(8)     Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; provided further, however, that such Liens shall be limited to all or part of the same property (including any after acquired property to the extent it would have been subject to a Lien in respect of the arrangements under which such Liens arose) that secured the obligations to which the original Liens relate (plus improvements on such property);

(9)     Liens on assets or property at the time the Company or a Restricted Subsidiary acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; provided further, however, that the Liens shall be limited to all or part of the same property (including any after acquired property to the extent it would have been subject to a Lien in respect of the arrangements under which such Liens arose) that secured the obligations to which the original Liens relate (plus improvements on such property);

21

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be Incurred in accordance with Section 4.03;

(11)    Liens securing Hedging Obligations not Incurred in violation of this Indenture;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)    leases, subleases, licenses and sublicenses of real property which do not materially interfere with the ordinary conduct of the business of the Company or any Restricted Subsidiaries;

(14)    Liens on assets or property of the Company or any Restricted Subsidiary securing the Notes or any Guarantees;

(15)    Liens in favor of the Company or any Guarantor;

(16)    [reserved];

(17)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(18)    Liens on the Equity Interests of Unrestricted Subsidiaries and on the Equity Interests of joint ventures securing obligations of such joint ventures;

(19)    grants of software and other technology licenses in the ordinary course of business;

(20)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in clauses (6), (7), (8), (9) and (20); provided, however, that (x) such new Lien shall be limited to all or part of the same property (including any after acquired property to the extent it would have been subject to a Lien in respect of the Indebtedness being refinanced, refunded, extended, renewed or replaced) that secured the original Lien as in effect immediately prior to the refinancing, refunding, extension, renewal or replacement of the Indebtedness secured by such Lien (plus improvements on such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9) and (20) at the time the original Lien became a Permitted Lien under this Indenture and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement and (z) such new Lien shall not have priority over, rank ahead of, or otherwise be senior pursuant to any intercreditor agreement to the original Lien securing the Indebtedness being refinanced, refunded, extended, renewed or replaced; provided further, however, that in the case of any Liens to secure any refinancing, refunding, extension, renewal or replacement of Indebtedness secured by a Lien referred to in any of clauses (6), (7), (8) or (9), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension, renewal or replacement shall be deemed secured by a Lien under such original clause and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause 6(i);

(21)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

22

(22)    judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24)    Liens arising by virtue of any statutory or common law provisions relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(25)    any interest or title of a lessor under any Capitalized Lease Obligation;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)    Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(28)    Other Liens securing obligations Incurred in the ordinary course of business which obligations do not exceed $[  ] million at any time outstanding;

(29)    Liens arising from Uniform Commercial Code filings regarding operating leases entered into by the Company and the Restricted Subsidiaries in the ordinary course of business;

(30)    Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents;

(31)    Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets prior to completion; and

(32)    Liens securing the First Lien Obligations, subject to the Intercreditor Agreement.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution or winding-up.

"*Public Debt*" means any Indebtedness consisting of bonds, debentures, notes or other similar debt securities issued in (a) a public offering registered under the Securities Act or (b) a private placement to institutional investors that is underwritten for resale in accordance with Rule 144A or Regulation S of such Act, whether or not it includes registration rights entitling the holders of such debt securities to registration thereof with the SEC. The term "Public Debt" (i) shall not include the Notes and (ii) for the avoidance of doubt, shall not be construed to include any Indebtedness issued to institutional investors in a direct placement of such Indebtedness that is not underwritten by an intermediary (it being understood that, without limiting the foregoing, a financing that is distributed to not more than 10 Persons (provided that multiple managed accounts and affiliates of any such Persons shall be treated as one Person for the purposes of this definition) shall be deemed not to be underwritten), or any commercial bank or similar

23

Indebtedness, Capitalized Lease Obligation or recourse transfer of any financial asset or any other type of Indebtedness Incurred in a manner not customarily viewed as a "securities offering."

"*Rating Agency*" means (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Notes for reasons outside of the Company's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Company or any direct or indirect parent of an Company as a replacement agency for Moody's or S&P, as the case may be.

"*Registration Rights Agreement*" means the Registration Rights Agreement related to the Notes, dated as of the Issue Date, among the Issuer, the Guarantors and the Initial Purchasers, as such agreement may be amended, modified or supplemented from time to time, and, with respect to any Additional Notes, one or more registration rights agreements between the Issuer and the other parties thereto, as such agreement(s) may be amended, modified or supplemented from time to time, relating to rights given by the Issuer to the purchasers of Additional Notes to register such Additional Notes under the Securities Act.

"*Representative*" means the trustee, agent or representative (if any) for any Indebtedness; provided that if, and for so long as, any Indebtedness lacks such a Representative, then the Representative for such Indebtedness shall at all times constitute the holder or holders of a majority in outstanding principal amount of obligations under such Indebtedness.

"*Restricted Cash*" means cash and Cash Equivalents held by the Company or any Restricted Subsidiaries that are contractually restricted from being distributed or otherwise paid to the Company or not available for general corporate purposes, except for such restrictions that are contained in agreements governing Indebtedness permitted under this Indenture.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company.

"*Sale/Leaseback Transaction*" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary or between Restricted Subsidiaries.

"*S&P*" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Indebtedness*" means any Indebtedness secured by a Lien.

"*Secured Leverage Ratio*" means, with respect to any Person at any date, the ratio of (i) Secured Indebtedness of such Person less the amount of Cash Equivalents in excess of any Restricted Cash that would be stated on the balance sheet of such Person and its Restricted Subsidiaries and held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding the

Secured Leverage Calculation Date (as defined below). In the event that such Person or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Secured Indebtedness subsequent to the commencement of the period for which the Secured Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Leverage Ratio is made (the "*Secured Leverage Calculation Date*"), then the Secured Leverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Secured Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; provided, however, that the Company may elect pursuant to an Officers' Certificate delivered to the Trustee to treat all or any portion of the commitment under any Secured Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Secured Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

Four purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business and any operational changes that the Company or any of the Restricted Subsidiaries have determined to make or have made during the four quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date (each for purposes of this definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Secured Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently becomes a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change, in each case with respect to an operating unit or business, that would have required adjustment pursuant to this definition, then the Secured Leverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officers' Certificate, to reflect operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event.

"*Securities Act*" means the US Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Agreement*" means that certain Security Agreement, dated as of the Issue Date, in substantially the form attached as Exhibit C hereto, among the Collateral Agent, the Company and the Guarantors, as the same may be amended or supplemented from time to time.

"*Security Documents*" means, collectively, the Intercreditor Agreement, the Security Agreement, each Mortgage, each pledge agreement and each document or other instrument (other than this Indenture) creating or purporting to create Liens in favor of the Collateral Agent, in each case, as the same may be amended or supplemented from time to time.

25

"*Senior Indebtedness*" means, with respect to any Person, (a) Indebtedness of such Person, whether outstanding on the Issue Date or thereafter Incurred and (b) all other Obligations of such Person (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person whether or not post-filing interest is allowed in such proceeding) in respect of Indebtedness described in clause (a), unless, in the case of clauses (a) and (b), in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such Indebtedness or other Obligations in respect thereof are subordinate in right of payment to the Notes or the Guarantee of such Person, as the case may be; provided, however, that Senior Indebtedness shall not include:

(1)      any obligation of such Person to the Company or any Subsidiary of the Company;

(2)      any liability for national, state, local or other taxes owed or owing by such Person;

(3)      any accounts payable or other liability to trade creditors arising in the ordinary course of business (including guarantees thereof (other than by way of letter of credit, bank guarantee, performance or other bond, or other similar obligation) or instruments evidencing such liabilities);

(4)      any Capital Stock;

(5)      any Indebtedness or other Obligation of such Person which is subordinate or junior in right of payment to any other Indebtedness or other Obligation of such Person; or

(6)      that portion of any Indebtedness which at the time of Incurrence is Incurred in violation of this Indenture.

"*Senior Secured First Lien Leverage Ratio*" means, with respect to any Person at any date, the ratio of (i) Senior Secured First Lien Indebtedness less the amount of Cash Equivalents in excess of any Restricted Cash that would be stated on the balance sheet of such Person and its Restricted Subsidiaries and held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding the Senior Secured First Lien Leverage Calculation Date (as defined below). In the event that such Person or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Senior Secured First Lien Indebtedness subsequent to the commencement of the period for which the Senior Secured First Lien Leverage Ratio is being calculated but prior to the event for which the calculation of the Senior Secured First Lien Leverage Ratio is made (the "*Senior Secured First Lien Leverage Calculation Date*"), then the Senior Secured First Lien Leverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Senior Secured First Lien Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; provided, however, that the Company may elect pursuant to an Officers' Certificate delivered to the Trustee to treat all or any portion of the commitment under any Senior Secured First Lien Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Senior Secured First Lien Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

Four purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business and any operational changes that the Company or any of the Restricted Subsidiaries have determined to make or have made during the four quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Senior Secured First Lien Leverage Calculation Date (each for purposes of this

26

definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Senior Secured First Lien Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently becomes a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change, in each case with respect to an operating unit or business, that would have required adjustment pursuant to this definition, then the Senior Secured First Lien Leverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officers' Certificate, to reflect operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event.

"*Significant Subsidiary*" means any Restricted Subsidiary that meets any of the following conditions:

(1)     the Company's and the Restricted Subsidiaries' investments in and advances to the Restricted Subsidiary exceed 10% of the total assets of the Company and the Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year;

(2)     the Company's and the Restricted Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Restricted Subsidiary exceeds 10% of the total assets of the Company and the Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

(3)     the Company's and the Restricted Subsidiaries' equity in the income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle of the Restricted Subsidiary exceeds 10% of such income of the Company and the Restricted Subsidiaries on a consolidated basis for the most recently completed fiscal year.

"*Similar Business*" means (a) any businesses, services or activities engaged in by the Company or any of its Subsidiaries on the Issue Date and (b) any businesses, services and activities engaged in by the Company or any of its Subsidiaries that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the Company unless such contingency has occurred).

"*Subordinated Indebtedness*" means (a) with respect to the Company, any Indebtedness of the Company which is by its terms subordinated in right of payment to the Notes and (b) with respect to any

27

Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to its Guarantee.

"*Subsidiary*" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Subsidiary Guarantor*" means each Guarantor that is a Subsidiary of the Company.

"*Substantially All*" when used in relation to assets, means assets of the relevant entity or entities having a market value of at least 75% of the market value of all of the assets of such entity or entities at the date of the relevant transactions.

"*Tax Distributions*" means any distributions described in Section 4.04(b)(xii).

"*Taxes*" means all present and future taxes, levies, imposts, deductions, charges, duties and withholdings and any charges of a similar nature (including interest, penalties and other liabilities with respect thereto) that are imposed by any government or other taxing authority.

"*Total Assets*" means the total consolidated assets of the Company and the Restricted Subsidiaries, as shown on the most recent balance sheet of the Company.

"*Treasury Rate*" (as determined by the Company) means, with respect to the Notes, as of any redemption date, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the date the redemption notice is mailed (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to [  ]; provided, however, that if the period from the redemption date to such date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Officer*" means any officer within the corporate trust department of the Trustee, including any managing director, vice president, senior associate or any other officer of the Trustee (1) who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and (2) who shall have direct responsibility for the administration of this Indenture.

"*Trustee*" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"*Trust Indenture Act*" or "*TIA* " means the Trust Indenture Act of 1939, as amended and as in effect on the date hereof.

"*Unrestricted Subsidiary*" means:

(1)     any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of the Company in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

provided, however, that the Issuer shall not be an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; provided, however, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of the Restricted Subsidiaries; provided further, however, that either:

(a)     the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b)     if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided, however, that immediately after giving effect to such designation:

(x)     (1) the Company could Incur $1.00 of additional Indebtedness pursuant to Section 4.03(a) or (2) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation; and

(y)     no Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*US Controlled Foreign Subsidiary*" means any Person that (A)(i) is a Foreign Subsidiary and (ii) is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and the US Treasury Regulations thereunder or (B)(i) is a Domestic Subsidiary and

(ii) has no material assets other than securities of one or more Foreign Subsidiaries (which are "controlled foreign corporations" within the meaning of Section 957(a) of the Code and the US Treasury Regulations thereunder) of such Domestic Subsidiary and indebtedness issued by such Foreign Subsidiaries.

29

"*US Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. Dollars, at any time for determination thereof by the Company or the Trustee, the amount of U.S. Dollars obtained by converting such currency other than U.S. Dollars involved in such computation into U.S. Dollars at the spot rate for the purchase of U.S. Dollars with the applicable foreign currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if The Wall Street Journal is no longer published, or if such information is no longer available in The Wall Street Journal, such source as may be selected in good faith by the Company) on the date of such determination.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness or Disqualified Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"*Wholly Owned Restricted Subsidiary*" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or other similar shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

SECTION 1.02    Other Definitions.

|  | Defined in Section |
| --- | --- |
| "Additional Amounts" | 10.08(a) |
| "Additional Notes" | Preamble |
| "Affiliate Transaction" | 4.07(a) |
| "Asset Sale Offer" | 4.06(b) |
| "Authentication Order" | 2.03 |
| "Bankruptcy Laws" | 6.01 |
| "Change of Control Offer" | 4.08(c) |
| "Change of Control Payment" | 4.08(c) |
| "Change of Control Payment Date" | 4.08(c) |
| "Company" | 2.04(b) |
| "Consolidation" | 5.01(b) |
| "covenant defeasance option" | 8.01 |
| "Custodian" | 6.01 |
| "Definitive Security" | Appendix A |
| "Depositary" | Appendix A |
| "Directive" | 10.08(a) |
| "DTC" | Appendix A |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.06(b) |
| "Exchange Notes" | Appendix A |

30

"Exchange Offer Registration Statement" ........................................................ Appendix A
"Global Securities Legend" .......................................................................... Appendix A
"Global Securities" ..................................................................................... Appendix A
"Guaranteed Obligations" ............................................................................ 10.01(a)
"Indenture" ................................................................................................ Preamble
"Initial Paying Agent" ................................................................................. 2.04(a)
"legal defeasance option" ............................................................................ 8.01
"Notes" ..................................................................................................... Preamble
"Offer Period" ............................................................................................ 4.06(e)
"Original Notes" .......................................................................................... Preamble
"Paying Agent" ........................................................................................... 2.04(a)
"Payor" ..................................................................................................... 10.08(a)
"Permitted Debt" ......................................................................................... 4.03(b)
"protected purchaser" ................................................................................... 2.08
"Purchase Agreement" ................................................................................. Appendix A
"QIB" ........................................................................................................ Appendix A
"Refinancing Indebtedness" .......................................................................... 4.03(b)
"Refunding Capital Stock" ............................................................................ 4.04(b)
"Registered Exchange Offer" ........................................................................ Appendix A
"Registrar" ................................................................................................. 2.04(a)
"Regulation S" ............................................................................................ Appendix A
"Regulation S Securities" .............................................................................. Appendix A
"Relevant Taxing Jurisdiction" ..................................................................... 10.08(a)
"Restricted Payments" .................................................................................. 4.04(a)
"Retired Capital Stock" ................................................................................ 4.04(b)
"Rule 144A" ............................................................................................... Appendix A
"Rule 144A Securities" ................................................................................ Appendix A
"Second Commitment" ................................................................................. 4.06(b)
"Shelf Registration Statement" ..................................................................... Appendix A
"Successor Holding Company" ...................................................................... 5.01(a)
"Successor Guarantor" .................................................................................. 5.01(b)
"Successor Issuer" ....................................................................................... 5.01(c)
"Suspended Covenants" ................................................................................ 4.19(a)
"Transfer Agent" ......................................................................................... 2.04(a)
"Transfer Restricted Securities" ..................................................................... Appendix A

SECTION 1.03   <u>Rules of Construction</u>. Unless the context otherwise requires:

(a)      a term has the meaning assigned to it;

(b)      an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)      "or" is not exclusive;

(d)      "including" means including without limitation;

(e)      words in the singular include the plural and words in the plural include the singular;

01:21244188.1

(f)      the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(g)      the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(h)      unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(i)      [Reserved];

(j)      unless otherwise specified herein, references to any Person shall be to it and any successor in interest thereto;

(k)      references to sections of, or rules under, the Securities Act or Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(l)      unless the context otherwise requires, any reference to an "Article," "Section" or "clause" refers to an Article, Section or clause, as the case may be, of this Indenture; and

(m)      the words "herein," "hereof" and "hereunder" and any other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision.

## ARTICLE II

### The Notes

SECTION 2.01    Amount of Notes. The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Issue Date is $[35.0] million. All Original Notes shall be substantially identical except as to denomination.

The Issuer may from time to time after the Issue Date issue Additional Notes under this Indenture in an unlimited principal amount, so long as (i) the Incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Section 4.03 and (ii) such Additional Notes are issued in compliance with Section 4.12 and the other applicable provisions of this Indenture. With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.07, 2.08, 2.09, 2.10, 4.06(g), 4.08(c) or Appendix A), there shall be (a) established in or pursuant to a resolution of the Board of Directors of the Issuer and (b) (i) set forth or determined in the manner provided in an Officers' Certificate or (ii) established in one or more indentures supplemental hereto, prior to the issuance of such Additional Notes:

(1)      the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture;

(2)      the issue price and issuance date of such Additional Notes, including the date from which interest on such Additional Notes shall accrue;

(3)      if applicable, that such Additional Notes shall be issuable in whole or in part in the form of one or more Global Securities and, in such case, the respective depositaries for such Global Securities, the form of any legend or legends which shall be borne by such Global Securities in addition to or in lieu of those set forth in Exhibit A hereto and any circumstances in addition to or in lieu of those set forth in Section 2.3 of Appendix A in which any such Global Security may be exchanged in whole or in part for Additional Notes registered, or any transfer of such Global Security in whole or in part may be registered, in the name or names of Persons other than the depositary for such Global Security or a nominee thereof; and

(4)      whether such Additional Notes shall be Original Notes or shall be issued in the form of Exchange Notes as set forth in Exhibit A.

If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors of the Issuer, a copy of an appropriate record of such action shall be certified by an Officer or authorized signatory of the Issuer and delivered to the Trustee at or prior to the delivery of the Officers' Certificate or the indenture supplemental hereto setting forth the terms of the Additional Notes.

The Notes shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase.

SECTION 2.02   Form and Dating. Provisions relating to the Notes and the Exchange Notes are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The Notes and the Trustee's certificate of authentication (if issued as Transfer Restricted Securities) and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Exchange Notes shall be in substantially the form of Exhibit A hereto, as applicable, except that the Exchange Notes shall not contain the "Restricted Securities Legend", as set forth in Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or any Guarantor is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. The Notes shall be issuable only in registered form without interest coupons and in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. The Global Securities shall be in registered form without interest coupons and the Definitive Securities shall be in registered form without interest coupons. Each Global Security shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Security" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Security to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Registrar, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.03 hereof.

33

SECTION 2.03    Execution and Authentication. The Trustee shall authenticate and in the case of a Global Security registered in the name of DTC or its nominee, hold such Global Security as custodian for DTC upon a written order of the Issuer signed by an Officer or authorized signatory of the Issuer (an "*Authentication Order*") (a) Original Notes for original issue on the date hereof in an aggregate principal amount of $[35.0] million and(b) pursuant to an Exchange Offer, Exchange Notes from time to time for issue only in a Registered Exchange Offer for a like principal amount of Original Notes. Such order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

One Officer or authorized signatory of the Issuer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer or authorized signatory whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Note. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.04    Registrar and Paying Agent. (a)  The Issuer shall maintain (i) a paying agent (the "*Paying Agent*") for the Notes in the United States where Notes may be presented for payment, (ii) one or more registrars (each, a "*Registrar*") and (iii) a transfer agent (the "*Transfer Agent*") in the United States where the Notes may be presented for registration of transfer or for exchange. The Issuer may have one or more additional co-registrars and one or more additional paying agents. The term "*Registrar*" includes the Registrar and any additional co-registrars. The term "*Paying Agent*" includes the Initial Paying Agent and any additional paying agents. The initial Paying Agent shall be Wilmington Trust FSB, in the United States (the "*Initial Paying Agent*"). The initial Registrar shall be Wilmington Trust FSB. The initial Transfer Agent shall be Wilmington Trust FSB, in the United States. Each hereby accepts such appointments. The Transfer Agent shall facilitate transfers of Definitive Securities on behalf of the Issuer. The Transfer Agent shall perform the functions of a transfer agent.

(b)      The Issuer may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such Agent. The Issuer shall notify the Trustee of the name and address of any such Agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06. UCI Acquisition Holdings (No. 1) Corp., a Delaware corporation and the direct parent of the Issuer (the "*Company*"), or any of its Subsidiaries may act as Registrar or, provided that such Subsidiaries are located in the United States, Paying Agent (other than with respect to Global Securities).

(c)      The Issuer may change any Registrar, Paying Agent or Transfer Agent upon written notice to such Registrar, Paying Agent or Transfer Agent and to the Trustee, without prior notice to Holders; provided, however, that no such removal shall become effective until acceptance of an

34

appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent as the case may be, and delivered to the Trustee and provided, further, that in all circumstances the Paying Agent will be located in the United States. The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee in accordance with Section 7.07.

SECTION 2.05    Paying Agent to Hold Money. At least one Business Day prior to each due date of the principal of and interest on any Note, the Issuer shall deposit with the Paying Agent (or if the Company or any of its Subsidiaries is acting as Paying Agent, segregate and hold for the benefit of the Persons entitled thereto) a sum in immediately available funds sufficient to pay such principal and interest when so becoming due. The Issuer shall require each Paying Agent to agree in writing (and the Initial Paying Agent hereby agrees) that such Paying Agent shall hold for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. If the Company or any of its Subsidiaries acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it for the benefit of the Persons entitled thereto. The Issuer at any time may require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent. Upon complying with this Section 2.05, the Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06    Holder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each payment date on the Notes and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

SECTION 2.07    Transfer and Exchange. The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A. When a Note is presented to the Registrar with a request to register a transfer, the Registrar shall register the transfer as requested if its requirements therefor are met. To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Notes at the Registrar's request. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section 2.07. The Issuer shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Prior to registration of transfer of any Note, the Issuer, the Guarantors, the Trustee, the Paying Agent, the Transfer Agent and the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, any Guarantor, the Trustee, the Paying Agent, the Transfer Agent or the Registrar shall be affected by notice to the contrary.

Any Holder of a beneficial interest in a Global Security shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Security may be effected only through a book-entry system maintained by (a) the Holder of such Global Security (or its agent) or (b) any Holder of a beneficial interest in such Global Security, and that ownership of a beneficial interest in such Global Security shall be required to be reflected in a book entry.

35

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

SECTION 2.08    Replacement Notes. If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the Holder (a) satisfies the Issuer or the Trustee within a reasonable time after such Holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other requirements of the Trustee. If required by the Trustee or the Issuer, such Holder shall provide an indemnity or security sufficient in the judgment of the Trustee or the Issuer to protect the Issuer, the Trustee, the Paying Agent, the Transfer Agent and the Registrar from any loss that any of them may suffer if a Note is replaced. The Issuer, the Registrar and the Trustee may charge the Holder for their expenses in replacing a Note (including attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09    Outstanding Notes. Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by the Registrar or any Agent in accordance with this Indenture, those delivered to it for cancellation and those described in this Section 2.09 as not outstanding. Subject to Section 12.04, a Note does not cease to be outstanding because the Issuer or any Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser.

A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If the Paying Agent holds, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and the Paying Agent is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) shall cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10    Temporary Notes. In the event that Definitive Securities are to be issued under the terms of this Indenture, until such Definitive Securities are ready for delivery, the Issuer may prepare and the Trustee or an agent thereof shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Securities but may have variations that the Issuer considers

36

appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee or an agent thereof shall authenticate Definitive Securities and the Registrar and the Agents shall make them available for delivery in exchange for temporary Notes upon surrender of such temporary Notes at the office or agency of the Issuer, without charge to the Holder. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as Definitive Securities.

SECTION 2.11    Cancellation. The Issuer at any time may deliver Notes to the Registrar for cancellation. The Paying Agent shall forward to the Registrar any Notes surrendered to it for registration of transfer, exchange or payment. The Registrar and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures upon receipt of written instructions from the Issuer. The Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Registrar for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.12    Defaulted Interest. If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (plus interest on such defaulted interest to the extent lawful) in any lawful manner. The Issuer may pay the defaulted interest to the Persons who are Holders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly deliver or cause to be delivered to each affected Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13    CUSIPs, Common Codes, ISINs, etc. The Issuer in issuing the Notes may use CUSIPs, ISINs and Common Codes, as applicable and, if so, the Trustee shall use CUSIPs, ISINs and Common Codes, as applicable in notices of redemption as a convenience to Holders; provided, however, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption, that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall advise the Trustee and each Agent of any change in the CUSIPs, ISINs and Common Codes.

SECTION 2.14    Calculation of Principal Amount of Notes. The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of the Holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the Holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09 and Section 12.04 of this Indenture. Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.15    Currency. The US Dollar is the sole currency of account and payment for all sums payable by the Issuer or any Guarantor under or in connection with the Notes, including damages. Any amount with respect to the Notes received or recovered in a currency other than US Dollars, whether as a result of, or the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or any Guarantor or otherwise by any noteholder or by the Trustee, in respect of any sum expressed to be due to it from the Issuer or any Guarantor will only constitute a discharge to the Issuer or any Guarantor to the extent of the US Dollar amount which the

37

recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

If that US Dollar amount is less than the US Dollar amount expressed to be due to the recipient or the Trustee under any Note, the Issuer and any Guarantor will indemnify such recipient and/or the Trustee against any loss sustained by it as a result. In any event, the Issuer and any Guarantor will indemnify the recipient and/or Trustee against the cost of making any such purchase. For the purposes of this currency indemnity provision, it will be prima facie evidence of the matter stated therein for the holder of a Note or the Trustee to certify in a manner satisfactory to the Issuer (indicating the sources of information used) the loss it Incurred in making any such purchase. These indemnities constitute a separate and independent obligation from the Issuer and any Guarantor's other obligations, will give rise to a separate and independent cause of action, will apply irrespective of any waiver granted by any holder of a Note or the Trustee (other than a waiver of the indemnities set out herein) and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or to the Trustee.

Except as otherwise specifically set forth herein, for purposes of determining compliance with any US Dollar-denominated restriction herein, the US Dollar Equivalent amount for purposes hereof that is denominated in a non-US Dollar currency shall be calculated based on the relevant currency exchange rate in effect on the date such non-US Dollar amount is Incurred or made, as the case may be.

ARTICLE III

Redemption

SECTION 3.01    Redemption. The Notes may be redeemed, in whole or in part, from time to time, subject to the conditions and at the redemption prices set forth in Section 5 of the form of Note set forth in Exhibit A, which is hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest and premiums (if any) to the redemption date.

SECTION 3.02    Applicability of Article. Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by the Notes or any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03    Notices to Trustee. If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 5 of the form of Note, the Issuer shall notify the Trustee in writing of (i) the paragraph of such Note and/or the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date and the record date, (iii) the principal amount of the Notes to be redeemed and (iv) the redemption price. The Issuer shall give notice to the Trustee provided for in this paragraph at least 30 days but not more than 60 days before the applicable redemption date, unless a shorter period is acceptable to the Trustee. Such notice shall be accompanied by an Officers' Certificate and Opinion of Counsel from the Issuer to the effect that such redemption complies with the conditions herein. If fewer than all of the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee. Any such notice may be canceled at any time prior to notice of such redemption being delivered to any Holder and shall thereby be void and of no effect.

SECTION 3.04    Selection of Notes to Be Redeemed. If less than all of the Notes are to be redeemed, the Trustee will select Notes for redemption on a pro rata basis, to the extent practicable and

38

in compliance with the requirements of DTC and any stock exchange on which the applicable Notes are then admitted to trading of which the Trustee shall have been notified in writing by the Issuer; provided, however, that no Note of $2,000 in aggregate principal amount or less, or other than in an integral multiple of $1,000 in excess thereof, shall be redeemed in part.

SECTION 3.05   Notice of Optional Redemption. (a) At least 30 days but not more than 60 days before a redemption date pursuant to Section 5 of the form of Note, the Issuer shall deliver or cause to be delivered by electronic transmission or mailed by first-class mail, postage prepaid, at their respective addresses as they appear on the registration books of the Registrar (or otherwise deliver such notice in accordance with applicable DTC procedures), a notice of redemption to each Holder whose Notes are to be redeemed; provided, however, that with respect to Definitive Securities only, the Issuer shall mail such notice to Holders by first-class mail, postage prepaid, at their respective addresses as they appear on the registration books of the Registrar.

Any such notice shall identify the Notes to be redeemed and shall state:

(i)      the redemption date and record date;

(ii)      the redemption price and the amount of accrued interest to the redemption date as calculated by the Issuer or an agent or adviser thereof;

(iii)      the name and address of the Paying Agent;

(iv)      the Notes called for redemption must be surrendered to the Paying Agent (or, if book-entry, in accordance with DTC procedures) to collect the redemption price, plus accrued interest;

(v)      if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi)      that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on the Notes (or a portion thereof) called for redemption ceases to accrue on and after the redemption date;

(vii)      the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(viii)      the CUSIP, ISIN and/or the Common Code, if any, printed on the Notes being redeemed; and

(ix)      that no representation is made as to the correctness or accuracy of the CUSIP, ISIN and/or the Common Code, if any, listed in such notice or printed on the Notes.

(b)      At the Issuer's written request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the information required by this Section 3.05 at least one Business Day (or as soon as commercially practicable thereafter) prior to the date such notice is to be provided to Holders and such notice may not be canceled. The Trustee shall use good faith efforts to deliver the notice on the date requested, but if the

39

Issuer requests that the Trustee deliver such notice on less than (i) two Business Days notice at any time when all Notes then outstanding shall be represented by Global Securities or (ii) five Business Days notice at any other time, the Trustee shall have no liability for the failure to deliver the redemption notice to Holders on the date selected by the Issuer.

(c)       If any Note is to be redeemed in part only, the notice of redemption that relates to that Note shall state the portion of the principal amount thereof to be redeemed. In the case of a Definitive Security, a new Note in currency and in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the noteholder thereof upon cancellation of the original Note. In the case of a Global Security, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof. Subject to the terms of the applicable redemption notice, Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest shall cease to accrue on the Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest and premiums (if any) on, the Notes to be redeemed.

SECTION 3.06    Effect of Notice of Redemption. Once notice of redemption is delivered in accordance with Section 3.05, the Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the first sentence of the fourth paragraph in Section 5 of the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, plus accrued interest, to, but not including, the redemption date; provided, however, that if the redemption date is after a regular record date and on or prior to the interest payment date, the accrued interest shall be payable to the Holder of the redeemed Notes registered on the relevant record date. Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.07    Deposit of Redemption Price. With respect to any Notes, no later than 10:00 a.m., New York time, one Business Day prior to the redemption date, the Issuer shall deposit with the Paying Agent (or, if the Company or any of its Subsidiaries is the Paying Agent, shall segregate and hold) money in immediately available funds sufficient to pay the redemption price of and accrued interest on all of the Notes or portions thereof to be redeemed on that date, other than Notes or portions of Notes called for redemption that have been delivered by the Issuer to the Registrar for cancellation. On and after the redemption date, interest shall cease to accrue on the Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest and premiums (if any) on, the Notes to be redeemed. If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with this Section 3.07, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01.

SECTION 3.08    Notes Redeemed in Part. Upon surrender of a Note that is redeemed in part:

(a)       in the case of a Definitive Security, upon cancellation of the Note surrendered, the Issuer shall execute and the Trustee or an authentication agent shall authenticate for the Holder (at the Issuer's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered in the name of such Holder; and

40

(b)      in the case of a Global Security, the Registrar shall make an appropriate notation on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof.

SECTION 3.09    Mandatory Redemption. The Issuer shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.


ARTICLE IV

Covenants

SECTION 4.01    Payment of Notes. The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. An installment of principal of or interest shall be considered paid on the date due if on the Business Day prior to such date the Trustee or the Paying Agent holds as of 10:00 a.m. New York time money in immediately available funds sufficient to pay such principal or interest due for payment on the following Business Day, and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

Wherever in this Indenture, the Notes or any Guarantee there is mentioned, in any context:

(1)      the payment of principal,

(2)      redemption prices or purchase prices in connection with a redemption or purchase of Notes,

(3)      interest, or

(4)      any other amount payable on or with respect to any of the Notes or any Guarantee,

such reference shall be deemed to include payment of Additional Amounts as set forth in Section 10.08 to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

SECTION 4.02    Reports and Other Information.[5] (a)  Notwithstanding that the Company may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Company will file with the SEC (and provide the Trustee and holders of the Notes with copies thereof, without cost to each holder, within 15 days after it files them with the SEC):

---

[5] To be modified to conform to First Lien Facility and as may be required by the holders

41

01:21244188.1

(i)        within the time period specified in the SEC's rules and regulations, annual reports on Form 20-F (or any successor or comparable form applicable to the Company within the time period for non-accelerated filers to the extent such term is applicable to such form) containing the information required to be contained therein (or required in such successor or comparable form); provided, however, that, prior to the filing of the Exchange Offer Registration Statement or the Shelf Registration Statement, as the case may be, such report shall not be required to contain any certification required by any such form or by law;

(ii)       within 60 days after the end of each fiscal quarter, other than the fourth fiscal quarter of any year, the information that would be required by a report on Form 10-Q (or any successor or comparable form applicable to the Company) (which information, if the Company is not required to file reports on Form 10-Q, will be filed on Form 6-K (or any successor or comparable form applicable to the Company)); provided, however, that prior to the filing of the Exchange Offer Registration Statement or the Shelf Registration Statement, as the case may be, such report shall not be required to contain any certification required by any such form or by law; and

(iii)      promptly from time to time after the occurrence of an event required to be reported on Form 8-K (or any successor or comparable form applicable to the Company), the information that would be required by a Form 8-K (or any successor or comparable form applicable to the Company) (which information, if the Company is not required to file reports on Form 8-K will be filed on Form 6-K (or any successor or comparable form applicable to the Company));

*provided, however,* that the Company shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Company will post the reports specified in the first sentence of this paragraph on its website within the time periods that would apply if the Company was required to file those reports with the SEC. In addition, the Company will make available such information to prospective purchasers of Notes, in addition to providing such information to the Trustee and the holders of the Notes, in each case within 15 days after the time the Company would be required to file such information with the SEC if it was subject to Section 13 or 15(d) of the Exchange Act. Notwithstanding the foregoing, the Company may satisfy the foregoing reporting requirements (i) prior to the filing with the SEC of the Exchange Offer Registration Statement, or if the Exchange Offer Registration Statement is not filed within the applicable time limits pursuant to the Registration Rights Agreement, the Shelf Registration Statement, by providing the Trustee and the noteholders with (x) substantially the same information as would be required to be filed with the SEC by the Company on Form 20-F (or any successor or comparable form applicable to the Company) if it was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act within 90 days after the end of the applicable fiscal year and (y) substantially the same information as would be required to be filed with the SEC by the Company on Form 10-Q (or any successor or comparable form applicable to the Company) if it was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act within 60 days after the end of the applicable fiscal quarter and (ii) after filing with the SEC the Exchange Offer Registration Statement, or if the Exchange Offer Registration Statement is not filed within the applicable time limits pursuant to the Registration Rights Agreement, the Shelf Registration Statement, but prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement, by publicly filing with the SEC the Exchange Offer Registration Statement or Shelf Registration Statement, to the extent any such registration statement contains substantially the same information as would be required to be filed by the Company if it was subject to the reporting requirements of Section 13 or 15(d) of the

42

Exchange Act, and by providing the Trustee and the noteholders with such registration statement (and amendments thereto) promptly following the filing with the SEC thereof.

(b)        Notwithstanding the provisions of Sections 4.02(a), the Company will be deemed to have furnished such reports referred to above to the Trustee and the holders of the Notes if the Company has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available.

(c)        So long as any of the Notes remain outstanding and during any period during which the Company is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g 3-2(b) of the Exchange Act, the Company will make available to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered by Rule 144A(d)(4) under the Securities Act.

(d)        Delivery of reports, information and documents to the Trustee under Article IV hereunder is for informational purposes only and the Trustee's receipt or constructive receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on an Officers' Certificate). The Trustee is also not obligated to confirm that the Company has complied with its obligations contained in this Section 4.02 to post such reports and other information on a website.

SECTION 4.03    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock. (a) (i) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Company will not permit any Restricted Subsidiary (other than the Issuer or a Subsidiary Guarantor) to issue any shares of Preferred Stock; provided, however, that the Company may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any Restricted Subsidiary may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four full fiscal quarters for which internal financial statements of the Company are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; provided that the amount of Indebtedness that may be Incurred and Disqualified Stock or Preferred Stock that may be issued pursuant to the foregoing by Restricted Subsidiaries (other than the Issuer or a Subsidiary Guarantor) shall not exceed $[  ] million at any one time outstanding.

(b)        The foregoing limitations will not apply to (collectively, "*Permitted Debt*"):

(i)        the Incurrence by the Company or any Restricted Subsidiary of Indebtedness under the Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof) in an aggregate principal amount not to exceed, at any one time outstanding, the greater of (A) $[  ] million and (B) the maximum amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Senior Secured First Lien Leverage Ratio of the Company to exceed [  ] to 1.00;

43

(ii)     the Incurrence by the Issuer and the Guarantors of Indebtedness represented by the Notes (not including any Additional Notes) and the Guarantees;

(iii)    Indebtedness existing on the Issue Date (other than Indebtedness described in clauses (i) and (ii) of this Section 4.03(b));

(iv)     Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any Restricted Subsidiary, Disqualified Stock issued by the Company or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary to finance (whether prior to or within 270 days after) the purchase, lease, construction or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) and Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that serves to refund, refinance or defease any of the foregoing; provided that the aggregate amount of all Indebtedness outstanding pursuant to this clause (iv) shall not at any time exceed the greater of $[  ] million and [  ]% of Total Assets;

(v)      Indebtedness Incurred by the Company or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(vi)     Indebtedness arising from agreements of the Company and any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii)    Indebtedness of the Company to any Restricted Subsidiary; provided that, except in respect of intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of the Company and the Restricted Subsidiaries, any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Guarantor shall within 90 days of the Issue Date, to the extent legally permitted, be subordinated in right of payment to the obligations of the Issuer under the Notes; provided further, however, that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii)   shares of Preferred Stock of any Restricted Subsidiary issued to the Company or another Restricted Subsidiary; provided that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or a

44

Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (viii);

(ix)    Indebtedness of any Restricted Subsidiary to the Company or another Restricted Subsidiary; provided that except in respect of intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of the Company and the Restricted Subsidiaries, if the Issuer or a Subsidiary Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor, such Indebtedness shall within 90 days of the Issue Date, to the extent legally permitted, be subordinated in right of payment to the Notes or the Guarantee of such Guarantor, as applicable; provided further that any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company, the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (ix);

(x)    Hedging Obligations that are Incurred not for speculative purposes but (A) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (B) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (C) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(xi)    obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or consistent with past practice;

(xii)    (A) any guarantee by the Company or any Restricted Subsidiary of Indebtedness or other obligations of the Company or any Restricted Subsidiary so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary was not in violation of the terms of this Indenture or (B) Indebtedness of the Company or any Restricted Subsidiary arising by reason of any Lien permitted to be granted or to subsist pursuant to Section 4.12 and so long as the Indebtedness secured by such Lien was not incurred in violation of this Indenture;

(xiii)    the Incurrence by the Company or any Restricted Subsidiary of Indebtedness or Disqualified Stock or Preferred Stock of any Restricted Subsidiary, in either case, that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) or clauses (ii), (iii), (xiii) and (xiv) of this Section 4.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premium), defeasance costs and fees in connection therewith (subject to the following proviso, "*Refinancing Indebtedness*") prior to its respective maturity; provided, however, that such Refinancing Indebtedness will be Refinancing Indebtedness if and to the extent it:

(A)    has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred that is not less than the shorter of (1) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (2) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and

45

Preferred Stock being refunded or refinanced that were due on or after the date one year following the last maturity date of any Notes then outstanding were instead due on such date one year following the last date of maturity of the Notes (provided that any Refinancing Indebtedness Incurred in reliance on this subclause (A)(2) does not provide for any scheduled principal payments prior to the maturity date of the Notes in excess of, or prior to, the scheduled principal payments due prior to such maturity for the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced or defeased);

(B)      has a Stated Maturity that is not earlier than the earlier of (1) the Stated Maturity of the Indebtedness being refunded, refinanced or defeased or (2) 91 days following the maturity date of the Notes; and

(C)      refinances (1) Indebtedness junior to the Notes or any Guarantee, such Refinancing Indebtedness is junior to the Notes or the Guarantee of such Guarantor, as applicable, or (2) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, respectively; provided, further, however, that Refinancing Indebtedness will not include (x) Indebtedness of any Restricted Subsidiary that is not the Issuer or a Subsidiary Guarantor that refinances, refunds or defeases Indebtedness of the Company, the Issuer or any Guarantor, or (y) Indebtedness the Company or any Restricted Subsidiary that refinances, refunds or defeases Indebtedness of an Unrestricted Subsidiary;

(xiv)    Indebtedness, Disqualified Stock or Preferred Stock of (A) the Company or a Restricted Subsidiary Incurred to finance an acquisition, merger, consolidation or amalgamation or (B) Persons that constitutes Acquired Indebtedness; provided, however, that after giving effect to such acquisition or merger, consolidation or amalgamation, the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of Section 4.03(a) or the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(xv)     [reserved];

(xvi)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xvii)   Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the First Lien Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xviii)  [reserved];

(xix)    Indebtedness of the Company or any Restricted Subsidiary consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

46

(xx)    Indebtedness Incurred on behalf of, or representing Guarantees of Indebtedness of, joint ventures of the Company or any Restricted Subsidiary not in excess, at any one time outstanding, of the greater of $[  ] million and [  ]% of Total Assets at the time of Incurrence;

(xxi)    Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary and Preferred Stock of the Company or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xxi), does not exceed the greater of $[  ] million and [  ]% of Total Assets at the time of Incurrence (subject to Section 4.03(c), it being understood that any Indebtedness Incurred under this clause (xxi) shall cease to be deemed Incurred or outstanding for purposes of this clause (xxi) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Company or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xxi));

(xxii)    Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary and Preferred Stock of the Company or any Restricted Subsidiary not otherwise permitted hereunder and Refinancing Indebtedness thereof in an aggregate principal amount or liquidation preference not exceeding at any one time outstanding 200.0% of the net cash proceeds received by the Company and the Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company) or cash contributed to the capital of the Company as determined in accordance with clauses (2) and (3) of the definition of "Cumulative Credit" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Restricted Payments pursuant to Section 4.04(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1), (2) and (3) of the definition thereof);

(xxiii)    Indebtedness arising as a result of implementing composite accounting or other cash pooling arrangements involving solely the Company and the Restricted Subsidiaries or solely among Restricted Subsidiaries and entered into in the ordinary course of business and netting, overdraft protection and other arrangements among the Company, any Restricted Subsidiary and a bank arising under standard business terms of such bank at which the Company or any Restricted Subsidiary maintains an overdraft, cash pooling or other similar arrangement;

(xxiv)    Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any of its direct or indirect parent companies to the extent described in Section 4.04(b)(iv);

(xxv)    Indebtedness of the Company or any of its Restricted Subsidiaries consisting of obligations (including guarantees thereof) to repurchase equipment sold to customers or third party leasing companies pursuant to the terms of sale of such equipment in the ordinary course of business;

(xxvi)    without limiting Section 4.03(b)(i), Indebtedness under local overdraft and other local working capital facilities in an aggregate principal amount not to exceed, at any one time outstanding, the greater of $[  ] million and [  ]% of Total Assets at the time of Incurrence; and

47

(xxvii)  Indebtedness in the form of deferred payment obligations under any arrangement permitted by Section 4.04(b)(xii).

Notwithstanding the foregoing, neither the Company, the Issuer nor any Subsidiary Guarantors will Incur any Indebtedness as any Permitted Debt if the proceeds thereof are used, directly or indirectly, to refinance any Subordinated Indebtedness of the Company, the Issuer or any Subsidiary Guarantor unless such Indebtedness shall be subordinated to the Notes or the applicable Guarantee to at least the same extent as such Subordinated Indebtedness.

(c)     For purposes of determining compliance with this Section 4.03:

(i)     in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses 4.03(b)(i) through (xxvii) or is entitled to be Incurred pursuant to Section 4.03(a), the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; provided, however, that (A) Indebtedness Incurred under the First Lien Credit Agreement on the Issue Date shall be deemed to have been Incurred pursuant to Section 4.03(b)(i) and the Company shall not be permitted to reclassify all or any portion of such Indebtedness and (B) the Company shall not be permitted to reclassify all or any portion of any Secured Indebtedness Incurred as Permitted Debt unless at the time of such reclassification the Company could secure such Secured Indebtedness pursuant to clause (6) of the definition of "Permitted Liens;" and

(ii)     the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 4.03(a) and (b) above, and in that connection shall be entitled to treat a portion of such Indebtedness as having been Incurred under Section 4.03(a) and thereafter the remainder of such Indebtedness having been Incurred under Section 4.03(b).

(d)     Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; provided that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

(e)     For purposes of determining compliance with this Section 4.03, the US Dollar Equivalent of the principal amount of Indebtedness denominated in another currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term Indebtedness, or first drawn, in the case of Indebtedness Incurred under a revolving credit facility; provided that (a) if such Indebtedness is Incurred to refinance other Indebtedness denominated in a currency other than US Dollars, and such refinancing would cause the applicable US Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such US Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal

48

amount of such Indebtedness being refinanced; (b) the US Dollar Equivalent of the principal amount of any such Indebtedness outstanding on the Issue Date shall be calculated based on the relevant currency exchange rate in effect on the Issue Date; and (c) if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreements.

(f)       Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Company and the Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

(g)       For all purposes of this Indenture, (1) unsecured Indebtedness will not be treated as subordinated or junior to Secured Indebtedness merely because it is unsecured, (2) Senior Indebtedness will not be treated as subordinated or junior to any other Senior Indebtedness merely because it has junior priority with respect to the same collateral, (3) Indebtedness of such Person which is not guaranteed will not be treated as subordinated or junior to Indebtedness that is guaranteed merely because of such guarantee and (4) Indebtedness under any Secured Indebtedness will not be deemed to be subordinated because of the application of waterfall or other payment-ordering or collateral-sharing provisions affecting any such Secured Indebtedness.

SECTION 4.04   Limitation on Restricted Payments. (a)  the Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly:

(i)       declare or pay any dividend or make any distribution on account of the Company's or any Restricted Subsidiary's Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; (B) dividends or distributions payable to the Company or a Restricted Subsidiary or (C) in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, such dividends or distributions paid to minority shareholders; provided that the Company or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities (except to the extent non-pro rata payments of such dividends or distributions are required by law or under the terms of any agreement in effect on the Issue Date);

(ii)       purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company, in each case held by Persons other than the Company or a Restricted Subsidiary;

(iii)       make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company, the Issuer or any Subsidiary Guarantor (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal

49

installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) any Subordinated Indebtedness between the Company and a Restricted Subsidiary or between Restricted Subsidiaries); or

(iv)     make any Restricted Investment, (all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1)     no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)     immediately after giving effect to such transaction on a pro forma basis, the Company could Incur $1.00 of additional Indebtedness under the provisions of Section 4.03(a); and

(3)     such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and the Restricted Subsidiaries after the Issue Date (and not returned or rescinded) (including Restricted Payments permitted by clauses (i), (iv) (only to the extent of one-half of the amounts paid pursuant to such clause), (vi) and (viii) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)), is less than the amount equal to the Cumulative Credit.

(b)     The provisions of Section 4.04(a) will not prohibit:

(i)     the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture;

(ii)     (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Retired Capital Stock*") of the Company, any direct or indirect parent of the Company or any Restricted Subsidiary in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests or any direct or indirect parent of the Company or contributions to the equity capital of the Company (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Company (collectively, including any such contributions, "*Refunding Capital Stock*"), and (B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Refunding Capital Stock;

(iii)     the redemption, repurchase, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company, the Issuer or any Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Company, the Issuer or a Subsidiary Guarantor which is Incurred in accordance with Section 4.03 so long as:

(A)     the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), plus any accrued and unpaid interest and premiums (if any), of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (plus the amount

50

of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, and any defeasance costs, fees and expenses Incurred in connection therewith);

(B)      such Indebtedness is subordinated to the Notes or the related Guarantee, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value;

(C)      such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (1) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired or (2) 91 days following the maturity date of the Notes; and

(D)      such Indebtedness has a Weighted Average Life to Maturity at the time Incurred that is not less than the shorter of (1) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (2) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date one year following the last maturity date of any Notes then outstanding were instead due on such date one year following the last date of maturity of the Notes (provided that in the case of this subclause (D)(2), such Indebtedness does not provide for any scheduled principal payments prior to the maturity date of the Notes in excess of, or prior to, the scheduled principal payments due prior to such maturity for the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced or defeased);

(iv)      a Restricted Payment to pay for the purchase, repurchase, retirement, defeasance, redemption or other acquisition for value of Equity Interests of the Company or any direct or indirect parent of the Company held by any future, present or former employee, director or consultant of the Company or any direct or indirect parent of the Company or any Subsidiary of the Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; provided, however, that the aggregate Restricted Payments made under this clause (iv) do not exceed $2.5 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over for the two succeeding calendar years subject to a maximum payment (without giving effect to the following proviso) of $[  ] million in any calendar year); provided further, however, that such amount in any calendar year may be increased by an amount not to exceed:

(A)      the cash proceeds received by the Company or any Restricted Subsidiary from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and the Restricted Subsidiaries or any direct or indirect parent of the Company that occurs after the Issue Date (provided that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under clause (2) of the definition of Cumulative Credit); plus

51

(B)    the cash proceeds of key man life insurance policies received by the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) or the Restricted Subsidiaries after the Issue Date;

*provided, however*, that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (A) and (B) above in any calendar year;

(v)    the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any Restricted Subsidiary issued or Incurred in accordance with Section 4.03;

(vi)    (A) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date, (B) a Restricted Payment to any direct or indirect parent of the Company, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Company issued after the Issue Date and (C) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (ii) of this Section 4.04(b); provided, however, that, (1) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a pro forma basis, the Company would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00 and (2) the aggregate amount of dividends declared and paid pursuant to subclauses (A) and (B) of this clause (vi) does not exceed the net cash proceeds actually received by the Company from any such sale or issuance of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

(vii)    Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed the greater of $[  ] million and [  ]% of Total Assets (determined at the time of such Investment and with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(viii)    the payment of dividends on the Company's ordinary shares (or a Restricted Payment to any direct or indirect parent of the Company to fund the payment by such direct or indirect parent of the Company of dividends on such entity's ordinary shares) of up to 6.0% per annum of the net proceeds received the Company from any public offering of ordinary shares of the Company or any of its direct or indirect parents;

(ix)    Restricted Payments that are made up to the aggregate amount of Excluded Contributions;

(x)    other Restricted Payments in an aggregate amount not to exceed $[  ] million;

(xi)    the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Company, the Issuer or a Restricted Subsidiary by, any Unrestricted Subsidiary;

(xii)    Restricted Payments (A) to any direct or indirect parent of the Company in amounts required for such parent to pay national, state or local income taxes (as the case may be) imposed directly on such parent to the extent such income taxes are attributable to the income of the Company and the Restricted Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Company or the Restricted Subsidiaries are members) or (B) to the Company or any of its Affiliates relating to the transfer or surrender, in each case on arm's-length terms, of any tax losses or other tax assets that can be used by the Company or a Restricted Subsidiary;

(xiii)    the payment of dividends, other distributions or other amounts or the making of loans or advances or any other Restricted Payment, if applicable:

(A)    in amounts required for any direct or indirect parent of the Company to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any direct or indirect parent of the Company and general corporate operating and overhead expenses (including, without limitation, compliance and reporting expenses) of any direct or indirect parent of the Company to the extent such fees and expenses are attributable to the ownership or operation of the Company and its Subsidiaries; provided, however, that for so long as such direct or indirect parent owns no material assets other than Equity Interests in the Company or any direct or indirect parent of the Company, such fees and expenses shall be deemed for purposes of this clause (xiii)(A) to be attributable to such ownership or operation;

(B)    in amounts required for any direct or indirect parent of the Company to pay interest and principal on Indebtedness the proceeds of which have been contributed to the Company or any Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company Incurred in accordance with Section 4.03; and

(C)    in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent;

(xiv)    [Restricted Payments owed by the Company or any direct or indirect parent of the Company, as the case may be, or any Restricted Subsidiary to Affiliates for services rendered or goods sold, in each case to the extent permitted by Section 4.07];

(xv)    repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xvi)    [reserved];

(xvii)    payments of cash, or dividends, distributions, advances or other Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

53

(xviii)   the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; provided, however, that all Notes tendered by holders of the Notes in connection with a Change of Control or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value in accordance with the terms of this Indenture; and

(xix)   payments or distributions to dissenting stockholders pursuant to applicable law or in connection with a consolidation, amalgamation, merger or transfer of all or Substantially All of the assets of the Company and the Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; provided that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

*provided, however*, that at the time of, and after giving effect to any Restricted Payment permitted under clauses (x) and (xi) of this Section 4.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)   As of the Issue Date, all of the Company's Subsidiaries will be Restricted Subsidiaries. For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and the Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments". Such designation will only be permitted if a Restricted Payment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary."

SECTION 4.05   Dividend and Other Payment Restrictions Affecting Subsidiaries. (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(i)   (A) pay dividends or make any other distributions to the Company or any Restricted Subsidiary (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits; or (B) pay any Indebtedness owed to the Company or any Restricted Subsidiary;

(ii)   make loans or advances to the Company or any Restricted Subsidiary; or

(iii)   sell, lease or transfer any of its properties or assets to the Company or any Restricted Subsidiary; except in each case for such encumbrances or restrictions existing under or by reason of:

(1)   contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the First Lien Credit Agreement (and any security documents related thereto), local overdraft and other local working capital facilities and contractual encumbrances or restrictions pursuant to customary intercreditor agreements entered into after the Issue Date in connection with the

54

incurrence of additional Secured Indebtedness as contemplated under the First Lien Credit Agreement;

(2)       this Indenture, the Notes, the Guarantees, the Security Documents, any Currency Agreement, any agreement or instrument creating a Hedging Obligation and any other intercreditor agreements;

(3)       applicable law or any applicable rule, regulation or order;

(4)       any agreement or other instrument of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)       contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(6)       any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment;

(7)       restrictions on cash or other deposits or net worth imposed by regulatory authorities (including with respect to tax obligations and value-added taxes), in connection with deductions made for tax, pension, national insurance and other similar purposes or for the benefit of customers under contracts entered into in the ordinary course of business;

(8)       customary provisions in joint venture agreements, similar agreements relating solely to such joint venture and other similar agreements entered into in the ordinary course of business;

(9)       Capitalized Lease Obligations and purchase money obligations for property acquired in the ordinary course of business;

(10)      customary provisions contained in leases (other than financing or similar leases), licenses and other similar agreements entered into in the ordinary course of business;

(11)      [reserved];

(12)      any encumbrance or restriction arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be Incurred subsequent to the Issue Date by Section 4.03 of this Indenture (A) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the holders of the Notes than the encumbrances and restrictions contained in the First Lien Credit Agreement or this Indenture as of the Issue Date (in each case, as determined in good faith by the Company) or

55

(B) if such encumbrance or restriction is not materially more disadvantageous to the holders of the Notes than is customary in comparable financings (as determined in good faith by the Company) and either (x) the Company determines that such encumbrance or restriction will not materially affect the Issuer's ability to make principal or interest payments on the Notes as and when they come due or (y) such encumbrance or restriction applies only if a default occurs in respect of a payment or financial covenant relating to such Indebtedness;

(13)    any encumbrances or restrictions of the type referred to in clause (iii) of <u>Section 4.05(a)</u> above existing by reason of any Lien permitted under <u>Section 4.12</u>;

(14)    any encumbrances or restrictions of the type referred to in clauses (i), (ii) and (iii) of <u>Section 4.05(a)</u> above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; provided, however, that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings taken as a whole are, in the good faith judgment of the Company, no more materially restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; and

(15)    restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business.

(b)    For purposes of determining compliance with this <u>Section 4.05</u>, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on ordinary shares shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of (or remedy bars in respect of) loans or advances made to the Company or a Restricted Subsidiary to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06    <u>Asset Sales</u>. (a)  The Company will not, and will not permit any Restricted Subsidiary to, cause or make an Asset Sale, unless (x) the Company or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; provided, however, that for purposes of clause (y) the amount of:

(i)    any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Notes or any Guarantee) that are assumed by the transferee of any such assets,

(ii)    any notes or other obligations or other securities or assets received by the Company or such Restricted Subsidiary from such transferee that are converted by the Company

56

or such Restricted Subsidiary into cash within 180 days of the receipt thereof (to the extent of the cash received), and

      (iii)     any Designated Non-cash Consideration received by the Company or any Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of $[ ] million and [ ]% of Total Assets (determined at the time of the receipt of such Designated Non-cash Consideration and with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value),

      (iv)     shall be deemed to be Cash Equivalents for the purposes of this clause (y).

      (b)     Within 12 months after the Company or any Restricted Subsidiary's receipt of the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary may apply the Net Proceeds from such Asset Sale, at its option:

      (i)     to repay (A) Obligations constituting Secured Indebtedness (and, if such Indebtedness repaid is under a revolving credit facility, to correspondingly reduce commitments with respect thereto), (B) Obligations constituting Senior Indebtedness (other than Secured Indebtedness) (and, if such Indebtedness repaid is under a revolving credit facility, to correspondingly reduce commitments with respect thereto); provided, however, that if any such Senior Indebtedness described in this clause (B) other than the Notes are repaid with the Net Proceeds of any Asset Sale, the Issuer will equally and ratably reduce Obligations under the Notes through open-market purchases (provided that such purchases are at or above 100% of the principal amount thereof), by optional redemption under this Indenture or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, the pro rata principal amount of Notes or (C) Obligations constituting Indebtedness of a Restricted Subsidiary that is not the Issuer or a Guarantor, in the case of each of clauses (A), (B) and (C), other than Indebtedness owed to the Company or its Affiliates;

      (ii)     to make an investment in any one or more businesses (provided that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary if it is not already a Restricted Subsidiary), assets, or property or capital expenditures (including refurbishments), in each case used or useful in a Similar Business; or

      (iii)     to make an investment in any one or more businesses (provided that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary), properties or assets that replace the properties and assets that are the subject of such Asset Sale.

In the case of Sections 4.06(b)(ii) and (iii), a binding commitment to make an investment described in such sections shall be treated as a permitted application of the Net Proceeds from the date of such commitment; provided, however, that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary enters into another binding commitment (a "*Second Commitment*") within nine months of such cancellation or termination of the prior binding commitment and such Net Proceeds are ultimately applied

to make such an investment; provided, further, however, that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale.

Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the immediately two preceding paragraphs (it being understood that any portion of such Net Proceeds used to make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds". When the aggregate amount of Excess Proceeds exceeds $[  ] million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Issuer, to holders of any Senior Indebtedness of the Issuer or a Guarantor or any other Indebtedness of a Restricted Subsidiary of the Company that is not an Obligor) (an "*Asset Sale Offer*") to purchase on a pro rata basis the maximum principal amount of Notes (and such Senior Indebtedness and other Indebtedness), that is at least $2,000 and an integral multiple of $1,000 that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Senior Indebtedness or other Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest and additional interest, if any (or, in respect of such Senior Indebtedness or other Indebtedness, such lesser price, if any, as may be provided for by the terms of such Senior Indebtedness or other Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Indenture. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $[  ] million by mailing (or otherwise delivering in accordance with applicable DTC procedures) the notice required pursuant to the terms of this Indenture, with a copy to the Trustee. To the extent that the aggregate amount of Notes (and such Senior Indebtedness or other Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company or such Restricted Subsidiary may use any remaining Excess Proceeds for general corporate purposes. If the aggregate principal amount of Notes (and such Senior Indebtedness or other Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described below. Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero. An Asset Sale Offer need not be made by the Issuer until the date that is 12 months after the date on which an Asset Sale is made, the proceeds of which, in aggregate with all funds not applied in accordance with Section 4.06 or the subject of an Asset Sale Offer, exceed $[  ] million.

(c)    The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(d)    If more Notes (and such Senior Indebtedness or other Indebtedness) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, selection of such Notes for purchase will be made by the Trustee in integral multiples of $1,000 on a pro rata basis, to the extent practicable and in compliance with the requirements of DTC and any stock exchange on which the Notes are then admitted to trading; provided that no Notes of $2,000 or less shall be purchased in part. Selection of such Senior Indebtedness or other Indebtedness will be made pursuant to the terms of such Senior Indebtedness or other Indebtedness.

58

(e)      An Asset Sale Offer insofar as it relates to the Notes, will remain open for a period of not less than 20 Business Days following its commencement (the "*Offer Period*"). No later than five Business Days after the termination of the applicable Offer Period the Issuer will purchase the principal amount of the Notes (and purchase or repay any relevant Senior Indebtedness or other Indebtedness required to be so purchased or repaid as set out above) validly tendered.

(f)      To the extent that any portion of the Net Proceeds payable in respect of the Notes is denominated in a currency other than the currency in which the Notes are denominated, the amount payable in respect of such Notes shall not exceed the net amount of funds in the currency in which such Notes are denominated as is actually received by the Company or such Restricted Subsidiary upon converting the relevant portion of the Net Proceeds into such currency.

(g)      Notices of an Asset Sale Offer shall be mailed by first-class mail, postage prepaid (or otherwise delivered in accordance with applicable DTC procedures) at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

(h)      The Issuer's obligation under this <u>Section 4.06</u> to make an Asset Sale Offer may be waived or modified with the consent of a majority in principal amount of the Notes.

SECTION 4.07    <u>Transactions with Affiliates</u>. (a)  The Company will not, and will not permit any Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "*Affiliate Transaction*") involving aggregate consideration in excess of $[  ] million, unless:

(i)      such Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(ii)      with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $[  ] million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above.

(b)      An Affiliate Transaction shall be deemed to have satisfied the approval requirements set forth in clause (a) if (1) such Affiliate Transaction is approved by a majority of the Disinterested Directors or (2) in the event there are no Disinterested Directors, a fairness opinion is provided by an Independent Financial Advisor with respect to such Affiliate Transaction.

(c)      The provisions of <u>Section 4.07(a)</u> shall not apply to the following:

(i)      transactions between or among the Company or any Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) or between or among Restricted Subsidiaries and any merger, consolidation or amalgamation of the Company and any direct parent of the Company; provided that such parent shall have no material liabilities

59

and no material assets other than cash, Cash Equivalents and the Capital Stock of the Company and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Indenture and effected for a bona fide business purpose;

(ii)    Restricted Payments permitted by <u>Section 4.04</u> and Permitted Investments (other than Investments discussed in clause (3) of the definition of Permitted Investments);

(iii)    [Reserved];

(iv)    the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent of the Company;

(v)    [Reserved];

(vi)    transactions in which the Company or any Restricted Subsidiary, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of <u>Section 4.07(a)</u>;

(vii)    payments or loans (or cancellation of loans) to directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(viii)    any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by senior management or the Board of Directors of the Company;

(ix)    the existence of, or the performance by the Company or any Restricted Subsidiaries of its obligations under the terms of, the Credit Agreement Documents, any intercreditor agreements, any shareholders' agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date or any other agreement or arrangement in existence on the Issue Date, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; provided, however, that the existence of, or the performance by the Company or any Restricted Subsidiaries of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the Issue Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original transaction, agreement or arrangement as in effect on the Issue Date and the existence of, or the performance by the Company or any Restricted Subsidiaries of its obligations under the terms of any intercreditor agreements entered into after the Issue Date in connection with the Incurrence of additional Secured Indebtedness as contemplated under the Credit Agreement Documents;

(x)    [reserved];

60

(xi)    (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Company and the Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business;

(xii)    [reserved];

(xiii)    the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(xiv)    the issuance of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding or entering into of employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent of the Company or of a Restricted Subsidiary of the Company, as appropriate;

(xv)    the entering into and performance of any tax sharing agreement or arrangement and any payments permitted by Section 4.04(b)(xii);

(xvi)    any contribution to the capital of the Company;

(xvii)    transactions between the Company or any Restricted Subsidiary and any Person, a director of which is also a director of the Company or any direct or indirect parent of the Company; provided, however, that such director abstains from voting as a director of the Company or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xviii)    pledges of Equity Interests of Unrestricted Subsidiaries;

(xix)    the formation and maintenance of any consolidated or combined group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xx)    any employment agreements entered into by the Company or any Restricted Subsidiary in the ordinary course of business; and

(xxi)    intercompany transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officers' Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Indenture.

SECTION 4.08    Change of Control. (a) Upon the occurrence of a Change of Control, each holder will have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), except to the extent the Issuer has previously elected to redeem all of the Notes as described under Article III of this Indenture. In the event that at the time of such Change of Control the terms of any Bank Indebtedness restrict or

61

prohibit the repurchase of Notes pursuant to this <u>Section 4.08</u>, then prior to the mailing (or delivery) of the notice to holders provided for in <u>Section 4.08(c)</u>, but in any event within 45 days following any Change of Control, the Issuer shall: (i) repay in full all such Bank Indebtedness or, if doing so will allow the purchase of Notes, offer to repay in full all such Bank Indebtedness and repay the Bank Indebtedness of each lender that has accepted such offer; or (ii) obtain the requisite consent under the agreements governing such Bank Indebtedness to permit the repurchase of the Notes as provided for in <u>Section 4.08(c)</u>.

(b)    The Issuer's failure to comply with such provisions or the provisions of the immediately following paragraph shall constitute an Event of Default under 6.01(d) and not 6.01(b).

(c)    Within 45 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes by delivery of a notice of redemption in accordance with <u>Article III</u> and all conditions to such redemption have been satisfied or waived, the Issuer shall mail (or otherwise deliver in accordance with applicable DTC procedures) a notice (a "*Change of Control Offer*") to each holder with a copy to the Trustee stating:

(i)    that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101 % of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of holders of record on a record date to receive interest on the relevant interest payment date) (the "*Change of Control Payment*");

(ii)    the circumstances and relevant facts and financial information regarding such Change of Control;

(iii)    the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed or delivered) (the "*Change of Control Payment Date*");

(iv)    the instructions determined by the Issuer, consistent with this <u>Section 4.08</u>, that a holder must follow in order to have its Notes purchased; and

(v)    if applicable and such notice is mailed prior to the occurrence of a Change of Control, that such offer is conditioned on the occurrence of such Change of Control.

(d)    Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer, at the address specified in the notice at least three Business Days prior to the purchase date. The Holders shall be entitled to withdraw their election if the Trustee or the Issuer receive not later than one Business Day prior to the purchase date a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Note purchased.

(e)    A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f)    Notwithstanding the foregoing provisions of this <u>Section 4.08</u>, the Issuer will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements

62

set forth in this Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.

(g)    On the Change of Control Payment Date, if the Change of Control shall have occurred, the Issuer will, to the extent lawful:

(i)    accept for payment all Notes properly tendered pursuant to the Change of Control Offer;

(ii)    deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes so tendered;

(iii)    deliver or cause to be delivered to the Trustee an Officers' Certificate stating the Notes or portions of the Notes being purchased by the Issuer in the Change of Control Offer;

(iv)    in the case of Global Securities, deliver, or cause to be delivered, to the principal Paying Agent the Global Securities in order to reflect thereon the portion of such Notes or portions thereof that have been tendered to and purchased by the Issuer; and

(v)    in the case of Definitive Securities, deliver, or cause to be delivered, to the relevant Registrar for cancellation all Definitive Securities accepted for purchase by the Issuer.

(h)    The Paying Agent will promptly mail (or otherwise deliver in accordance with applicable DTC procedures) to each holder of Notes so tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each holder of Notes a new Note equal in principal amount to the unpurchased portion of the Notes surrendered, if any; provided, however, that each such new Note will be in a principal amount that is at least $2,000 and integral multiples of $1,000 in excess thereof.

(i)    Notes repurchased by the Issuer or an Affiliate pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by an unaffiliated third party pursuant to Section 4.08(h) will have the status of Notes issued and outstanding.

(j)    The Issuer will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section 4.08. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.08 by virtue thereof.

(k)    The Issuer's obligation under this Section 4.08 to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in principal amount of outstanding Notes.

SECTION 4.09    Compliance Certificate. The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company, beginning with the fiscal year end on December 31, 201[6], and, within 14 days of a request by the Trustee, an Officers' Certificate stating that in the course of the performance by the signers thereof of their duties as Officers of the Company, they would normally have knowledge of any Default and whether or not the signers know of any Default that occurred during such period. If they do, the certificate shall describe the Default, its status and what

63

action the Company is taking or proposes to take with respect thereto. The Company also is required to deliver to the Trustee (i) as soon as it becomes aware of the occurrence of an Event of Default, written notice of the occurrence of such Event of Default referring to this Indenture and the Section or Sections under which such Event of Default has occurred and (ii) within 30 days after the occurrence thereof, written notice of any event which would constitute a Default under clauses (c), (d), (e), (f) or (g) of Section 6.01, referring to this Indenture and the Section or Sections under which such Default or Event of Default has occurred, their status and what action the Company is taking or proposes to take in respect thereof.

SECTION 4.10    Further Instruments and Acts. The Issuer or the Company shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture (including upon request of the Trustee but without affirmative duty to do so).

SECTION 4.11    Future Guarantors. (a) Each Restricted Subsidiary (unless such Subsidiary is the Issuer or a Subsidiary Guarantor) that guarantees, assumes or in any other manner becomes liable with respect to (x) any Indebtedness under any First Lien Document or (y) any Public Debt (including any proceeds loans or other intercompany loans in respect thereof) of the Issuer, the Company or any Subsidiary Guarantor, in each case, will execute and deliver to the Trustee a supplemental indenture pursuant to which such Restricted Subsidiary will guarantee payment of the Notes on the terms provided for in this Indenture; provided that notwithstanding the foregoing:

(i)    no Guarantee shall be required as a result of any Indebtedness or guarantee of Indebtedness that existed at the time such Person became a Restricted Subsidiary if the Indebtedness or guarantee was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary;

(ii)    if such Indebtedness is by its terms expressly subordinated to the Notes or any Guarantee, any such assumption, guarantee or other liability of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated to such Restricted Subsidiary's Guarantee of the Notes at least to the same extent as such Indebtedness is subordinated to the Notes or any other senior guarantee;

(iii)    no Guarantee shall be required from a Financial Assistance Restricted Subsidiary

(iv)    no Guarantee shall be required from a US Controlled Foreign Subsidiary unless it guarantees, assumes or in any other manner becomes liable with respect to any Indebtedness under any Credit Agreement (including any proceeds loans or other intercompany loans in respect thereof) of the Issuer, the Company or any Subsidiary Guarantor;

(v)    no Guarantee shall be required if such Guarantee could reasonably be expected to give rise to or result in (x) personal liability for, or material risk of personal liability for, the officers, directors or shareholders of the Company, any parent of the Company or any Restricted Subsidiary, (y) any violation of, or material risk of violation of, applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or any such Restricted Subsidiary, including, for the avoidance of doubt, "whitewash" or similar procedures or (z) any significant cost, expense, liability or obligation (including with respect of any Taxes) other than reasonable out-of-pocket expenses and other than reasonable expenses incurred in connection with any governmental or regulatory filings required as a result of, or any measures pursuant to clause (y) undertaken in connection with, such Guarantee, which cannot be

64

avoided through measures reasonably available to the Company or any such Restricted Subsidiary; and

(vi)     each such Guarantee will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

(b)     The Guarantees shall be released in accordance with the provisions of Section 10.06.

SECTION 4.12    Liens. (a)  The Company will not, and will not permit any Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist any Lien on any asset or property of the Company or such Restricted Subsidiary (including Capital Stock or Indebtedness of a Restricted Subsidiary), whether owned on the Issue Date or acquired thereafter, or any interest therein or any income, profits or proceeds therefrom securing any Indebtedness (an "*Initial Lien*"), except Permitted Liens; provided, however, that any Lien on such property or assets will be permitted notwithstanding that it is not a Permitted Lien if the Notes and Guarantees are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Notes or the Guarantees), the obligations so secured until such time as such obligations are no longer secured by a Lien.

(b)     Any Lien created for the benefit of the holders pursuant to this Section 4.12 will provide by its terms that such Lien will be automatically and unconditionally released and discharged (a) upon the release and discharge of the Initial Lien, (b) upon the sale or other disposition of the assets subject to such Initial Lien (or the sale or other disposition of the Person that owns such assets) in compliance with the terms of this Indenture, (c) upon the designation of a Restricted Subsidiary whose property or assets secure such Initial Lien as an Unrestricted Subsidiary in accordance with the terms of this Indenture, (d) following an Event of Default under this Indenture or an event of default under any other Indebtedness secured by the collateral securing such Indebtedness, pursuant to an enforcement action, if required, in accordance with the terms of any applicable intercreditor agreement or (e) upon the effectiveness of any defeasance or satisfaction and discharge of the Notes as specified in this Indenture.

SECTION 4.13    Maintenance of Office or Agency. (a)  The Issuer shall maintain one or more offices or agencies (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee and the Paying Agent of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee and the Paying Agent with the address thereof, such presentations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 12.01.

(b)     The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee and the Paying Agent of any such designation or rescission and of any change in the location of any such other office or agency.

65

(c)    The Issuer hereby designates the corporate trust office of the Trustee or its Agent as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.14    Taxes. The Issuer will pay any present or future stamp, court or documentary Taxes, or any other excise, property or similar Taxes that arise in any jurisdiction from the execution, delivery, registration or enforcement of any Notes, this Indenture, or any other document or instrument in relation thereto (other than a transfer of the Notes) excluding any such Taxes imposed by any jurisdiction that is not a Relevant Taxing Jurisdiction, and the Issuer and each Guarantor agree to indemnify the noteholders and the Trustee for any such Taxes paid by such noteholders. The foregoing obligations will survive any termination, defeasance or discharge of this Indenture and will apply mutatis mutandis to any jurisdiction in which any successor to an Issuer is organized or otherwise considered to be a resident for tax purposes or any political subdivision or taxing authority or agency thereof or therein.

SECTION 4.15    Suspension/Fall-Away of Covenants on Achievement of Investment Grade Status. (a)  If on any date (i) the Notes have Investment Grade Ratings from both Rating Agencies, and the Company has delivered written notice of such Investment Grade Ratings to the Trustee, and (ii) no Default has occurred and is continuing under this Indenture, then, beginning on that day, the Company and the Restricted Subsidiaries will not be subject to Sections 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.11 and Section 5.01(a)(iv) of this Indenture (the "*Suspended Covenants*").

(b)    In the event that the Company and the Restricted Subsidiaries are not subject to the Suspended Covenants under this Indenture for any period of time as a result of the foregoing, and on any subsequent date one or both of the Rating Agencies (a) withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating or (b) the Company or any of its Affiliates enters into an agreement to effect a transaction that would result in a breach of a Suspended Covenant if not so suspended and one or more of the Rating Agencies indicate that if consummated, such transaction (alone or together with any related recapitalization or refinancing transactions) would cause such Rating Agency to withdraw its Investment Grade Rating or downgrade the ratings assigned to the Notes below an Investment Grade Rating, then the Company and the Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture. Such covenants will not, however, be of any effect with regard to the actions of the Company and the Restricted Subsidiaries properly taken during the continuance of the covenant suspension and Section 4.04 shall be interpreted as if it had been in effect since the Issue Date except that no Default will be deemed to have occurred and will not occur solely by reason of a Restricted Payment made during the covenant suspension.

(c)    During the continuance of the covenant suspension, no Restricted Subsidiary may be designated as an Unrestricted Subsidiary.

(d)    The Company, in an Officers' Certificate, shall provide the Trustee notice of any action that results in Suspended Covenants or the revocation of such suspension. The Trustee will have no obligation to (i) independently determine or verify if such events have occurred, (ii) make any determination regarding the impact of actions taken during the suspension period on future compliance by the Company and the Restricted Subsidiaries with their covenants or (iii) notify the holders of the occurrence of any action that results in Suspended Covenants or a revocation of such suspension.

ARTICLE V

Successor Company

66

SECTION 5.01    When the Issuer, the Company or a Guarantor May Merge or Transfer Assets. (a) The Company may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind-up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of properties or assets constituting all or Substantially All of the properties or assets of the Company and its Subsidiaries taken as a whole in one or more related transactions, to any Person unless:

(i)    the Company is the surviving person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding-up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, the District of Columbia, or any state or territory thereof (the Company, or such Person, as the case may be, being herein called the "*Successor Holding Company*");

(ii)    the Successor Holding Company (if other than the Company) expressly assumes all the obligations of the Company under its Guarantee and this Indenture pursuant to supplemental indentures or other documents or instruments in form satisfactory to the Trustee;

(iii)    immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Holding Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Holding Company or such Restricted Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(iv)    immediately after giving pro forma effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Holding Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Holding Company or such Restricted Subsidiary at the time of such transaction), either:

(1)    the Successor Holding Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(2)    the Fixed Charge Coverage Ratio for the Successor Holding Company and its Restricted Subsidiaries would be greater than such ratio for the Company and the Restricted Subsidiaries immediately prior to such transaction;

(v)    if the Successor Holding Company is not the Company, the Issuer and each Subsidiary Guarantor, unless it is the other party to the transactions described above, shall have by supplemental indenture confirmed that its obligations under this Indenture, the Notes and its respective Guarantee, as applicable, shall apply to such Person's obligations under this Indenture, the Notes and the Guarantee; and

(vi)    the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture, provided that in giving such opinion such counsel may rely on an Officers' Certificate as to compliance with the foregoing clauses (iii) and (iv) of this Section 5.01(a) and as to any matters of fact.

67

The Successor Holding Company (if other than the Company) will succeed to, and be substituted for, the Company, under this Indenture and its Guarantee, and in such event the Company will automatically be released and discharged from its obligations under this Indenture and its Guarantee. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01(a), (A) any Restricted Subsidiary may merge, consolidate or amalgamate with a Restricted Subsidiary that is a Subsidiary Guarantor), no Subsidiary Guarantor will, and the Company or to another Restricted Subsidiary, and (B) the Company may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Company in the United States, the District of Columbia, or any state or territory thereof, or may convert into a limited liability company, so long as the amount of Indebtedness of the Company and the Restricted Subsidiaries is not increased thereby. The provisions set forth in this Article V will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and the Restricted Subsidiaries.

(b)    subject to the provisions of Section 10.06 (which govern the release of a Guarantee upon the sale or disposition of a Restricted Subsidiary that is a Subsidiary Guarantor), no Subsidiary Guarantor will, and the Company will not permit any Subsidiary Guarantor to, consolidate, amalgamate or merge with or into or wind-up into (whether or not such Guarantor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or Substantially All of the properties or assets of the Company and its Subsidiaries taken as a whole in one or more related transactions, to any Person unless:

(i)    either (A) such Guarantor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, the District of Columbia, or any state or territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Guarantor*"), and the Successor Guarantor (if other than such Guarantor) expressly assumes all the obligations of such Guarantor under this Indenture and such Guarantor's Guarantee pursuant to a supplemental indenture or other documents or instruments in form satisfactory to the Trustee, or (B) if such sale or disposition or consolidation, amalgamation or merger is with a Person other than the Company or any Restricted Subsidiary, such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii)    the Successor Guarantor (if other than such Guarantor) shall have delivered or caused to be delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, in a transaction to which Section 5.01(b)(1)(A) applies, the Successor Guarantor (if other than such Guarantor) will succeed to, and be substituted for, such Guarantor under this Indenture and such Guarantor's Guarantee, and such Guarantor will automatically be released and discharged from its obligations under this Indenture and such Guarantor's Guarantee. Notwithstanding the foregoing, (A) a Guarantor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating such Guarantor in the United States, the District of Columbia, or any state or territory thereof, so long as the amount of Indebtedness of the Guarantor is not increased thereby, and (B) a Guarantor may merge, amalgamate or consolidate with another Guarantor or the Issuer.

68

In addition, notwithstanding the foregoing, any Subsidiary Guarantor may, without complying with the foregoing covenant, (A) consolidate, amalgamate or merge with or into or wind-up into (each, a "*Consolidation*") (x) the Issuer or any Guarantor or (y) any Restricted Subsidiary that is not a Guarantor; provided, however, that at the time of each such Consolidation pursuant to clause (y) the aggregate amount of properties and assets subject to all such Consolidations since the Issue Date shall not exceed 5.0% of the consolidated assets of the Company, the Issuer and the Subsidiary Guarantors as shown on the most recent available consolidated balance sheet of the Company after giving effect to each such Consolidation and including all Consolidations occurring from and after the Issue Date or (B) sell, assign, transfer, lease, convey or otherwise dispose of, to the Issuer or any Guarantor, all or Substantially All of the properties or assets of the Company and its Subsidiaries taken as a whole to the extent such properties or assets are owned by such Subsidiary Guarantor.

(c)    the Issuer may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or Substantially All of the properties or assets of the Company and its Subsidiaries taken as a whole in one or more related transactions, to any Person unless:

(i)    the Issuer is the surviving person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, the District of Columbia, or any state or territory thereof (the Issuer or such Person, as the case may be, being herein called the "*Successor Issuer*"); provided, however, that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii)    the Successor Issuer (if other than the Issuer) expressly assumes all the obligations of the Issuer under the Notes, this Indenture and the Security Documents pursuant to supplemental indentures or other documents or instruments in form satisfactory to the Trustee;

(iii)    immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(iv)    immediately after giving pro forma effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either:

(1)    the Successor Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(2)    the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and the Restricted Subsidiaries immediately prior to such transaction;

69

(v)     if the Successor Issuer is not the Issuer, each Guarantor, unless it is the other party to the transactions described above, shall have by supplemental indenture confirmed that its obligations under this Indenture, the Notes, the Security Documents and its Guarantee, as applicable, shall apply to such Person's obligations under this Indenture, the Notes, the Security Documents and the Guarantee; and

(vi)     the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or amalgamation and such supplemental indentures (if any) comply with this Indenture, provided that in giving such opinion such counsel may rely on an Officers' Certificate as to compliance with the foregoing clauses (3) and (4) of this Section 5.01(c) and as to any matters of fact.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under this Indenture and in such event the Issuer will automatically be released and discharged from its obligations under this Indenture. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01(c), (A) any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Issuer or to another Restricted Subsidiary, and (B) the Issuer may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Issuer in the United States, the District of Columbia, or any state or territory thereof, or may convert into a limited liability company, so long as the amount of Indebtedness of the Issuer and the Restricted Subsidiaries is not increased thereby. The provisions set forth in this Article V will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company, the Issuer and the Restricted Subsidiaries.

## ARTICLE VI

## Defaults and Remedies

SECTION 6.01    Events of Default. An "Event of Default" occurs if:

(a)     there is a default in any payment of interest on any Note when the same becomes due and payable, and such default continues for a period of 30 days;

(b)     there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon required redemption, upon declaration or otherwise;

(c)     the Company or any Restricted Subsidiary fails to comply with its obligations under Section 5.01;

(d)     the Company or any Restricted Subsidiaries fails to comply for 60 days after notice with its agreements contained in the Notes or this Indenture (other than a failure to repurchase Notes when required following an Asset Sale Offer or Change of Control Offer);

(e)     the Company or any Significant Subsidiary fails to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $10.0 million or its foreign currency equivalent;

70

(f)    the Company, a Significant Subsidiary or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer, pursuant to or within the meaning of any Bankruptcy Law:

(i)    commences a voluntary case or proceeding;

(ii)    consents to the entry of an order for relief against it in an involuntary case or proceeding;

(iii)    consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv)    takes any comparable action to that set forth in this Section 6.01(f) under any foreign laws relating to insolvency;

(g)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against the Company, a Significant Subsidiary or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer, in an involuntary case;

(ii)    appoints a Custodian of the Company, a Significant Subsidiary or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer, or for any substantial part of its property; or

(iii)    orders the winding up or liquidation of the Company, a Significant Subsidiary or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer;

and the order or decree remains unstayed and in effect for 60 days;

(h)    the Company or any Significant Subsidiary fails to pay final judgments aggregating in excess of $[  ] million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days following the entry thereof; or

(i)    any (x) Guarantee, (y) Security Document governing a security interest with respect to any Collateral having a fair market value in excess of $[  ] million or (z) obligation under the Security Documents, in each case, of the Company or a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together as of the latest audited consolidated financial statements for the Issuer and its Restricted Subsidiaries would constitute a Significant Subsidiary, ceases to be in full force and effect (except as contemplated by the terms of this Indenture and the Guarantees and except for the failure of any security interest with respect to the Collateral to remain in full force and effect, which is governed by paragraph (10) below) or is declared null and void in a judicial proceeding or Holdings, or any Subsidiary Guarantor that is a Significant Subsidiary or group of Subsidiary Guarantors that taken together as of the latest audited consolidated financial statements of the Issuer and its Restricted Subsidiaries would constitute a Significant Subsidiary denies or disaffirms its obligations under this Indenture, its Guarantee or any Security Document and the Issuer fails to cause such Subsidiary Guarantor or Subsidiary Guarantors, as the case may be, to rescind such denials or disaffirmations within 30 days; or

71

(j)        failure by the Issuer or any Restricted Subsidiary for 60 days after receipt of written notice given by the Trustee or the Holders of at least 25% in principal amount of the Notes then outstanding and issued under this Indenture to comply with any of its other agreements in this Indenture, the Security Documents or the Notes (other than those specified in clause (a), (b) or (c) above);

(k)        with respect to any Collateral having a fair market value in excess of $25.0 million, individually or in the aggregate,

(i)        the failure of the security interest with respect to such Collateral under the Security Documents, at any time, to be in full force and effect for any reason other than in accordance with their terms and the terms of this Indenture and other than the satisfaction in full of all obligations under this Indenture and discharge of this Indenture if such failure continues for 60 days or (B) the declaration that the security interest with respect to such Collateral created under the Security Documents or under this Indenture is invalid or unenforceable, if such Default continues for 60 days or (C) the assertion by the Issuer or any Guarantor, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal, state or non-US bankruptcy, insolvency, receivership or similar law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

A Default under clause (d) of this Section 6.01 (other than a failure to purchase Notes) shall not constitute an Event of Default until the Trustee or the holders of 25% in principal amount of outstanding Notes of such series notify the Issuer of the default and the Issuer does not cure or cause the cure of such default within the time specified in clause (d) hereof, after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default".

The Company shall deliver to the Trustee (i) as soon as it becomes aware of the occurrence of an Event of Default, written notice of the occurrence of such Event of Default and (ii) within 30 days after the occurrence thereof, written notice of any event which would constitute a Default under clauses (c), (d), (e), (f) or (g) of this Section 6.01, their status and what action the Company is taking or proposes to take in respect thereof.

SECTION 6.02    Acceleration. If an Event of Default (other than an Event of Default specified in Section 6.01(f) or (g) with respect to the Company or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer) occurs and is continuing, the Trustee and the holders of at least 25% in principal amount of outstanding Notes by notice to the Trustee and the Company may declare the principal of, premium, if any, and accrued but unpaid interest (including additional interest, if any, or any other monetary obligations) on all the Notes to be due and payable. Upon such a declaration, such principal, premium and interest will be due and payable immediately. If an Event of Default specified in Section 6.01(f) or (g) with respect to the Company or any Restricted Subsidiary that, directly or indirectly, owns or holds any Equity Interest of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. The Holders of a majority in principal

72

amount of the Notes by notice to the Trustee may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent Default or impair any right consequent thereto.

In the event of any Event of Default specified in <u>Section 6.01(e)</u>, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officers' Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

SECTION 6.03    <u>Other Remedies</u>. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of (or premium, if any) or interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture, the Guarantees, the Security Documents or the Intercreditor Agreement.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04    <u>Waiver of Past Defaults</u>. The Holders of a majority in principal amount of outstanding Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under <u>Section 9.02</u> cannot be amended without the consent of the Holders of not less than 100% of the then outstanding aggregate principal amount of the Notes. When a Default is waived, it is deemed cured and the Issuer, the Guarantors, the Trustee and the Holders shall be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05    <u>Control by Majority</u>. The Holders of a majority in principal amount of outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or, subject to <u>Section 7.01</u>, that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Notes, the Guarantees, the Security Documents or the Intercreditor Agreement, the Trustee will be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06    <u>Limitation on Suits</u>. (a) Subject to <u>Section 7.01</u>, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the holders unless such holders have

73

offered to the Trustee indemnity or security satisfactory to it against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

      (i)     such Holder has previously given the Trustee notice that an Event of Default is continuing,

      (ii)     Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

      (iii)     such Holders have offered the Trustee security or indemnity satisfactory to it against any loss, liability or expense,

      (iv)     the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

      (v)     the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

      SECTION 6.07    Rights of the Holders to Receive Payment. Notwithstanding any other provision of this Indenture (including, without limitation, Section 6.06), the right of any Holder to receive payment of principal of, premium (if any), or interest on the Notes held by such Holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holders of not less than 100% of the then outstanding aggregate principal amount of the Notes.

      SECTION 6.08    Collection Suit by Trustee. If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.06.

      SECTION 6.09    Trustee May File Proofs of Claim. The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for contractually agreed compensation, reasonable expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the Holders allowed in any judicial proceedings relative to the Issuer or any Guarantor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization

74

or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10   Priorities. If the Trustee collects any money or property pursuant to this Article VI or pursuant to the remedial provisions contained in the Security Documents, it shall pay out the money or property in the following order:

FIRST: to the Trustee for amounts due under Section 7.06;

SECOND: to the Holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal premium, if any, and interest, respectively; and

THIRD: to the Issuer or, to the extent the Trustee collects any amount for any Guarantor, to such Guarantor.

The Trustee may fix a record date and payment date for any payment to the Holders pursuant to this Section 6.10. At least 15 days before such record date, the Issuer shall deliver to each Holder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11   Undertaking for Costs. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of outstanding Notes.

SECTION 6.12   Waiver of Stay or Extension Laws. None of the Issuer or any Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and each Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 6.13   Direction to Agents. Following the occurrence of an Event of Default or a potential Event of Default, the Trustee may, by notice to the Agents, require them to act under its direction.

ARTICLE VII

Trustee

SECTION 7.01   Duties of Trustee. (a)  If an Event of Default has occurred and is continuing, the Trustee or the Collateral Agent shall exercise the rights and powers vested in it by this

Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)        Except during the continuance of an Event of Default:

(i)        the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii)        in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture, the Notes, the Guarantee, the Security Documents or the Intercreditor Agreement, as applicable. The Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the form requirements of this Indenture, the Notes, the Guarantee, the Security Documents or the Intercreditor Agreement, as applicable (but need not confirm or investigate the truth or accuracy of mathematical calculations or other facts, statements or opinions stated therein).

(c)        The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)        this paragraph does not limit the effect of paragraph (b) of this <u>Section 7.01</u>;

(ii)        the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)        the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to <u>Section 6.02</u> or <u>6.05</u>; and

(iv)        no provision of this Indenture, the Notes, the Guarantee, the Security Documents or the Intercreditor Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d)        Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this <u>Section 7.01</u>.

(e)        The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or any Guarantor.

(f)        Money held by the Trustee need not be segregated from other funds except to the extent required by law, the Security Documents, the Intercreditor Agreement or <u>Section 11.05</u>.

SECTION 7.02    <u>Rights of Trustee</u>. Subject to <u>Section 7.01</u>:

(a)    The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel.

(c)    The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e)    The Trustee may consult with professional advisers and/or counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes or any other agreement referenced herein shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such professional advisers and/or counsel.

(f)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the Holders of not less than a majority in principal amount of outstanding Notes at the time outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall incur no liability of any kind by reason of such inquiry or investigation.

(g)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security and/or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee, including without limitation its right to be indemnified and all other rights provided under this Article VII, are extended to, and shall be enforceable by, Wilmington Trust FSB, as the Trustee and in each of its other capacities hereunder.

(i)    The Trustee shall not be liable for any action taken or omitted by it in good faith at the direction of the Holders of not less than a majority in principal amount of outstanding Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j)    Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the Holder of any Note shall be conclusive and binding

77

upon future Holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k)    The Trustee shall have no duty to inquire as to the performance of the covenants of the Company and its Subsidiaries under Article IV hereof, except with respect to Section 4.01 and shall be entitled to assume that the Issuer has performed in accordance with all of the provisions of this Indenture, unless otherwise notified to it in writing. Delivery of reports, information and documents to the Trustee under Section 4.02 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including compliance with any of the covenants of the Company and its Subsidiaries hereunder (as to which the Trustee is entitled to rely on Officers' Certificates).

(l)    The Trustee shall not have any obligation or duty to monitor, determine or inquire as to compliance, and shall not be responsible or liable for compliance with restrictions on transfer, exchange, redemption, purchase or repurchase, as applicable, of minimum denominations imposed under this Indenture or under applicable law or regulation with respect to any transfer, exchange, redemption, purchase or repurchase, as applicable, of any interest in any Notes.

(m)    The Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture or the Notes.

(n)    The Trustee shall not, under any circumstance be liable for any special or consequential damages (being loss of business, goodwill, opportunity or profit of any kind) of the Issuer or any Guarantor or any other Subsidiary of the Company or any other Person.

(o)    The Issuer shall deliver no later than the date of execution of this Indenture an Officers' Certificate setting forth the names of the individuals and/or titles of officers, authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded, and the Trustee shall be entitled to rely on the most recent Officers' Certificate received.

(p)    The Trustee will not be liable if prevented or delayed in performing any of its obligations by reason of any present or future law applicable to it, by any governmental or regulatory authority or by any force majeure circumstances beyond its control.

(q)    In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of, or caused by, directly or indirectly, forces majeures beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God; it being understood that the Trustee shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(r)    The Trustee may refrain from taking any action in any jurisdiction if the taking of such action in that jurisdiction would, in its opinion based upon legal advice in the relevant jurisdiction, be contrary to any law of that jurisdiction or, to the extent applicable, of the State of New York. Furthermore, the Trustee may also refrain from taking such action if it could otherwise render it liable to any person in that jurisdiction or the State of New York or if, in its opinion based upon such legal advice, it would not have the power to do the relevant thing in that jurisdiction by virtue of any applicable law in

78

that jurisdiction or in the State of New York or if it is determined by any court or other competent authority in that jurisdiction or in the State of New York that it does not have such power.

SECTION 7.03    <u>Individual Rights of Trustee</u>. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent or Registrar may do the same with like rights. However, the Trustee must comply with <u>Section 7.09</u>.

SECTION 7.04    <u>Trustee's Disclaimer</u>. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, any Guarantee or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer, the Company or any other Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication. The Trustee shall not be charged with knowledge of any Default or Event of Default under <u>Sections 6.01(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> or <u>(i)</u> or of the identity of any Significant Subsidiary unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof referencing this Indenture and the applicable section of <u>6.01</u> hereof in accordance with <u>Section 12.01</u> hereof from the Issuer, any Guarantor or any Holder. In accepting the trust hereby created, the Trustee acts solely as Trustee for the Holders of the Notes and not in its individual capacity and all persons, including the Holders of Notes and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.05    <u>Notice of Defaults</u>. If a Default occurs and is continuing and has been notified to the Trustee, the Trustee must mail (or otherwise deliver in accordance with applicable DTC procedures, as applicable) to each registered holder of Notes notice of the Default within the earlier of 90 days after it occurs or 30 days after written notice of it is received by the Trustee: provided that the Trustee may withhold such notice (except in the case a Default or Event of Default in payment of principal of, premium on, if any, or interest, if any, on any Note) if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

SECTION 7.06    <u>Compensation and Indemnity</u>. (a)  The Issuer, failing which the Guarantors, shall pay to the Trustee and each Agent from time to time compensation for their respective services as agreed in writing between the Issuer and the Trustee and each Agent from time to time and, following the occurrence of an Event of Default or a potential Event of Default, such additional fees and expenses as the Trustee deems to be appropriate. The Trustee's and each Agent's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer, failing which the Guarantors, shall reimburse the Trustee and each Agent upon request for all properly incurred out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the properly incurred compensation and expenses, disbursements and advances of the Trustee's and each Agent's agents, counsel, accountants and experts. The Issuer and each Guarantor, jointly and severally, shall indemnify the Trustee and each Agent (which in each case, for purposes of this <u>Section 7.06</u>, shall include its officers, directors, employees, agents and counsel) against any and all loss, liability, claim, taxes, costs, damage or expense (including properly incurred attorneys' fees and expenses) incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture or Guarantee against the Issuer or a Guarantor (including this <u>Section 7.06</u>) and defending itself against or investigating any claim (whether asserted by the Issuer, any Guarantor, any Holder or any other Person). The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the

79

removal or resignation of the Trustee or the applicable Agent. The Trustee or the applicable Agent shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; provided, however, that any failure so to notify the Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder. The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense. Such indemnified parties may have separate counsel and the Issuer and the Guarantors, as applicable, shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by an indemnified party solely through such party's own willful misconduct, negligence or bad faith.

(b)        To secure the payment obligations of the Issuer and the Guarantors in this Section 7.06, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held to pay principal of and interest on particular Notes.

(c)        The Issuer's and the Guarantors' payment obligations pursuant to this Section 7.06 shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any Bankruptcy Law or the resignation or removal of the Trustee. Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Company or the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

(d)        No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if adequate indemnity against such risk or liability is not assured to its satisfaction.

For the avoidance of doubt, the rights, privileges, protections, immunities and benefits given to the Trustee in this Section 7.06, including its rights to be indemnified, are extended to, and shall be enforceable by, the Trustee and by each Agent.

SECTION 7.07    Replacement of Trustee or Agent. (a)  The Trustee and any Agent may resign at any time by so notifying the Issuer. The Holders of a majority in principal amount of outstanding Notes may remove the Trustee or any Agent by so notifying the Trustee or such Agent and may appoint a successor Trustee or Agent. The Issuer shall remove the Trustee or any Agent if:

(i)        the Trustee or such Agent fails to comply with Section 7.09;

(ii)        the Trustee or such Agent is adjudged bankrupt or insolvent;

(iii)        a receiver or other public officer takes charge of the Trustee or such Agent or its property; or

(iv)        the Trustee or such Agent otherwise becomes incapable of acting.

(b)        If the Trustee resigns, is removed by the Issuer or by the Holders of a majority in principal amount of outstanding Notes and such Holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

(c)        A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon the resignation or removal of the retiring Trustee shall

80

become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall deliver a notice of its succession to the Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.06(b).

(d)     If a successor Trustee or Agent, as applicable, does not take office within 60 days after the retiring Trustee resigns or is removed, (i) the retiring Trustee or Agent, as applicable, or the Holders of 10% in principal amount of outstanding Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee or (ii) the retiring Trustee or Agent, as applicable, may appoint a successor Trustee or Agent, as applicable, at any time prior to the date on which a successor Trustee or Agent, as applicable, takes office; provided that such appointment shall be reasonably satisfactory to the Issuer.

(e)     If the Trustee fails to comply with Section 7.09, any Holder who has been a bona fide Holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's or the Guarantors' obligations under Section 7.06 shall continue for the benefit of the retiring Trustee or Agent, as applicable.

SECTION 7.08    Successor Trustee by Merger. If the Trustee consolidates with, merges or converts into, or transfers all or Substantially All of its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; provided, however, that the right to adopt the certificate of authentication of any predecessor Trustee or to authenticate Notes in the name of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

SECTION 7.09    Eligibility; Disqualification. This Indenture shall at all times have a Trustee that is an entity organized and doing business under the laws of the United States or any state thereof that is authorized under such laws to exercise corporate trustee power and that is subject to supervision or examination by federal or state authorities. The Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition. No obligor under the Notes or Person directly controlling, controlled by, or under common control with such obligor shall serve as Trustee.

ARTICLE VIII

Discharge of Indenture; Defeasance

81

SECTION 8.01    Discharge of Liability on Notes; Defeasance. This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture, or the obligations of a Payor to pay Additional Amounts applicable to any payment with respect to the Notes or any Guarantee) as to all outstanding Notes when:

(a)    either (i) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (ii) all of the Notes (A) have become due and payable, (B) will become due and payable at their stated maturity within one year or (C) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(b)    the Issuer or the Guarantors have paid all other sums payable under this Indenture; and

(c)    the Issuer has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with; provided, however, that any counsel may rely on an Officers' Certificate as to matters of fact.

Notwithstanding clauses (a) and (b) above, the Issuer's, the Company's and the other Guarantors' obligations, as applicable, in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 4.14, 7.06, 7.07, 10.08 and in this Article VIII shall survive until the Notes have been paid in full. Thereafter, the Issuer's, the Company's and the other Guarantors' obligations, as applicable, in Sections 7.06 and 8.05 and shall survive such satisfaction and discharge.

Subject to the preceding paragraph and Section 8.02, the Issuer at any time may terminate (i) all of its obligations under the Notes and this Indenture (with respect to such Notes) ("legal defeasance option") or (ii) its obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12, 4.15 and the operation of Section 5.01 and Sections 6.01(c), 6.01(d) (with respect to the foregoing Sections of Article IV only), 6.01(e), 6.01(f) (with respect to Significant Subsidiaries only), 6.01(g) (with respect to Significant Subsidiaries only), and 6.01(h) ("covenant defeasance option"). The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, each Guarantor will be released from all of its obligations with respect to its Guarantee.

If the Issuer exercises its legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If the Issuer exercises its covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e), 6.01(f) (with respect to Significant Subsidiaries only), 6.01(g) (with respect only to Significant Subsidiaries) or 6.01(h).

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those obligations that the Issuer terminates.

SECTION 8.02    <u>Conditions to Defeasance</u>. (a)  The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i)    the Issuer irrevocably deposits with the Trustee money in US Dollars, the principal of and the interest on which shall be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii)    the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited US Dollars, plus any deposited money without investment shall provide cash at such times and in such amounts as shall be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii)    90 days pass after the deposit is made and during the 90-day period no Default specified in <u>Section 6.01(f)</u> or <u>(g)</u> with respect to the Company or the Issuer occurs which is continuing at the end of the period;

(iv)    the deposit does not constitute a default under any other material agreement binding on the Issuer or the Company;

(v)    in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable US federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders shall not recognize income, gain or loss for US federal income tax purposes as a result of such deposit and defeasance and shall be subject to US federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; provided, however, the Opinion of Counsel required with respect to a legal defeasance need not be delivered if all Notes not theretofore delivered to the Trustee for cancellation have become due and payable;

(vi)    in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders shall not recognize income, gain or loss for US Federal income tax purposes as a result of such deposit and defeasance and shall be subject to US Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(vii)    the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this <u>Article VIII</u> have been complied with.

(b)    Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with <u>Article III</u>.

83

SECTION 8.03    <u>Application of Trust Money</u>. The Trustee shall hold money or deposited with it pursuant to this <u>Article VIII</u>. It shall apply the deposited money through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04    <u>Repayment to the Issuer</u>. Each of the Trustee and the Paying Agent shall promptly pay to the Issuer upon request an amount equal to any money held by it as provided in this <u>Article VIII</u> which, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this <u>Article VIII</u>.

Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, Holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and the Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05    <u>Reinstatement</u>. If the Trustee or the Paying Agent is unable to apply any money in accordance with this <u>Article VIII</u> by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this <u>Article VIII</u> until such time as the Trustee or the Paying Agent is permitted to apply all such money in accordance with this <u>Article VIII</u>; provided, however, that, if the Issuer or any Guarantor has made any payment of principal of or interest on, any such Notes because of the reinstatement of the Issuer's obligations, the Issuer or such Guarantor, as the case may be, shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or the Paying Agent.

ARTICLE IX

Amendments and Waivers

SECTION 9.01    <u>Without Consent of the Holders</u>. (a) The Issuer, the Company and the Trustee may amend this Indenture and the Notes:

(i)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(ii)    to give effect to any provision of this Indenture (including, without limitation, the release of any Guarantees in accordance with the terms of <u>Section 10.06</u>);

(iii)    to comply with <u>Article V</u>;

(iv)    to provide for the assumption by a Successor Issuer or a Successor Holding Company, as applicable, of the obligations of the Issuer or the Company, as applicable, under this Indenture and the Notes, to provide for the assumption by a Successor Guarantor of the obligations of a Guarantor under this Indenture and its Guarantee;

(v)    to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code);

(vi)    to add a Guarantee with respect to the Notes;

84

(vii)    to provide for collateral for the Notes in accordance with <u>Section 4.12</u>;

(viii)    to add to the covenants of the Company and its Subsidiaries for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or the Company;

(ix)    to make any change that does not adversely affect the rights of any Holder;

(x)    to evidence and give effect to the acceptance and appointment under this Indenture of a successor Trustee;

(xi)    to provide for the accession of the Trustee to any instrument in connection with the Notes;

(xii)    to make certain changes to this Indenture to provide for the issuance of Additional Notes; or

(xiii)    to comply with any requirement of the SEC in connection with the qualification of this Indenture under the Trust Indenture Act, if such qualification is required.

Before entering into any such amendment or supplemental indenture, the Trustee shall be entitled to require and rely absolutely on an Opinion of Counsel and an Officers' Certificate.

After an amendment under this <u>Section 9.01</u> becomes effective, the Issuer shall mail (or otherwise deliver in accordance with applicable DTC procedures) to the Holders a notice briefly describing such amendment. However, the failure to give such notice to all Holders entitled to receive such notice, or any defect therein, shall not impair or affect the validity of the amendment under this <u>Section 9.01</u>.

SECTION 9.02    <u>With Consent of the Holders</u>. (a)  The Issuer, the Company and the Trustee may amend this Indenture and the Notes with the consent of the holders of 66.67% or more of the aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange for the Notes) and any past default or compliance with any provisions may be waived with the consent of the holders of 66.67% or more of the aggregate principal amount of the Notes then outstanding; provided, however, that without the consent of each holder of an outstanding Note affected, no amendment may, among other things:

(i)    reduce the amount of Notes whose holders must consent to an amendment;

(ii)    reduce the rate of or extend the time for payment of interest on any Note;

(iii)    reduce the principal of or extend the Stated Maturity of any Note;

(iv)    reduce the premium or amount payable upon the redemption of any Note, change the time at which any Note may be redeemed in accordance with <u>Article III</u> of this Indenture or Section 5 of the Notes;

(v)    make any Note payable in money other than that stated in such Note;

(vi)    expressly subordinate the Notes or any Guarantee to any other Indebtedness of the Company, the Issuer or any Subsidiary Guarantor not otherwise permitted by this Indenture;

85

(vii)    impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(viii)    release any Guarantee of any Subsidiary Guarantor;

(ix)    release substantially all the Liens on the Collateral securing the Notes;

(x)    make any change in <u>Section 6.04</u>, the proviso at the end of the first sentence of this <u>Section 9.02</u> or <u>Section 9.06</u>;

(xi)    make any change in <u>Sections 4.14</u> or <u>10.08</u> of this Indenture or Section 6 or Section 10 of the Notes that adversely affects the rights of any Holder to receive payments of Additional Amounts pursuant to such provisions or amend the terms of the Notes or this Indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder that are required to be withheld or deducted by any Relevant Taxing Jurisdiction from any payments made on the Note or any Guarantees by the Payors, unless the Company or any Restricted Subsidiary agrees to pay any Additional Amounts that arise as a result; provided that for purposes of this clause (x) a "Relevant Taxing Jurisdiction" shall include the United States.

It shall not be necessary for the consent of the Holders under this <u>Section 9.02</u> to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this <u>Section 9.02</u> becomes effective, the Issuer shall mail (or otherwise deliver in accordance with applicable DTC procedures) to the Holders a notice briefly describing such amendment. However, the failure to give such notice to all Holders entitled to receive such notice, or any defect therein, shall not impair or affect the validity of the amendment under this <u>Section 9.02</u>.

SECTION 9.03    <u>Revocation and Effect of Consents and Waivers</u>. (a)    A consent to an amendment or a waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officers' Certificate from the Issuer certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every Holder. An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the Notes of the requisite principal amount of Notes, (ii) satisfaction of conditions to effectiveness as set forth in <u>Section 12.01</u> and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b)    The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding clause (a) of this <u>Section 9.03</u>, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.04    Notation on or Exchange of Notes. If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the Holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines in exchange for the Note, the Issuer shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.05    Trustee to Sign Amendments. The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity or security satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Guarantors, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof.

SECTION 9.06    Payment for Consent. The Issuer and each Affiliate of the Issuer shall not, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 9.07    Compliance with the Trust Indenture Act. All amendments and supplements shall comply with the Trust Indenture Act if, at the time of any such amendment, supplement or waiver, the Trust Indenture Act is applicable to this Indenture. In the event the Notes are registered with the SEC pursuant to the Registration Rights Agreement, the Trust Indenture Act shall govern this Indenture.

ARTICLE X

Guarantees

SECTION 10.01    Guarantees. (a) Each Guarantor hereby unconditionally and irrevocably guarantees, jointly and severally, on a senior basis, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment of principal of and interest on the Notes when due, whether at maturity, by acceleration, by redemption or otherwise, and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "*Guaranteed Obligations*"), subject to the limitations imposed by applicable local law and the other limitations imposed by the terms of this Indenture. Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from such Guarantor and that such Guarantor will remain bound under this Article X notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)    Each Guarantor waives presentation to, demand of, payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of

87

each Guarantor hereunder shall not be affected by (1) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person (including any Guarantor) under this Indenture, the Notes or any other agreement or otherwise; (2) any extension or renewal of any thereof; (3) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (4) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (5) the failure of any Holder or the Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (6) except as set forth in Section 10.06, any change in the ownership of such Guarantor.

(c)     Each Guarantor further agrees that its Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(d)     Except as expressly set forth in Article VIII and Sections 10.02 and 10.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law or equity.

(e)     Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(f)     In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Holders or the Trustee an amount equal to the sum of (A) the unpaid amount of such Guaranteed Obligations, (B) accrued and unpaid interest and premiums (if any) on such Guaranteed Obligations (but only to the extent not prohibited by law) and (C) all other monetary Guaranteed Obligations of the Issuer to the Holders and the Trustee.

(g)     Each Guarantor agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations hereby may be accelerated as provided in Article VI for the purposes of such Guarantor's Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

88

(h)    Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee or any Holder in enforcing any rights under this Section 10.01.

SECTION 10.02    Limitation on Liability. Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

SECTION 10.03    Successors and Assigns. This Article X shall be binding upon each Guarantor and its successors and shall inure to the benefit of and be enforceable by the successors, transferees and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture. Each Guarantee shall be a continuing guarantee and shall, subject to Section 10.06, remain in full force and effect until the payment in full of the Guaranteed Obligations.

SECTION 10.04    No Waiver. Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article X shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article X at law, in equity, by statute or otherwise.

SECTION 10.05    Modification. No modification, amendment or waiver of any provision of this Article X, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 10.06    Release of Guarantor. A Guarantee of a Subsidiary Guarantor will be automatically released upon (x) receipt by the Trustee of a notification from the Issuer or the Company that such Guarantee be released and (y) the occurrence of any of the following:

(a)    the consummation of any transaction permitted by this Indenture as a result of which such Subsidiary Guarantor ceases to be a Restricted Subsidiary;

(b)    the release or discharge of the guarantee or other obligation by such Subsidiary Guarantor of the First Lien Credit Agreement or such other guarantee or other obligation that resulted in the creation of such Guarantee, except a release or discharge by or as a result of payment under such guarantee;

(c)    the Company designating such Subsidiary Guarantor to be an Unrestricted Subsidiary in accordance with Section 4.04 and the definition of "Unrestricted Subsidiary";

89

(d)    the Issuer's exercise of its legal defeasance option or covenant defeasance option as described under Article VIII or if the Issuer's obligations under this Indenture are otherwise discharged in accordance with the terms of this Indenture; or

(e)    the transfer or sale of the equity interests of such Subsidiary Guarantor pursuant to an enforcement action.

A Guarantee of a Guarantor will also be released as provided in Section 5.01.

Upon the occurrence of any event set forth by this Section 10.06, the Issuer shall deliver to the Trustee an Officers' Certificate stating that all conditions precedent provided for in this Indenture relating to the release of the relevant Guarantor have been complied with. Upon any occurrence specified in this Section 10.06, the Trustee shall, at the instruction of and at the cost of the Issuer, execute any documents reasonably requested of it to evidence such release.

SECTION 10.07   Contribution. Each Guarantor that makes a payment under its Guarantee shall be entitled upon payment in full of all Guaranteed Obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

SECTION 10.08   Withholding Taxes. (a)  All payments made by any Guarantor or any successor in interest to any Guarantor (each, a "*Payor*") on or with respect to the Notes or any Guarantee will be made without withholding or deduction for, or on account of, any Taxes unless such withholding or deduction is required by law. If any withholding or deduction for, or on account of, any Taxes imposed or levied by or on behalf of:

(i)    any jurisdiction (other than the United States or any political subdivision or governmental authority thereof or therein having the power to tax) from or through which payment on or with respect to the Notes or any Guarantee is made by a Payor, or any political subdivision or governmental authority thereof or therein having the power to tax; or

(ii)    any other jurisdiction (other than the United States or any political subdivision or governmental authority thereof or therein having the power to tax) in which a Payor that actually makes a payment on or with respect to the Notes or any Guarantee is organized or otherwise considered to be a resident for tax purposes, or any political subdivision or governmental authority thereof or therein having the power to tax, (each of clause (i) and (ii) of this Section 10.08(a), a "*Relevant Taxing Jurisdiction*"), is at any time required from any payment made by a Payor on or with respect to the Notes or any Guarantee, including payments of principal, redemption price, interest or premium, if any, then the relevant Payor will pay (together with such payment) such additional amounts (the "*Additional Amounts*") as may be necessary in order that the net amounts received in respect of such payment by a noteholder or the Trustee, as the case may be, after such withholding or deduction (including any such withholding or deduction from such Additional Amounts), will not be less than the amount that would have been received in respect of such payment on the Notes or Guarantee in the absence of such withholding or deduction; provided, however, that no such Additional Amounts will be payable for or on account of:

(1)    any Taxes that would not have been so imposed or levied but for the existence of any present or former connection between the relevant

90

noteholder (or between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over the relevant noteholder, if such noteholder is an estate, nominee, trust, partnership, limited liability company or corporation) and the Relevant Taxing Jurisdiction (including being a citizen or resident or national of, or carrying on a business or maintaining a permanent establishment in, or being physically present in, the Relevant Taxing Jurisdiction) but excluding, in each case, any connection arising solely from the acquisition, ownership or holding of a Note or the receipt of any payment in respect thereof;

(2)     any Taxes that would not have been so imposed or levied if the relevant noteholder (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over, the relevant noteholder, if such noteholder is an estate, nominee, trust, partnership, limited liability company or corporation) had complied with a reasonable request in writing of the Payor (such request being made at a time that would enable such Person acting reasonably to comply with that request) to make a declaration of nonresidence or any other claim or filing or satisfy any certification, information or reporting requirement for exemption from, or reduction in the rate of, withholding to which it is entitled (provided that such declaration of nonresidence or other claim, filing or requirement is required by the applicable law, treaty, regulation or administrative practice of the Relevant Taxing Jurisdiction as a precondition to exemption from the requirement to deduct or withhold all or a part of any such Taxes);

(3)     any Taxes that are payable otherwise than by withholding from a payment by a Payor of the principal of, premium, if any, or interest under the Notes or any Guarantee;

(4)     any estate, inheritance, gift, sales, excise, transfer, personal property or similar Tax;

(5)     any Taxes that are required to be deducted or withheld on a payment pursuant to the European Union Directive 2003/48/EC regarding the taxation of savings income (the "*Directive*") or any law implementing, or introduced in order to conform to, the Directive;

(6)     except in the case of the liquidation, dissolution or winding-up of the Payor, any Taxes imposed in connection with a Note presented for payment by or on behalf of a noteholder or beneficial owner to the extent such Taxes could have been avoided by presenting such Note to, or otherwise accepting payment from, another paying agent in a member state of the European Union; or

(7)     any combination of the above.

Such Additional Amounts will also not be payable (x) if the payment could have been made without such deduction or withholding if the beneficiary of the payment had presented the Note for payment (where presentation is required) within 30 days after the relevant payment was first made available for payment to the noteholder or (y) where, had the beneficial owner of the Note been the holder of the Note, such beneficial owner would not have been entitled to payment of Additional Amounts by reason of any of clauses (1) to (7) inclusive above.

91

(b)      The Payor will (i) make any required withholding or deduction and (ii) remit the full amount withheld or deducted to the relevant taxing authority of the Relevant Taxing Jurisdiction in accordance with applicable law. Upon request, such Payor will use all reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each relevant taxing authority of each Relevant Taxing Jurisdiction imposing such Taxes and will provide such certified copies to the Trustee. If, notwithstanding the efforts of such Payor to obtain such receipts, the same are not obtainable, such Payor will provide the Trustee with other evidence reasonably satisfactory to the relevant noteholder.

(c)      If any Payor will be obligated to pay Additional Amounts under or with respect to any payment made on the Notes or any Guarantee, at least 30 days prior to the date of such payment, such Payor will deliver to the Trustee an Officers' Certificate stating the fact that Additional Amounts will be payable and the amount so payable and such other information necessary to enable the Paying Agent to pay Additional Amounts to noteholders on the relevant payment date (unless such obligation to pay Additional Amounts arises less than 45 days prior to the relevant payment date, in which case such Payor shall deliver such Officers' Certificate and such other information as promptly as practicable after the date that is 30 days prior to the payment date, but no less than five (5) Business Days prior thereto, and otherwise in accordance with the requirements of DTC).

(d)      Wherever in this Indenture, the Notes or any Guarantee there is mentioned, in any context: (i) the payment of principal, (ii) redemption prices or purchase prices in connection with a redemption or purchase of Notes, (iii) interest or (iv) any other amount payable on or with respect to any of the Notes or any Guarantee, such reference shall be deemed to include payment of Additional Amounts as described under this Section 10.08 to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

The foregoing obligations will survive any termination, defeasance or discharge of this Indenture and will apply mutatis mutandis to any jurisdiction in which any successor to an Issuer is organized or otherwise considered to be a resident for tax purposes or any political subdivision or taxing authority or agency thereof or therein.

ARTICLE XI

Collateral and Security

SECTION 11.01   The Collateral.

(a)      The Issuer hereby appoints [ ] to act as Collateral Agent, and each Holder by its acceptance of any Notes and the Guarantees, irrevocably consents and agrees to such appointment. The Collateral Agent shall have the privileges, powers and immunities as set forth in this Indenture, the Security Documents and the Intercreditor Agreement. The due and punctual payment of the principal of, premium, if any, and interest (including Additional Interest) on the Notes and the Guarantees when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, interest on the overdue principal of and interest (to the extent permitted by law), if any, on the Notes and the Guarantees and performance of all other obligations under this Indenture, including, without limitation, the obligations of the Issuer set forth in Section 7.06, and the Notes, the Guarantees and the Security Documents, shall be secured by Liens and security interests on the Collateral (subject to Permitted Liens), as and to the extent provided in the Security Documents and the Intercreditor Agreement.  The proceeds of any collection, sale, disposition or other realization of Collateral received in connection with the exercise of remedies (including distributions of cash, securities

92

or other property on account of the value of the Collateral in a bankruptcy, insolvency, reorganization or similar proceedings) shall be applied in accordance with the terms of the Security Documents, subject to the Intercreditor Agreement. The Issuer and the Guarantors hereby agree that the Collateral Agent shall hold the Collateral in trust for the benefit of all of the Holders and the Trustee, in each case pursuant to the terms of the Security Agreement and the other Security Documents. The Collateral Agent is hereby authorized to execute and deliver the Security Agreement, the other Security Documents and the Intercreditor Agreement.

(b)     Each Holder, by its acceptance of any Notes and the Guarantees, irrevocably consents and agrees to the terms of the Security Documents and the Intercreditor Agreement (including, without limitation, the provisions providing for foreclosure) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes and directs the Collateral Agent to perform its obligations and exercise its rights, powers and discretions under the Security Documents and the Intercreditor Agreement in accordance therewith.

(c)     The Trustee and each Holder, by accepting the Notes and the Guarantees, acknowledges that, as more fully set forth in the Security Documents and the Intercreditor Agreement, the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders and the Trustee.

SECTION 11.02   Impairment of Security Interest. Neither the Company, the Issuer, nor any of their Restricted Subsidiaries will take or omit to take any action which would materially adversely affect or impair the Liens in favor of the Collateral Agent and the Holders with respect to the Collateral. Neither the Issuer nor any of its Restricted Subsidiaries shall grant to any Person, or permit any Person to retain (other than the Collateral Agent), any Liens in the Collateral, other than Permitted Liens. None of the Issuer, the Company or any of their respective Restricted Subsidiaries will enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person in a manner that conflicts with this Indenture, the Notes, the Guarantees and the Security Documents. Company and the Issuer will, and the Issuer will cause each Restricted Subsidiary to, at its sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee or the Collateral Agent reasonably requests, to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Security Documents.

SECTION 11.03   Release of Liens on the Collateral.

(a)     The Liens on the Collateral securing the Notes will automatically and without the need for any further action by any Person be released:

(1)     in whole or in part, as applicable, as to all or any portion of property subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(2)     in whole upon satisfaction and discharge in full of the Indenture or legal defeasance or covenant defeasance as set forth in Article VIII;

(3)     in part, as to any property that (a) is sold, transferred or otherwise disposed of by the Issuer or any Guarantor (other than to the Company, the Issuer or a Restricted Subsidiary) in a transaction not prohibited by this Indenture at the time of such sale, transfer or disposition or (b) is cash or Net

93

Proceeds withdrawn from the Collateral Account for any one or more purposes permitted by Section 4.06(b);

(4)    in part, as to any property that is owned or at any time acquired by a Guarantor that has been released from its Guarantee in accordance with this Indenture, concurrently with the release of such Guarantee;

(5)    in part, in accordance with the applicable provisions of the Security Documents; and

(b)    in whole or in part, as applicable, with the consent of Holders of 75% of the outstanding aggregate principal amount the Notes (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, Notes).

To the extent applicable, the Issuer and each Guarantor will furnish to the Trustee, prior to each proposed release of such Collateral pursuant to the Security Documents and this Indenture:

(1)    an Officers' Certificate requesting such release;

(2)    an Officers' Certificate and an Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture and the Security Documents to such release have been complied with

(3)    a form of such release (which release shall be in form reasonably satisfactory to the Trustee and shall provide that the requested release is without recourse or warranty to the Trustee);

(4)    all documents required by TIA §314(d), this Indenture, the Security Documents and the Intercreditor Agreement; and

(5)    an Opinion of Counsel to the effect that such accompanying documents constitute all documents required by TIA §314(d), this Indenture and the Security Documents.

Upon compliance by the Issuer or the Guarantors, as the case may be, with the conditions precedent set forth above, and upon delivery by the Issuer or such Guarantor to the Trustee of an Opinion of Counsel to the effect that such conditions precedent have been complied with, the Trustee or the Collateral Agent shall promptly cause to be released and reconveyed to the Issuer, or the Guarantors, as the case may be, the released Collateral.

(c)    For purposes of the TIA, the release of any Collateral from the terms of the Security Documents will not be deemed to impair the security under this Indenture in contravention of the provisions hereof or affect the Lien of this Indenture or the Security Documents if and to the extent the Collateral is released pursuant to this Indenture and the Security Documents or upon the termination of this Indenture.

SECTION 11.04    Authorization of Actions to be Taken by the Trustee or the Collateral Agent Under the Security Documents.

(a)    Subject to the provisions of the Security Documents and the Intercreditor Agreement, each of the Trustee or the Collateral Agent may, in its sole discretion and without the consent

94

of the Holders, on behalf of the Holders, take all actions it deems necessary or appropriate in order to (a) enforce any of its rights or any of the rights of the Holders under the Security Documents and the Intercreditor Agreement and (b) collect and receive any and all amounts payable in respect of the Collateral in respect of the obligations of the Issuer and the Subsidiaries hereunder and thereunder. Subject to the provisions of the Security Documents and the Intercreditor Agreement, the Trustee or the Collateral Agent shall have the power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Documents, the Intercreditor Agreement or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(b)     The Trustee or the Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee or the Collateral Agent shall have no responsibility for recording, filing, re-recording or refiling any financing statement, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to it under the Security Documents or otherwise.

(c)     Where any provision of this Indenture requires that additional property or assets be added to the Collateral, the Issuer and each Guarantor shall deliver to the Trustee or the Collateral Agent the following:

(i)     a request from the Issuer that such Collateral be added;

(ii)     the form of instrument adding such Collateral, which, based on the type and location of the property subject thereto, shall be in substantially the form of the applicable Security Documents entered into on the Escrow Release Date, with such changes thereto as the Issuer shall consider appropriate, or in such other form as the Issuer shall deem proper; provided that any such changes or such form are administratively satisfactory to the Trustee or the Collateral Agent;

(iii)     an Officers' Certificate to the effect that the Collateral being added is in the form, consists of the assets and is in the amount or otherwise has the fair market value required by this Indenture;

(iv)     an Officers' Certificate and Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture to the addition of such Collateral have been complied with, which Opinion of Counsel shall also opine as to the creation and perfection of the Collateral Agent's Lien on such Collateral and as to the due authorization, execution, delivery, validity and enforceability of the Security Documents being entered into; and

95

(v)      such financing statements, if any, as the Issuer shall deem necessary to perfect the Collateral Agent's security interest in such Collateral.

(d)      The Trustee or the Collateral Agent, in giving any consent or approval under the Security Documents, shall be entitled to receive, as a condition to such consent or approval, an Officers' Certificate and an Opinion of Counsel to the effect that the action or omission for which consent or approval is to be given does not adversely affect the interests of the Holders or impair the security of the Holders in contravention of the provisions of this Indenture or the Security Documents, and the Trustee or the Collateral Agent shall be fully protected in giving such consent or approval on the basis of such Officers' Certificate and Opinion of Counsel.

SECTION 11.05   Collateral Accounts.

(a)      The Trustee is authorized to receive any funds for the benefit of the Holders distributed under, and in accordance with, the Security Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture, the Security Documents and the Intercreditor Agreement.

(b)      The Issuer shall have established the Collateral Accounts, which shall at all times hereafter until this Indenture shall have terminated, be maintained with, and under the control of the First Lien Agent or the Collateral Agent, as the case may be. The Collateral Accounts shall be trust accounts and shall be established and maintained by the First Lien Agent and all Collateral shall be credited thereto. All Net Proceeds from Asset Sales, Recovery Events in respect of Collateral, Net Awards or Net Insurance Proceeds, including earnings, revenues, rents, issues, profits and income therefrom and interest earned thereon, shall be deposited in the Collateral Account. In connection with any and all deposits to be made into the Collateral Accounts under this Indenture, the Security Documents or the Intercreditor Agreement, the Trustee and/or the Collateral Agent, as applicable, shall receive an Officers' Certificate identifying which Collateral Account shall receive such deposit.

(c)      Pending the distribution of funds in the Collateral Account in accordance with the provisions hereof and of the Intercreditor Agreement and provided that no Event of Default shall have occurred and be continuing, the Issuer may direct the First Lien Agent to invest such funds in Cash Equivalents specified in such direction, such investments to mature by the times such funds are needed hereunder and such direction to certify that such funds constitute Cash Equivalents and that no Event of Default shall have occurred and be continuing. So long as no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent to sell, liquidate or cause the redemption of any such investments, such direction to certify that no Event of Default shall have occurred and be continuing. Any gain or income on any investment of funds in the Collateral Account shall be credited to the Collateral Account. The Collateral Agent shall have no liability for any loss incurred in connection with any investment or any sale, liquidation or redemption thereof made in accordance with the provisions of this Section 11.05(c).

SECTION 11.06   Control Agreements. The Issuer and the Guarantors shall maintain all cash and Cash Equivalents of the Issuer and the Guarantors at an account or accounts (a) with a financial institution that has entered into a control agreement in favor of the Collateral Agent with respect to such account(s) or (b) at an account the entire balance of which is swept at least once every three business days to an account described in clause (a) above as soon as practicable but in any event within 30 days after the Issue Date.

SECTION 11.07   Information Regarding Collateral.

(a)      The Issuer shall furnish to the Collateral Agent, with respect to the Issuer or any Guarantor, promptly (and in any event within 30 days of such change) written notice of any change in such Person's (i) legal name, (ii) jurisdiction of organization or formation, (iii) identity or corporate structure or (iv) Organizational Identification Number. The Issuer and the Guarantors agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in the Security Documents in order for the Collateral to be made subject to the Lien of the Collateral Agent under the Security Documents in the manner and to the extent required by the Indenture or any of the Security Documents and shall take all necessary action so that such Lien is perfected with the same priority as immediately prior to such change to the extent required by the Security Documents. The Issuer also agrees promptly to notify the Collateral Agent if any material portion of the Collateral is damaged, destroyed or condemned.

(b)      Each year, within 120 days after the end of the preceding fiscal year, the Issuer shall deliver to the Trustee a certificate of a financial Officer setting forth the information required pursuant to the schedules required by the Security Documents or confirming that there has been no change in such information since the date of the prior annual financial statements; provided that no such certificate shall be required for any fiscal year ended prior to the Issue Date.

ARTICLE XII

Miscellaneous

SECTION 12.01  Notices. (a)  Any notice or communication required or permitted hereunder shall be in the English language in writing and delivered in person, via facsimile, email or mailed by first-class mail addressed as follows:

if to the Issuer or a Guarantor:

[ ]

and

if to the Trustee, Collateral Agent, Paying Agent, Transfer Agent or Registrar:

[ ]

The Issuer, any Guarantor, the Trustee, the Collateral Agent and the Transfer Agent, Registrar and Paying Agent, by notice to the other parties hereto, may designate additional or different addresses for subsequent notices or communications.

(b)      Any notice or communication delivered to a Holder shall be delivered electronically or mailed, first class mail, to the Holder at the Holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so delivered within the time prescribed.

(c)      Failure to deliver a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is delivered in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

(d)      The Trustee and the Agents agree to accept and act upon notice, instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods; provided, however, that (a) the party providing such written instructions, subsequent to such transmission of written instructions, shall provide executed instructions or directions to the Trustee or the Agents in a timely manner, and

(e)      such executed instructions or directions shall be signed (manually or by facsimile) by an authorized representative of the party providing such instructions or directions. If the party elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee and the Agents shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's and the Agents' reliance upon and compliance in good faith with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction received by the Trustee and the Agents following action taken pursuant to prior instruction. The party providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting in good faith on unauthorized instructions, and the risk of interception and misuse by third parties.

(f)      Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption or purchase) to a Holder of a Global Security (whether by mail or otherwise), such notice shall be sufficiently given if given to DTC or its designee pursuant to the standing instructions from DTC or its designee.

SECTION 12.02   Certificate and Opinion as to Conditions Precedent. Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a)      an Officers' Certificate in form satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)      an Opinion of Counsel in form satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 12.03   Statements Required in Certificate or Opinion. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a)      a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

01:21244188.1

(d)        a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; provided, however, that with respect to matters of fact an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

SECTION 12.04    <u>When Notes Disregarded</u>. In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer or any Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or any Guarantor shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee knows are so owned shall be so disregarded. Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 12.05    <u>Rules by Trustee, Paying Agent and Registrar</u>. The Trustee may make reasonable rules for action by or a meeting of the Holders. The Registrar and the Paying Agent may make reasonable rules for their functions.

SECTION 12.06    <u>Legal Holidays</u>. If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 12.07    <u>GOVERNING LAW</u>. THIS INDENTURE AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE PARTIES HERETO HEREBY AGREE TO WAIVE ANY RIGHT THEY MAY HAVE TO TRIAL BY JURY.

SECTION 12.08    <u>Consent to Jurisdiction and Service</u>. Each of the Company and each Guarantor that is a Foreign Subsidiary will irrevocably and unconditionally: (a) submit itself and its property in any legal action or proceeding relating to this Indenture to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the general jurisdiction of the courts of the State of New York, sitting in the Borough of Manhattan, The City of New York, the courts of the United States of America for the Southern District of New York, appellate courts from any thereof and courts of its own corporate domicile, with respect to actions brought against it as defendant; (b) consent that any such action or proceeding may be brought in such courts and waive any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (c) designate and appoint the Issuer as its authorized agent upon which process may be served in any action, suit or proceeding arising out of or relating to this Indenture that may be instituted in any Federal or state court in the State of New York; and (d) agree that service of any process, summons, notice or document by US registered mail addressed to UCI International, with written notice of said service to 14601 Highway 41 North Evansville, Indiana 47725 (fax number: 812-867-4157), shall be effective service of process for any action, suit or proceeding brought in any such court.

SECTION 12.09    <u>No Recourse Against Others</u>. No (i) director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company, the Issuer or any direct or indirect parent corporation or (ii) director, officer, employee or manager of a Guarantor, will have any liability for any obligations of the Issuer, the Company or any Subsidiary Guarantor under the Notes, this Indenture or any Guarantee, or for any claim based on, in respect of, or by reason of, such obligations or

99

their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

SECTION 12.10  Successors. All agreements of the Issuer, the Company and each Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee, and each Agent in this Indenture shall bind its successors.

SECTION 12.11  Multiple Originals. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

SECTION 12.12   Table of Contents; Headings. The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 12.13   Indenture Controls. If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 12.14   Severability. In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 12.15   Place of Performance. The parties to this Indenture shall perform their obligations under or in connection with the Note Documents exclusively at the Place of Performance (as defined below). For the purposes of the above, "Place of Performance" means (a) in relation to any payment under or in connection with a Note Document, the place at which such payment is to be made pursuant to Section 4.01 and (b) in relation to any other obligation or liability under or in connection with the Note Documents, the premises of the Trustee in New York or any other place as the Trustee may specify from time to time.

[Remainder of page intentionally left blank]

100

**Exhibit 1.132**
**<u>Shareholders Agreement</u>**

**THIS DOCUMENT IS A DRAFT FORM PREPARED BY PROFESSIONALS OF THE PLAN SPONSORS.  THE DOCUMENT REMAINS SUBJECT TO ONGOING DISCUSSION AND CONFIRMATION BY THE PLAN PROPONENTS OF CERTAIN TERMS, REQUIREMENTS AND MECHANICS.**

**STOCKHOLDERS AND REGISTRATION RIGHTS AGREEMENT** (this "Agreement"), dated as of [●], 2016, by and among [New UCI Inc.], a corporation organized under the laws of the State of Delaware (the "Company"), and the initial stockholders of the Company as of the Effective Date (as hereinafter defined) listed on Schedule A hereto (the "Initial Stockholders") and their Transferees (as hereinafter defined), and such other Persons (as hereinafter defined) that may become party to this Agreement in accordance with the terms of this Agreement.

## RECITALS

**WHEREAS**, pursuant to or in connection with the Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated as of October 13, 2016, filed in re: UCI International, LLC, et al., case no. 16-11354 (MFW) (jointly administered), in the United States Bankruptcy Court for the District of Delaware (the "Plan"), the Company shall issue shares of Common Stock to the Initial Stockholders;

**WHEREAS**, this Agreement constitutes the Stockholders' Agreement referred to in the Disclosure Statement (as hereinafter defined);

**WHEREAS**, Section F.14(a) of the Disclosure Statement provides that the Company Securities to be issued to the Stockholders of the Company will be subject to the terms of this Stockholders' Agreement;

**WHEREAS**, pursuant to the Confirmation Order (as defined in the Plan), this Agreement has been approved as valid and binding on the Company and all Company Security Holders as of the Effective Date; and

**WHEREAS**, the Company and each of the other parties hereto desire, for their mutual benefit and protection, to enter into this Agreement to set forth their respective rights and obligations with respect to the Company Securities (whether issued on the Effective Date or hereafter acquired).

**NOW, THEREFORE**, in consideration of the premises and of the mutual consents and obligations hereinafter set forth, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, and in accordance with the Plan and the Confirmation Order, the parties hereto hereby agree as follows:

**SECTION 1.        DEFINITIONS**

Capitalized terms not defined herein shall have their respective meanings specified in the Plan.  As used herein, the following terms shall have the following respective meanings:

"Additional Company Security Holders" shall have the meaning set forth in Section 8(a).

"Affiliate" shall mean, as to any specified Person, any other Person or entity who

directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified Person and includes each executive officer or director, general partner, or member of such other Person (including any investment funds that are directly or indirectly managed or advised by such other Person or by a common manager or advisor with such specified Person). As used in this definition, and elsewhere herein in relation to control of Affiliates, the term "control" means the possession, directly or indirectly, of the power to substantially direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as director or manager, as trustee or executor, by contract or credit arrangement, or otherwise.

"Agreement" shall have the meaning set forth in the Preamble.

"Approved Sale" shall have the meaning set forth in Section 3(a).

"Backstop Commitment Agreement" shall mean that certain Backstop Commitment Agreement, dated as of September 30, 2016, by and among the Debtors and the Backstop Parties.

"Backstop Parties" shall mean the parties identified on Schedule I to the Backstop Commitment Agreement.

"BlackRock" shall mean funds and accounts under management by BlackRock Financial Management, Inc., BlackRock Advisors, LLC and BlackRock Institutional Trust Company, N.A.

"BlackRock Director" shall mean a director nominated and elected by the BlackRock Security Holder Group pursuant to Section 2(a)(i) or Section 2(a)(ii) hereof.

"BlackRock Security Holder Group" shall mean BlackRock, together with its Affiliates.

"BlackRock Security Holder Group Majority" shall mean the Stockholders of the BlackRock Security Holder Group that beneficially own at least a majority of the outstanding Common Stock beneficially owned by the BlackRock Security Holder Group.

"Board" shall have the meaning set forth in Section 2(a)(i).

"Board Majority" shall mean the approval of the Board, which approval shall consist of at least a majority of the members of the Board.

"Business Day" shall mean a day that is not a Saturday, Sunday or day on which banking institutions in the city to which the notice or communication is to be sent are not required to be open.

"By-Laws" shall mean the by-laws of the Company, as amended, amended and restated, modified, or supplemented from time to time.

"Certificate of Incorporation" shall mean the Company's certificate of

incorporation, as amended, amended and restated, modified, or supplemented from time to time.

"Common Stock" shall mean the Common Stock of the Company, par value [$0.01] per share and any other class of common stock of the Company authorized after the date of this Agreement, designated in and authorized by the Company's Certificate of Incorporation.

"Common Stock Equivalent" shall mean any stock, warrants, rights calls, options or other securities exchangeable or exercisable for, or convertible into, directly or indirectly, Common Stock.

"Company" shall have the meaning set forth in the Preamble.

"Company Security" shall mean any capital stock of the Company, including any Common Stock or Common Stock Equivalent.

"Company Security Holder" shall mean a holder of any Company Security party or subject hereto.

"Company Security Holder Group" shall mean (i) with respect to any Company Security Holder that is a natural Person, (A) such Company Security Holder, (B) the spouse, parents, siblings, lineal descendants and adopted children of such Company Security Holder and (C) a trust for the benefit of any of the foregoing, and (ii) with respect to any Company Security Holder that is a corporation, partnership, limited liability company, firm, association, trust, government, governmental agency or other entity, such Company Security Holder and its Affiliates (so long as they remain Affiliates).

"Competitor" shall mean any business [that supplies original equipment or aftermarket replacement parts for light and heavy-duty vehicles, including filtration, fuel delivery systems and cooling systems products].

"Confidential Information" shall mean any information concerning this Agreement or the transactions contemplated hereby and any information received by the Company Security Holders concerning the Company or any of its Subsidiaries furnished to the Company Security Holders in their capacity as such; provided that Confidential Information does not include (a) information that was or becomes generally available publicly other than, with respect to a Company Security Holder, as a result of a disclosure by such Company Security Holder in violation of Section 10, or any other agreement with the Company or any of its Subsidiaries, (b) information that was or becomes available to the Company Security Holder or a Representative of such Company Security Holder on a non-confidential basis from a source other than the Company or any of its Subsidiaries, or (c) information that the Company Security Holder or a Representative of the Company Security Holder independently developed without reference to the Confidential Information or any derivative thereof.

"Consent of Spouse" shall have the meaning set forth in Section 22.

"CSAM" shall mean  the funds, accounts and other entities managed by Credit Suisse Asset Management, LLC

"CSAM Director" shall mean a director nominated and elected by the CSAM Security Holder Group pursuant to Section 2(a)(i) or Section 2(a)(ii) hereof.

"CSAM Security Holder Group" shall mean CSAM, together with its Affiliates.

"CSAM Security Holder Group Majority" shall mean the Stockholders of the CSAM Security Holder Group that beneficially own at least a majority of the outstanding Common Stock beneficially owned by the CSAM Security Holder Group.

"Debtors" shall mean, collectively, UCI International, LLC; Airtex Industries, LLC; Airtex Products, LP; ASC Holdco, Inc.; ASC Industries, Inc.; Champion Laboratories, Inc.; UCI Acquisition Holdings (No. 1) Corp; UCI Acquisition Holdings (No. 3) Corp; UCI Acquisition Holdings (No. 4) LLC; UCI-Airtex Holdings, Inc.; UCI Pennsylvania, Inc.; and United Components, LLC.

"Demand Registration" shall have the meaning set forth in Annex A to this Agreement.

"DGCL" shall mean the Delaware General Corporation Law.

"Disclosure Statement" shall mean the Modified First Amended Disclosure Statement with respect to the Plan, as amended, modified or supplemented from time to time.

"Disqualification Event" shall have the meaning set forth in Section 2(d)(ii).

"Disqualified Designee" shall have the meaning set forth in Section 2(d)(ii).

"Drag-Along Seller" shall have the meaning set forth in Section 3(b).

"Dragging Stockholders" shall have the meaning set forth in Section 3(a).

"Effective Date" shall mean [●], 2016.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, or any successor Federal statute, and the rules and regulations of the SEC promulgated thereunder, all as the same shall be in effect at the time.

"Excluded Affiliate" shall mean an Affiliate of a Competitor (a) that is not (i) a Competitor or (ii) controlled by a Competitor, and (b) the principal business of which is not [supplying aftermarket replacement parts for light and heavy-duty vehicles, including filtration, fuel delivery systems, vehicle electronics and cooling systems products]; provided, that for the avoidance of doubt, in no event shall an Affiliate of Rank be an Excluded Affiliate.

"Financial Officer" shall mean any of the chief financial officer, principal accounting officer, treasurer, or controller of the Company.

"Fully Diluted Basis" shall mean all outstanding Common Stock, assuming the conversion, exercise or exchange, as applicable, of all Common Stock Equivalents into Common Stock, in all cases using the treasury method.

"GAAP" shall mean United States generally accepted accounting principles applied on a consistent basis.

"Indebtedness" shall mean, for any Person, without duplication, determined on a consolidated basis in accordance with GAAP, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (f) all guarantees by such Person of Indebtedness of others, (g) all capital lease obligations of such Person and (h) all direct or contingent obligations of such Person as an account party in respect of letters of credit (including standby and commercial), bankers' acceptances and bank guarantees.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent that, by its terms, such Indebtedness is nonrecourse to such Person.

"Ineligible Person" means any Person that is Rank, an Affiliate of Rank or a Competitor of the Company.

"Initial Major Holders" shall mean the BlackRock Security Holder Group, the JPM Security Holder Group and the CSAM Security Holder Group.

"Initial Stockholders" shall have the meaning set forth in the Preamble.

"Initial Subscribing Investor" shall have the meaning set forth in Section 6(c).

"IPO" shall mean an initial Underwritten Public Offering.

"Joinder Agreement" shall have the meaning set forth in Section 8(a).

"JPM" shall mean [J.P. Morgan Investment Management Inc.]

"JPM Director" shall mean a director nominated and elected by the JPM Security Holder Group pursuant to Section 2(a)(i) or Section 2(a)(ii) hereof.

"JPM Security Holder Group" shall mean JPM, together with its Affiliates.

"JPM Security Holder Group Majority" shall mean the Stockholders of the JPM Security Holder Group that beneficially own at least a majority of the outstanding Common Stock beneficially owned by the JPM Security Holder Group.

"Major Holder" shall mean any Company Security Holder, together with its Affiliates, that beneficially owns more than [_____] shares of Common Stock and is not an Ineligible Person.[1]

"Nominating Stockholder" shall mean, collectively, Company Security Holders holding a majority of the then outstanding Common Stock held by all Company Security Holders.

"Nominee" shall have the meaning set forth in Section 3(e).

"Non-Recourse Person" shall have the meaning set forth in Section 23.

"Notice Date" shall have the meaning set forth in Section 2(a)(vi)(1).

"Observer" shall have the meaning set forth in Section 2(e).

"Offer Securities" shall have the meaning set forth in Section 4(a).

"Offeree Securityholders" shall have the meaning set forth in Section 4(a).

"Organizational Documents" shall mean the Certificate of Incorporation and By-Laws.

"Other Accredited Stockholder" shall have the meaning set forth in Section 6(c).

"Person" shall mean any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency, or other entity, whether acting in an individual, fiduciary or other capacity.

"Plan" shall have the meaning set forth in the Recitals.

"Preemptive Amount" shall have the meaning set forth in Section 6(a).

"Preemptive Notice" shall have the meaning set forth in Section 6(b).

"Preemptive Reply" shall have the meaning set forth in Section 6(b).

"Preemptive Right" shall have the meaning set forth in Section 6(a).

"Proxy" shall mean any proxy, contract, arrangement, understanding, or relationship (whether written or oral), other than a revocable proxy given in response to a public proxy solicitation made pursuant to, and in accordance with, the Exchange Act, pursuant to which a Company Security Holder has a right to vote, shares voting rights, has authorized another Person to vote, has transferred any right to vote, or relates in any way to the voting of any Company Securities.

---

[1] Note to Draft: To equal ten percent (10%) of the Common Stock issued on the Effective Date.

"Public Offering" shall mean a public offering and sale of shares (of capital stock) of the Company pursuant to an effective registration statement under the Securities Act (other than on Form S-4, S-8, or any similar or successor form relating to Common Stock or Common Stock Equivalents issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company or in connection with a direct or indirect business combination involving the Company and another Person, filed under the Securities Act). For the avoidance of doubt, a Public Offering shall not include sales by Company Security Holders pursuant to an exemption provided by Rules 144, 144A or Regulation S under the Securities Act.

"Qualified IPO" shall mean any Underwritten Public Offering of Common Stock resulting in (i) at least ($_____) of gross proceeds to the Company and the Selling Securityholders and (ii) pre-money equity value of at least ($_____).

"Rank" means Rank Group Limited.

"Registration Rights" shall have the meaning set forth in Section 5.

"Representatives" shall have the meaning set forth in Section 10.

"Requisite Majority" shall mean the Company Security Holders that beneficially own, collectively, a majority of the outstanding shares of Common Stock, provided that such Company Security Holders must include the BlackRock Security Holder Group Majority, so long as the BlackRock Security Holder Group is a Major Holder, and one of either (a) the JPM Security Holder Group Majority or the CSAM Security Holder Group Majority, in each case, so long as both the JPM Security Holder Group and the CSAM Security Holder Group are Major Holders.

"Rule 144" shall mean Rule 144 promulgated under the Securities Act.

"Rule 506(d) Related Party" shall have the meaning set forth in Section 2(d)(iii).

"Sale Notice" shall have the meaning set forth in Section 4(a).

"SEC" shall mean the Securities and Exchange Commission or any successor governmental agency.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any successor Federal statute, and the rules and regulations of the SEC promulgated thereunder, all as the same shall be in effect at the time.

"Selling Securityholder" shall have the meaning set forth in Section 4(a).

"Stockholder" shall mean a holder of Common Stock party or subject hereto.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, joint venture, or other legal entity of which a majority of the securities or other interests having ordinary voting power for the election of directors or other

governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, in either case, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

"Tag-Along Sale" shall mean a transaction or series of related transactions involving the direct or indirect Transfer to a Person or a group of Persons (including pursuant to a stock sale, merger, business combination, recapitalization, consolidation, reorganization, restructuring, or similar transaction), in which the aggregate number of shares of Common Stock (on an as-converted basis) to be Transferred by a Selling Securityholder would exceed [_____]² ; provided, however, that a Tag-Along Sale shall not include Transfers (a) to Affiliates or to the Company or its Subsidiaries, (b) in a Public Offering or (c) effected by a distribution of Company Securities by a Company Security Holder to its general or limited partners, members, managers, or stockholders in accordance with such Stockholder's governing documents.

"Tag-Along Securities" shall have the meaning set forth in Section 4(b).

"Tag-Along Seller" shall have the meaning set forth in Section 4(c).

"Transfer" shall mean to sell, assign, transfer, or otherwise dispose of, directly or indirectly, any Company Security.

"Transferee" shall mean any Person who acquires any Company Security from a Company Security Holder.

"Underwritten Public Offering" means an underwritten Public Offering of Common Stock to the public involving public marketing efforts. For the avoidance of doubt, block sales to a single purchaser or small group of purchasers shall not be deemed to be an Underwritten Public Offering, even if such sale is in fact underwritten.

**SECTION 2.        BOARD OF DIRECTORS**

(a)        Board Composition.

(i)        The board of directors of the Company (the "Board") shall initially consist of five (5) directors, it being understood that (x) the Board is intended to initially consist of (A) two (2) directors designated by the BlackRock Security Holder Group Majority, (B) one (1) director designated by the CSAM Security Holder Group Majority, (C) one (1) director designated by the JPM Security Holder Group Majority and (D) one (1) director designated by the Initial Major Holders, collectively, in each case, pursuant to the Plan Supplement, (y) as of the Effective Date, [_____] has been appointed and designated as the [_____] Director, [_____] has been appointed and designated as the [_____] Director, [_____] has been appointed and designated as the [_____] Director and the Board consists of [____] vacancies, including a [_____] Director and [_____] Director

---

² To equal 15% of the Common Stock issued on the Effective Date.

9

and (z) at any time prior to the first annual meeting after the Effective Date, such vacancies may be filled by individuals designated by the Company Security Holder Group intended to be entitled to designate such directors by providing notice of thereof to the Board and the Board and the Company (and to the extent necessary all other Company Security Holders) will take all actions necessary to elect such directors.

(ii)     From and after the Effective Date, the members of the Board shall be nominated and elected as follows:

(1)     for so long as the BlackRock Security Holder Group beneficially owns (x) at least [_____][3] shares of Common Stock (on an as-converted basis), the BlackRock Security Holder Group Majority shall have the right to nominate and elect in accordance with Section 2(a)(v), and, failing that for any reason, upon complying with Section 2(g), elect, two (2) BlackRock Directors; or (y) at least [_____][4] shares of Common Stock (on an as-converted basis), the BlackRock Security Holder Group Majority shall have the right to nominate and have elected in accordance with Section 2(a)(v), and, failing that for any reason, upon complying with Section 2(g), elect, one (1) BlackRock Director;

(2)     for so long as the JPM Security Holder Group beneficially owns at least [_____][5] shares of Common Stock (on an as-converted basis), the JPM Security Holder Group Majority shall have the right to nominate and elect in accordance with Section 2(a)(v), and, failing that for any reason, upon complying with Section 2(g), elect, one (1) JPM Director;

(3)     for so long as the CSAM Security Holder Group beneficially owns at least [_____][6] shares of Common Stock (on an as-converted basis), the CSAM Security Holder Group Majority shall have the right to nominate and elect in accordance with Section 2(a)(v), and, failing that for any reason, upon complying with Section 2(g), elect, one (1) CSAM Director; and

(4)     the remaining directors shall be nominated by the Board and/or a Nominating Stockholder who wishes to exercise its rights under Section 2(a)(vi), which remaining directors shall be elected in accordance with the Certificate of Incorporation, the By-Laws and Sections 2(a)(v) and 2(g).

(iii)     (A) The BlackRock Security Holder Group Majority, in the case of Section 2(a)(ii)(1), (B) the JPM Security Holder Group Majority, in the case of Section 2(a)(ii)(2), (C) the CSAM Security Holder Group Majority, in the case of Section 2(a)(ii)(3), and (D) Company Security Holders holding a majority of the shares of Common Stock (on a Fully Diluted Basis), in the case of Section 2(a)(ii)(4) shall at any time, and from time to time, have the exclusive right to remove any director nominated pursuant to such Section and elected to the Board in accordance with this Section 2 by delivering a written notice to the Company

---

[3] To equal 10% of the Common Stock issued on Effective Date.
[4] To equal 5% of the Common Stock issued on the Effective Date.
[5] To equal 5% of the Common Stock issued on the Effective Date.
[6] To equal 5% of the Common Stock issued on the Effective Date.

(containing the information set forth in Section 2(a)(vi)(2) regarding the replacement director), and, if such Person determines to exercise such right to remove such director, such director shall immediately resign and each of the parties hereto shall take all actions necessary to promptly cause the election, of a replacement director to the Board (including the removal of any director who refuses to resign) nominated pursuant to Section 2(a)(ii) above by the Person(s) who exercised the right to remove such director as soon as possible after the date of the removal of such director. If the BlackRock Security Holder Group ceases to have the right to nominate and have elected in accordance with Section 2(a)(ii)(1) two (2) directors, but retains the right to nominate and have elected one (1) director, then the BlackRock Security Holder Group Majority will designate one (1) of the then serving BlackRock Directors to be deemed no longer a BlackRock Director and such designated director shall no longer be a BlackRock Director and shall thereafter be subject to Section 2(a)(ii)(4) and such director's removal shall thereafter be subject to Section 2(a)(iii)(D). In the event that the BlackRock Security Holder Group ceases to have the (and no longer has any) right to nominate and have elected any director in accordance with Section 2(a)(ii)(1), then the then serving BlackRock Director shall no longer be a BlackRock Director and shall thereafter be subject to Section 2(a)(ii)(4) and such director's removal shall thereafter be subject to Section 2(a)(iii)(D). In the event that the JPM Security Holder Group and/or the CSAM Security Holder Group cease to have the (and no longer has any) right to nominate and have elected any director in accordance with Section 2(a)(ii)(2) or Section 2(a)(ii)(3), as applicable, then the then serving JPM Director or CSAM Director shall no longer be a JPM Director or CSAM Director and shall thereafter be subject to Section 2(a)(ii)(4) and such director's removal shall thereafter be subject to Section 2(a)(iii)(D).

(iv)    In the event that any director shall cease to serve in such capacity, the vacancy resulting thereby shall be filled by an individual nominated (and appointed or elected) by the Company Security Holder or Company Security Holder Group, if any, that nominated and elected such director who has ceased to serve (or, if such director was not nominated by any Company Security Holder or Company Security Holder Group, or such Person(s) no longer has the right to so designate directors pursuant to Section 2(a)(ii)(1), (2) or (3), then pursuant to Section 2(a)(ii)(4)), and each of the parties hereto shall take all actions necessary to promptly appoint and elect or cause the election of, if necessary, such successor or replacement director to the Board as soon as possible after the date of such vacancy.

(v)    Nominations of individuals for election to the Board in accordance with Section 2(a)(ii)(4) may be made at any annual meeting of Company Security Holders or at any special meeting of Company Security Holders, if one of the purposes for which such special meeting was called was the election of directors, by a Nominating Stockholder, present in person or represented by Proxy, and entitled to vote on the election of directors, if: (i) at the close of business on the date of the giving of the notice by such Nominating Stockholder to the Company as provided for below in Section 2(a)(vi)(1), such Nominating Stockholder beneficially owns or is entered in the securities register of the Company as a holder(s) of at least the amount of Common Stock (on a Fully Diluted Basis) required to be a Nominating Stockholder (and, in the case of beneficial ownership, provides to the Company evidence of such beneficial ownership reasonably satisfactory to the Company); and (ii) such Nominating Stockholder complies with the notice procedures set forth below in this Section 2(a)(vi):

(1)        A Nominating Stockholder shall provide notice to the Secretary of the Company in written form at the principal executive offices of the Company: (x) in the case of an annual meeting of Company Security Holders not less than thirty (30) days prior to the date of the annual meeting of Company Security Holders; provided, however, that, in the event that the annual meeting of Company Security Holders is to be held on a date that is less than thirty (30) days after the date (the "Notice Date") on which notice of the date of the annual meeting was made to Company Security Holders by the Company, notice by a Nominating Stockholder may be made not later than the close of business on the third (3rd) day following the Notice Date; and (y) in the case of a special meeting (which is not also an annual meeting) of Company Security Holders called for the purpose of electing directors (whether or not called for other purposes), not later than the close of business on the fifteenth (15th) day following the day on which the first notice of the date of the special meeting of Company Security Holders was made to Company Security Holders by the Company. In no event shall any adjournment or postponement of a meeting of Company Security Holders or the announcement thereof commence a new time period for the giving of a Nominating Stockholder's notice as described above.

(2)        A Nominating Stockholder's notice to the Secretary of the Company must set forth as to each individual whom the Nominating Stockholder proposes to nominate for election as a director: (A) the name, age, business address, and residence address of the individual; (B) the principal occupation, business, or employment of the individual for the most recent five years, and the name and principal business of any company in which any such employment is carried on; and (C) the number of shares of Common Stock (on an as-converted basis) beneficially owned, or controlled or directed, directly or indirectly, by the Nominating Stockholder as of the record date for the meeting of Company Security Holders (if such date shall then have been made available and shall have occurred) and as of the date of such notice. The Company may require any proposed nominee to furnish such other information as may reasonably be required by the Company to determine the eligibility of such proposed nominee to serve as a director of the Company.

(3)        Notwithstanding the foregoing, the Board may, in its sole discretion, waive any requirement in this Section 2(a)(vi).

(b)        Term. Each director shall hold office for a term expiring not later than the close of the first annual meeting of Company Security Holders following such director's election or until the director's earlier death, resignation, disqualification or removal.

(c)        Compensation. The Board in its discretion may determine the compensation, if any, of directors for service as a director.

(d)        Director Qualifications. No director shall be nominated or elected pursuant to Section 2(a)(i), 2(a)(ii) or 2(a)(vi) or otherwise who (A) has been convicted of or pled guilty to a felony, (B) has been censured or subject to equivalent action by the SEC or any internationally recognized securities exchange, or (C) would be disqualified from being a director under the provisions of the DGCL.

(e)    Observers.  From and after the Effective Date, each of the Initial Major Holders shall have the right to designate one (1) individual (each, an "Observer") to attend all meetings of the Board solely in a non-voting observer capacity; provided that an Initial Major Holder shall only have the right to designate an Observer for so long as such Initial Major Holder also has the right to nominate and elect a director pursuant to Section 2(a)(ii)(1), (2) or (3), as applicable.  The Company shall provide each Observer with copies of all notices and written materials given to all of the members of the Board (for the avoidance of doubt, the Observers shall not be deemed to be members of the Board).

(f)    Expenses. The Company shall pay the reasonable out-of-pocket expenses (including travel and lodging) incurred by each director and each Observer in connection with (i) attending meetings of the Board and the committees thereof and (ii) attending any other meetings or performing any other activities at the request of the Board. Expenses shall be reimbursed reasonably promptly after presentment of reasonable documentation to the secretary of the Company.

(g)    Obligation to Support Purposes of this Agreement. Without limiting Section 2(a)(ii) and 2(a)(vi), each Company Security Holder shall vote (or, if applicable, consent in writing with respect to) all of its Common Stock or other voting securities (to the extent entitled to vote or consent with respect to the relevant matter), and each Company Security Holder and the Company shall take all necessary and desirable actions within its control, including causing any director it has nominated or designated pursuant to Section 2(a)(ii) and 2(a)(vi) above to take such actions, as may be requested in order to effect the provisions of this Agreement, including the provisions relating to the nomination, designation, election, removal, or replacement of directors and including the obligation to vote in favor of any prospective director designated or nominated in accordance with this Section 2 and to ensure the continuing Board composition contemplated hereby. Without limiting Section 2(a)(ii) and 2(a)(vi), each Company Security Holder shall cause all of the Common Stock or other Company Securities entitled to vote for the election of directors beneficially owned by it to be present for quorum purposes at each annual meeting of Company Security Holders and at any special meeting of the Company Security Holders at which directors are to be elected or removed or vacancies on the Board are to be filled, or in connection with any such action proposed to be taken by written consent. Without limiting Section 2(a)(ii) and 2(a)(vi), each Company Security Holder hereby grants an irrevocable Proxy coupled with an interest and power of attorney to the Company and its designee to take all necessary actions and execute and deliver all documents deemed necessary and appropriate by the Company or its designee to effectuate the nomination and election of any director pursuant to Section 2(a)(ii) and 2(a)(vi). The parties hereto understand and agree that monetary damages would not adequately compensate an injured party for the breach of this Section 2 by any party, that this Section 2 shall be specifically enforceable, and that any breach or threatened breach of this Section 2 shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

(h)    Indemnification. The Certification of Incorporation and By-Laws shall require indemnification and advancement of defense costs to members of the Board to the maximum extent permitted by the laws of the State of Delaware and shall provide for permissive indemnification for officers, employees, and agents to the maximum extent permitted by

applicable law. The Company may enter into a director indemnification agreement with each director appointed or elected to the Board as set forth in this Section 2 and shall purchase and maintain customary directors and officers insurance from a nationally recognized insurance provider on an "occurrence basis."

## SECTION 3.    DRAG-ALONG RIGHTS

(a)    Prior to a Qualified IPO, at any time that the Stockholders holding a Requisite Majority (the "Dragging Stockholders") approve a sale of the Company to a bona fide third party (including pursuant to a sale of stock, merger or other business combination) (an "Approved Sale"), each Company Security Holder, together with the Company, is hereby obligated to consent to, and raise no objections against, such Approved Sale, and each Company Security Holder is hereby obligated to sell its Company Securities on the terms and subject to the conditions approved by such Dragging Stockholders. The Company shall provide all Company Security Holders with written notice of any Approved Sale at least fifteen (15) Business Days prior to the consummation thereof setting forth in reasonable detail the terms of such Approved Sale, including the class and number of shares of Company Securities to be sold (including the number of Common Stock Equivalents represented thereby), the identity of the prospective Transferee(s), the purchase price per share and form of consideration to be paid in respect of each Company Security to be transferred in connection with such Approved Sale, and the date on which such Approved Sale is proposed to be consummated. The Company Security Holders shall not be required to comply with, and shall have no rights under, Sections 4, 6, and 8 in connection with any Approved Sale.

(b)    Each Company Security Holder required to sell Company Securities pursuant to an Approved Sale (each, a "Drag-Along Seller") shall cooperate in consummating such Approved Sale, including by becoming a party to the sales, merger, or other agreement pursuant to which it is proposed such Approved Sale will be consummated and all other appropriate related agreements, delivering, at the consummation of such sale, stock certificates (if any) and other instruments for such securities duly endorsed for transfer, free and clear of all liens and encumbrances, and voting or consenting in favor of such transaction (to the extent a vote or consent is required) and taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments, and other documents. In addition, each Drag-Along Seller shall, if and to the extent requested by the Dragging Stockholders, agree to be severally responsible for its proportionate share, based on the percentage of Company Securities (calculated based on the consideration paid per share of Common Stock to each Drag-Along Seller) transferred in such Approved Sale, of (i) the third-party expenses incurred on behalf and for the benefit of all Drag-Along Sellers in connection with such Approved Sale, to the extent not paid by the Company or any other Person, and (ii) the monetary obligations and liabilities applicable to all Drag-Along Sellers in connection with such Approved Sale (for the avoidance of doubt, the foregoing shall not include monetary obligations or liabilities incurred by a Drag-Along Seller individually, if such obligations and liabilities are not being incurred by or on behalf of all Drag-Along Sellers). Such monetary obligations and liabilities (x) shall include (to the extent such obligations are incurred): monetary obligations and liabilities for indemnification (including for (A) breaches of representations and warranties made with respect to such Drag-Along Seller's ownership of Company Securities (but not, for the avoidance of doubt, breaches of representations and

warranties made with respect to the Company, other than as contemplated by clause (y) below), (B) breaches by such Drag-Along Seller of covenants in effect prior to closing made by such Drag-Along Seller and relating to such Drag-Along Seller, and (C) other matters to be agreed, but only, in the case of clause (C), to the extent such breaches or inaccuracies are of a type for which insurance has not been obtained on commercially reasonable terms), and (y) shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided that all such obligations are equally applicable on a several and not joint basis to each Drag-Along Seller based on the consideration to be received in respect of all Company Securities transferred in connection with such Approved Sale. The foregoing notwithstanding, (1) without the written consent of a Drag-Along Seller, the amount of such obligations and liabilities for which such Drag-Along Seller shall be responsible shall not exceed the gross proceeds received by such Drag-Along Seller in connection with such Approved Sale, and, to the extent that an indemnification escrow has been established, such obligations and liabilities shall be satisfied out of any funds escrowed for such purpose prior to recourse against such Drag-Along Seller, (2) a Drag-Along Seller shall not be responsible for the fraud or willful misconduct of any other Drag-Along Seller or Dragging Stockholder(s) or any indemnification obligations and liabilities for (I) breaches of representations and warranties made by any other Drag-Along Seller with respect to such other Drag-Along Seller's ownership of and title to Company Securities, organization, authority, or conflicts and consents, or any other matters that relate to such other Drag-Along Seller, and (II) breaches of covenants made by any other Drag-Along Seller relating to such other Drag-Along Seller, (3) no Drag-Along Seller shall be required to enter into any non-competition or non-solicitation or similar restrictive covenant in connection with such Approved Sale and (4) no Drag-Along Seller shall be required to provide any representation, warranty, agreement, covenant or other provision that is not also being provided by the Dragging Stockholders and the other Drag-Along Sellers.

(c)     Each Drag-Along Seller hereby waives, and agrees not to demand or exercise, appraisal or any similar right under Section 262 of the DGCL, as amended, or that may otherwise apply with respect to an Approved Sale as to which such appraisal rights are available.

(d)     Notwithstanding the foregoing, no Company Security Holder will be required to comply with the obligations of this Section 3 in respect of an Approved Sale unless:

(i)     Upon the consummation of an Approved Sale, (A) each Company Security Holder will receive the same form of consideration for its Company Securities of such class or series as is received by other Company Security Holders in respect of their Company Securities of such same class or series (unless such consideration includes securities, the receipt of which would require the recipient to qualify as an "accredited investor" under Regulation D of the Securities Act and such recipient does not so qualify) and (B) each Company Security Holder, regardless of class or series, will receive the same amount of consideration per share of Common Stock (on an as-converted basis) as is received by other Company Security Holders in respect of their shares of Common Stock (on an as-converted basis); and

(ii)     Subject to the above requiring the same form of consideration to be available to the Company Security Holders of any class or series of Company Securities, if any Company Security Holders are given an option as to the form and amount of consideration to be received as a result of an Approved Sale, all holders of such class or series of Company

Securities will be given the same option, exercisable in each case at each such holder's sole discretion, except as limited or prohibited by applicable law.

(e)     The Company and each Company Security Holder hereby grants an irrevocable Proxy and power of attorney to any nominee of the Dragging Stockholder(s) (the "Nominee") to take all necessary actions and execute and deliver all documents deemed necessary and appropriate by such Person to effectuate the consummation of any Approved Sale. The Company Security Holders hereby agree to indemnify, defend and hold the Nominee harmless (severally in accordance with their pro rata share of the consideration received in any such Approved Sale (and not jointly and severally)) against all liability, loss or damage, together with all reasonable costs and expenses (including reasonable legal fees and expenses), relating to or arising from its exercise of the Proxy and power of attorney granted hereby.  Notwithstanding anything to the contrary contained herein, each Company Security Holder shall indemnify, defend and hold the Dragging Stockholder(s) and their respective Affiliates and Representatives harmless against all liability, loss or damage, together with all costs and expenses (including legal fees and expenses), relating to or arising out of such Company Security Holder's failure to comply with its obligations in respect of such Approved Sale, including, without limitation, costs and expenses in respect of enforcement by the Dragging Stockholder(s) of their rights hereunder.

## SECTION 4.         TAG-ALONG RIGHTS

(a)     Prior to a Qualified IPO, if any Company Security Holder proposes to Transfer Company Securities pursuant to a Transfer or Transfers that would constitute a Tag-Along Sale (such proposing Company Security Holder(s), each a "Selling Securityholder"), then the Selling Securityholder(s) shall first give written notice (the "Sale Notice") to all other Company Security Holders (unless the consideration to be received in such Tag-Along Sale includes securities, the receipt of which would require the recipient to qualify as an "accredited investor" under Regulation D of the Securities Act and a Company Security Holder does not qualify, in which case such Company Security Holder shall not be provided a Sale Notice and shall not be considered an Offeree Securityholder for purposes of such Tag-Along Sale) (such Company Security Holders to be given such written notice, the "Offeree Securityholders"), stating that the Selling Securityholder(s) desires to make such Transfer pursuant to this Section 4, specifying the type(s) and number of Company Securities proposed to be purchased by the proposed transferee (the "Offer Securities"), and specifying the price, the form of consideration, name and description of the transferee (including any controlling Persons thereof) and the material terms pursuant to which such Transfer is proposed to be made, including, to the extent reasonably determinable, any liabilities and obligations to be incurred on behalf of and for the benefit of all Tag-Along Sellers (as hereinafter defined), to the extent reasonably determinable. For the avoidance of doubt, this Section 4 does not apply to any Transfer that is not a Tag-Along Sale.

(b)     Within ten (10) Business Days after the date of receipt of the Sale Notice, each Offeree Securityholder shall deliver to the Selling Securityholder(s) and to the Company a written notice stating whether the Offeree Securityholder elects to sell a pro rata portion of its Common Stock (on an as-converted basis) (equal to (i) the total number of shares of such Common Stock (on an as-converted basis) owned by such Offeree Securityholder multiplied by (ii) a fraction, (A) the numerator of which is the number of Offer Securities (on an as-converted

to Common Stock basis) and (B) the denominator of which is the total number of outstanding shares of Common Stock (on a Fully Diluted Basis) to such proposed transferee on the same terms, purchase price, and conditions as the Selling Securityholder(s) (or if any Selling Securityholders are given an option as to the amount and form of consideration to be received, all Tag-Along Sellers shall be given the same option) (with respect to each Offeree Securityholder, its "Tag-Along Securities"). An election pursuant to the first sentence of this Section 4(b) shall constitute an irrevocable commitment by the Offeree Securityholder making such election to sell such Tag-Along Securities to the proposed transferee, if the sale of Offer Securities to the proposed transferee is consummated on the terms set forth in the applicable Sale Notice. Such terms may include a maximum number of shares of Common Stock (on an as-converted basis) such proposed transferee is willing to purchase, and, in such case, the Selling Securityholder(s) and the Offeree Securityholder(s) selling Company Securities pursuant hereto shall be reduced pro rata based on the number of shares of Common Stock (on an as-converted basis) each such Selling Securityholder(s) and Offeree Securityholder(s) is electing to sell.

(c)     A Tag-Along Sale pursuant to this Section 4 shall only be permitted if the proposed transferee shall purchase, within ninety (90) days of the date of the Sale Notice, concurrently with and on the same terms and conditions and at the same price as the applicable class of Offer Securities, all of each Offeree Securityholder's Tag-Along Securities of the same class with respect to such sale, in accordance with their elections pursuant to Section 4(b), and subject to the last sentence thereof. Each Offeree Securityholder electing to sell Tag-Along Securities (a "Tag-Along Seller") agrees to cooperate in consummating such a sale, including by becoming a party to the sales agreement and all other appropriate related agreements, delivering, at the consummation of such sale, stock certificates (if any) and other instruments for such Company Securities duly endorsed for transfer, free and clear of all liens and encumbrances, and voting or consenting in favor of such transaction (to the extent a vote or consent is required) and taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments, and other documents. In addition, each Tag-Along Seller shall, if and to the extent requested by the Selling Securityholders, agree to be severally responsible for its proportionate share, based on the number of Company Securities transferred in the Tag-Along Sale, of the third-party expenses of sale incurred on behalf of and for the benefit of all Tag-Along Sellers in connection with a sale consummated under this Section 4, to the extent not paid by the Company or any other Person, and the monetary obligations and liabilities incurred by the sellers on behalf of all sellers in connection with such sale. Such monetary obligations and liabilities shall include (to the extent such obligations are incurred) obligations and liabilities for indemnification (including for (i) breaches of representations and warranties made with respect to such Tag-Along Seller's ownership of Company Securities, (ii) breaches by the Tag-Along Seller of covenants in effect prior to closing made by such Tag-Along Seller and relating to such Tag-Along Seller, (iii) breaches of representations and warranties made in connection with such sale with respect to the Company, its Subsidiaries, or the Company's or its Subsidiaries' business, and (iv) other matters to be agreed, but only, in the case of this clause (iv), to the extent such breaches or inaccuracies are of a type for which insurance has not been obtained on commercially reasonable terms), and shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided that all such obligations are equally applicable on a several and not joint basis to all Persons participating in a Tag-Along Sale, whether as a Selling Securityholder or as a Tag-Along Seller.

### SECTION 5.        REGISTRATION RIGHTS

The Company Security Holders shall comply with, and be entitled to the benefits of, the provisions set forth in Annex A attached hereto governing and providing for, among other matters, registration rights with respect to Registrable Securities (as defined in Annex A) (the "Registration Rights").

### SECTION 6.        PREEMPTIVE RIGHTS

(a)        Except as set forth in Section 6(c), if the Company proposes to issue any Company Securities, each Major Holder shall have the right (the "Preemptive Right") to elect to purchase (or to delegate an Affiliate to purchase) for the same price (net of any underwriting discounts or sales commissions), and on the same terms and conditions as such Company Securities of the same type are proposed to be offered to others, Company Securities up to such Major Holder's Preemptive Amount. "Preemptive Amount" means the maximum number of Company Securities proposed to be issued in the relevant issuance multiplied by a fraction, the numerator of which shall be the number of shares of Common Stock (on an as-converted basis) beneficially owned by such Company Security Holder immediately prior to the issuance and the denominator of which shall be the total number of shares of Common Stock (on an as-converted basis) beneficially owned by all Major Holders immediately prior to such issuance.

(b)        The Company shall cause to be given to each Major Holder prior to the proposed issuance a written notice setting forth the consideration that the Company intends to receive and the terms and conditions upon which the Company Securities shall be issued (the "Preemptive Notice"). After receiving a Preemptive Notice, any Major Holder that desires to exercise its Preemptive Right must give notice to the Company in writing, within ten (10) Business Days after the date that such Preemptive Notice is delivered, specifying (i) that such Major Holder (or an Affiliate thereof) desires to purchase Company Securities of such issuance and (ii) the number of such Company Securities, up to the applicable Preemptive Amount (the "Preemptive Reply"). Such Preemptive Reply shall also include the maximum number of Company Securities the Major Holder (or an Affiliate thereof) would be willing to purchase in the event any other Major Holder elects to purchase less than its pro rata portion of such Company Securities. If any Major Holder fails to elect to purchase its full pro rata portion of such Company Securities, the Company shall allocate any remaining amount among those Major Holders who have indicated in their Preemptive Reply a desire to purchase Company Securities in excess of their respective pro rata portion. Such allocation of such remaining amount shall be made pro rata in accordance with the shares of Common Stock (on an as-converted basis) held by each such Major Holder (immediately prior to giving effect to the issuance of the Company Securities) relative to the aggregate number of shares of Common Stock (on an as-converted basis) held by the Major Holders that have elected to purchase more than their pro rata portion of such Company Securities (up to, in the case of each such Major Holder, the maximum number specified in such Major Holder's Preemptive Reply). A Preemptive Reply shall constitute an irrevocable commitment by such Major Holder (or an Affiliate thereof) to purchase such Company Securities if the issuance occurs on the terms contemplated in the Preemptive Notice. The closing of the sale pursuant to a Preemptive Reply shall occur concurrently with the closing of the issuance giving rise to the Preemptive Right, but no later than ninety (90) days following the expiration of such ten (10) Business Day period. After such ten (10) Business Day period,

any Company Securities not subscribed for pursuant to valid Preemptive Replies may, during the period not exceeding ninety (90) days following the expiration of such ten (10) Business Day period, be issued to third parties on terms and conditions no less favorable to the Company, and at a price not less than the price set forth in the Preemptive Notice. Any such Company Securities not issued during such ninety (90) day period shall thereafter again be subject to the Preemptive Rights provided for in this Section 6. In the event that the consideration received by the Company in connection with an issuance is property other than cash, each Major Holder (or an Affiliate thereof) that elects to exercise its Preemptive Right pursuant to this Section 6(b) may, at its election, pay in cash the fair market value, as determined by the Board in good faith, of such non-cash consideration on a per-Company Security basis.

(c)    Notwithstanding anything to the contrary contained herein, the Company may, in order to expedite the issuance of Company Securities under this Section 6, issue all or a portion of such Company Securities to one or more Persons (each, an "Initial Subscribing Investor"), without complying with the provisions of this Section 6; provided that, prior to such issuance, either (i) each Initial Subscribing Investor agrees to offer to sell to each Major Holder (or an Affiliate thereof) that is an "accredited investor" and that is not an Initial Subscribing Investor (each such Major Holder (or an Affiliate thereof), an "Other Accredited Stockholder") its respective Preemptive Amount of such Company Securities on the same terms and conditions as issued to the Initial Subscribing Investors or (ii) the Company shall offer to sell an additional amount of such Company Securities to each Other Accredited Stockholder only in an amount and manner that provides such Other Accredited Stockholders with rights substantially similar to the rights outlined in Sections 6(a) and (b). The Initial Subscribing Investors or the Company, as applicable, shall offer to sell such Company Securities to each Other Accredited Stockholder within sixty (60) days after the closing of the purchase of the Company Securities by the Initial Subscribing Investors.

(d)    The provisions of this Section 6 shall not apply to issuances by the Company: (i) to any wholly owned Subsidiary of the Company; (ii) upon the exercise or conversion of any Common Stock Equivalents; (iii) to officers, employees, directors, independent contractors, or consultants of the Company or any of its Subsidiaries in connection with such Person's employment, independent contractor, or consulting arrangements with the Company or any of its Subsidiaries, in each case to the extent approved by the Board or the appropriate committee of the Board or pursuant to an employee benefit plan or arrangement approved by the Board or the appropriate committee of the Board; provided that issuances by the Company pursuant to this Section 6(d)(iii) shall not exceed in the aggregate [500,000] shares of Common Stock; (iv) (A) in any business combination or acquisition transaction involving the Company or any of its Subsidiaries, (B) in connection with any joint venture or strategic partnership entered into primarily for purposes other than raising capital (as determined by the Board or the appropriate committee of the Board in good faith), or (C) to financial institutions, commercial lenders, broker/finders, or any similar party, or their respective designees, in connection with the incurrence or guarantee of indebtedness by the Company or any of its Subsidiaries, in each case to the extent approved by the Board or the appropriate committee of the Board; (v) in connection with any stock split, stock dividend paid on a proportionate basis to all holders of the affected class of capital stock, or recapitalization approved by the Board; or (vi) pursuant to or after a Public Offering.

**SECTION 7.          CONFLICTS OF INTEREST**

Subject to the other express provisions of this Agreement or except as otherwise expressly agreed in writing, each Company Security Holder at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Company Security Holder the right to participate therein.  Each Company Security Holder may invest in, or provide services to, any Person that directly or indirectly competes with the Company and shall have no obligation to present any business opportunity to the Company or any other Company Security Holders, even if the opportunity is one that the Company might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so.  No Company Security Holder shall be liable to the Company or any other Company Security Holder for breach of any fiduciary or other duty solely by reason of the fact that any such Company Security Holder pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity to the Company.  For the avoidance of doubt, this Section 7 does not apply to officers or employees of the Company.

**SECTION 8.          ADDITIONAL COMPANY SECURITY HOLDERS AND LIMITATIONS ON TRANSFERS BY COMPANY SECURITY HOLDERS**

(a)     The parties hereto acknowledge that certain Persons, including, without limitation, Transferees, directors, employees and consultants of the Company and its Affiliates, may become Company Security Holders after the Effective Date (the "Additional Company Security Holders"). As a condition to the Transfer or issuance of Company Securities to each such Additional Company Security Holder, the Company shall require each such Additional Company Security Holder to execute and deliver an agreement in writing to be bound by the terms and conditions of this Agreement and, if such Additional Company Security Holder is a Transferee, assume the rights and obligations of its transferor (or if such transferor is not a party or subject hereto, the rights and obligations that such transferor would have hereunder as a party hereto as of the Effective Date) pursuant to a joinder agreement substantially in the form attached as Exhibit A hereto (a "Joinder Agreement"). Notwithstanding the foregoing, with no further action or consent required, including, but not limited to, failure to execute and deliver a Joinder Agreement, any Person that is required to or becomes a Company Security Holder on or after the Effective Date shall be bound by the terms of this Agreement and shall be deemed to be a Company Security Holder with respect to such Company Securities pursuant to the terms of this Agreement, and any Company Securities Transferred to such Additional Company Security Holder shall become or remain subject to the terms of this Agreement.

(b)     Subject to the other provisions of this Section 8, this Agreement shall not prohibit or limit the Transfer of Company Securities, except that (i) all Company Securities shall be subject to the provisions of Section 3 and (ii) Transfers of Company Securities, if subject to the provisions of Section 4, must be made in compliance with such provisions of Section 4.

(c)     Notwithstanding anything herein to the contrary, no Company Security Holder may Transfer any Company Securities unless such Transfer is in compliance with

applicable securities laws and no Company Securities may be Transferred (other than in connection with, but subject to consummation of, an Underwritten Public Offering) if such Transfer would result in the Company being subject to the reporting requirements of the Exchange Act or any other similar rule or regulation.

(d)     Notwithstanding anything herein to the contrary, (i) no Company Security Holder may Transfer any Company Securities to any Person if, after giving effect to such proposed Transfer to such Person, such Person, together with its Company Security Holder Group, would beneficially own, directly or indirectly, [_____][7] shares of Common Stock (on a Fully Diluted Basis) and (ii) no Person or Company Security Holder Group (other than the Initial Major Holders) shall beneficially own, after giving effect to any acquisition or proposed acquisition of Company Securities, directly or indirectly, [_____][8] shares of Common Stock (on a Fully Diluted Basis), in the case of each of (i) and (ii) without the approval of a majority of the disinterested directors of the Board (provided that so long as any Initial Major Holder has the right to nominate and elect directors pursuant to Section 2(a)(ii), a majority of the directors so nominated and elected shall also be required) in respect of the acquisition thereof (as determined by the Board in its sole discretion).

(e)     Notwithstanding anything herein to the contrary, no Company Security Holder shall Transfer (other than pursuant to Section 3 above) any Company Securities to an Ineligible Person or an Affiliate of an Ineligible Person (other than an Excluded Affiliate) without the consent of the Board Majority; provided, further, that, for so long as the BlackRock Security Holder Group has the right to designate and nominate a  BlackRock Director, such Board Majority must include at least one (1) of the BlackRock Directors.

(f)     Any Transfer or attempted Transfer of Company Securities in violation of any provisions of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported Transferee of such Company Securities as the owner of such Company Securities for any purpose, including with respect to the payment of dividends with respect thereto. Furthermore, prior to recording such Transfer on its books or treating any purported Transferee of such Company Securities as the owner of such Company Securities for any purpose, the Company may require such purported Transferee to certify or make representations with respect to the matters set forth in this Section 8.

## SECTION 9.     INFORMATION RIGHTS

(a)     Until such time as the Company becomes a reporting company under the Exchange Act, the Company shall make available (via a password-protected "data site" hosted by IntraLinks or similar site) the following reports to each Company Security Holder that is not an Ineligible Person:

(i)     [Annual Reports. [Within one hundred twenty (120) days after the end of each fiscal year], the Company's consolidated balance sheet and related statements of income, Stockholders' equity, and cash flows showing the financial condition of the Company and its consolidated Subsidiaries as of the close of such fiscal year and the results of its

---

[7] To equal 10% of the Company Securities issued on the Effective Date.
[8] To equal 10% of the Company Securities issued on the Effective Date.

operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by independent public accountants or auditors of recognized national standing and accompanied by an opinion of such accountants, which shall be without a "going concern" or like qualification, exception, or reference and without any qualification or exception as to the scope of such audit, to the effect that such consolidated financial statements fairly present the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, together with a customary "management discussion and analysis" provision]; and

(ii)  [Quarterly Reports. [Within sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year], the Company's consolidated balance sheet and related statements of income, Stockholders' equity, and cash flows showing the financial condition of the Company and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by a Financial Officer as fairly presenting in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments, together with a customary "management discussion and analysis" provision; provided, however, that the requirement to deliver the information described in the foregoing clauses (i) and (ii) shall be deemed to have been satisfied to the extent that the Company delivers to the Company Security Holder copies of such information delivered to the lenders under the [New Term Loan Facility]].

(b)  Limitations. Notwithstanding the foregoing, the Company shall not be obligated to make available any of the above information to any Company Security Holder that is, or is an Affiliate (other than an Excluded Affiliate) of, an Ineligible Person.

(c)  Any Company Security Holder shall have the right during the usual hours for business and upon reasonable notice to the Company to inspect for any proper purpose, and to make copies and extracts from: (i) the Company's stock ledger, a list of its Company Security Holders, and its other books and records; and (ii) any of the Company's Subsidiaries' books and records, to the extent that the Company has actual possession and control of such records of such subsidiary, or the Company could obtain such records through the exercise of control over the applicable Subsidiary; provided that as of the date of the making of the demand: (x) the Company Security Holder's inspection of such books and records of the applicable Subsidiary would not constitute a breach of an agreement between the Company or the applicable Subsidiary and any Person or Persons not affiliated with the Company; and (y) the Subsidiary would not have the right under applicable law to it to deny the Company access to such books and records upon demand by the Company.

**SECTION 10.      CONFIDENTIALITY**

Each Company Security Holder agrees that Confidential Information has been and may be made available to it in connection with its interest in the Company or any of its Subsidiaries. Each Company Security Holder agrees not to divulge or communicate to a third

party (including, without limitation, an Ineligible Person or an Affiliate of an Ineligible Person), or use for any purpose, other than in connection with such Company Security Holder's investment in the Company or any of its Subsidiaries, in whole or in part, Confidential Information, without the prior written consent of the Company or any of its Subsidiaries; provided that (a) Confidential Information may be disclosed if required by applicable law or any governmental authority, or in response to a request from a regulatory or self-regulatory or supervisory authority having or asserting jurisdiction over the applicable Company Security Holder, so long as such Company Security Holder has used commercially reasonable efforts to preserve the confidentiality of such Confidential Information, and (b) each Company Security Holder may disclose Confidential Information to its Affiliates and its and their partners, members, equityholders, advisors, directors, officers, employees, agents, accountants, attorneys, advisors, existing and potential investors, or Persons who have expressed a bona fide interest in becoming partners or members in such Company Security Holder or its related investment funds, or an acquiror or potential acquiror of Company Securities held by the Company Security Holder to which a Transfer would not be prohibited pursuant to the terms hereof (collectively, the "Representatives"), so long as such Representatives agree to keep such information confidential on substantially the same, and no less burdensome, terms than those set forth in this Section 10.

### SECTION 11.        PROTECTIVE COVENANTS

(a)      Neither the Company nor any of its Subsidiaries shall take any of the following actions without the affirmative vote of a Requisite Majority:

(i)      subject to Section 3, enter into any merger, amalgamation, consolidation or other reorganization with or into another entity (other than a wholly owned Subsidiary of the Company);

(ii)      increase or decrease the size of the Board;

(iii)      create any new class of stock or modify the rights of any existing class of stock;

(iv)      increase the number of authorized shares of any class of stock;

(v)      issue or authorize any additional shares of Common Stock or Common Stock Equivalents or any other equity interests of the Company or any equity interests in any of its Subsidiaries other than to the Company or a direct or indirect wholly owned Subsidiary of the Company, other than in connection with a Qualified IPO or issuances of the sorts described in Section 6(d);

(vi)      redeem or repurchase any shares of Common Stock or Common Stock Equivalents (other than the repurchase of shares of Common Stock or Common Stock Equivalents from employees in respect of the departure or termination of such employees, as may be approved by Board Majority);

(vii)     [purchase or acquire or sell or divest any business the enterprise value of which exceeds $[•];]

(viii)    incur any Indebtedness, if after giving effect to such incurrence the aggregate Indebtedness of the Company and its Subsidiaries exceeds one hundred million dollars ($100,000,000);

(ix)      declare dividends;

(x)       enter into any transaction with any officer, director or any beneficial owner of more than 5% of the Common Stock (on a Fully Diluted Basis) other than (i) employment agreements, indemnities, expense reimbursement or other customary transactions related to the services of directors and officers of the Company, or [(ii) any such transaction on an arm's length basis, and approved by a majority of the disinterested directors in respect thereof];

(xi)      [settle litigation, arbitration or administrative proceedings for an amount in excess of $[_____];]

(xii)     amend or modify the Organizational Documents of the Company; or

(xiii)    agree to do any of the foregoing.

(b)       Notwithstanding anything herein to the contrary, the foregoing prohibitions in this Section 11 shall not apply to any such actions taken in connection with an Approved Sale under Section 3 hereof.

### SECTION 12.          LEGEND ON STOCK CERTIFICATES

(a)       Each certificate (if any) representing shares of Common Stock beneficially owned by the Stockholders shall bear the following legend until such time as the shares represented thereby are no longer subject to the provisions hereof:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SHARES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY 11

U.S.C. SECTION 1145, UNDER AN ORDER CONFIRMING THE CHAPTER 11 PLAN OF REORGANIZATION FILED BY UCI HOLDINGS LLC AND CERTAIN OF ITS AFFILIATES IN THE BANKRUPTCY CASE IN THE DISTRICT OF DELAWARE DOCKET NO. 16-11354 (MFW), INCLUDING EXHIBITS AND ALL SUPPLEMENTS, APPENDICES AND SCHEDULES THERETO, AS THE SAME MAY BE ALTERED, AMENDED OR MODIFIED FROM TIME TO TIME.  THE HOLDER OF THIS SECURITY IS REFERRED TO 11 U.S.C. SECTION 1145 FOR GUIDANCE AS TO THE SALE OF THIS SECURITY.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE CERTIFICATE OF INCORPORATION OF [NEW UCI INC.] (THE "CORPORATION"), AS AMENDED FROM TIME TO TIME (THE "CERTIFICATE OF INCORPORATION"), AND THE STOCKHOLDERS AND REGISTRATION RIGHTS AGREEMENT DATED [●], 2016, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THESE SHARES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS, TO EACH HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE, A COPY OF THE CERTIFICATE OF INCORPORATION AND STOCKHOLDERS AGREEMENT CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF SHARES.

THE HOLDER OF THIS CERTIFICATE BY ACCEPTANCE OF THIS CERTIFICATE AGREES TO BE BOUND BY THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, INCLUDING RESTRICTIONS RELATING TO THE EXERCISE OF VOTING RIGHTS RELATED THERETO.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE CORPORATION THAT (A) THIS SECURITY MAY NOT BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED BY ANY HOLDER THAT IS AN "AFFILIATE" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) OF THE CORPORATION,

OTHER THAN (I) TO THE CORPORATION OR A SUBSIDIARY THEREOF, (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR (III) ACCOMPANIED BY AN OPINION OF COUNSEL, REASONABLY SATISFACTORY TO THE CORPORATION, STATING THAT SUCH OFFER, RESELL, PLEDGE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT AND UNDER ANY APPLICABLE STATE SECURITIES LAWS, AND IN EACH OF CASES (I) THROUGH (III) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS SET FORTH IN (A) ABOVE.

(b)     In the event that the restrictive legend set forth in Section 12(a) above has ceased to be applicable to the shares of Common Stock held by a Stockholder, the Company shall provide such Stockholder, at his, her or its request, with new certificates for such shares not bearing the legend with respect to which the restriction has ceased and terminated. In connection with and following the Company's IPO, the Company shall provide each Stockholder, at his, her or its request, with new certificates for all shares of Common Stock held by such Stockholder not bearing the legend.

### SECTION 13.        DURATION OF AGREEMENT

The rights and obligations of the Company Security Holders and the Company under Sections 2 (Board of Directors), 3 (Drag-Along Rights), 4 (Tag-Along Rights), 6 (Preemptive Rights), 7 (Conflicts of Interest), 8 (Additional Company Security Holders and Limitations on Transfers by Company Security Holders), 9 (Information Rights), 11 (Protective Covenants), and 23 (Issuances of Company Securities) shall terminate upon a Qualified IPO. Except as otherwise provided or specified in this Agreement, the rights and obligations of each Company Security Holder under this Agreement shall terminate, as to such Company Security Holder, upon the Transfer in accordance with this Agreement or disposition pursuant to an effective registration statement under the Securities Act and in compliance with all applicable state securities and "blue sky" laws of all Company Securities beneficially owned by such Company Security Holder, and as to all Company Security Holders upon a Transfer of all or substantially all of the assets, Company Securities, or merger of the Company in which the Company Security Holders receive cash or securities of any person that is not an Affiliate of the Company or any of its Subsidiaries upon such merger.

### SECTION 14.        SEVERABILITY

If any provision of this Agreement or the application of any such provision to any Person(s) or circumstance(s) shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any

other provision hereof, and this Agreement shall remain in full force and be effectuated as if such illegal, invalid, or unenforceable provision is not part hereof.

### SECTION 15.          GOVERNING LAW, JURISDICTION, PROCESS

(a)     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to choice of law principles thereof).

(b)     <u>Jurisdiction and Venue</u>. Subject to the proviso to the last sentence of this Section 15(b), each of the parties hereto (i) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (iii) agrees that it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Chancery Court of Delaware and, if such court declines jurisdiction, a Federal court sitting in the State of Delaware. In any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, each party irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action is brought in an inconvenient forum or that the venue of such action is improper; provided, however, that, notwithstanding anything to the contrary in this Section 15 or otherwise, the Company shall retain the right to bring any such action arising out of or relating to this Agreement or any of the transactions contemplated hereby, to the extent that the subject matter of such action is contemplated by the Plan or the Disclosure Statement, in the United States Bankruptcy Court for the District of Delaware, and each of the parties hereto (i) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

(c)     <u>Service of Process</u>. Each party hereto irrevocably consents to service of process in the manner provided for the giving of notices pursuant to Section 18.

### SECTION 16.          STOCK DIVIDENDS, ETC.

The provisions of this Agreement shall apply to any and all Company Securities that may be issued in respect of, in exchange for, or in substitution for Company Securities, by reason of any stock dividend, split, reverse split, combination, recapitalization, reclassification, or otherwise in such a manner as to reflect the intent and meaning of the provisions hereof.

### SECTION 17.          BENEFITS OF AGREEMENT

Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns

of the parties (including Transferees of any Company Securities). Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement provided, however, that the rights and benefits of each Initial Major Holder pursuant to Section 2 are personal to each such Initial Major Holder and may not be assigned to any Person.

### SECTION 18.        NOTICES

All notices or other communications which are required or permitted hereunder shall be in writing and shall be deemed to have been given if (a) personally delivered or sent by facsimile or electronic mail (in each case, subject to the receipt of acknowledgment of successful transmission), (b) sent by nationally recognized overnight courier or (c) sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

(i)        If to the Company:

[●]
Attention: [●]
Facsimile: [●]
Email: [●]

(ii)        If to the Initial Stockholders and Company Security Holders as of the Effective Date, to their respective addresses set forth on <u>Schedule A</u> or, if to such other Company Security Holders, to such address as the party to whom notice is to be given may have furnished in writing in accordance herewith.

Any such communication shall be deemed to have been received (A) when delivered, if personally delivered or sent by facsimile, (B) the next Business Day after delivery, if sent by nationally recognized overnight courier, and (C) on the third Business Day following the date on which the piece of mail containing such communication is posted, if sent by first-class mail.

### SECTION 19.        MODIFICATION

Subject to Section 24(c), any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively), only with the consent of a Requisite Majority; <u>provided</u>, <u>however</u>, that (i) for so long as the BlackRock Security Holder Group owns any Company Securities, no amendment or waiver to this clause (i), or any provision with respect to the BlackRock Directors, Observer or BlackRock Demand Registration rights shall be effective without the consent of the BlackRock Security Holder Group Majority, (ii) for so long as the JPM Security Holder Group owns any Company Securities, no amendment or waiver to this clause (ii), or any provision with respect to the JPM Director, Observer or JPM's Demand Registration rights shall be effective without the consent of the JPM Security Holder Group Majority, (iii) for so long as the CSAM Security Holder Group owns any Company Securities, no amendment or waiver to this clause (iii), or any provision with respect to the CSAM Director,

Observer or CSAM's Demand Registration rights shall be effective without the consent of the CSAM Security Holder Group Majority, (iv) any amendment which affects an Initial Major Holder in a manner that is disproportionately adverse relative to the other Initial Major Holders shall not be effective against such disproportionately affected Initial Major Holder without its written consent, and (v) no amendment or waiver to this clause (v) or clause (iv) shall be effective without the consent of each Initial Major Holder that holds any Company Securities. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each current Company Security Holder, each future Company Security Holder, and the Company.

### SECTION 20.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

### SECTION 21.    NO PARTNERSHIP; SEVERAL OBLIGATIONS; SOLE RECOURSE

Nothing in this Agreement and no actions taken by the parties under this Agreement shall constitute a partnership, association or other co-operative entity between any of the parties or cause any party to be deemed the agent of any other party for any purpose. Notwithstanding anything to the contrary contained in this Agreement, the obligations of each Stockholder hereunder shall be several, not joint and several.   Each party, by its acceptance of the benefits hereof, covenants, agrees and acknowledges that no person other than persons that are expressly named as parties hereto shall have any obligation hereunder and that, notwithstanding the organizational structure of a party, no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any current or future director, officer, agent, employee, general or limited partner, member, manager, stockholder or affiliate of any party hereto or any current or future director, officer, agent, employee, general or limited partner, member, manager, stockholder, affiliate or assignee of any of the foregoing (each, a "Non-Recourse Person"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Non-Recourse Person, as such, for any obligations of any party under this Agreement or any documents or instruments delivered in connection herewith or for any claim based on, in respect of or by reason of such obligations or their creation.

### SECTION 22.    CONSENT OF SPOUSE

If any Company Security Holder is married on the date of this Agreement, the Company request that such Company Security Holder's spouse execute and deliver to the Company a consent of spouse in the form of Exhibit B hereto ("Consent of Spouse"), effective on the date hereof.  Notwithstanding the execution and delivery thereof, such consent shall not be deemed to confer or convey to the spouse any rights in such Company Security Holder's Company Securities that do not otherwise exist by operation of law.  If any Company Security Holder should marry or remarry subsequent to the date of this Agreement, the Company may

request that such Company Security Holder within thirty (30) days thereafter obtain his/her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing such spouse to execute and deliver a Consent of Spouse acknowledging the restrictions and obligations contained in this Agreement and agreeing and consenting to the same.

## SECTION 23.        WAIVER OF JURY TRIAL

TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER AND (B) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY.

## SECTION 24.        INTERPRETATION; ABSENCE OF PRESUMPTION

(a)     For the purposes hereof, (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, (iii) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless the context otherwise requires or unless otherwise specified, (iv) the word "or" shall not be exclusive, (v) provisions shall apply, when appropriate, to successive events and transactions, (vi) "own," "ownership," "held," and "holding" refer to ownership or holding as record holder or record owner, (vii) "beneficially own" in respect of any capital stock refers to beneficial ownership assuming the conversion, exercise, and exchange of all Common Stock Equivalent in respect of such capital stock, and (viii) the headings and captions of this Agreement are for convenience of reference only and shall not define, limit or otherwise affect any of the terms hereof.

(b)     This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

(c)     Wherever in this Agreement there is a reference to a specific number of shares of Common Stock or Common Stock Equivalents of the Company of any class or series, then, upon the occurrence of any subdivision, combination or stock dividend of such class or series of stock, the specific number of shares so referenced in this Agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock by such subdivision, combination or stock dividend.  Notwithstanding anything to the contrary herein, the Company may amend and restate this Agreement to reflect such adjustment and any other prior amendments that have been properly adopted and effected in accordance herewith, without any additional consent required.

**SECTION 25.         LOST, ETC. CERTIFICATES EVIDENCING SHARES; EXCHANGE**

Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of any certificate evidencing any share owned by a Stockholder and (in the case of loss, theft or destruction) of a bond or an indemnity satisfactory to it, and upon surrender and cancellation of such certificate, if mutilated, the Company will make and deliver in lieu of such certificate a new certificate of like tenor and for the number of securities evidenced by such certificate which remain outstanding.  Upon surrender of any certificate representing any shares for exchange at the office of the Company, the Company at its expense will cause to be issued in exchange therefor new certificates in such denomination or denominations as may be requested for the same aggregate number of shares represented by the certificate so surrendered and registered as such holder may request.

**SECTION 26.         ISSUANCES OF COMPANY SECURITIES**

Any issuance or attempted issuance of Company Securities in violation of any provisions of this Agreement shall be void, and the Company shall not record any such issuance on its books.

**SECTION 27.         COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts taken together shall constitute but one agreement.

IN WITNESS WHEREOF, the Company has executed this Agreement as of the date first above written.

**NEW UCI INC.**


By: _____
      Name:
      Title:

COMPANY SECURITY HOLDER[9]


By:_____
      Name:
      Title:

---

[9] Update signature page to come.

[Signature Page to Stockholders and Registration Rights Agreement]

**SCHEDULE A**
**Initial Stockholders and Company Security Holders as of the Effective Date**

**SCHEDULE B**
**Transferees/Grantees of Company Securities Subsequent to the Effective Date**

**ANNEX A**
**Registration Rights**

**THIS DOCUMENT IS A DRAFT FORM PREPARED BY PROFESSIONALS OF THE PLAN SPONSORS.  THE DOCUMENT REMAINS SUBJECT TO ONGOING DISCUSSION AND CONFIRMATION BY THE PLAN PROPONENTS OF CERTAIN TERMS, REQUIREMENTS AND MECHANICS.**

**ANNEX A**

**REGISTRATION RIGHTS**

ARTICLE I

DEFINITIONS

SECTION 1.01.    <u>Defined Terms</u>.  (a)  All terms used and not defined herein have the meaning ascribed thereto in the Agreement to which this <u>Annex A</u> is attached.  As used in this <u>Annex A</u>, the following terms shall have the following meanings:

"<u>Adverse Disclosure</u>" means public disclosure of material non-public information that, in the Board's good faith judgment, after consultation with independent outside counsel to the Company, would be required to be made in any Registration Statement filed with the SEC by the Company so that such Registration Statement would not be materially misleading and would not be required to be made at such time but for the filing of such Registration Statement, but which information the Company has a bona fide business purpose for not disclosing publicly.

"<u>Agents</u>" shall mean, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants, equity financing partners or financial advisors or other Person associated with, or acting on behalf of, such Person.

"<u>Annex A</u>" shall mean this <u>Annex A</u> to the Stockholders and Registration Rights Agreement.

"<u>Eligible Holders</u>" shall mean, at any given time, each of (i) BlackRock (to the extent the BlackRock Security Holder Group beneficially owns at least [_____][1] shares of Common Stock (on a Fully Diluted Basis)), (ii) JPM (to the extent the JPM Security Holder Group beneficially owns at least [_____][2] shares of Common Stock (on a Fully Diluted Basis)), (iii) CSAM (to the extent the CSAM Security Holder Group beneficially owns at least [_____][3] shares of Common Stock (on a Fully Diluted Basis)), and (iv) any Major Holders.

"<u>FINRA</u>" shall mean the Financial Industry Regulatory Authority.

"<u>Form S-1</u>" shall mean a registration statement on Form S-1 under the Securities Act, or any comparable or successor form or forms thereto.

"<u>Form S-3</u>" shall mean a registration statement on Form S-3 under the Securities Act, or any comparable or successor form or forms thereto.

---

[1] To equal 5% of the Common Stock issued on the Effective Date

[2] To equal 5% of the Common Stock issued on the Effective Date

[3] To equal 5% of the Common Stock issued on the Effective Date

A-1

"IPO" shall mean an initial Underwritten Public Offering.

"Issuer Free Writing Prospectus" shall mean an issuer free writing prospectus, as defined in Rule 433 under the Securities Act, relating to an offer of Registrable Securities.

"Marketed Underwritten Offering" shall mean any Underwritten Offering (including a Marketed Underwritten Shelf Take-Down, but, for the avoidance of doubt, not including any Shelf Take-Down that is not a Marketed Underwritten Shelf Take-Down) that involves a customary "road show" (including an "electronic road show") or other substantial marketing effort by the Company and the underwriters over a period of at least 48 hours.

"Participating Eligible Holder" shall mean, with respect to any Registration, any Eligible Holder that is a holder of Registrable Securities covered by the applicable Registration Statement.

"Participating Company Security Holder" means, with respect to any Registration, any Company Security Holder that is a holder of Registrable Securities covered by the applicable Registration Statement.

"Pro Rata Company Security Holder Shelf Percentage" means, as of the date that a Shelf Initiating Company Security Holder delivers a Shelf Notice to the Company pursuant to Section 2.02(a), an amount equal to the fraction (expressed as a percentage) determined by dividing (i) the number of Registrable Securities held by such Shelf Initiating Company Security Holder (and its Security Holder Group) requested by such Shelf Initiating Company Security Holder to be registered on the applicable Shelf Registration Statement as of such date by (ii) the total number of Registrable Securities held as of such date by such Shelf Initiating Company Security Holder (and its Security Holder Group).

"Pro Rata Shelf Percentage" shall mean, as of any date, with respect to a Company Security Holder, a number of Registrable Securities equal to (i) the number of Registrable Securities held by such Company Security Holder as of such date multiplied by (ii) the largest Pro Rata Company Security Holder Shelf Percentage with respect to the Participating Company Security Holder (s) for the applicable Shelf Registration Statement.

 "Prospectus" shall mean the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including pre- and post-effective amendments to such Registration Statement, and all other material incorporated by reference in such prospectus.

"Registrable Securities" shall mean (a) all Common Stock, (b) any shares or securities of the Company or any successor or assignee of the Company (whether by merger, consolidation, reorganization, sale of assets or otherwise) into which such Common Stock may hereafter be converted or for which such Common Stock may be exchanged, and (c) any shares or other securities issued or issuable in respect of, or in substitution for, such shares by way of a stock dividend, split, reverse split, combination, recapitalization, reclassification, or otherwise; provided that any Registrable Security will cease to be a Registrable Security when (i) a registration statement covering such Registrable Security has been declared effective by the SEC in respect of a prospectus qualifying the sale of such Registrable Security and such Registrable

Security has been disposed of pursuant to such effective registration statement or prospectus or (ii) it is sold under circumstances in which all of the applicable conditions of Rule 144 (or any similar provisions then in force) under the Securities Act that allows the purchaser to acquire such Registrable Security without any resale restriction are met or it is eligible for sale under Rule 144 of the Securities Act without respect to any volume limitations.

"Registration" shall mean a registration with the SEC of the Company's securities for offer and sale to the public under a Registration Statement.  The term "Register" shall have a correlative meaning.

"Registration Statement" shall mean any registration statement of the Company that covers Registrable Securities pursuant to the provisions of this Annex A filed with, or to be filed with, the SEC under the rules and regulations promulgated under the Securities Act, including the related Prospectus, amendments, and supplements to such registration statement, including pre- and post-effective amendments, and all exhibits and all material incorporated by reference in such registration statement.

"SEC" shall mean the Securities and Exchange Commission or any successor governmental agency.

"Shelf Registration" shall mean a Registration effected pursuant to Section 2.02.

"Shelf Registration Statement" shall mean a Registration Statement of the Company filed with the SEC on either (i) Form S-3 or (ii) if the Company is not permitted to file a Registration Statement on Form S-3, an evergreen Registration Statement on Form S-1, in each case for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any successor provision) covering all or any portion of the Registrable Securities, as applicable.

"Underwritten Offering" shall mean a Registration in which securities of the Company are sold to an underwriter or underwriters on a firm commitment basis for reoffering to the public.

(b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Company Public Sale | 2.03(a) |
| Company Security Holder Related Persons | 2.09(a) |
| Company Security Holder Registration Demands | 2.11(c) |
| Damages | 2.09(a) |
| Demand Company Notice | 2.01(d) |
| Demand Notice | 2.01(a) |
| Demand Period | 2.01(c) |
| Demand Registration | 2.01(a) |
| Demand Registration Statement | 2.01(a) |

A-3

| | |
|---|---|
| Demand Suspension | 2.01(e) |
| Initiating Shelf Take-Down Holder | 2.02(e) |
| Initiating Company Security Holder | 2.01(a) |
| Long-Form Registration | 2.01(a) |
| Marketed Underwritten Shelf-Take Down | 2.02(e) |
| Marketed Underwritten Shelf Take-Down Notice | 2.02(e) |
| Piggyback Registration | 2.03(a) |
| Registration Expenses | 2.08 |
| Shelf Holder | 2.02(c) |
| Shelf Initiating Company Security Holder | 2.02(a) |
| Shelf Notice | 2.02(a) |
| Shelf Suspension | 2.02(d) |
| Shelf Take-Down | 2.02(e) |
| Short-Form Registration | 2.01(a) |
| Special Registration | 2.12 |
| Underwritten Shelf Take-Down Notice | 2.02(e) |

SECTION 1.02.        Other Interpretive Provisions.  In this Annex A, except as otherwise provided:

(a)        A reference to an Article or Section is a reference to an Article or Section of this Annex A.

(b)        Headings are inserted for convenience only and shall not affect the construction or interpretation of this Annex A.

(c)        Unless the context otherwise requires, words importing the singular include the plural and vice versa, words importing the masculine include the feminine and vice versa, and words importing persons include corporations, associations, partnerships, joint ventures and limited liability companies and vice versa.

(d)        Unless the context otherwise requires, the words "hereof" and "herein", and words of similar meaning, refer to this Annex A as a whole and not to any particular Article, Section or clause.  The words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation."

(e)        A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof and any legislative provision substituted therefor.

ARTICLE II

REGISTRATION RIGHTS

SECTION 2.01.       Demand Registration.

(a)       Demand by Eligible Holders.  At any time one hundred and eighty (180) days after the effective date of the IPO, each Eligible Holder (each, an "Initiating Company Security Holder") may, subject to Section 2.11, make a written request (a "Demand Notice") to the Company for Registration of all or part of the Registrable Securities held by such Initiating Company Security Holder (i) on Form S-1 (a "Long-Form Registration") or (ii) on Form S-3 (a "Short-Form Registration") if the Company qualifies to use such short form (any such requested Long-Form Registration or Short-Form Registration, a "Demand Registration").  Each Demand Notice shall specify the aggregate amount of Registrable Securities of the Initiating Company Security Holder to be registered and the intended methods of disposition thereof.  Subject to Section 2.11, after delivery of such Demand Notice, the Company (x) shall file promptly (and, in any event, within (i) ninety (90) days in the case of a request for a Long-Form Registration or (ii) thirty (30) days in the case of a request for a Short-Form Registration, in each case, following delivery of such Demand Notice) with the SEC, a Registration Statement relating to such Demand Registration (a "Demand Registration Statement"), and (y) shall use its reasonable best efforts to cause such Demand Registration Statement to promptly be declared effective under (A) the Securities Act and (B) the "blue sky" laws of such jurisdictions as any Participating Company Security Holder or any underwriter, if any, reasonably requests.

(b)       Demand Withdrawal.  An Initiating Company Security Holder may withdraw its Registrable Securities from a Demand Registration at any time prior to the effectiveness of the applicable Demand Registration Statement.  Upon delivery of a notice by the Initiating Company Security Holder(s) to such effect, the Company shall cease all efforts to secure effectiveness of the applicable Demand Registration Statement, and such Registration shall not be deemed to be a Demand Registration with respect to such Initiating Company Security Holder for purposes of Section 2.11.

(c)       Effective Registration.  The Company shall be deemed to have effected a Demand Registration with respect to the applicable Initiating Company Security Holder for purposes of Section 2.11 if the Demand Registration Statement is declared effective by the SEC and remains effective for not less than one hundred and twenty (120) days (or such shorter period as shall terminate when all Registrable Securities covered by such Registration Statement have been sold or withdrawn), or if such Registration Statement relates to an Underwritten Offering, such longer period as, in the opinion of counsel for the underwriter or underwriters, a Prospectus is required by U.S. law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer (the applicable period, the "Demand Period").  No Demand Registration shall be deemed to have been effected for purposes of Section 2.11 if (i) during the Demand Period such Registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, (ii) the conditions to closing specified in the underwriting agreement, if any, entered into in connection with such Registration are not satisfied other than by reason of a wrongful act, misrepresentation or breach of such

A-5

applicable underwriting agreement by an Initiating Company Security Holder or (iii) there is a Demand Suspension.

(d)        Demand Company Notice.  Promptly upon delivery of any Demand Notice (but in no event more than ten (10) Business Days thereafter), the Company shall deliver a written notice (a "Demand Company Notice") of any such Registration request to all Company Security Holders (other than the Initiating Company Security Holder), and the Company shall, subject to Section 2.01(g), include in such Demand Registration all such Registrable Securities of such Company Security Holders which the Company has received written requests for inclusion therein within ten (10) Business Days after the date that such Demand Company Notice has been delivered.  All requests made pursuant to this Section 2.01(d) shall specify the aggregate amount of Registrable Securities of such Company Security Holder to be registered.

(e)        Delay in Filing; Suspension of Registration.  If the Company shall furnish to the Participating Company Security Holders a certificate signed by the Chief Executive Officer or equivalent senior executive officer of the Company stating that the filing, effectiveness or continued use of a Demand Registration Statement would require the Company to make an Adverse Disclosure, then the Company may delay the filing (but not the preparation of) or initial effectiveness of, or suspend use of, the Demand Registration Statement (a "Demand Suspension"); provided, however, that the Company, unless otherwise approved in writing by each Eligible Holder, its successors or assigns, shall not be permitted to exercise aggregate Demand Suspensions and Shelf Suspensions more than twice, or for more than an aggregate of one hundred and twenty (120) days, in each case, during any twelve (12) month period; provided, further, that in the event of a Demand Suspension, such Demand Suspension shall terminate at such earlier time as the Company would no longer be required to make any Adverse Disclosure.  Each Participating Company Security Holder shall keep confidential the fact that a Demand Suspension is in effect, the certificate referred to above and its contents unless and until otherwise notified by the Company, except (A) for disclosure to such Participating Company Security Holder's employees, agents and professional advisers who reasonably need to know such information for purposes of assisting the Participating Company Security Holder with respect to its investment in the Company and agree to keep it confidential, (B) for disclosures to the extent required in order to comply with reporting obligations to its limited partners or other direct or indirect investors who have agreed to keep such information confidential, (C) if and to the extent such matters are publicly disclosed by the Company or any of its Subsidiaries or any other Person that, to the actual knowledge of such Participating Company Security Holder, was not subject to an obligation or duty of confidentiality to the Company and its Subsidiaries and (D) as required by U.S. law, rule or regulation.  In the case of a Demand Suspension, the Participating Company Security Holders agree to suspend use of the applicable Prospectus and any Issuer Free Writing Prospectus in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, upon delivery of the notice referred to above.  The Company shall immediately notify the Participating Company Security Holders upon the termination of any Demand Suspension, amend or supplement the Prospectus and any Issuer Free Writing Prospectus, if necessary, so it does not contain any untrue statement or omission and furnish to the Participating Company Security Holders such numbers of copies of the Prospectus and any Issuer Free Writing Prospectus as so amended or supplemented as the Participating Company Security Holders may reasonably request.  The Company agrees, if necessary, to supplement or make amendments to the Demand Registration Statement if required by the registration form

used by the Company for the applicable Registration or by the instructions applicable to such registration form or by the Securities Act or the rules or regulations promulgated thereunder, or as may reasonably be requested by any Initiating Company Security Holder.

(f)    <u>Underwritten Offering</u>.  If the Initiating Company Security Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2.01(a) and the Company shall include such information in the written notice referred to in Section 2.01(a). The underwriter will be selected by the Initiating Company Security Holder.  In such event, the right of any Company Security Holder to include securities in such registration or qualification shall be conditioned upon such Company Security Holder's participation in such underwriting and the inclusion of such Company Security Holder's securities in the underwriting (unless otherwise mutually agreed by the Initiating Company Security Holder, on the one hand, and such Company Security Holder, on the other hand), to the extent provided herein.  All Company Security Holders of the Company proposing to distribute their securities through such underwriting shall (together with the Company) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

(g)    <u>Priority of Securities Registered Pursuant to Demand Registrations</u>.  If the managing underwriter or underwriters of a proposed Underwritten Offering of the Registrable Securities included in a Demand Registration advise the Board in writing that, in its or their opinion, the number of securities requested to be included in such Demand Registration exceeds the number which can be sold in such offering without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the securities to be included in such Demand Registration (i) <u>first</u>, shall be allocated pro rata among the Eligible Holders that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Eligible Holder (<u>provided</u> that any securities thereby allocated to an Eligible Holder that exceed such Eligible Holder's request shall be reallocated to the remaining requesting Eligible Holder(s)), (ii) <u>second</u>, and only if all the securities referred to in clause (i) have been included in such Registration, shall be allocated *pro rata* among the Company Security Holders (excluding the Eligible Holders) that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Company Security Holder (<u>provided</u> that any securities thereby allocated to a Company Security Holder that exceed such Company Security Holder's request shall be reallocated among the remaining requesting Company Security Holders in like manner), (iii) <u>third</u>, and only if all the securities referred to in clause (ii) have been included in such Registration, the number of securities that the Company proposes to include in such Registration that, in the opinion of the managing underwriter or underwriters, can be sold without having such adverse effect, and (iv) <u>fourth</u>, and only if all of the securities referred to in clause (i) have been included in such Registration, any other securities eligible for inclusion in such Registration that, in the opinion of the managing underwriter or underwriters, can be sold without having such adverse effect.

SECTION 2.02.    <u>Shelf Registration</u>.

(a)    <u>Filing</u>.  Subject to the right to deliver a Shelf Notice in the manner contemplated by the first proviso below, at any time after the first (1st) anniversary of the IPO,

each Eligible Holder (the "Shelf Initiating Company Security Holder") may, subject to Section 2.11, make a written request (a "Shelf Notice") to the Company to file a Shelf Registration Statement, which Shelf Notice shall specify whether such Registration shall be a Long-Form Registration or, if the Company qualifies to use such short form, a Short-Form Registration, the aggregate amount of Registrable Securities of the Shelf Initiating Company Security Holder to be registered therein and the intended methods of distribution thereof.  Following the delivery of a Shelf Notice, the Company (x) shall file promptly (and, in any event, within (i) ninety (90) days in the case of a request for a Long-Form Registration or (ii) thirty (30) days in the case of a request for a Short-Form Registration, in each case, following delivery of such Shelf Notice) with the SEC, such Shelf Registration Statement (which shall be an automatic Shelf Registration Statement, if the Company qualifies at such time to file such a Shelf Registration Statement) relating to the offer and sale of all Registrable Securities requested for inclusion therein by the Shelf Initiating Company Security Holder and, to the extent requested under Section 2.02(c), the other Company Security Holders from time to time in accordance with the methods of distribution elected by such Company Security Holders (to the extent permitted in this Section 2.02) and set forth in the Shelf Registration Statement.  If, on the date of any such request, the Company does not qualify to file a Shelf Registration Statement under the Securities Act, the provisions of this Section 2.02 shall not apply, and the provisions of Section 2.01 shall apply instead.

(b)     Continued Effectiveness.  The Company shall use its reasonable best efforts to keep any Shelf Registration Statement filed pursuant to Section 2.02(a) continuously effective under the Securities Act in order to permit the Prospectus forming a part thereof to be usable by Shelf Holders until the earliest of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration Statement or another Registration Statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder), (ii) the date as of which each of the Shelf Holders is permitted to sell its Registrable Securities without Registration pursuant to Rule 144 without volume limitation or other restrictions on transfer thereunder, and (iii) such shorter period as the Company Security Holders with respect to such Shelf Registration shall agree in writing.

(c)     Company Notices.  Promptly upon delivery of any Shelf Notice pursuant to Section 2.02 (but in no event more than five (5) Business Days thereafter), the Company shall deliver a written notice of such Shelf Notice to all Company Security Holders (other than the Shelf Initiating Company Security Holder) and the Company shall include in such Shelf Registration all such Registrable Securities of such other Company Security Holders which the Company has received a written request for inclusion therein within five (5) Business Days after such written notice is delivered to such other Company Security Holders (each such Company Security Holder delivering such a request, together with the Shelf Initiating Company Security Holder, a "Shelf Holder"); provided that the Company shall not include in such Shelf Registration Registrable Securities of any Company Security Holder in an amount in excess of such Company Security Holder's Pro Rata Shelf Percentage.

(d)     Suspension of Registration.  If the Company shall furnish to the Shelf Holders a certificate signed by the Chief Executive Officer or equivalent senior executive officer of the Company stating that the continued use of a Shelf Registration Statement filed pursuant to

Section 2.02(a) would require the Company to make an Adverse Disclosure, then the Company may suspend use of the Shelf Registration Statement (a "Shelf Suspension"); provided, however, that the Company, unless otherwise approved in writing by each Eligible Holder, its successors or assigns, shall not be permitted to exercise aggregate Demand Suspensions and Shelf Suspensions more than twice, or for more than an aggregate of ninety (90) days, in each case, during any twelve (12)-month period; provided, further, that, in the event of a Shelf Suspension, such Shelf Suspension shall terminate at such earlier time as the Company would no longer be required to make any Adverse Disclosure. Each Shelf Holder shall keep confidential the fact that a Shelf Suspension is in effect, the certificate referred to above, and its contents, unless and until otherwise notified by the Company, except (A) for disclosure to such Shelf Holder's employees, agents, and professional advisers who reasonably need to know such information for purposes of assisting the Company Security Holder with respect to its investment in the Common Stock and agree to keep it confidential, (B) for disclosures to the extent required in order to comply with reporting obligations to its limited partners or other direct or indirect investors who have agreed to keep such information confidential, (C) if and to the extent such matters are publicly disclosed by the Company or any of its Subsidiaries or any other Person that, to the actual knowledge of such Shelf Holder, was not subject to an obligation or duty of confidentiality to the Company and its Subsidiaries, and (D) as required by U.S. law, rule, or regulation. In the case of a Shelf Suspension, the Company Security Holders agree to suspend use of the applicable Prospectus and any Issuer Free Writing Prospectus in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, upon delivery of the notice referred to above. The Company shall immediately notify the Shelf Holders upon the termination of any Shelf Suspension, amend or supplement the Prospectus and any Issuer Free Writing Prospectus, if necessary, so it does not contain any untrue statement or omission, and furnish to the Shelf Holders such numbers of copies of the Prospectus and any Issuer Free Writing Prospectus as so amended or supplemented as the Shelf Holders may reasonably request. The Company agrees, if necessary, to supplement or make amendments to the Shelf Registration Statement if required by the registration form used by the Company for the applicable Registration or by the instructions applicable to such registration form or by the Securities Act or the rules or regulations promulgated thereunder, or as may reasonably be requested by any Shelf Initiating Company Security Holder.

      (e)    Shelf Take-Downs.

      i.    An offering or sale of Registrable Securities pursuant to a Shelf Registration Statement (each, a "Shelf Take-Down") may be initiated only by an Eligible Holder (an "Initiating Shelf Take-Down Holder"). Except as set forth in Section 2.02(e)(iii) with respect to Marketed Underwritten Shelf Take-Downs, each such Initiating Shelf Take-Down Holder shall not be required to permit the offer and sale of Registrable Securities by other Shelf Holders in connection with any such Shelf Take-Down initiated by such Initiating Shelf Take-Down Holder.

      ii.    Subject to Section 2.11, if the Initiating Shelf Take-Down Holder elects by written request to the Company, a Shelf Take-Down shall be in the form of an Underwritten Public Offering (an "Underwritten Shelf Take-Down Notice") and the Company shall amend or supplement the Shelf Registration Statement for such purpose as soon as practicable. The Company shall have the right to select the managing

underwriter or underwriters to administer such offering subject to the consent of such Initiating Shelf Take-Down Holder (not to be unreasonably withheld, delayed, or conditioned).  The provisions of the paragraph after Section 2.01(g) shall apply to any Underwritten Public Offering pursuant to this Section 2.02(e), *mutatis mutandis*.

iii.     If the plan of distribution set forth in any Underwritten Shelf Take-Down Notice includes a customary "road show" (including an "electronic road show") or other substantial marketing effort by the Company and the underwriters over a period expected to exceed 48 hours (a "Marketed Underwritten Shelf Take-Down"), promptly upon delivery of such Underwritten Shelf Take-Down Notice (but in no event more than three (3) Business Days thereafter), the Company shall promptly deliver a written notice (a "Marketed Underwritten Shelf Take-Down Notice") of such Marketed Underwritten Shelf Take-Down to all Shelf Holders (other than the Initiating Shelf Take-Down Holder), and the Company shall include in such Marketed Underwritten Shelf Take-Down all such Registrable Securities of such Shelf Holders that are Registered on such Shelf Registration Statement for which the Company has received written requests, which requests must specify the aggregate amount of such Registrable Securities of such Company Security Holder to be offered and sold pursuant to such Marketed Underwritten Shelf Take-Down, for inclusion therein within three (3) Business Days after the date that such Marketed Underwritten Shelf Take-Down Notice has been delivered.

SECTION 2.03.     Piggyback Registration.

(a)     Participation.  If the Company at any time proposes to file a Registration Statement with respect to any offering of its Common Stock for its own account or for the account of any other Persons (other than (i) a Registration under Section 2.01 or 2.02, it being understood that this clause (i) does not limit the rights of Company Security Holders to make written requests pursuant to Sections 2.01 or 2.02 or otherwise limit the applicability thereof, (ii) a Registration Statement on Form S-4 or S-8 (or such other similar successor forms then in effect under the Securities Act), (iii) a registration of securities solely relating to an offering and sale to employees, directors or consultants of the Company or its Subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement, (iv) a registration not otherwise covered by clause (ii) above pursuant to which the Company is offering to exchange its own securities for other securities, (v) a Registration Statement relating solely to dividend reinvestment or similar plans, or (vi) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities of the Company or any of its Subsidiaries that are convertible or exchangeable for Common Stock and that are initially issued pursuant to Rule 144A and/or Regulation S (or any successor provisions) of the Securities Act may resell such notes and sell the Common Stock into which such notes may be converted or exchanged) (a "Company Public Sale"), then, (A) as soon as practicable (but in no event less than thirty (30) days prior to the proposed date of filing of such Registration Statement), the Company shall give written notice of such proposed filing to the Eligible Holders, and such notice shall offer each Eligible Holder the opportunity to Register under such Registration Statement such number of Registrable Securities as such Eligible Holder may request in writing delivered to the Company within ten (10) days of delivery of such written notice by the Company, and (B) subject to Section 2.03(c), as soon as practicable after the expiration of such ten-day (10) period (but in no event less than fifteen (15) days prior to the proposed date of filing of such Registration

A-10

Statement), the Company shall give written notice of such proposed filing to the Company Security Holders, and such notice shall offer each such Company Security Holder the opportunity to Register under such Registration Statement such number of Registrable Securities as such Company Security Holder may request in writing within ten (10) days of delivery of such written notice by the Company.  Subject to Sections 2.03(b) and (c), the Company shall include in such Registration Statement all such Registrable Securities that are requested by Company Security Holders to be included therein in compliance with the immediately foregoing sentence (a "Piggyback Registration"); provided that if at any time after giving written notice of its intention to Register any equity securities and prior to the effective date of the Registration Statement filed in connection with such Piggyback Registration, the Company shall determine for any reason not to Register or to delay Registration of the equity securities covered by such Piggyback Registration, the Company shall give written notice of such determination to each Company Security Holder that had requested to Register its, his or her Registrable Securities in such Registration Statement and, thereupon, (1) in the case of a determination not to Register, shall be relieved of its obligation to Register any Registrable Securities in connection with such Registration (but not from its obligation to pay the Registration Expenses in connection therewith, to the extent payable), without prejudice, however, to the rights of the Eligible Holders to request that such Registration be effected as a Demand Registration under Section 2.01, and (2) in the case of a determination to delay Registering, in the absence of a request by the Eligible Holder(s) to request that such Registration be effected as a Demand Registration under Section 2.01, shall be permitted to delay Registering any Registrable Securities, for the same period as the delay in Registering the other equity securities covered by such Piggyback Registration.  If the offering pursuant to such Registration Statement is to be underwritten, the Company shall so advise the Company Security Holders as a part of the written notice given pursuant this Section 2.03(a), and each Company Security Holder making a request for a Piggyback Registration pursuant to this Section 2.03(a) must, and the Company shall make such arrangements with the managing underwriter or underwriters (which, in the case of any Piggyback Registration, shall be selected by the Company) so that each such Company Security Holder may, participate in such Underwritten Offering, subject to the conditions of Section 2.03(b) and (c).  If the offering pursuant to such Registration Statement is to be on any other basis, the Company shall so advise the Company Security Holders as part of the written notice given pursuant to this Section 2.03(a), and each Company Security Holder making a request for a Piggyback Registration pursuant to this Section 2.03(a) must, and the Company shall make such arrangements so that each such Company Security Holder may, participate in such offering on such basis, subject to the conditions of Section 2.03(b) and (c).  Each Company Security Holder shall be permitted to withdraw all or part of its Registrable Securities from a Piggyback Registration at any time prior to the effectiveness of such Registration Statement.

(b)    Priority of Piggyback Registration.  If the managing underwriter or underwriters of any proposed Underwritten Offering of Registrable Securities included in a Piggyback Registration informs the Company and the Company Security Holders that have requested to participate in such Piggyback Registration in writing that, in its or their opinion, the number of securities which such Company Security Holders and any other Persons intend to include in such offering exceeds the number which can be sold in such offering without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, then the securities to be included in such Piggyback Registration shall be (i) first, 100% of the securities that the Company or (subject to

Section 2.07) any Person (other than a Company Security Holder) exercising a contractual right to demand Piggyback Registration, as the case may be, proposes to sell, (ii) <u>second</u>, and only if all the securities referred to in clause (i) have been included, the number of Registrable Securities that, in the opinion of such managing underwriter or underwriters, can be sold without having such adverse effect in such Piggyback Registration, which such number shall be allocated pro rata among the Eligible Holders that have requested to participate in such Piggyback Registration based on the relative number of Registrable Securities then held by each such Eligible Holder (<u>provided</u> that any securities thereby allocated to a Eligible Holder that exceed such Eligible Holder's request shall be reallocated to the remaining requesting Eligible Holders), (iii) <u>third</u>, and only if all the securities referred to in clause (ii) have been included in such Piggyback Registration, the number of Registrable Securities that, in the opinion of such managing underwriter or underwriters, can be sold without having such adverse effect in such Registration, which such number shall be allocated *pro rata* among the Company Security Holders (excluding the Eligible Holders) that have requested to participate in such Piggyback Registration based on the relative number of Registrable Securities then held by each such Company Security Holder (<u>provided</u> that any securities thereby allocated to a Company Security Holder that exceed such Company Security Holder's request shall be reallocated among the remaining requesting Company Security Holders in like manner),and (iv) <u>fourth</u>, and only if all of the Registrable Securities referred to in clause (i) have been included in such Piggyback Registration, any other securities eligible for inclusion in such Piggyback Registration that, in the opinion of the managing underwriter or underwriters, can be sold without having such adverse effect in such Piggyback Registration.

(c)  <u>No Effect on Demand Registrations</u>.  No Registration of Registrable Securities effected pursuant to a request under this Section 2.03 shall be deemed to have been effected pursuant to Sections 2.01 or 2.02 or shall relieve the Company of its obligations under Sections 2.01 or 2.02.

SECTION 2.04.  <u>Lock-Up Periods</u>.

(a)  <u>Lock-Up Periods for Company Security Holders</u>.  In the event of a Company Public Sale of the Company's equity securities in an Underwritten Offering, each of the Company and the Company Security Holders agrees, if requested by the managing underwriter or underwriters in such Underwritten Offering, not to (1) offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any Common Stock (including Common Stock that may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the SEC and Common Stock that may be issued upon exercise of any options or warrants) or Common Stock Equivalents, (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise, (3) make any demand for or exercise any right or cause to be filed a Registration Statement, including any amendments thereto, with respect to the registration of any Common Stock or Common Stock Equivalents or any other securities of the Company or (4) publicly disclose the intention to do any of the foregoing, in each case, during the period beginning seven (7) days before and ending one hundred and eighty (180) days (in the event of

the IPO) or ninety (90) days (in the event of any other Company Public Sale) after the date of the underwriting agreement entered into in connection with such Company Public Sale, to the extent timely notified in writing by the Company or the managing underwriter or underwriters; provided that no Company Security Holder shall be subject to any such lock-up period of longer duration than that applicable to any Eligible Holder, or any director or executive officer who holds Registrable Securities.  If requested by the managing underwriter or underwriters of any such Company Public Sale, the Company Security Holders shall execute a separate agreement to the foregoing effect.  The Company may impose stop-transfer instructions with respect to the Common Stock (or other securities) subject to the foregoing restriction until the end of the period referenced above.

        (b)     <u>Lock-Up Period for the Company and Others</u>.  In the case of an offering of Registrable Securities pursuant to Section 2.01 or 2.02 that is a Marketed Underwritten Offering, the Company and each of the Company Security Holders agree, if requested by a Participating Eligible Holder or the managing underwriter or underwriters with respect to such Marketed Underwritten Offering, not to (1) offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any Common Stock (including Common Stock that may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the SEC and Common Stock that may be issued upon exercise of any options or warrants) or Common Stock Equivalents, (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise, (3) make any demand for or exercise any right or cause to be filed a Registration Statement, including any amendments thereto, with respect to the registration of any Common Stock or Common Stock Equivalents or any other securities of the Company or (4) publicly disclose the intention to do any of the foregoing, in each case, during the period beginning seven (7) days before, and ending ninety (90) days (or such other period as may be reasonably requested by a Participating Eligible Holder or the managing underwriter or underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in the rules and regulations of FINRA, the SEC, or any successor provisions or amendments thereto) after, the date of the underwriting agreement entered into in connection with such Marketed Underwritten Offering, to the extent timely notified in writing by a Participating Eligible Holder or the managing underwriter or underwriters, as the case may be; provided that no Company Security Holder shall be subject to any such lock-up period of longer duration than that applicable to any Participating Eligible Holder.  Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to Registrations on Form S-4 or S-8 or any successor form to such Forms or as part of any Registration of securities for offering and sale to employees, directors or consultants of the Company and its Subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.  The Company agrees to use its reasonable best efforts to obtain from each of its directors and officers and each other holder of restricted securities of the Company which securities are the same as or similar to the Registrable Securities being Registered, or any restricted securities convertible into or exchangeable or exercisable for any of such securities, an agreement not to effect any public sale

or distribution of such securities during any such period referred to in this paragraph, except as part of any such Registration, if permitted.  Without limiting the foregoing (but subject to Section 2.07), if after the date hereof the Company or any of its Subsidiaries grants any Person (other than a Company Security Holder) any rights to demand or participate in a Registration, the Company shall, and shall cause its Subsidiaries to, provide that the agreement with respect thereto shall include such Person's agreement to comply with any lock-up period required by this Section as if it were a Company Security Holder hereunder.  If requested by the managing underwriter or underwriters of any such Marketed Underwritten Offering, the Company Security Holders shall execute a separate agreement to the foregoing effect.  The Company may impose stop-transfer instructions with respect to the Common Stock (or other securities) subject to the foregoing restriction until the end of the period referenced above.

SECTION 2.05.    Registration Procedures.

(a)    In connection with the Company's Registration obligations under Sections 2.01, 2.02 and 2.03 and subject to the applicable terms and conditions set forth therein, the Company shall use its reasonable best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of distribution thereof as expeditiously as reasonably practicable, and in connection therewith the Company shall:

i.    prepare the required Registration Statement including all exhibits and financial statements required under the Securities Act to be filed therewith, and before filing a Registration Statement, Prospectus or any Issuer Free Writing Prospectus, or any amendments or supplements thereto, (x) furnish to the underwriters, if any, and the Participating Eligible Holders, if any, copies of all documents prepared to be filed, which documents shall be subject to the review and comment of such underwriters and the Participating Eligible Holders and their respective counsel and (y) except in the case of a Registration under Section 2.03, not file any Registration Statement or Prospectus or amendments or supplements thereto to which any Participating Eligible Holder or the underwriters, if any, shall reasonably object;

ii.    as promptly as practicable file with the SEC a Registration Statement relating to the Registrable Securities including all exhibits and financial statements required by the SEC to be filed therewith, and use its reasonable best efforts to cause such Registration Statement to become effective under the Securities Act as soon as practicable;

iii.    prepare and file with the SEC such pre- and post-effective amendments to such Registration Statement, supplements to the Prospectus and such amendments or supplements to any Issuer Free Writing Prospectus as may be necessary to comply with the Securities Act or as (x) reasonably requested by any Participating Eligible Holder, (y) reasonably requested by any other Participating Company Security Holder (to the extent such request relates to information relating to such Company Security Holder), or (z) necessary to keep such Registration effective for the period of time required by this Annex A, and comply with provisions of the applicable securities laws with respect to the sale or other disposition of all securities covered by such Registration Statement during

A-14

such period in accordance with the intended method or methods of disposition by the sellers thereof set forth in such Registration Statement;

iv.         promptly notify the Participating Company Security Holders and the managing underwriter or underwriters, if any, and (if requested) confirm such advice in writing and provide copies of the relevant documents, as soon as reasonably practicable after notice thereof is received by the Company (A) when the applicable Registration Statement or any amendment thereto has been filed or becomes effective, and when the applicable Prospectus or Issuer Free Writing Prospectus or any amendment or supplement thereto has been filed, (B) of any written comments by the SEC or any request by the SEC or any other federal or state governmental authority for amendments or supplements to such Registration Statement, Prospectus or Issuer Free Writing Prospectus or for additional information (provided that such notice to the Participating Company Security Holders shall be deemed given upon a notice to a representative to be designated by the Participating Company Security Holders, which shall be [BlackRock so long as BlackRock is a Participating Company Security Holder)], (C) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or any Issuer Free Writing Prospectus or the initiation or threatening of any proceedings for such purposes, (D) if, at any time, the representations and warranties of the Company in any applicable underwriting agreement cease to be true and correct in all material respects; provided by a notice to a representative to be designated by the Participating Company Security Holders, which shall be [BlackRock so long as BlackRock is a Participating Company Security Holder], (E) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction and (F) of the receipt by the Company of any notification with respect to the initiation or threatening of any proceeding for the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction;

v.         promptly notify the Participating Company Security Holders and the managing underwriter or underwriters, if any, when the Company becomes aware of the happening of any event as a result of which the applicable Registration Statement, the Prospectus included in such Registration Statement (as then in effect) or any Issuer Free Writing Prospectus contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of such Prospectus, any preliminary Prospectus or any Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement, or, if for any other reason it shall be necessary during such time period to amend or supplement such Registration Statement, Prospectus or Issuer Free Writing Prospectus in order to comply with the Securities Act and, in either case as promptly as reasonably practicable thereafter, prepare and file with the SEC, and furnish without charge to the Participating Company Security Holders and the managing underwriter or underwriters, if any, an amendment or supplement to such Registration Statement, Prospectus or Issuer Free Writing Prospectus which shall correct such misstatement or omission or effect such compliance;

A-15

vi.        use its reasonable best efforts to prevent, or obtain the withdrawal of, any stop order or other order suspending the use of any preliminary or final Prospectus or any Issuer Free Writing Prospectus;

vii.        promptly incorporate in a Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment to the applicable Registration Statement such information as the managing underwriter or underwriters and the Participating Eligible Holder(s) agree should be included therein relating to the plan of distribution with respect to such Registrable Securities, and make all required filings of such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment as soon as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment;

viii.        furnish to each Participating Company Security Holder and each underwriter, if any, without charge, as many conformed copies as such Company Security Holder or underwriter may reasonably request of the applicable Registration Statement and any amendment or post-effective amendment thereto, including financial statements and schedules, all documents incorporated therein by reference and all exhibits (including those incorporated by reference);

ix.        deliver to each Participating Company Security Holder and each underwriter, if any, without charge, as many copies of the applicable Prospectus (including each preliminary Prospectus), any Issuer Free Writing Prospectus and any amendment or supplement thereto as such Company Security Holder or underwriter may reasonably request (it being understood that the Company consents to the use of such Prospectus, any Issuer Free Writing Prospectus and any amendment or supplement thereto by such Company Security Holder and the underwriters, if any, in connection with the offering and sale of the Registrable Securities thereby) and such other documents as such Company Security Holder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such Company Security Holder or underwriter;

x.        on or prior to the date on which the applicable Registration Statement is declared effective, use its reasonable best efforts to register or qualify, and cooperate with the Participating Company Security Holders, the managing underwriter or underwriters, if any, and their respective counsel, in connection with the registration or qualification of such Registrable Securities for offer and sale under the securities or "blue sky" laws of each state and other jurisdiction of the United States as any Participating Company Security Holder or managing underwriter or underwriters, if any, or their respective counsel reasonably request in writing and do any and all other acts or things reasonably necessary or advisable to keep such registration or qualification in effect for such period as required by Section 2.01(c) or 2.02(b), whichever is applicable, provided that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to taxation or general service of process in any such jurisdiction where it is not then so subject;

xi.        cooperate with the Participating Company Security Holders and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates (if certificated) representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities to the underwriters;

xii.        use its reasonable best efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such Registrable Securities;

xiii.        not later than the effective date of the applicable Registration Statement, provide a CUSIP number for all Registrable Securities and provide the applicable transfer agent with printed certificates for the Registrable Securities which are in a form eligible for deposit with The Depository Trust Company;

xiv.        make such representations and warranties to the Participating Company Security Holders and the underwriters or agents, if any, in form, substance and scope as are customarily made by issuers in secondary underwritten public offerings;

xv.        enter into such customary agreements (including underwriting and indemnification agreements) and take all such other actions as any Participating Eligible Holder or the managing underwriter or underwriters, if any, reasonably request in order to expedite or facilitate the registration and disposition of such Registrable Securities;

xvi.        obtain for delivery to the Participating Company Security Holders and to the underwriter or underwriters, if any, an opinion or opinions from counsel for the Company dated the effective date of the Registration Statement or, in the event of an Underwritten Offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to the Participating Company Security Holders holding a majority of the Registrable Securities included in the Registration, or underwriters, as the case may be, and their respective counsel;

xvii.        in the case of an Underwritten Offering, obtain for delivery to the Company and the managing underwriter or underwriters, with copies to the Participating Company Security Holders, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

xviii.        cooperate with each Participating Company Security Holder and each underwriter, if any, participating in the disposition of such Registrable Securities and

their respective counsel in connection with any filings required to be made with FINRA or the SEC;

xix.        use its reasonable best efforts to comply with all applicable securities laws and make available to its security holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder;

xx.        provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

xxi.        use its reasonable best efforts to cause all Registrable Securities covered by the applicable Registration Statement to be listed on each securities exchange on which any of the Common Stock are then listed or quoted and on each inter-dealer quotation system on which any of the Common Stock are then quoted;

xxii.        make available upon reasonable notice at reasonable times and for reasonable periods for inspection by any Participating Eligible Holder, by any underwriter participating in any disposition to be effected pursuant to such Registration Statement and by any attorney, accountant or other agent retained by such Participating Eligible Holder(s) or any such underwriter, all pertinent financial and other records, pertinent corporate documents and properties of the Company, and cause all of the Company's officers, directors and employees and use reasonable best efforts to cause the independent public accountants who have certified its financial statements to make themselves available to discuss the business of the Company and to supply all information reasonably requested by any such Person in connection with such Registration Statement as shall be necessary to enable them to exercise their due diligence responsibility; provided that any such Person gaining access to information regarding the Company pursuant to this Section 2.05(a)(xxii) shall agree to hold in strict confidence and shall not make any disclosure or use any information regarding the Company that the Company determines in good faith to be confidential, and of which determination such Person is notified, unless (w) the release of such information is requested or required by U.S. law or by deposition, interrogatory, requests for information or documents by a governmental entity, subpoena or similar process, (x) such information is or becomes publicly known other than through a breach of this or any other agreement of which such Person has actual knowledge, (y) such information is or becomes available to such Person on a non-confidential basis from a source other than the Company or (z) such information is independently developed by such Person; and

xxiii.        in the case of an Underwritten Offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the managing underwriter or underwriters in any such Underwritten Offering and otherwise to facilitate, cooperate with, and participate in each proposed offering contemplated herein and customary selling efforts related thereto.

(b)      The Company may require each Participating Company Security Holder to furnish to the Company such information regarding the distribution of such securities and such other information relating to such Company Security Holder and its ownership of Registrable Securities as the Company may from time to time reasonably request in writing.  Each Participating Company Security Holder agrees to furnish such information to the Company and to cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Annex A.

(c)      Each Participating Company Security Holder agrees that, upon delivery of any notice by the Company of the happening of any event of the kind described in Section 2.05(a)(iv)(C), (D), or (E) or Section 2.05(a)(v), such Company Security Holder will forthwith discontinue disposition of Registrable Securities pursuant to such Registration Statement until (i) such Company Security Holder's receipt of the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated by Section 2.05(a)(v), (ii) such Company Security Holder is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus, as the case may be, may be resumed, (iii) such Company Security Holder is advised in writing by the Company of the termination, expiration or cessation of such order or suspension referenced in Section 2.05(a)(iv)(C) or (E) or (iv) such Company Security Holder is advised in writing by the Company that the representations and warranties of the Company in such applicable underwriting agreement are true and correct in all material respects.  If so directed by the Company, such Company Security Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Company Security Holder's possession, of the Prospectus or any Issuer Free Writing Prospectus covering such Registrable Securities current at the time of delivery of such notice.  In the event the Company shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated by Section 2.05(a)(v) or is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus may be resumed.

SECTION 2.06.      Underwritten Offerings.

(a)      Demand and Shelf Registrations.  If requested by the underwriters for any Underwritten Offering requested by any Participating Eligible Holder pursuant to a Registration under Section 2.01 or Section 2.02, the Company shall enter into an underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company, each Participating Eligible Holder and the underwriters, and to contain such representations and warranties by the Company and such other terms as are generally prevailing in agreements of that type, including indemnities no less favorable to the recipient thereof than those provided in Section 2.09.  Each Participating Eligible Holder shall cooperate with the Company in the negotiation of such underwriting agreement and shall give consideration to the reasonable suggestions of the Company regarding the form thereof.  The Participating Company Security Holders shall be parties to such underwriting agreement, which underwriting agreement shall (i) contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Participating Company

Security Holders as are customarily made by issuers to selling stockholders in secondary underwritten public offerings and (ii) provide that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement also shall be conditions precedent to the obligations of such Participating Company Security Holders.  Any such Participating Company Security Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters in connection with such underwriting agreement other than representations, warranties or agreements regarding such Participating Company Security Holder, such Participating Company Security Holder's title to the Registrable Securities, such Participating Company Security Holder's authority to sell the Registrable Securities, such Participating Company Security Holder's intended method of distribution, absence of liens with respect to the Registrable Securities, enforceability of the applicable underwriting agreement as against such Participating Company Security Holder, receipt of all consents and approvals with respect to the entry into such underwriting agreement and the sale of such Registrable Securities and any other representations required to be made by such Participating Company Security Holder under applicable law, rule or regulation, and the aggregate amount of the liability of such Participating Company Security Holder in connection with such underwriting agreement shall not exceed such Participating Company Security Holder's net proceeds from such Underwritten Offering.

(b)  Piggyback Registrations.  If the Company proposes to register any of its securities under the Securities Act as contemplated by Section 2.03 and such securities are to be distributed in an Underwritten Offering through one or more underwriters, the Company shall, if requested by any Company Security Holder pursuant to Section 2.03 and subject to the provisions of Sections 2.03(b) and (c), use its reasonable best efforts to arrange for such underwriters to include on the same terms and conditions that apply to the other sellers in such Registration all the Registrable Securities to be offered and sold by such Company Security Holder among the securities of the Company to be distributed by such underwriters in such Registration.  The Participating Company Security Holders shall be parties to the underwriting agreement between the Company and such underwriters, which underwriting agreement shall (i) contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Participating Company Security Holders as are customarily made by issuers to selling stockholders in secondary underwritten public offerings and (ii) provide that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement also shall be conditions precedent to the obligations of such Participating Company Security Holders.  Any such Participating Company Security Holder shall not be required to make any representations or warranties to, or agreements with the Company or the underwriters in connection with such underwriting agreement other than representations, warranties or agreements regarding such Participating Company Security Holder, such Participating Company Security Holder's title to the Registrable Securities, such Participating Company Security Holder's authority to sell the Registrable Securities, such Company Security Holder's intended method of distribution, absence of liens with respect to the Registrable Securities, enforceability of the applicable underwriting agreement as against such Participating Company Security Holder, receipt of all consents and approvals with respect to the entry into such underwriting agreement and the sale of such Registrable Securities or any other representations required to be made by such Participating Company Security Holder under applicable law, rule or regulation, and the aggregate amount of the liability of such Participating

A-20

Company Security Holder in connection with such underwriting agreement shall not exceed such Participating Company Security Holder's net proceeds from such Underwritten Offering.

(c)    <u>Participation in Underwritten Registrations</u>.  Subject to the provisions of Sections 2.06(a) and (b) above, no Person may participate in any Underwritten Offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Persons entitled to approve such arrangements and (ii) completes and executes all questionnaires, powers of attorney, indemnities (to the extent consistent with the Company Security Holders Agreement), underwriting agreements, and other documents reasonably required under the terms of such underwriting arrangements and the provisions of the Company Security Holders Agreement in respect of registration rights.

(d)    <u>Price and Underwriting Discounts</u>.  In the case of an Underwritten Offering under Section 2.01 or 2.02, the price, underwriting discount and other financial terms for the Registrable Securities shall be determined by the Participating Company Security Holders holding a majority of the Registrable Securities included in the Registration.  In the case of an Underwritten Offering under Section 2.03, the price, underwriting discount and other financial terms for the Registrable Securities shall be determined by the Company.

SECTION 2.07.    <u>No Inconsistent Agreements; Additional Rights</u>.  The Company is not currently a party to, and shall not hereafter enter into without the prior written consent of the Requisite Majority, any agreement with respect to its securities that is inconsistent with the rights granted to the Eligible Holders and Company Security Holders by this <u>Annex A</u>, including allowing any other holder or prospective holder of any securities of the Company (a) registration rights in the nature or substantially in the nature of those set forth in Section 2.01, Section 2.02 or Section 2.03 that would have priority over the Registrable Securities with respect to the inclusion of such securities in any Registration (except to the extent such registration rights are solely related to registrations of the type contemplated by Section 2.03(a)(ii) through (iv)) or (b) demand registration rights in the nature or substantially in the nature of those set forth in Section 2.01 or Section 2.02 that are exercisable prior to such time as the Eligible Investors can first exercise their rights under Section 2.01 or Section 2.02.

SECTION 2.08.    <u>Registration Expenses</u>.  All expenses incident to the Company's performance of or compliance with this <u>Annex A</u> shall be paid by the Company, including (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with the SEC, FINRA, and if applicable, the fees and expenses of any "qualified independent underwriter," as such term is defined in Rule 5121 of FINRA (or any successor provision), and of its counsel, (ii) all fees and expenses in connection with compliance with any securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities), (iii) all printing, duplicating, word processing, messenger, telephone, facsimile and delivery expenses (including expenses of printing certificates for the Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses and Issuer Free Writing Prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company (including the expenses of any special audit and cold comfort letters required by or incident to such performance), (v) Securities Act liability insurance or similar insurance if the Company so desires or the underwriters so require

in accordance with then-customary underwriting practice, (vi) all fees and expenses incurred in connection with the listing of Registrable Securities on any national securities exchange or quotation of the Registrable Securities on any inter-dealer quotation system, (vii) all applicable rating agency fees with respect to the Registrable Securities, (viii) all reasonable fees and disbursements of one legal counsel and, to the extent necessary, one local counsel, and one accounting firm as selected by the holders of a majority of the Registrable Securities included in such Registration, (ix) any reasonable fees and disbursements of underwriters customarily paid by issuers or sellers of securities, (x) all fees and expenses of any special experts or other Persons retained by the Company in connection with any Registration, (xi) all of the Company's internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), (xii) all expenses related to the "road-show" for any Underwritten Offering, including all travel, meals and lodging and (xiii) any other fees and disbursements customarily paid by the issuers of securities.  All such expenses are referred to herein as "Registration Expenses".  The Company shall not be required to pay any underwriting discounts and commissions and transfer taxes, if any, attributable to the sale of Registrable Securities.

     SECTION 2.09.  Indemnification.

     (a)  Indemnification by the Company.  The Company agrees to indemnify and hold harmless, to the full extent permitted by U.S. law, each Company Security Holder holding Registrable Securities, each of their respective Affiliates, employees, directors, managers, officers, trustees, or agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) such directors, officers, employees, stockholders, general partners, limited partners, members, trustees, advisory directors, managing directors, and Affiliates (other than the Company and its Subsidiaries) (and directors, officers, employees, stockholders, general partners, limited partners, members, advisory directors, managing directors, and controlling persons thereof) (collectively, "Company Security Holder Related Persons") and each of their respective Agents from and against any and all losses, claims, damages, or liabilities, joint or several, and expenses (including, without limitation, reasonable attorneys' fees and any and all reasonable expenses incurred investigating, preparing, or defending against any litigation, commenced or threatened, or any claim, and any and all amounts paid in any settlement of any such claim or litigation) to which such Company Security Holder Related Persons may become subject, insofar as such losses, claims, damages, or liabilities (or actions or proceedings in respect thereof) (the "Damages") or expenses arising out of or based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which such Registrable Securities were Registered under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment or supplement thereto or any documents incorporated by reference therein), any Issuer Free Writing Prospectus or amendment or supplement thereto, or any other disclosure document produced by or on behalf of the Company or any of its Subsidiaries including reports and other documents filed under the Exchange Act, (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, (iii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company or any of its Subsidiaries in connection with any such registration, qualification, compliance or sale of Registrable Securities, (iv) any failure to register or qualify Registrable Securities in any state

where the Company or its agents have affirmatively undertaken or agreed in writing that the Company (the undertaking of any underwriter being attributed to the Company) will undertake such registration or qualification on behalf of the Company Security Holders of such Registrable Securities (<u>provided</u> that in such instance the Company shall not be so liable if it has undertaken its reasonable best efforts to so register or qualify such Registrable Securities) or (v) any actions or inactions or proceedings in respect of the foregoing whether or not such indemnified party is a party thereto, and the Company will reimburse, as incurred, each such Company Security Holder and each of their respective direct or indirect partners, members or shareholders and each of such partner's, member's or shareholder's partners, members or shareholders and, with respect to all of the foregoing Persons, each of their respective Affiliates, employees, directors, managers, officers, trustees or agents and controlling Persons and each of their respective Agents, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; <u>provided</u> that the Company shall not be liable to any particular indemnified party to the extent that any such Damage arises out of or is based upon (A) an untrue statement or alleged untrue statement or omission or alleged omission made in any such Registration Statement or other document in reliance upon and in conformity with written information furnished to the Company by such indemnified party expressly for use in the preparation thereof or (B) an untrue statement or omission in a preliminary Prospectus relating to Registrable Securities, if a Prospectus (as then amended or supplemented) that would have cured the defect was furnished to the indemnified party from whom the Person asserting the claim giving rise to such Damage purchased Registrable Securities at least five days prior to the written confirmation of the sale of the Registrable Securities to such Person and a copy of such Prospectus (as amended and supplemented) was not sent or given by or on behalf of such indemnified party to such Person at or prior to the written confirmation of the sale of the Registrable Securities to such Person.  This indemnity shall be in addition to any liability the Company may otherwise have.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Company Security Holder or any indemnified party and shall survive the transfer of such securities by such Company Security Holder.  The Company shall also indemnify underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, their officers and directors and each Person who controls such Persons (within the meaning of the Securities Act and the Exchange Act) to the same extent as provided above with respect to the indemnification of the indemnified parties.

(b)    <u>Indemnification by the Participating Company Security Holders</u>.  Each Participating Company Security Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted under any Federal or state law of the United States or regulation or governmental authority, other than the Securities Act, the Company, its directors and officers and each Person who controls the Company (within the meaning of the Securities Act or the Exchange Act), and each other Company Security Holder, each of such other Company Security Holder's respective direct or indirect partners, members or shareholders and each of such partner's, member's or shareholder's partners, members or shareholders and, with respect to all of the foregoing Persons, each of their respective Affiliates, employees, directors, managers, officers, trustees or agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) such Persons and each of their respective Agents from and against any Damages resulting from (i) any untrue statement of a material fact in any Registration Statement under which such Registrable Securities were Registered under the

A-23

Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment or supplement thereto or any documents incorporated by reference therein) or any Issuer Free Writing Prospectus or amendment or supplement thereto, or (ii) any omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission is contained in any information furnished in writing by such Company Security Holder to the Company specifically for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting the claim, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, prospectus, offering circular, Issuer Free Writing Prospectus or other document, in reliance upon and in conformity with written information furnished to the Company by such Company Security Holder expressly for use therein.  In no event shall the liability of such Company Security Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Company Security Holder under the sale of Registrable Securities giving rise to such indemnification obligation.

(c)    Conduct of Indemnification Proceedings.  Any Person entitled to indemnification under this Section 2.09 shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it is actually and materially prejudiced by reason of such delay or failure) and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided that any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (A) the indemnifying party has agreed in writing to pay such fees or expenses, (B) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after delivery of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (C) the indemnified party has reasonably concluded (based upon advice of its counsel) that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party, or (D) in the reasonable judgment of any such Person (based upon advice of its counsel) a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if the Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person).  If the indemnifying party assumes the defense, the indemnifying party shall not have the right to settle such action, consent to entry of any judgment or enter into any settlement, in each case without the prior written consent of the indemnified party, unless the entry of such judgment or settlement (i) includes as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of an unconditional release from all liability in respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such indemnified party, and provided that any sums payable in connection with such settlement are paid in full by the indemnifying party.  If such defense is not assumed by the indemnifying party, the

A-24

indemnifying party will not be subject to any liability for any settlement made without its prior written consent, but such consent may not be unreasonably withheld.  It is understood that the indemnifying party or parties shall not, except as specifically set forth in this Section 2.09(c), in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm admitted to practice in such jurisdiction at any one time unless (x) the employment of more than one counsel has been authorized in writing by the indemnifying party or parties, (y) an indemnified party has reasonably concluded (based on the advice of counsel) that there may be legal defenses available to it that are different from or in addition to those available to the other indemnified parties, and/or (z) a conflict or potential conflict exists or may exist (based upon advice of counsel to an indemnified party) between such indemnified party and the other indemnified parties, in each of which cases the indemnifying party shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels.

(d)     Contribution.  If for any reason the indemnification provided for in paragraphs (a) and (b) of this Section 2.09 is unavailable to an indemnified party or insufficient in respect of any Damages referred to therein, then the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Damage in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party or parties on the other hand in connection with the acts, statements or omissions that resulted in such losses, as well as any other relevant equitable considerations.  In connection with any Registration Statement filed with the SEC by the Company, the relative fault of the indemnifying party on the one hand and the indemnified party on the other hand shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 2.09(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this Section 2.09(d).  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The amount paid or payable by an indemnified party as a result of the Damages referred to in Sections 2.09(a) and 2.09(b) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 2.09(d), in connection with any Registration Statement filed by the Company, a Participating Company Security Holder shall not be required to contribute any amount in excess of the dollar amount of the net proceeds received by such Company Security Holder under the sale of Registrable Securities giving rise to such contribution obligation less any amount paid by such Company Security Holders pursuant to Section 2.09(b).  If indemnification is available under this Section 2.09, the indemnifying parties shall indemnify each indemnified party to the full extent provided in Sections 2.09(a) and 2.09(b) hereof without regard to the provisions of this Section 2.09(d).

(e)     <u>No Exclusivity</u>.  The remedies provided for in this Section 2.09 are not exclusive and shall not limit any rights or remedies which may be available to any indemnified party at law or in equity or pursuant to any other agreement.

(f)     <u>Survival</u>.  The indemnities provided in this Section 2.09 shall survive the transfer of any Registrable Securities by such Company Security Holder.

SECTION 2.10.     <u>Rules 144 and 144A and Regulation S</u>.  The Company covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder (or, if the Company is not required to file such reports, it will, upon the reasonable request of a Company Security Holder, make publicly available such necessary information for so long as necessary to permit sales pursuant to Rules 144, 144A or Regulation S under the Securities Act), and it will take such further action as any Company Security Holder may reasonably request, all to the extent required from time to time to enable the Company Security Holders, following the IPO, to sell Registrable Securities without Registration under the Securities Act within the limitation of the exemptions provided by (i) Rules 144, 144A or Regulation S under the Securities Act, as such Rules may be amended from time to time, or (ii) any similar rule or regulation hereafter adopted by the SEC. Upon the reasonable request of a Company Security Holder, the Company will deliver to such Company Security Holder a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

SECTION 2.11.     <u>Limitation on Registrations and Underwritten Offerings</u>.

(a)     Notwithstanding the rights and obligations set forth in Sections 2.01 and 2.02, in no event shall the Company be obligated to take any action to effect any Demand Registration or any Marketed Underwritten Shelf Take-Down after the Company has effected such number of Demand Registrations and/or Marketed Underwritten Shelf Take-Downs at the request of an Eligible Holder or its Affiliates equal to the number of Eligible Holder Registration Demands; and

(b)     Notwithstanding the rights and obligations set forth in Sections 2.01 and 2.02, in no event shall the Company be obligated to take any action to (i) effect more than one Marketed Underwritten Offering in any consecutive one hundred and twenty (120) day period or (ii) effect any Underwritten Offering unless the Eligible  Holder initiating such Underwritten Offering proposes to sell Registrable Securities in such Underwritten Offering having a reasonably anticipated gross aggregate price (before deduction of underwriter commissions and offering expenses) of at least $[10,000,000] or 100% of the Registrable Securities then held by such Eligible Holder (if the value of such Registrable Securities is reasonably anticipated to have a gross aggregate price of less than $[10,000,000]).

(c)     For purposes of this <u>Annex A</u>, "<u>Eligible Holder Registration Demands</u>" means (i) two (2), for each Eligible Holder; <u>provided</u>, <u>however</u>, that with respect to Registrations pursuant to Section 2.02(a), if the Company is eligible to file a Short-Form Registration, such Short-Form Registrations shall be limited to four (4) in the aggregate per 12-month period, but shall not count as an Eligible Holder Registration Demand for purposes of Section 2.11(a).

SECTION 2.12.    <u>Clear Market</u>.  With respect to any Underwritten Offerings of Registrable Securities by an Eligible Holder, the Company agrees not to effect (other than pursuant to the Registration applicable to such Underwritten Offering or pursuant to a Special Registration or pursuant to the exercise by another Eligible Holder of any of its rights under Section 2.01 or Section 2.02) any public sale or distribution, or to file any Registration Statement (other than pursuant to the Registration applicable to such Underwritten Offering or pursuant to a Special Registration or pursuant to the exercise by an Eligible Holder of any of its rights under Section 2.01 or Section 2.02) covering any of its equity securities or any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed ten (10) days prior and sixty (60) days following the effective date of such offering or such longer period up to ninety (90) days as may be requested by the managing underwriter for such Underwritten Offering.  "<u>Special Registration</u>" means the registration of (A) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (B) equity securities and/or options or other rights in respect thereof to be offered to directors, employees, consultants, customers, lenders or vendors of the Company or its Subsidiaries or in connection with dividend reinvestment plans.

SECTION 2.13.    <u>In-Kind Distributions</u>.  If any Company Security Holder seeks to effectuate an in-kind distribution of all or part of its Common Stock to its direct or indirect equityholders, the Company will reasonably cooperate with and assist such Company Security Holder, such equityholders and the Company's transfer agent to facilitate such in-kind distribution in the manner reasonably requested by such Company Security Holder (including the delivery of instruction letters by the Company or its counsel to the Company's transfer agent, the delivery of customary legal opinions by counsel to the Company and the delivery of Common Stock without restrictive legends, to the extent no longer applicable).

ARTICLE III

MISCELLANEOUS

SECTION 3.01.    <u>Term</u>.  The provisions of this <u>Annex A</u> shall terminate with respect to any Company Security Holder (a) for those Company Security Holders that beneficially own less than two percent (2%) of the Company's outstanding shares of Common Stock (on a Fully Diluted Basis), after the IPO, if all of the Registrable Securities then owned by such Company Security Holder could be sold in any ninety (90) day period pursuant to Rule 144, (b) as to any Company Security Holder, if all of the Registrable Securities held by such Company Security Holder have been sold in a Registration pursuant to the Securities Act, or pursuant to an exemption therefrom, or (c) with respect to any management Company Security Holder, on the date on which such management Company Security Holder ceases to be an employee of the Company or its Subsidiaries.  Notwithstanding the foregoing, the provisions of Sections 2.09, 2.10 and 2.13 and all of this Section 3.01 shall survive any such termination.

A-27

**EXHIBIT A**
**Form of Joinder Agreement**

## FORM OF ADDITIONAL COMPANY SECURITY HOLDER
## JOINDER AGREEMENT TO STOCKHOLDERS AND REGISTRATION
## RIGHTS AGREEMENT OF [NEW UCI INC.]

### Dated as of [_____]

The undersigned hereby agrees to become a party to the Stockholders and Registration Rights Agreement of [New UCI Inc.] (the "Company"), dated as of [●], 2016 (as amended, supplemented or otherwise modified from to time to time, the "Agreement"), and shall be entitled to all of the rights and subject to all of the obligations of a Company Security Holder and Stockholder (each as defined in the Agreement), as applicable, under the Agreement. The undersigned hereby acknowledges that all Company Securities (as defined in the Agreement) beneficially owned by the undersigned shall be deemed to be Company Securities, as applicable, for all purposes of the Agreement. If the undersigned is a transferee of such Company Securities, the undersigned hereby assumes the rights and obligations of its transferor in respect of beneficial ownership of such Company Securities. The undersigned hereby authorizes the Company to add the name of the undersigned, the number and type of Company Securities transferred/granted to the undersigned, the date of such transfer/grant, the address of the undersigned, and its transferor, if applicable, to Schedule B of the Agreement.

[TRANSFEREE/GRANTEE]

By:_____

Name:_____

Title:_____

Address: _____

_____

Facsimile:_____

Type and Number of Company Securities
Transferred/Granted:

_____

_____

Transferor of Company Securities, if applicable:

_____

Acknowledged and Accepted:

[New UCI Inc.]

By:_____

Name:_____

Title:_____

**EXHIBIT B**
**Form of Consent of Spouse**

CONSENT OF SPOUSE

I, _____, spouse of _____ acknowledge that I have read the Stockholders and Registration Rights Agreement of [New UCI Inc.], dated as of [•], 2016, to which this consent is attached as <u>Exhibit B</u> (the "<u>Agreement</u>"), and that I know the contents of the Agreement.  I am aware that the Agreement contains provisions regarding restrictions on the Company Securities (as defined in the Agreement) that my spouse may own, including any interest I might have therein.

I hereby agree that my interest, if any, in any Company Securities subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such Company Securities shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this consent.  I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I am waiving such right.


By: _____
Name:

Dated: _____

**Exhibit 5.6.2**
**Rank Contribution Election Releases**

As set forth in the *Notice of Rank Contribution Election Pursuant to Joint Plan of Reorganization for UCI International, LLC and its Debtor Affiliates Proposed by the Debtors, the Ad Hoc Committee of Senior Noteholders and the Official Committee of Unsecured Creditors* [D.I. 875] (the "Rank Contribution Election Notice"), Rank, on behalf of itself and each other member of the Rank Group, has elected to make and is deemed to have made the Rank Contribution Election pursuant to the terms of the Plan and through a global settlement (the "Global Settlement") among the Debtors, Plan Sponsors, Rank and certain members of the Rank Group, the Creditors' Committee, and the Pension Benefit Guaranty Corporation ("PBGC"). The Global Settlement is embodied in two separate settlement agreements.  On November 9, 2016, the Debtors filed the *Debtors' Motion to Approve (I) Global Settlement Among the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of Noteholders, and Rank Group and (II) the PBGC Settlement Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019* [D.I. 876] (the "Settlement Motion") seeking authority to enter into the Global Settlement.

As a result of Rank electing to make the Rank Contribution Election, pursuant to the Plan, each member of the Rank Group and each of their Related Persons (including any former directors or officers of any of the Debtors that are or were Related Persons of the Rank Group) shall constitute "Released Parties" under the Plan and shall receive releases under the Plan to the extent permitted by applicable law, which releases will be in addition to any releases contained in the Global Settlement.

For further information, please see the Rank Contribution Election Notice and the Settlement Motion.

**Exhibit 5.10.2**
**Directors and Officers of Reorganized UCI**


**[To be Disclosed Prior to Confirmation Hearing]**

**Exhibit 5.10.3**
**Directors and Managers or Officers of Reorganized Debtors Other Than Reorganized UCI**

**[To be Disclosed Prior to Confirmation Hearing]**

**Exhibit 6.1.1**
**Rejected Executory Contract and Unexpired Lease List**

**UCI International, LLC et al.**

**Rejected Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Advance Stores Company | Advance Stores Company<br>7807 Creekridge Circle<br>Minneapolis, MN 55439 | Customer Agreement dated 6/1/2012 and allamendments and addendums |
| Advance Stores Company Inc | Advance Stores Company Inc<br>5008 Airport Rd<br>Roanoke, VA 24012 | Confidentiality and Nondisclosure Agreement dated October 16, 2006 |
| Bruce Zorich | Bruce Zorich<br>Address Redacted | Separation Agreement and General Release of all Claims |
| Crown Equipment Corporation | Crown Equipment Corporation<br>470-44 South Washington St<br>New Bremen, OH 45869 | Mutual Non-Disclosure Agreement dated October 14, 2013 |
| Dana Automotive Systems Group LLC | Dana Automotive Systems Group LLC<br>3939 Technology Dr<br>Maumee, OH 43537 | Confidentiality Agreement dated August 26, 2013 |
| Element  Fleet | Element  Fleet<br>PO Box 100363<br>Atlanta, GA 30384-0363 | Equipment Lease - Ford Fusion |
| Hewitt Associates LLC  / Aon Consulting Inc | Hewitt Associates LLC  / Aon Consulting Inc<br>4 Overlook Point<br>Lincolnshire, IL 60069-4302 | Master Consulting Agreement effective 1/1/14 |
| Kuss Filtration Inc | Kuss Filtration Inc<br>2150 Industrial Dr<br>Findlay, OH 45840 | Mutual Non-Disclosure and Confidential Information Agreement dated November 9, 2015 |
| Ricardo Felipe Alvergue | Ricardo Felipe Alvergue<br>Address Redacted | Employment Agreement |
| Schnair Sales & Services Inc | Schnair Sales & Services Inc<br>1801 Royal Lane<br>Ste 510<br>Dallas, TX 75529 | Sales Representation Agreement dated 8/1/2015 |
| Southern Business Machines Inc | Southern Business Machines Inc<br>2040 E Division Street<br>Evansville, IN 47711 | Postage meter machines (N14032143) (N14032168) |
| Surety Refrigeration Serv & Equip Co | Surety Refrigeration Serv & Equip Co<br>862 S Broadway<br>St. Louis, MO 63111-3809 | Equipment Lease |
| Tasco LLC | Tasco LLC<br>One Commerce Square<br>Ste 1500<br>Memphis, TN 38103 | Sales Representation Agreement dated 11/1/2014 including all amendments and addendums |
| The Northern Trust Company | The Northern Trust Company<br>50 South La Salle St<br>M-28<br>Chicago, IL 60603 | Employee Benefits Trust Agreement effective 1/1/15 |

**UCI International, LLC et al.**

**Rejected Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Trustees Of The CF Syndicate | Trustees Of The CF Syndicate<br>49 Bishops Rd<br>London 5W6 7Al United Kingdom<br><br>Trustees Of The CF Syndicate<br>Beadles Hall Chignall Smealey<br>Chelmsford Essex Cmq 4Sz United Kingdom<br><br>Trustees Of The CF Syndicate<br>Rosemary Cottage Rosers Cross<br>Waldron East Essex Tn21 0Qn United Kingdom<br><br>Trustees Of The CF Syndicate<br>The Old Barns The Old Rd<br>Felmersham Berkshire Mk43 7Jd United Kingdom | Underlease dated 03/19/2002 relating to Unit 1 Mansfield Park, Crown Farm Way, Mansfield, Nottinghamshire |
| Weichai America Corp | Weichai America Corp<br>3100 Golf Rd<br>Rolling Meadows, IL 60008 | Mutual Non-Disclosure Agreement executed October 19, 2015 |
| Xerox HR Solutions LLC | Xerox HR Solutions LLC<br>2828 North Haskell Dr<br>Building #1, 9th Floor<br>Dallas, TX 75204 | Plan Administrator Agreement |

**Exhibit 6.1.2**
**Assumed Executory Contract and Unexpired Lease List**

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Acklands-Grainger Inc | Acklands-Grainger Inc<br>PO Box 7100<br>Winnipeg Mb R3C 3B3 Canada | Customer Agreement dated 9/1/2014 |
| Adam Opel Ag | Adam Opel Ag<br>Bahnofsplatz<br>65423 Russelsheim Am Main Germany | Customer Agreement |
| Advance Stores Company Inc | Advance Stores Company Inc<br>5008 Airport Rd<br>Roanoke, VA 24012 | Customer Agreement dated 1/1/2012 and allamendments and addendums |
| Advance Stores Company Inc | Advance Stores Company Inc<br>5008 Airport Rd<br>Roanoke, VA 24012 | Customer Agreement dated 6/22/2012 and all amendments and addendums |
| Advance Stores Company Inc | Advance Stores Company Inc<br>5673 Airport Rd<br>Roanoke, VA 24012 | Customer Agreement dated 12/1/2005 and all amendments and addendums |
| Aftermarket Auto Parts Alliance Inc | Aftermarket Auto Parts Alliance Inc<br>2706 Treble Creek<br>Ste 100<br>San Antonio, TX 78248 | Customer Agreement dated 4/4/2012 |
| Aldon | Aldon<br>77 4th Ave<br>Waltham, MA 02451 | Software License Terms and Conditions |
| Aldon | Aldon<br>77 4th Ave<br>Waltham, MA 02451 | Support and Maintenance Services Agreement |
| Alere Wellbeing Inc | Alere Wellbeing Inc<br>999 Third Ave<br>Ste 2000<br>Seattle, WA 98104 | Master Services Agreement effective 11/4/16 |
| Allison Transmission Inc | Allison Transmission Inc<br>PO Box 894<br>Indianapolis, IN 46206-0894 | Scheduling Agreement Change dated 8/17/2015 |
| Allison Transmission Inc | Allison Transmission Inc<br>One Allison Way<br>Indianapolis, IN 46222 | Mutual Confidentiality and Non-Disclosure Agreement dated March 3, 2015 |
| Allison Transmission Inc | Allison Transmission Inc<br>One Allison Way<br>Indianapolis, IN 46222 | Confidentiality and Non-Disclosure Agreement dated April 7, 2016 |
| Allison Transmission Inc | Allison Transmission Inc<br>4700 West 10th St<br>Indianapolis, IN 46222 | Confidentiality and Non-Disclosure Agreement dated July 23, 2010 |
| Allison Transmisson Inc | Allison Transmisson Inc<br>4700 West 10th St<br>Indianapolis, IN 46222 | Confidentiality and Non-Disclosure Agreement dated November 4, 2010 |
| AM General | AM General<br>13200 McKinley Hwy<br>Mishawaka, IN 46545 | Blanket Customer Agreement dated 9/13/2002 |
| Amex World Trade | Amex World Trade<br>18765 S W 78th Ct<br>Miami, FL 33157 | Sales Representation Agreement |
| Amsoil Inc | Amsoil Inc<br>925 Tower Ave<br>Superior, WI 54880 | Customer Agreement dated 4/13/2011 |
| Amsoil Inc | Amsoil Inc<br>925 Tower Ave<br>Superior, WI 54880 | Mutual Confidentiality and Nondisclosure Agreement dated December 3, 2008 |

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Ana De Sotomayor | Ana De Sotomayor<br>Banco Del Pichincha CA<br>396 Alhambra Circle Penthouse 2<br>Coral Gables, FL 33134 | Sales Rep. Agreement (Master Brand) - 6-2-1993 |
| Ana De Sotomayor | Ana De Sotomayor<br>Banco Del Pichincha CA<br>396 Alhambra Circle Penthouse 2<br>Coral Gables, FL 33134 | Sales Rep. Agreement (Airtex, Master Brand, ASC) - 2-1-2007 |
| Andres Saratowicz | Andres Saratowicz<br>Av Sucre Conjunto Boyaca Torre Cnetro Piso<br>21-Of212 Los Dos Caminos<br>Caracas Venezuela | Sales Rep. Agreement |
| Ariens Specialty - Stens | Ariens Specialty - Stens<br>PO Box 5185<br>Janesville, WI 53547 | Customer Agreement dated 12/4/2006 |
| Association of Independent Oil Distributors | Association of Independent Oil Distributors<br>203 West Main St<br>PO Box 1861<br>Montrose, CO 81402 | Customer Agreement dated 1/1/2014 |
| Automation Mailing | Automation Mailing<br>1138 W 9th St<br>Ste 100<br>Cleveland, OH 44113-1007 | Equipment Lease - Postage Machine |
| Automotive Distribution Network | Automotive Distribution Network<br>3085  Fountainside Dr<br>Ste 210<br>Germantown, TN 38138 | Customer Agreement dated 7/1/2012 and all amendments and addendums |
| Automotive Parts Associates | Automotive Parts Associates<br>10551 Lackman Rd<br>Lenexa, KS 66219 | Customer Agreement dated 2/1/2015 |
| AutoZone Inc | AutoZone Inc<br>123 S Front St<br>Dept 8074<br>Memphis, TN 38103 | Customer Agreement dated 1/28/2013 and all amendments and addendums |
| AutoZone Inc | AutoZone Inc<br>123 S Front St<br>Memphis, TN 38103 | Confidentiality Agreement dated September 22, 1994 |
| AutoZone Parts Inc | AutoZone Parts Inc<br>123 S Front St<br>Memphis, TN 38103 | Customer Agreement dated 11/21/2008 |
| AutoZone Parts Inc | AutoZone Parts Inc<br>123 S Front St<br>Memphis, TN 38103 | Customer Agreement dated 1/23/2013 |
| AutoZone Parts Inc | AutoZone Parts Inc<br>123 S Front St<br>Memphis, TN 38103 | Advertising/Allow. dated 10/2/2014 - Mobil 1 30536 |
| AutoZone Parts Inc | AutoZone Parts Inc<br>123 S Front St<br>Memphis, TN 38103 | Customer Agreement dated 10/21/2014 |
| AutoZone Parts Inc | AutoZone Parts Inc<br>123 S Front St<br>Memphis, TN 38103 | Customer Agreement dated 10/02/2014 |
| Bank of America NA | Bank of America NA<br>Bank of America<br>PO Box 28<br>Norfolk, VA 23510 | BoA Card Services Security and Control Agreement, signed, 160503 |

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Bank of America NA | Bank of America NA<br>Bank of America<br>PO Box 28<br>Norfolk, VA 23510 | BoA United Components PCard Addendum, signed, 160503 |
| Bank of America NA | Bank of America NA<br>Bank of America<br>PO Box 28<br>Norfolk, VA 23510 | Deposit Agreement |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (Fisher) 053014 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (GPC NAPA) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (GPI Carquest) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - ASC - Bank of America (GPI Carquest) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (UAP NAPA Canada) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (Uniselect) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - Airtex - Bank of America (Uniselect USA) 032612 |
| Bank of America NA | Bank of America NA<br>1000 W Temple St<br>Mailcode CA9-705-07-05<br>Los Angeles, CA 90012-1514 | Factoring Agreement - ASC - Bank of America (Uniselect) 031213 |
| Bankruptcy Management Solutions Inc | Bankruptcy Management Solutions Inc<br>5 Peters Canyon Suite 200<br>Irvine, CA 92606 | BMS Trustworks Software Agreement for Rabobank Account |
| Benito L Cua | Benito L Cua<br>560 V Mapa St<br>Between 7Th Ave & Ligaya St<br>Caloocan City 1403 Philippines | Sales Rep. Agreement |
| Blain Supply Inc | Blain Supply Inc<br>3507 East Racine St<br>Janesville, WI 53545 | Customer Agreement dated 7/8/2007 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - Airtex - BB&T (Advance) 10314 |

**Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been**

11/18/2016        **amended, restated or supplemented from time to time.**        EK110

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - ASC - BB&T (Advance) 103114 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - Champion - BB&T (Advance) 103114 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>950 East Paces Ferry Rd<br>Ste 2200<br>Atlanta, GA 30326 | Factoring Agreement - Airtex - BB&T (Autozone) 052308 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>950 East Paces Ferry Rd<br>Ste 2200<br>Atlanta, GA 30326 | Factoring Agreement - ASC - BB&T (Autozone) 052308 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - Champion - BB&T (Autozone) 112213 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>950 East Paces Ferry Rd<br>Ste 2200<br>Atlanta, GA 30326 | Factoring Agreement - Airtex - BB&T (GPC NAPA) 100909 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>317 West High St<br>11th Floor<br>High Point, NC 27260 | Factoring Agreement - Airtex - BB&T (GPI Carquest) 102307 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>317 West High St<br>11th Floor<br>High Point, NC 27260 | Factoring Agreement - ASC - BB&T (GPI Carquest) 102307 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>950 East Paces Ferry Rd<br>Ste 2200<br>Atlanta, GA 30326 | Factoring Agreement - Champion - BB&T (GPI Carquest) 121714 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - Airtex - BB&T (O'Reilly) 053111 |
| Branch Banking and Trust Company | Branch Banking and Trust Company<br>3379 Peachtree Rd<br>Ste 600<br>Atlanta, GA 30326 | Factoring Agreement - ASC - BB&T (O'Reilly) 053111 |
| Brandlines Pt | Brandlines Pt<br>Unit 10<br>12 Yatala Road<br>Mt. Kuring-Gai 2080 Australia | Sales Representation Agreement |
| Briggs & Stratton Corporation | Briggs & Stratton Corporation<br>12301 W Wirth St<br>Wauwatosa, WI 53222 | Mutual Confidentiality Agreement executed July 16, 2013 |
| Brp Us Inc - Deloit | Brp Us Inc - Deloit<br>PO Box 597<br>Sturtevant, WI 53177 | Customer Agreement undated |

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Canadian Automotive Warehouse Inc (CANUSA) | Canadian Automotive Warehouse Inc (CANUSA) & Canusa Distribution Centres Toronto Inc (CDC) 343 Airport Rd Niagara-On-The-Lake On L0S 1J0 Canada | Customer Agreement dated 1/1/2015 |
| Canadian Tire Corporation Limited | Canadian Tire Corporation Limited 2180 Yonge St Toronto On M4S 2B9 Canada | Customer Agreement dated 6/29/2009 |
| Canadian Tire Corporation Limited | Canadian Tire Corporation Limited 2180 Yonge St Niagara-on-the-Lake, ON L0S 1J0, Canada Toronto On M4S 2B9 Canada | Customer Agreement dated 10/17/2010 |
| Castrol Limited | Castrol Limited FAO The Trade Marks Manager Wakefield House Pipers Way Swindon Wiltshire SN3 1RE United Kingdom | License Agreement dated 10/25/2012 |
| Caterpillar Inc | Caterpillar Inc 100 NE Adams St Peoria, IL 61629 | Tooling Bailment Agreement dated 1/15/2016 |
| Church & Dwight Co Inc | Church & Dwight Co Inc 500 Charles Ewing Blvd Ewing, NJ 08628 | Trademark License Agreement, Amendment No. 1 dated 12/1/15 |
| Church & Dwight Co Inc | Church & Dwight Co Inc 500 Charles Ewing Blvd Ewing, NJ 08628 | Trademark License Agreement dated 3/1/13 |
| Cintas Corporation | Cintas Corporation PO Box 630910 Cincinnati, OH 45263-0910 | Equipment Lease - Mats |
| Citibank NA | Citibank NA 388 Greenwich St 25th Floor New York, NY 10013 | Factoring Agreement - Airtex - Citibank (Autozone) 100308 |
| Citibank NA | Citibank NA 388 Greenwich St 25th Floor New York, NY 10013 | Factoring Agreement - ASC - Citibank (Autozone) 100308 |
| Citibank NA | Citibank NA 388 Greenwich St 25th Floor New York, NY 10013 | Factoring Agreement - Champion - Citibank (Autozone) 052413 |
| Clearwave Communications | Clearwave Communications PO Box 808 Harrisburg, IL 62946 | Business Service Agreement |
| D'Agostini Land Company | D'Agostini Land Company 38700 Van Dyke Ave Suite 200 Sterling Heights, MI 48312 | Property Lease dated 07/25/2002 including all amendments and addendums |
| Daimler Trucks of North America LLC | Daimler Trucks of North America LLC Hancock & Estabrook LLP 1500 Mony Tower I, PO Box 4976 Syracuse, NY 13221 | Confidentiality and Non-Disclosure Agreement for Proprietary Information executed May 7, 2012 |
| Dan Bock | Dan Bock 80 Overlook Road New Rochelle, NY 10804 | Sales Rep. Agreement - 1-12-2009 |
| Data Systems International Inc | Data Systems International Inc 1201 Walnut St Ste 1100 Kansas City, MO 64106 | Software Updates/Response Line Services Agreement Add. |

Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

11/18/2016                                                                                                                                                EK110

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| DataServ LLC | DataServ LLC<br>12825 Flushing Meadows Dr<br>Ste 100<br>St. Louis, MO 63131 | Retention Schedule |
| DataServ LLC | DataServ LLC<br>12825 Flushing Meadows Dr<br>Ste 100<br>St. Louis, MO 63131 | Master Service Agreement |
| Daxel Incorporated | Daxel Incorporated<br>116 South Arlington Heights Rd<br>Arlington Heights, IL 60005 | Sales Representation Agreement |
| Delta Dental of Illinois | Delta Dental of Illinois<br>111 Shuman Blvd<br>Naperville, IL 60563 | Administrative Services Contract |
| Deutsche Bank AG | Deutsche Bank AG<br>60 Wall St<br>New York, NY 10005 | Factoring Agreement - Airtex - Deutsche Bank (Advance) 101214 |
| Deutsche Bank AG | Deutsche Bank AG<br>60 Wall St<br>New York, NY 10005 | Factoring Agreement - ASC - DB (Advance) 062112 |
| Deutsche Bank AG | Deutsche Bank AG<br>60 Wall St<br>New York, NY 10005 | Factoring Agreement - Airtex - Deutsche Bank (Autozone) 070609 |
| Deutsche Bank AG | Deutsche Bank AG<br>60 Wall St<br>New York, NY 10005 | Factoring Agreement - ASC - DB (Autozone) 070909 |
| Deutsche Bank AG | Deutsche Bank AG<br>60 Wall St<br>New York, NY 10005 | Factoring Agreement - Champion - DB (Autozone) 051513 |
| Distribution Marketing Services | Distribution Marketing Services<br>23005 N 74th St<br>Unit 1056<br>Scottsdale, AZ 85255-7501 | Sales Representation Agreement - 2-1-2008 |
| Donaldson Company Inc | Donaldson Company Inc<br>1400 W 94th St<br>PO Box 1299<br>Minneapolis, MN 55440-1299 | Blanket Customer Agreement dated 4/28/2014 |
| Dresser Wayne-GE Business | Dresser Wayne-GE Business<br>One River Rd<br>Schenectady, NY 12345 | Mutual Nondisclosure Agreement executed January 31, 2012 |
| Dwight D Rutledge Consultant | Dwight D Rutledge Consultant<br>3511 Shady Village Dr<br>Kingwood, TX 77345 | REP. AGREEMENT dated 3/18/1999 and all amendments and addendums |
| Dwight Rutledge Consultant | Dwight Rutledge Consultant<br>3511 Shady Village Dr<br>Kingwood, TX 77345 | REP. AGREEMENT dated 10/1/2014 |
| Engelwood Resources LLC | Engelwood Resources LLC<br>180 Engelwood Dr<br>Ste J<br>Orion, MI 48359 | Property Lease dated-3-3-2014 including all amendments and riders |
| Equipment Dealers Purchasing Association LLC | Equipment Dealers Purchasing Association LLC<br>24165 Saxony Dr<br>Lake Villa, IL 60046 | Letter of Agreement dated 5/12/08 |
| Equipment Dealers Purchasing Association LLC | Equipment Dealers Purchasing Association LLC<br>24165 Saxony Dr<br>Lake Villa, IL 60046 | Letter of Agreement dated 5/12/08 |

Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

11/18/2016

EK110

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Factory Motor Parts | Factory Motor Parts<br>1380 Corporate Center Curve Ste 200<br>Eagan, MN 55121 | Customer Agreement 11/26/2014 |
| Fairdeal Automotive Supply Trade | Fairdeal Automotive Supply Trade<br>560 V Mapa St<br>Caloocan City 1403 Philippines | Sales Rep. Agreement - 10-1-2016 (Airtex & ASC) |
| Fast Undercar Group | Fast Undercar Group<br>4277 Transport St<br>Ventura, CA 93003 | Customer Agreement dated 2/1/2010 |
| Federated Auto Parts Dist Inc | Federated Auto Parts Dist Inc<br>508 Greenville Ave<br>Staunton, VA 24401 | Customer Agreement dated 2/1/2014 |
| Filpac Corporation | Filpac Corporation<br>740 E 3900 South<br>3rd Floor<br>Salt Lake City, UT 84107 | Customer Agreement dated 1/25/2007 |
| Fisher Auto Parts | Fisher Auto Parts<br>512 Greenville Ave<br>PO Box 2246<br>Staunton, VA 24402-2246 | Customer Agreement dated 1/1/2014 |
| Fleetpride Inc | Fleetpride Inc<br>600 Las Colinas Blvd E Ste 400<br>Irving, TX 75039- 563 | Confidentiality Agreement dated December 14, 2010 |
| Flotamex S A De C V | Flotamex S A De C V<br>48 Sur Centernario<br>N 205 CIVAC<br>Jiutepec Moreles 62578 Mexico | Bailment Agreement dated 02/11/2014 |
| Ford Motor Company | Ford Motor Company<br>300 Renaissance Ctr<br>PO Box 43356<br>Detroit, MI 48243 | Customer Agreement dated 1/1/2004 |
| Ford Motor Company | Ford Motor Company<br>300 Renaissance Ctr<br>PO Box 43356<br>Detroit, MI 48243 | Customer Agreement Attachment (dated 9/15/2011) to Sourcing Agreement Letter (dated 1/12/2011) |
| Frontier | Frontier<br>19 John St<br>Middletown, NY 10940 | Services Agreement including all amendments and addendums |
| Gamar Trading Corporation | Gamar Trading Corporation<br>1525 Ponce De Leon Ave<br>San Juan, PR 00926 | Sales Representation Agreement |
| GCommerce Inc | GCommerce Inc<br>601 East Locust St<br>Ste 103<br>Des Moines, IA 50309 | Connection Services Agreement |
| GE Supply Company | GE Supply Company<br>500 West Monroe<br>16th Floor<br>Chicago, IL 60661 | Master Lease Agreement dated 3/26/2013 including schedules 8781968-001 and all amendments |
| Generac Power Systems Inc | Generac Power Systems Inc<br>Hwy 59 and Hillside Rd<br>PO Box 8<br>Waukesha, WI 53178 | Confidentiality and Non-Disclosure Agreement dated August 25, 2014 |
| General Engine Products LLC | General Engine Products LLC<br>12200 Hubbard Rd<br>Livonia, MI 48151 | Proprietary Information Agreement dated July 22, 2014 |

Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been
amended, restated or supplemented from time to time.

11/18/2016

EK110

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| General Filters Inc | General Filters Inc<br>43800 Grand River Ave<br>Novi, MI 48375-1115 | Customer Agreement dated 7/20/2006 |
| Gonher | Gonher<br>Av Manuel Ordonez 600<br>Santa Catarina Nl 66350 Mexico | Customer Agreement dated 3/3/2010 |
| GOSS Industries International Inc | GOSS Industries International Inc<br>6226 Danville Rd<br>Mississauga On L5T 2H7 Canada | Fee Warehouse Agreement dated 2/13/2004 including all amendments |
| Grant Brothers Sales Limited | Grant Brothers Sales Limited<br>7885-1 Tranmere Dr<br>Mississauga Ontario L5S 1S1 Canada | Sales Representation Agreement |
| Grant Brothers Sales LTD | Grant Brothers Sales LTD<br>7885-1 Tranmere Dr<br>Mississauga Ontario L5S 1S1 Canada | Sales Representation Agreement |
| Grupo Carossi | Grupo Carossi<br>Herediam Carretera Braulio Carillo, Kilomtetro 12<br>Contiguo a la entrada a<br>San isidro de Heredia, Costa Rica | 2015 Fee Warehouse Contract |
| Harbinger Corporation | Harbinger Corporation<br>1000 Campus Dr<br>Ann Arbor, MI 45104-5700 | Software Schedule |
| Harbinger Corporation | Harbinger Corporation<br>1277 Lenox park Blvd<br>Atlanta, GA 30319 | Master Software License Agreement |
| Harbor Capital Leasing LLC | Harbor Capital Leasing LLC<br>7901 Southpark Plaza<br>Ste 204<br>Littleton, CO 80120 | Master Lease Agreement dated October 23, 2013, including schedules 2017-001, 2017-002, 2017-004, 2017-005, 2017-006, 2017-007, 2017-008, 2017-009, 2017-011, 2017-012, 2017-003 as amended, and 2017-010 as amended |
| Harley-Davidson Motor Company | Harley-Davidson Motor Company<br>3700 Juneau Ave<br>Milwaukee, WI 53208 | Mutual Supplier Confidentiality Agreement dated July 1, 2016 |
| Hawkeye Information Systems | Hawkeye Information Systems<br>Bloomfield Insustrial park<br>13139 Bloomfield Street<br>Sherman Oaks, CA 91423 | License Agreement |
| Hayes Lemmerz And Eop | Hayes Lemmerz and EOP<br>Equity Office Properties Trust<br>Two North Riverside Plaza<br>Chicago, IL 60606<br><br>Hayes Lemmerz And Eop<br>Hayes Lemmerz Int'l Inc<br>15300 Centennial Drive<br>Northville, MI 48167<br><br>Hayes Lemmerz and EOP<br>Re: Equity Office Properties Trust<br>c/o Farella Braun + Martel LLP<br>235 Montgomery Street<br>San Francisco, CA 94104 | Benecia Industrial Park Joint Defense and Cost Sharing Agreement dated 11/14/2002 |

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| HD America Inc | HD America Inc<br>329 Industrial Dr<br>Albion, IL 62806 | Confidentiality Agreement executed October 15, 2009 |
| HD Truck Pride | HD Truck Pride<br>608 Lambert Pointe Dr Bldg C<br>Hazelwood, MO 63042 | Customer Agreement dated 1/5/2016 |
| Hedahl's Parts Plus | Hedahl's Parts Plus<br>100 East Broadway Ave<br>Bismarck, ND 58501 | Customer Agreement dated 1/4/2013 |
| HSBN Bank USA NA | HSBN Bank USA NA<br>95 Washington St<br>Buffalo, NY 14203 | Acct Opening Documents Signed, 160316 |
| HSBN Bank USA NA | HSBN Bank USA NA<br>95 Washington St<br>Buffalo, NY 14203 | MMCA Service Agreement |
| IBM Corporation | IBM Corporation<br>IBM Resiliency Services - Contract Operations<br>PO Box 700<br>Suffern, NY 10901-0700 | Multivendor IT Recovery Services Contract |
| IBM Corporation | IBM Corporation<br>IBM - Contract Operations<br>PO Box 700<br>Suffern, NY 10901-0700 | Master Services Attachment for ServiceElite |
| IBM Corporation | IBM Corporation<br>150 Kettletown Rd<br>MD 243<br>Southbury, CT 06488 | Hosting Agreeement |
| Imam Group / Impex Earthmovers | Imam Group / Impex Earthmovers<br>House-83 Rd -03 Block - F<br>Banani<br>1213 Bangladesh | Customer Agreement dated 10/2/2010 |
| International Data Technologies Corporation (IDT) | International Data Technologies Corporation (IDT)<br>13025 Yonge St<br>Ste 103<br>Richmond Hill On L4E 1A1 Canada | Software Upgrade, Hosting & Service Level Agreement including all amendments and exhibits |
| International Filters Inc | International Filters Inc<br>503 N Elevar St<br>Oxnard, CA 93030 | Customer Agreement dated 11/26/2007 |
| Intraco Corporation | Intraco Corporation<br>530 Stephenson Hwy<br>Troy, MI 48083 | Customer Agreement dated 1/1/2015 |
| Intraco Corporation | Intraco Corporation<br>530 Stephenson Hwy<br>2nd Floor<br>Troy, MI 48083-1131 | Sales Rep. Agreement |
| Isuzu Motors America Inc | Isuzu Motors America Inc<br>1400 S Douglas St<br>Ste 100<br>Anaheim, CA 92806 | Confidential Disclosure Agreement executed October 20, 2010 |
| Isuzu Motors America Inc | Isuzu Motors America Inc<br>1400 S Douglas St<br>Ste 100<br>Anaheim, CA 92806 | Confidential Disclosure Agreement executed October 21, 2010 |

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Isuzu Motors America Inc | Isuzu Motors America Inc<br>1400 S Douglas St<br>Ste 100<br>Anaheim, CA 92806 | Non-Disclosure Agreement executed October 19, 2009 |
| Isuzu Motors America LLC | Isuzu Motors America LLC<br>1400 S Douglass St<br>Ste 100<br>Anaheim, CA 92806 | Customer Agreement dated 10/27/2010 |
| Jason Busse | Jason Busse<br>Address Redacted | Educational Assistance Reimbursement Agreement |
| Jasper Innovative Solutions | Jasper Innovative Solutions<br>6400 E Industrial Park Rd<br>Leavenworth, IN 47137 | Non-Disclosure Agreement executed June 14, 2010 |
| John Owen Sales Company | John Owen Sales Company<br>PO Box 78797<br>Charlotte, NC 28271 | Sales Representation Agreement |
| JP Morgan Chase Bank NA | JP Morgan Chase Bank NA<br>10420 Highland Manor Dr<br>Block2<br>Floor 4<br>Tampa, FL 33610 | Factoring Agreement - Airtex - JPM (Autozone) 121508 |
| JP Morgan Chase Bank NA | JP Morgan Chase Bank NA<br>10420 Highland Manor Dr<br>Block2<br>Floor 4<br>Tampa, FL 33610 | Factoring Agreement - ASC - JPM (Autozone) 121508 |
| JP Morgan Chase Bank NA | JP Morgan Chase Bank NA<br>420 West Van Buren St<br>Mailcode: IL1-P001<br>Chicago, IL 60606-3534 | Factoring Agreement - Champion - JPM (Autozone) 022015 |
| K&N Engineering Inc | K&N Engineering Inc<br>PO Box 1329<br>561 Iowa Ave<br>Riverside, CA 92502 | Customer Agreement dated 10/3/1997 |
| Kawasaki Motors Manufacturing Corp USA | Kawasaki Motors Manufacturing Corp USA<br>28147 Business Hwy 71<br>Maryville, MO 64468 | Mutual Non-Disclosure and Confidentiality Agreement dated April 21, 2016 |
| Keystone Automotive Operations Inc | Keystone Automotive Operations Inc<br>44 Tunkhannock Ave<br>Exeter, PA 18643 | Customer Agreement dated 7/6/2011 |
| Keystone LKQ | Keystone LKQ<br>655 Grassmere Park Dr<br>Nashville, TN 37211 | Customer Agreement dated 7/11/2012 |
| Kolima Sales Agent | Kolima Sales Agent<br>Calle Lera Y Calle Victoria<br>Barriada Miraflores<br>Edificio Fostasa Local 1B Panama | Sales Representative Agreement dated 8/1/2015 |
| Kronos | Kronos<br>297 Billerica Rd<br>Chelmsford, MA 01824 | Supply Agreement |
| Lou-Mac Manufacturing | Lou-Mac Manufacturing<br>#206 Oscar Flores Tapia<br>Arteaga Coahuila Cp 25350 Mexico | Bailment Agreement dated 1/27/2016 |
| Love's Travel Stops & Country Stores Inc | Love's Travel Stops & Country Stores Inc<br>PO Box 26210<br>Oklahoma City, OK 73126 | Vendor Information Packet dated 2/21/2011 |

Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

11/18/2016                                                                                                                                                                    EK110

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Lubbock Truck Sales Inc | Lubbock Truck Sales Inc<br>1801 E Slaton Hwy<br>Lubbock, TX 79404 | Customer Agreement dated 4/16/2008 |
| Mazda North American Operations | Mazda North American Operations<br>PO Box 19734<br>Irvine, CA 92623 | Confidentiality Agreement executed October 21, 2009 |
| Meisler Trailer Rentals Inc | Meisler Trailer Rentals Inc<br>1103 E Franklin St<br>Evansville, IN 47711 | Lease Agreement dated 7/31/2015 |
| Mercap SA | Mercap SA<br>14 Ave 7-12 Zona 14<br>Empresarial La Villa Of 2 01014 Guatemala | Sales Rep. Agreement - 1-1-2008 |
| Moving magnet Technologies SA | Moving magnet Technologies SA<br>1 Rue Christiaan Huygens<br>Besancon 25000 France | Mutual Secrecy Agreement dated March 19, 2014 |
| Mr Lube Canada Limited Partnership | Mr Lube Canada Limited Partnership<br>2330-6900 Graybar Rd<br>Richmond Bc V6W 0A5 Canada | Customer Agreement dated 1/1/2016 |
| Na Williams | Na Williams<br>2900 Paces Ferry Rd SE<br>Ste A100 A<br>Atlanta, GA 30339 | Sales Rep. Agreement - 11-2-2009 (ASC, Champion) |
| Nadine Wolfe Flp % Richard Wolfe | Nadine Wolfe Flp % Richard Wolfe<br>381 County Rd 850 N<br>Albion, IL 62806 | Property Lease dated 01/16/2013 |
| NAPA Auto Parts (Genuine Parts Company) | NAPA Auto Parts (Genuine Parts Company)<br>2999 Circle 75 Pkwy<br>Atlanta, GA 30339 | Customer Agreement dated 11/1/2011 |
| NAPA Auto Parts (Genuine Parts Company) | NAPA Auto Parts (Genuine Parts Company)<br>2999 Circle 75 Pkwy<br>Atlanta, GA 30339 | Addendum to Customer Agreement dated 9/12/2014 |
| NAPCC - Toyota Motor Sales | NAPCC - Toyota Motor Sales<br>Mailstop G312<br>19001 S Western Ave<br>Torrance, CA 90501 | Customer Agreement dated 3/8/2007 |
| National Pronto | National Pronto<br>2601 Heritage Ave<br>Grapevine, TX 76051 | Customer Agreement dated 2/28/2012 |
| North Pro Representatives | North Pro Representatives<br>711 Pine St South<br>Waconia, MN 55387 | Sales Rep. Agreement - 1-1-2009 (Airtex, ASC) |
| Ong Art Komannont | Ong Art Komannont<br>438/29 Rajwithi Road<br>Khet Rajthevee Bangkok 10400 Thailand | Sales Representation Agreement |
| Optio Software Inc | Optio Software Inc<br>3015 Windward Plaza<br>Alpharetta, GA 30005 | Master License Agreement |
| O'Reilly Auto Parts | O'Reilly Auto Parts<br>233 South Patterson<br>Springfield, MO 65802 | Customer Agreement dated 1/15/2009 and all amendments and addendums |
| Paccar Parts Of Canada | Paccar Parts Of Canada<br>750 Houser Way N<br>Renton, WA 98057 | Customer Agreement dated 7/19/2010 |

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Petro Sistemas Inc | Petro Sistemas Inc<br>14629 SW 104th St<br>#109<br>Miami, FL 33186 | Sales Representation Agreement |
| Phil Manos | Phil Manos<br>Address Redacted | Relocation Repayment Agreement |
| Phocas Inc | Phocas Inc<br>405 Lexington Ave<br>26th Floor<br>New York, NY 10174 | IT Services Agreement dated 2-4-2010 including all amendments |
| R D Jones Incorporated | R D Jones Incorporated<br>563 Welch Cir<br>Lake Barrington, IL 60010 | Sales Representation Agreement |
| Rabobank NA | Rabobank NA<br>90 E Thousand Oaks Blvd Ste 300<br>Thousand Oaks, CA 91360 | Trustee Deposit Agreement dated 3/16/2016 |
| Red Leonard & Associates | Red Leonard & Associates<br>5630 Bridgetown Rd<br>Ste 2<br>Cincinnati, OH 45258 | Sales Representation Agreement |
| Repforce Inc | Repforce Inc<br>210 Turner Industrial Way<br>Aston, PA 19014 | Sales Representation Agreement |
| Representaciones Fedger | Representaciones Fedger<br>Torre Centro Ofic 212<br>Conjunto Parque Boyaca<br>Av Sucre Los Dos Caminos Caracas Venezuela | Sales Representation Agreement |
| Representaciones Pascal | Representaciones Pascal<br>Representantes De Fabricas<br>Villavicencio 361 Of 116<br>Casilla 300 - Correo 22 Santiago Chile | Sales Rep. Agreement - 9-1-2007 (Airtex, ASC) |
| Rimini Street Inc | Rimini Street Inc<br>7251 West Lake Mead Blvd<br>Ste 300<br>Las Vegas, NV 89128 | IT Support Services dated 4-4-2012 including all amendments |
| Rocky Mountin Rep Agency | Rocky Mountin Rep Agency<br>6082 South Millbrook Ct<br>Aurora, CO 80016 | Sales Representation Agreement |
| Royal Purple Inc | Royal Purple Inc<br>One Royal Purple Lane<br>Porter, TX 77365 | Customer Agreement dated 11/1/2011 |
| RPS Marketing LLC | RPS Marketing LLC<br>11711 North Creek Pkwy South<br>Ste D101<br>Bothell, WA 98011 | Sales Representation Agreement |
| Russell Sakamoto dba RS Island Sales | Russell Sakamoto dba RS Island Sales<br>94-407 Kauopua St<br>Mililani, HI 96789 | Sales Representation Agreement |
| S&S Truck Parts (Newstar) | S&S Truck Parts (Newstar)<br>600 W Irving Park Rd<br>Schaumburg, IL 60193 | Customer Agreement dated 9/5/2008 |
| Service Champ Inc | Service Champ Inc<br>180 New Britain Blvd<br>Chalfont, PA 18914 | Customer Agreement dated 1/1/2016 |

**UCI International, LLC et al.**

**Assumed Executory Contract and Unexpired Lease List**

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Speciality Sales & Marketing | Speciality Sales & Marketing<br>6725 Millcreek Dr<br>Unit #5<br>Mississauga On L5N 5V3 Canada | Sales Rep. Agreement - 4-12-2007 (Airtex, ASC) |
| Specialty Sales and marketing | Specialty Sales and marketing<br>6725 Millcreek Dr<br>Unit #5<br>Mississauga On L5N 5V3 Canada | Sales Representation Agreement |
| Stan Padover Associates Inc | Stan Padover Associates Inc<br>359 E Meadow Ave<br>East Meadow, NY 11554 | Sales Representation Agreement |
| Sternberg Incorporated | Sternberg Incorporated<br>8950 North Kentucky Ave<br>Evansville, IN 47725 | Equipment Lease dated 1/28/2016 |
| SummaCare | SummaCare<br>10 N Main St<br>Akron, OH 44308<br><br>SummaCare<br>PO Box 75550<br>Cleveland, OH 44101-4755 | Renewal Rate Summary |
| Suntrust Bank | Suntrust Bank<br>303 Peachtree St<br>2nd Floor<br>Atlanta, GA 30308 | Factoring Agreement - Airtex - Suntrust (Advance) 121010 |
| Suntrust Bank | Suntrust Bank<br>303 Peachtree St<br>2nd Floor<br>Atlanta, GA 30308 | Factoring Agreement - ASC - Suntrust (Advance) 092507 |
| Suntrust Bank | Suntrust Bank<br>3333 Peachtree Rd NE<br>GA ATL 1761<br>Atlanta, GA 30326 | Factoring Agreement - Champion - Suntrust (Advance) 121714 |
| Suntrust Bank | Suntrust Bank<br>303 Peachtree St<br>2nd Floor<br>Atlanta, GA 30308 | Factoring Agreement - Airtex - Suntrust (Autozone) 092007 |
| Suntrust Bank | Suntrust Bank<br>303 Peachtree St<br>2nd Floor<br>Atlanta, GA 30308 | Factoring Agreement - ASC - Suntrust (Autozone) 092507 |
| Suntrust Bank | Suntrust Bank<br>3333 Peachtree Rd NE<br>GA ATL 1761<br>Atlanta, GA 30326 | Factoring Agreement - Champion - Suntrust (Autozone) 020413 |
| Suntrust Bank | Suntrust Bank<br>3333 Peachtree Rd NE<br>GA ATL 1761<br>Atlanta, GA 30326 | Factoring Agreement - Airtex - Suntrust (GPC NAPA) 101313 |
| Team Marketing | Team Marketing<br>1938 43rd Avenue East<br>Seattle, WA 98112-3235 | Sales Rep. Agreement - 7-1-2007 (Airtex, ASC) |

Contracts and unexpired leases listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

11/18/2016                                                                                                                                                    EK110

# UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| The Automotive Parts Services Group | The Automotive Parts Services Group<br>204 North Dooley St<br>Grapevine, TX 76051<br><br>The Automotive Parts Services Group<br>508 Greenville Ave<br>Staunton, VA 24401 | Customer Agreement dated 5/1/2015 |
| The Management Information Systems Group | The Management Information Systems Group<br>10 Laboratory Dr<br>PO Box 13966<br>Research Triangle Park, NC 27709-3966 | Supply Agreement-dated 6-21-2000 including all amendments |
| Ti Ashford & Associates | Ti Ashford & Associates<br>525 W 5th St<br>Covington, KY 41011 | License Agreement |
| Toro Purchasing Company | Toro Purchasing Company<br>8111 Lyndale Ave South<br>Bloomington, MN 55420-1196 | Customer Agreement dated 3/30/2015 |
| Total Fleet Solutions Ltd | Total Fleet Solutions Ltd<br>7050 Spring Meadows Dr West<br>Holland, OH 43528 | Lease Agreement |
| TR2 Corporation | TR2 Corporation<br>271 Great Rd Suite 20<br>Acton, MA 01720 | Sales Representation Agreement |
| UAP Inc | UAP Inc<br>7025 Ontario St<br>East Montreal Qc H1N 2B3 Canada | Customer Agreement dated 11/22/2011 |
| Uptime Parts Llc | Uptime Parts Llc<br>385 Fenton Lane Unit A<br>West Chicago, IL 60185 | Customer Agreement dated 1/4/2008 |
| Vipar Heavy Duty Inc | Vipar Heavy Duty Inc<br>760 Mcardle Dr Ste D<br>Crystal Lake, IL 60014 | Customer Agreement 1/1/2014 and allamendments and addendums |
| Volvo Group North America LLC Mack Trucks Inc | Volvo Group North America LLC Mack Trucks Inc<br>7900 National Service Rd<br>Greensboro, NC 27402 | Confidentiality Agreement dated March 13, 2013 |
| Voya (ReliaStar Life Ins Co) | Voya (ReliaStar Life Ins Co)<br>20 Washington Ave South<br>Minneapolis, MN 55401<br><br>Voya (ReliaStar Life Ins Co)<br>20 Washington Ave South<br>Minneapolis, MN 55440 | Excess Risk Application effective 1/1/16 |
| Voya (ReliaStar Life Ins Co) | Voya (ReliaStar Life Ins Co)<br>20 Washington Ave South<br>Minneapolis, MN 55401<br><br>Voya (ReliaStar Life Ins Co)<br>20 Washington Ave South<br>Minneapolis, MN 55440 | Life Insurance Policy dated 11/6/2013 |
| Wachovia Bank NA | Wachovia Bank NA<br>301 South College St<br>9th Floor<br>Mail Code NC0748<br>Charlotte, NC 28202 | Factoring Agreement - Airtex - Wachovia (Autozone) 062209 |

## UCI International, LLC et al.

## Assumed Executory Contract and Unexpired Lease List

| Party Name | Notice Address(es) | Contract Description |
|---|---|---|
| Wachovia Bank NA | Wachovia Bank NA<br>301 South College St<br>9th Floor<br>Mail Code NC0748<br>Charlotte, NC 28202 | Factoring Agreement - ASC - Wachovia (Autozone) 062209 |
| WageWorks | WageWorks<br>1100 Park Place<br>San Mateo, CA 94403 | Amendment to the Order Form effective 11/1/14 |
| Wal-Mart Stores Inc | Wal-Mart Stores Inc<br>702 SW 8th St<br>Bentonville, AR 72716 | Customer Agreement dated 8/20/2015 |
| Wicks Truck Release Of All Claims Agreement | Wicks Truck Release Of All Claims Agreement<br>10580 S 147th St<br>Omaha, NE 68138 | Release of All Claims Agreement dated August 28, 2006 |

**Exhibit 6.5**
**Terms of Management Equity Incentive Plan**

On or following the Effective Date of the Plan, Reorganized UCI shall adopt and implement the Management Equity Incentive Plan.

The Management Equity Incentive Plan will provide for 5% of the New Common Stock, on a fully diluted basis, to be reserved for grants of options and/or restricted stock for the Reorganized Debtors' management, directors and employees, as determined by the board of Reorganized UCI.

It is contemplated that, subject to the judgment of and as determined by the board of Reorganized UCI, the Management Equity Incentive Plan will provide for long-term incentive compensation combined with a retentive focus to specified directors and senior level executives. Subject to the judgment of and as determined by the board of Reorganized UCI, it is expected that the Management Equity Incentive Plan may include restricted stock grants that have a time-based vesting component (with shares vesting, for example, over a specified number of years following adoption of the plan) that may accelerate upon the occurrence of certain specified events and/or a performance-based vesting component that vest upon the satisfaction of certain performance metrics to be established by Reorganized UCI.

01:21244148.1