## EXHIBIT A

**Third Revised Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UCI INTERNATIONAL, LLC, et al.[1] | Case No.  16-11354 (MFW) |
| Debtors. | (Jointly Administered) |

## JOINT PLAN OF REORGANIZATION FOR
## UCI INTERNATIONAL, LLC AND ITS DEBTOR AFFILIATES
## PROPOSED BY THE DEBTORS, THE AD HOC COMMITTEE OF SENIOR
## NOTEHOLDERS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

| | |
|---|---|
| SIDLEY AUSTIN LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Larry J. Nyhan | Robert S. Brady (No. 2847) |
| Jessica C.K. Boelter | Edmon L. Morton (No. 3856) |
| Kerriann S. Mills | Ashley E. Jacobs (No. 5635) |
| Geoffrey M. King | Elizabeth S. Justison (No. 5911) |
| One South Dearborn Street | Rodney Square, 1000 North King Street |
| Chicago, Illinois  60603 | Wilmington, Delaware 19801 |
| Facsimile:  (312) 853-7036 | Facsimile:  (302) 571-1253 |

*Attorneys for the Debtors and Debtors in Possession*

| | |
|---|---|
| WILLKIE FARR & GALLAGHER LLP | MORRIS NICHOLS ARSHT & TUNNELL LLP |
| Matthew A. Feldman | Robert J. Dehney (No. 3578) |
| Paul V. Shalhoub | Matthew B. Harvey (No. 5186) |
| Daniel Forman | 1201 N. Market St., 16th Floor |
| 787 7th Avenue | P.O. Box 1347 |
| New York, NY 10019 | Wilmington, DE 19899-1347 |
| Facsimile: (212) 728 8111 | Facsimile: (302) 658-3989 |

*Attorneys for the Plan Sponsors*

| | |
|---|---|
| MORRISON & FOERSTER LLP | COLE SCHOTZ P.C. |
| Lorenzo Marinuzzi | Norman L. Pernick (No. 2290) |
| Jonathan I. Levine | Patrick J. Reilley (No. 4451) |
| Erica J. Richards | 500 Delaware Avenue, Suite 1410 |
| 250 W. 55th Street | Wilmington, DE 19801 |
| New York, NY 10019 | Facsimile: (302) 652-3117 |
| Facsimile: (212) 468-7900 | |

*Attorneys for the Official Committee of Unsecured Creditors*

**Dated:  December 2, 2016**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  UCI International, LLC (0186); Airtex Industries, LLC (0830); Airtex Products, LP (0933); ASC Holdco, Inc. (9758); ASC Industries, Inc. (7793); Champion Laboratories, Inc. (5645); UCI Acquisition Holdings (No. 1) Corp (5732); UCI Acquisition Holdings (No. 3) Corp (8277); UCI Acquisition Holdings (No. 4) LLC (8447); UCI-Airtex Holdings, Inc. (5425); UCI Holdings Limited (N/A); UCI Pennsylvania, Inc. (1527); and United Components, LLC (9857).  The mailing address for each Debtor is 1900 West Field Court, Lake Forest, Illinois 60045.

**TABLE OF CONTENTS**

PAGE

**ARTICLE I:** DEFINED TERMS AND RULES OF INTERPRETATION.................................1

**ARTICLE II:** TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
      PRIORITY TAX CLAIMS.................................................................17

    2.1.    Administrative Expense Claims.................................................17
    2.2.    Priority Tax Claims...................................................................18

**ARTICLE III:** CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
      AND INTERESTS.......................................................................18

    3.1.    Summary of Classification and Treatment of Classified Claims and
           Interests.....................................................................................18
    3.2.    Classification and Treatment of Claims Against and Interests in the
           Debtors......................................................................................20
    3.3.    Unimpaired Claims and Interests..............................................24

**ARTICLE IV:** ACCEPTANCE OR REJECTION OF THE PLAN ............................24

    4.1.    Impaired Classes of Claims Entitled to Vote on this Plan....................24
    4.2.    Acceptance by an Impaired Class of Claims ...........................................24
    4.3.    Presumed Acceptance by Unimpaired Classes.......................................25
    4.4.    Presumed Acceptance by the Holders of Intercompany Claims............25
    4.5.    Presumed Rejection by Certain Impaired Classes .................................25
    4.6.    Confirmability and Severability of this Plan .........................................25

**ARTICLE V:** MEANS FOR IMPLEMENTATION OF THE PLAN ............................25

    5.1.    Non-Substantive Consolidation ..............................................25
    5.2.    Sources of Cash Consideration for Plan Distributions ...........................26
    5.3.    New First Lien Credit Agreement............................................................26
    5.4.    Rights Offering ........................................................................................26
    5.5.    New Second Lien Exit Facility ................................................................28
    5.6.    Rank Contribution Election and Treatment of Pension Plans ................28
    5.7.    Restructuring Transactions......................................................................29
    5.8.    Issuance and Distribution of New Securities .........................................30
    5.9.    Corporate Governance, Directors, Officers and Corporate Action........31
    5.10.   Continued Corporate Existence and Vesting of Assets in the Reorganized
           Debtors......................................................................................................32
    5.11.   Cancellation of Certain Credit and Debt Documents ............................32
    5.12.   Cancellation of Liens ..............................................................................33
    5.13.   Payment of Indenture Trustee Allowed Fees..........................................33
    5.14.   Preservation of Rights of Action and Settlement of Ordinary Litigation
           Claims and Preserved Causes of Action .................................................33
    5.15.   Registration of New Common Stock .......................................................34

i

5.16.  Additional Transactions Authorized Under this Plan ...........................................34
5.17.  Release of Certain Avoidance Actions. ...............................................................34
5.18.  Comprehensive Settlement of Claims and Controversies.....................................34
5.19.  Dissolution of UCI Holdings .............................................................................34
5.20.  Environmental Obligations.. ..............................................................................34

**ARTICLE VI:** TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED
     LEASES, INSURANCE POLICIES AND EMPLOYEE BENEFIT PLANS .................35

6.1.  Assumption of Executory Contracts and Unexpired Leases...................................35
6.2.  Cure of Defaults Under Assumed Executory Contracts and Unexpired
     Leases...................................................................................................................36
6.3.  Claims Procedures Related to Rejection of Executory Contracts or
     Unexpired Leases..................................................................................................36
6.4.  Assumption of Collective Bargaining Agreements ...............................................37
6.5.  Insurance Policies and Agreements ......................................................................37
6.6.  Management Equity Incentive Plan .......................................................................37
6.7.  Employee Compensation and Benefit Plans ..........................................................37
6.8.  Postpetition Contracts and Leases ........................................................................38

**ARTICLE VII:** PROVISIONS GOVERNING DISTRIBUTIONS ............................................38

7.1.  Distributions on Account of Claims Allowed as of the Effective Date.................38
7.2.  Distributions on Account of Claims that Become Allowed after the
     Effective Date ......................................................................................................38
7.3.  Interest on Claims ................................................................................................38
7.4.  Distributions by Disbursing Agent(s) ...................................................................38
7.5.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ............38
7.6.  Record Date for Distributions...............................................................................39
7.7.  Allocation of Plan Distributions Between Principal and Interest ..........................39
7.8.  Means of Cash Payment........................................................................................40
7.9.  Withholding and Reporting Requirements ............................................................40
7.10.  Setoff and Recoupment........................................................................................40
7.11.  Fractional Securities.............................................................................................40
7.12.  De Minimis Distributions ....................................................................................40

**ARTICLE VIII:** PROCEDURES FOR RESOLVING DISPUTED CLAIMS.........................40

8.1.  Objection to and Estimation of Claims.................................................................40
8.2.  No Distributions Pending Allowance ...................................................................41
8.3.  Distributions on Account of Disputed Claims Once They Are Allowed...............41
8.4.  Reinstated Claims and Interests ...........................................................................41
8.5.  Disputed Claims Reserve(s)..................................................................................41

**ARTICLE IX:** CONFIRMATION AND CONSUMMATION OF THE PLAN.......................43

9.1.  Conditions to Effective Date................................................................................43
9.2.  Waiver of Conditions ...........................................................................................43

9.3.    Vacatur of Confirmation Order.................................................................44
9.4.    Notice of Effective Date ........................................................................44

**ARTICLE X:** EFFECT OF PLAN CONFIRMATION ...............................................44

10.1.    Binding Effect.......................................................................................44
10.2.    Discharge ..............................................................................................44
10.3.    **Releases by the Debtors** .....................................................................45
10.4.    **Releases by Certain Holders of Claims**.............................................45
10.5.    Exculpation ...........................................................................................46
10.6.    Injunction Related to Exculpation .......................................................46
10.7.    Survival of Indemnification Obligations .............................................47
10.8.    Term of Bankruptcy Injunction or Stays .............................................47
10.9.    Liability to Governmental Units. .........................................................47

**ARTICLE XI:** RETENTION OF JURISDICTION .................................................48

11.1.    Retention of Jurisdiction ......................................................................48

**ARTICLE XII:** MISCELLANEOUS PROVISIONS ...............................................50

12.1.    Surrender of Instruments......................................................................50
12.2.    Post-Confirmation Date Retention of Professionals ............................50
12.3.    Bar Date for Certain Administrative Expense Claims ..........................50
12.4.    Effectuating Documents and Further Transactions...............................51
12.5.    Corporate Action...................................................................................51
12.6.    Exemption from Transfer Taxes ...........................................................51
12.7.    Payment of Statutory Fees ...................................................................51
12.8.    Creditors' Committee............................................................................51
12.9.    Amendment or Modification of this Plan .............................................52
12.10.  Severability of Plan Provisions............................................................52
12.11.  Successors and Assigns.........................................................................52
12.12.  Revocation, Withdrawal or Non-Consummation .................................52
12.13.  Notice ...................................................................................................53
12.14.  Governing Law .....................................................................................53
12.15.  Tax Reporting and Compliance ............................................................53
12.16.  Exhibits ................................................................................................54
12.17.  Filing of Additional Documents ..........................................................54
12.18.  Plan Documents. ..................................................................................54
12.19.  Reservation of Rights............................................................................54

## APPENDIX AND EXHIBITS

Exhibit 1.24            By-Laws of Reorganized UCI

Exhibit 1.26            Certificate of Incorporation of Reorganized UCI

Exhibit 1.61            Terms of Intercreditor Agreement

Exhibit 1.78            Terms of New First Lien Credit Agreement

Exhibit 1.81            Terms of New Second Lien Credit Agreement

Exhibit 1.102           Preserved Causes of Action

Exhibit 1.122           Terms of Second Lien Rights Offering Facility Agreement

Exhibit 1.132           Shareholders Agreement

Exhibit 5.6.2           Rank Contribution Election Releases

Exhibit 5.10.2          Directors and Officers of Reorganized UCI

Exhibit 5.10.3          Directors and Managers or Officers of Reorganized Debtors Other Than
                        Reorganized UCI

Exhibit 6.1.1           Rejected Executory Contract and Unexpired Lease List

Exhibit 6.1.2           Assumed Executory Contract and Unexpired Lease List

Exhibit 6.5             Terms of Management Equity Incentive Plan

## INTRODUCTION

UCI Acquisition Holdings (No. 1) Corp. ("UCI"), UCI International, LLC ("UCI International"), and those Affiliates of UCI listed in footnote 1 hereto, together with the Plan Sponsors and Creditors' Committee (collectively, the "Plan Proponents") hereby propose the following joint plans of reorganization for the Debtors' reorganization cases under Chapter 11 of the Bankruptcy Code for the resolution of the outstanding Claims against and Interests in each of the Debtors. Although proposed jointly for administrative purposes, each plan of reorganization constitutes a separate plan of reorganization for the resolution of the outstanding Claims against and Interests in a particular Debtor. Capitalized terms used but not defined in this paragraph have the meanings assigned to them in Article I. The classification and treatment of Claims against and Interests in the Debtors are set forth in Article II and Article III. The Debtors, the Plan Sponsors and the Creditors' Committee are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and related matters.

## ARTICLE I:
## DEFINED TERMS AND RULES OF INTERPRETATION

A.    Defined Terms.  As used in this Plan, capitalized terms shall have the meanings set forth in this Article I. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1    Acceptable Settlement means a settlement agreed upon among the Debtors, Rank (or a designated member or members of the Rank Group), the Plan Sponsors and the Creditors' Committee relating to the Pension Plans, which settlement shall contain releases satisfactory to the Debtors, Rank, the Plan Sponsors and the Creditors' Committee.

1.2    Ad Hoc Group Professionals means the following professionals: (i) Willkie Farr & Gallagher LLP and Morris Nichols Arsht & Tunnell, retained by certain of the Plan Sponsors as legal counsel, (ii) GLC Advisors & Co., LLC, retained by Willkie Farr & Gallagher LLP as investment banker, (iii) Conway MacKenzie, Inc., retained by Willkie Farr & Gallagher LLP as financial advisor, and (iv) any other advisor agreed to by the Debtors.

1.3    Administrative Expense Claim means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors from and after the Petition Date (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for actual and necessary legal, financial, advisory, accounting and other services provided by the Professionals and the

1

reimbursement of actual and necessary expenses incurred by the Professionals pursuant to sections 328 or 330 of the Bankruptcy Code; (c) with the exception of section 507(b) Claims, any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any cash payment required to be made under this Plan (including the Plan Sponsors' Expense Claim) and payments to cure a default under an Executory Contract or Unexpired Lease that has been or will be assumed by any of the Debtors; or (e) any fees and charges assessed against the Estates under section 1930, Chapter 123, of Title 28 of the United States Code.

1.4    Administrative Expense Reserve(s) means one or more reserves to be established on or as soon as reasonably practicable after Effective Date pursuant to Section 8.5.1.

1.5    Affiliate has the meaning assigned to such term in section 101(2) of the Bankruptcy Code and when used in this Plan with reference to any Debtor shall include, but not be limited to, each of the other Debtors.

1.6    Airtex means Airtex Products, LP.

1.7    Allowed means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (a) that is evidenced by a proof of claim or interest and as to which no objection or request for estimation has been filed on or before any objection deadline established pursuant to Section 8.1 of this Plan or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding proof of claim or interest has been filed, (c) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order; or (d) that is expressly allowed (i) by a Final Order, (ii) solely with respect to those Claims that are not prepetition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless de minimis in nature, has been provided to and has not been objected to in writing by the Plan Proponents, or (iii) pursuant to the terms of this Plan.  For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses.

1.8    Allowed Claim or Interest means a Claim or Interest in a particular Class or of a particular type that is also an Allowed Claim or Interest.  For example, an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim.

1.9    A&R Letter Agreement means the A&R Letter Agreement as defined in the A&R Letter Agreement Order.

1.10    A&R Letter Agreement Order means the Order Authorizing the Debtors to Enter Into and Perform Under the Amended and Restated Letter Agreement [D.I. 435].

1.11    Assumed Executory Contract and Unexpired Lease List, means the list of Executory Contracts and Unexpired Leases set forth on Exhibit 6.1.2 to the Plan.

2

1.12    Autoparts Group means Autoparts Holdings (No.1) Limited and all direct and indirect subsidiaries thereof.

1.13    Avoidance Actions means causes of action arising under sections 542, 544, 545, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including fraudulent transfer laws, in each case whether or not litigation to prosecute such causes of action was commenced prior to the Effective Date.

1.14    Backstop Agreement means that certain Backstop Commitment Agreement, dated as of September 30, 2016, by and among the Debtors and the Backstop Parties in the form and substance annexed to the Debtors' motion to enter into and perform under such Backstop Commitment Agreement filed September 30, 2016 [D.I. 638], as may be subsequently modified, amended, or supplemented from time to time.

1.15    Backstop Commitment means, with respect to each Backstop Party, the sum of (a) such Backstop Party's Notes Pro Rata Allocation of the Second Lien Rights Offering Facility plus (b) the product of (i) such Backstop Party's Backstop Party Pro Rata Share times (ii) the amount of the Second Lien Rights Offering Facility not elected to be purchased by the Eligible Parties (other than Backstop Parties) prior to the Election Expiration Time.

1.16    Backstop Fee means an aggregate commitment fee of 4% of the New Common Stock (inclusive of the amount of New Common Stock that would be issued to Holders of Allowed General Unsecured Claims notwithstanding any GUC Cash Elections (as such terms are defined in the Plan) which fee shall be allocated to each Backstop Party in accordance with the terms of the Backstop Agreement.

1.17    Backstop Fee Share means, with respect to each Backstop Party, the percentage set forth opposite the name of such Backstop Party on Schedule II to the Backstop Commitment Agreement, as such Schedule II may be updated from time to time by agreement of the Backstop Parties.

1.18    Backstop Order means the *Order Authorizing and Approving (I) Entry Into a Backstop Commitment Agreement and (B) Payment of the Backstop Fees and Expenses and (II) Granting Related Relief* [D.I. 727].

1.19    Backstop Parties means the Senior Noteholders that are party to the Backstop Agreement.

1.20    Backstop Party Pro Rata Share or Backstop Party's Pro Rata Share means, with respect to each Backstop Party, the percentage set forth opposite the name of such Backstop Party on Schedule I to the Backstop Commitment Agreement, as such Schedule I may be updated from time to time by agreement of the Backstop Parties and/or pursuant to the terms of the Backstop Agreement.

1.21    Ballot means the ballot form for accepting or rejecting this Plan and making certain elections under this Plan, distributed with the Disclosure Statement to the Holders of Claims that are Impaired under this Plan and entitled to vote to accept or reject this Plan pursuant to Article III and Article IV.

1.22    <u>Bankruptcy Code</u> means Title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

1.23    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.24    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

1.25    <u>Business Day</u> means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.26    <u>By-Laws</u> means the amended and restated by-laws of Reorganized UCI, in form and substance acceptable to the Debtors and the Plan Sponsors and substantially in the form of <u>Exhibit 1.24</u>, to be filed with the Plan Supplement.

1.27    <u>Cash</u> means legal tender of the United States of America.

1.28    <u>Certificate of Incorporation</u> means the certificate of incorporation of Reorganized UCI, in form and substance acceptable to the Debtors and the Plan Sponsors and substantially in the form of <u>Exhibit 1.26</u>, to be filed with the Plan Supplement.

1.29    <u>Chapter 11 Cases</u> means the voluntary cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

1.30    <u>City of Fairfield</u> means the city of Fairfield, Illinois.

1.31    <u>Claim</u> means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.32    <u>Claims, Noticing, and Solicitation Agent</u> means Garden City Group, LLC.

1.33    <u>Class</u> means each category of Holders of Claims or Interests established under <u>Article III</u> pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.34    <u>Collective Bargaining Agreements</u> means all collective bargaining agreements to which any of the Debtors is a party on the Confirmation Date.

1.35    <u>Committee Challenge Stipulation</u> means the *Stipulation Regarding Committee Challenge Rights Under the Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition ABL Secured Parties Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* [D.I. 617].

1.36    <u>Confirmation</u> means the entry of the Confirmation Order by the Bankruptcy Court.

4

1.37    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

1.38    Confirmation Hearing means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be continued from time to time.

1.39    Confirmation Order means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to the Debtors and the Plan Sponsors.

1.40    Convenience Claim means a Claim that would otherwise be a General Unsecured Claim that is (a) in an amount equal to or less than $5,000 or (b) in an amount that has been reduced to $5,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that where any portion(s) of a single Claim has been transferred on or after August 26, 2016, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

1.41    Convenience Class Election means an irrevocable election made on the Ballot by the Holder of a Claim that would otherwise be a General Unsecured Claim in an amount greater than $5,000 to reduce such Claim to $5,000.

1.42    Creditors' Committee means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on June 10, 2016, as may be reconstituted from time to time.

1.43    Debtor(s) means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto.

1.44    Disallowed Claim means any Claim, including any portion thereof, that has been disallowed, denied, dismissed, expunged, or overruled pursuant to a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

1.45    Disbursing Agent(s) means any Entity acceptable to the Debtors and the Plan Sponsors (which shall not be unreasonably withheld, conditioned or delayed) in its capacity as a disbursing agent under this Plan.

1.46    Disclosure Statement means the disclosure statement relating to this Plan, in form and substance reasonably acceptable to the Debtors and the Plan Sponsors, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, in a manner acceptable to the Debtors and the Plan Sponsors, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.47    Disputed Claim means, with respect to any Claim, including any portion thereof, in any Class or category specified, a Claim arising on or before the Effective Date (a) that is neither an Allowed Claim nor a Disallowed Claim, or (b) to the extent the Debtors or any party in interest have interposed a timely objection or request for estimation of such Claim, which objection or request for estimation has not been withdrawn or determined pursuant to a Final Order.

1.48    Disputed Unsecured Claims Reserve(s) means one or more reserves to be established on or as soon as reasonably practicable after the Initial Distribution Date pursuant to Section 8.5.2.

1.49    Distribution Date means the Initial Distribution Date or a Quarterly Distribution Date, but in no event a date prior to the Effective Date.

1.50    Distribution Record Date means such date, acceptable to the Debtors and the Plan Sponsors, established by the Confirmation Order.

1.51    DTC means The Depository Trust Company.

1.52    Effective Date means, and shall occur on, the Business Day on which (i) each of the conditions precedent to the occurrence of the Effective Date set forth in Article IX has been satisfied or waived in accordance with the terms thereof and (ii) the Debtors file with the Bankruptcy Court a notice indicating the same.

1.53    Election Expiration Time means the time and date of expiration of the period during which Eligible Parties can elect to participate in the Rights Offering, which date shall be no earlier than November 29, 2016, or such later date as the Debtors may specify with the reasonable consent of the Plan Sponsors.

1.54    Eligible Parties means each holder of Allowed Senior Notes Claims as of the Voting Record Date.

1.55    Employee Benefit Plans means, with the exception of the Pension Plans, any employment, welfare, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, business expense reimbursement, dependent care, retirement, savings, deferred compensation, supplemental pension, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other compensation or benefit plans, agreements (including individual employee retention agreements) or arrangements for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor.

1.56    Entity means an entity as defined in section 101(15) of the Bankruptcy Code.

1.57    Environmental Law means all federal, state and local statutes, regulations, laws, ordinances, rules, licenses, permits, and similar provisions having the force or effect of law, all binding judicial and administrative orders, agreements, and determinations in each case concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Toxic Substances Control Act; applicable common law claims that can be asserted by a Governmental Unit, and any applicable state or local equivalents.

1.58    Environmental Obligations shall have the meaning ascribed to such term in Section 5.20.

1.59    Environmental Obligations Account shall have the meaning ascribed to such term in Section 5.20.

1.60    Estate(s) means, individually or collectively, the estate or estates of the Debtors created in the Chapter 11 Cases under section 541 of the Bankruptcy Code.

1.61    Exculpated Parties means each of the following solely in their capacity as such: (a) the Debtors; (b) the Debtors' officers, managers, directors, employees, financial advisors, attorneys, accountants, consultants, and other Professionals; and (c) the Creditors Committee's members, financial advisors, attorneys, accountants, consultants, and other Professionals.

1.62    Executory Contracts means all executory contracts to which a Debtor is a party.

1.63    Exhibit(s) means, individually or collectively, the exhibits to this Plan.

1.64    Final Cash Collateral Order means the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition ABL Secured Parties Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363 and 507; and (III) Granting Related Relief* [D.I. 436].

1.65    Final Order means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.66    General Unsecured Claim means a Claim against any Debtor that is not an Administrative Expense Claim, a Priority Tax Claims, a Priority Non-Tax Claim, an Other Secured Claim, a Prepetition ABL Credit Facility Claim, a Senior Notes Claim, a Convenience Claim, an Intercompany Claim, or a Section 510(b) Claim.

1.67    Governmental Unit shall have the meaning ascribed to such term in Section 10.9

1.68    GUC Cash Election shall have the meaning ascribed to such term in Section 3.2.5(b).

1.69    GUC Cash Pool shall have the meaning ascribed to such term in Section 3.2.5(b).

1.70    GUC Pro Rata Allocation means, with respect to each Holder of an Allowed Senior Notes Claim or Allowed General Unsecured Claim, the number of shares of New Common Stock

equal to the product of (a) the Total GUC Allocation times (b) a fraction equal to (i) the amount of such Holder's Allowed Senior Notes Claim and Allowed General Unsecured Claim divided by (ii) the total amount of Allowed Senior Notes Claims plus Allowed General Unsecured Claims.

1.71    Holder means an Entity holding a Claim against, or Interest in, any Debtor.

1.72    IEPA means the Illinois Environmental Protection Agency.

1.73    Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.74    Initial Distribution Date means a date selected by the Reorganized Debtors that is as soon as practicable following the Effective Date and is in no event later than fourteen (14) days after the Effective Date.

1.75    Intercompany Claim means any Claim against a Debtor that is held by another Debtor or a non-Debtor subsidiary of any Debtor.

1.76    Intercreditor Agreement means the intercreditor agreement that may be entered into on the Effective Date by and between the New First Lien Agent and the New Second Lien Agent or the Second Lien Rights Offering Facility Agent if the Debtors enter into the New Second Lien Exit Facility or the Second Lien Rights Offering Facility. The principal terms of the Intercreditor Agreement shall be set forth on Exhibit 1.64, to be filed with the Plan Supplement, and in form and substance acceptable to the Debtors and the Plan Sponsors.

1.77    Interest  means the interest of any Holder of equity securities in any Debtor that is represented by any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in such Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, rights of conversion, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of any such Debtor, obligating any such Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any such Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common stock, preferred stock or other equity securities (or any right, claim, or interest in and to any common stock, preferred stock or other equity securities) of any such Debtor, any Claims for the payment of any distributions with respect to any common stock, preferred stock, or other equity interests in or securities of such Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any such Debtor's outstanding common stock, preferred stock, or other equity interests or securities.

1.78    Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

01:21281009.1

1.79    Management Equity Incentive Plan means a post-Effective Date management equity incentive plan to be developed by the board of directors of Reorganized UCI, which plan shall provide for 5% of the New Common Stock to be reserved for grants of options and/or restricted stock for the Reorganized Debtors' management, directors and employees.

1.80    New Common Stock means the new common stock to be issued by Reorganized UCI on the Effective Date in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations qualifications and restrictions, in each case, as set forth in the Certificate of Incorporation and Shareholders Agreement.

1.81    New First Lien Agent means such person or entity (reasonably acceptable to the Plan Sponsors) acting in its capacity as administrative agent under the New First Lien Credit Agreement.

1.82    New First Lien Credit Agreement means that certain credit agreement, effective as of the Effective Date, by and among the Reorganized Debtors, the New First Lien Agent, and the New First Lien Lenders, which shall be in form and substance acceptable to the Debtors and the Plan Sponsors, together with all notes, agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and intercompany subordination agreements), documents, and instruments delivered pursuant to or in connection therewith, each in form and substance acceptable to the Plan Sponsors and the Debtors, as it may be amended, modified, or supplemented from time to time.  The principal terms of the New First Lien Credit Agreement shall be set forth on Exhibit 1.78, to be filed with the Plan Supplement, and in form and substance acceptable to the Debtors and the Plan Sponsors.

1.83    New First Lien Exit Facility means that certain term and/or revolving loan facility provided under the New First Lien Credit Agreement in an aggregate principal amount of up to $130,000,000, provided, however, that the aggregate principal amount of (i) the New First Lien Exit Facility and (ii) the Second Lien Rights Offering Facility or New Second Lien Exit Facility, as applicable, shall not exceed $130,000,000.

1.84    New First Lien Lenders means the banks and other financial institutions or other entities from time to time party to the New First Lien Credit Agreement as lenders, in their respective capacities as such.

1.85    New Second Lien Agent means such person or entity (reasonably acceptable to the Plan Sponsors) acting in its capacity in its capacity as administrative agent under the New Second Lien Credit Agreement.

1.86    New Second Lien Credit Agreement means that certain credit agreement, if any, effective as of the Effective Date, by and among the Reorganized Debtors, the New Second Lien Agent, and the New Second Lien Exit Facility Lenders, in form and substance acceptable to the Debtors and the Plan Sponsors, together with all other notes, agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and intercompany subordination agreements), documents, and instruments delivered pursuant to or in connection therewith, each in form and substance acceptable to the Plan Sponsors and the Debtors, as it may be amended, modified, or supplemented from time to time.  The principal terms

of the New Second Lien Credit Agreement shall be set forth on <u>Exhibit 1.73</u>, to be filed with the Plan Supplement, and in form and substance acceptable to the Debtors and the Plan Sponsors.

1.87   <u>New Second Lien Exit Facility</u> means that certain term loan facility provided under the New Second Lien Credit Agreement, if entered into in the discretion of the Plan Proponents, in an aggregate principal amount of up to $30,000,000.

1.88   <u>New Second Lien Exit Facility Lenders</u> means the banks and other financial institutions or other entities from time to time party to the New Second Lien Exit Facility as lenders, in their respective capacities as such.

1.89   <u>Notes Pro Rata Allocation</u> means, with respect to each Eligible Party, the fraction equal to (a) the amount of such holder's Allowed Senior Notes Claims as of the Voting Record Date divided by (b) the total amount of Allowed Senior Notes Claims.

1.90   <u>Ordinary Litigation Claims</u> means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Person as of the Petition Date including, without limitation, any and all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold under chapter 5 of the Bankruptcy Code, including Avoidance Actions; <u>provided</u>, <u>however</u>, Ordinary Litigation Claims shall not include (a) any claim, right of action, suit or proceeding that has been settled on or prior to the Effective Date, (b) any Preserved Causes of Action, (c) any Avoidance Action against a UCI Trade Creditor, and (d) other claims, rights of action, suits or proceedings waived or released pursuant to <u>Article X</u>.

1.91   <u>Other Secured Claim</u> means any Secured Claim against a Debtor other than a Prepetition ABL Credit Facility Claim.

1.92   <u>Pension Plans</u> means, collectively, the Pension for Employees of Airtex Products LP, Champion Laboratories Pension Plan, and Neapco Inc. Employees Pension Plan.

1.93   <u>Person</u> or <u>person</u> means a person as defined in section 101(41) of the Bankruptcy Code.

1.94   <u>Petition Date</u> means the date on which the Debtors commenced the Chapter 11 Cases.

1.95   <u>Plan</u> means this Chapter 11 plan of reorganization, including all Exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.96   <u>Plan Proponents</u> shall have the meaning ascribed to such term in the Introduction.

1.97   <u>Plan Sponsors</u> means those Senior Noteholders party to the Backstop Agreement <u>provided</u>, <u>that</u>, to the extent provisions of the Plan or Plan Supplement require the consent, approval or acceptance of the "Plan Sponsors," such term shall refer to the consent, approval or acceptance of the "Required Backstop Parties" as defined in the Backstop Agreement.

10

1.98    Plan Sponsors' Expense Claim means the Plan Sponsors' Claim for all reasonable documented fees, costs and expenses of the Ad Hoc Group Professionals, in their capacity as such, incurred prior to termination of the Backstop Agreement, which Claim shall be Allowed pursuant to the Backstop Order, the Confirmation Order and sections 503(b)(1), 503(b)(3), 503(b)(4), 507 and 1129(a)(4) of the Bankruptcy Code.

1.99    Plan Supplement means the supplement to this Plan to be filed with the Bankruptcy Court no later than ten (10) days prior to the Voting Deadline, in form and substance acceptable to the Plan Sponsors and the Debtors.

1.100    Prepetition Administrative Agent means Credit Suisse AG, Cayman Islands Branch in its capacity as administrative agent under the Prepetition Credit Agreement.

1.101    Prepetition ABL Credit Facility Agreement means that certain Prepetition ABL Credit Facility Agreement, dated as of September 30, 2015, among UCI Holdings, UCI Acquisition Holdings (No. 1) Corp,  UCI International, the subsidiary borrowers party thereto, the several lenders from time to time parties thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent, collateral agent, and issuing lender, as such Prepetition ABL Credit Facility Agreement may have been amended, amended and restated,  modified or supplemented from time to time.

1.102    Prepetition ABL Credit Facility Claims means all Claims against the Debtors arising under, evidenced by, or secured pursuant to, the Prepetition ABL Credit Facility Documents.

1.103    Prepetition ABL Credit Facility Documents means, collectively, the Prepetition Credit Agreement and all other agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and intercompany subordination agreements), documents and instruments delivered in connection therewith.

1.104    Preserved Causes of Action means any Claims held by any of the Debtors against any member of the Rank Group and each of their non-debtor Related Persons, including, without limitation, the claims and causes of action set forth in Exhibit 1.102, to be filed with the Plan Supplement.

1.105    Priority Non-Tax Claim means any Claim entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.106    Priority Tax Claim means any Claim of a governmental unit of the kind against a Debtor  entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.107    Professional means any Person retained by the Debtors or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

1.108    Quarterly Fees has the meaning ascribed to such term in Section 12.7 of the Plan.

1.109   Pro Rata or Pro Rata Share means the proportion that the amount of any Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class, except in reference to (a) a specific type of Claim, in which case Pro Rata or Pro Rata Share means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type, or (b) the subset of Holders of General Unsecured Claims making the GUC Cash Election, in which case Pro Rata or Pro Rata Share means the proportion that the Allowed Claims held by such Holder making such election bears to the aggregate amount of all Allowed General Unsecured Claims held by Holders making the GUC Cash Election.

1.110   Quarterly Distribution Date means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.111   Rank means Rank Group Limited.

1.112   Rank Contribution Election shall have the meaning ascribed to such term in Section 5.6.

1.113   Rank Finance means Rank Group Finance Holdings Limited.

1.114   Rank Group means Rank and each of its Affiliates (provided, that for the purposes of this definition limited partnerships and foreign business organizations shall be treated as if they were "corporations" within the meaning of section 101(9) of the Bankruptcy Code for purposes of determining whether such entities are Affiliates), but excludes the Debtors and the direct or indirect subsidiaries of each Debtor.

1.115   Reinstate, Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than any Debtor or an insider of any Debtor) for any pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

1.116   Rejected Executory Contract and Unexpired Lease List means the list of Executory Contracts and Unexpired Leases set forth on Exhibit 6.1.1 to the Plan.

1.117   Related Persons means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys,

12

accountants, investment bankers, consultants, agents and professionals each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, equity holders, members, and professionals); provided, however, that when used in reference to any Debtor or Reorganized Debtor, the term Related Persons shall not include (a) such Debtor's and Reorganized Debtor's respective present and former non-Debtor Affiliates, equity holders, and shareholders, or (b) directors affiliated with Rank Group, but shall include such Debtor's and Reorganized Debtor's subsidiaries; provided, further, however, that when used in reference to any member of the Rank Group, the term Related Persons shall not include any Debtors or the Debtors' subsidiaries.

1.118    Released Parties means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Plan Sponsors; (d) the Senior Unsecured Notes Indenture Trustee; (e) the New First Lien Lenders; (f) the New First Lien Agent; (g) the New Second Lien Agent; (h) the new Second Lien Lenders; (i) the Second Lien Rights Offering Facility Agent; (j) the Second Lien Rights Offering Facility Lenders; (k) the Creditors' Committee; (l) the Prepetition Administrative Agent and (m) with respect to each of the foregoing parties under (a) through (l), such Entities' Related Persons; provided, however, that any Holder of a Claim or Interest that would otherwise constitute a "Released Party" but opts out of the releases contained in the Plan shall not be a "Released Party"; provided, further, that, in the event the Rank Contribution Election is made, the parties and such parties' Related Persons set forth on Exhibit 5.6.2 shall constitute "Released Parties." For the avoidance of doubt, no member of the Rank Group or any of its Related Persons shall be Released Parties unless the Rank Contribution Election is made.

1.119    Reorganized _____ means, with respect to any Debtor, such Debtor and any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan, including, without limitation, each Restructuring Transaction. For example, (i) Reorganized UCI means reorganized UCI or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on the Effective Date in accordance with this Plan and (ii) Reorganized Debtors means, collectively, each of the reorganized Debtors or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.120    Restructuring Transactions means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the Reorganized Debtors may enter into or undertake on or after the Effective Date.

1.121    Rights Offering means that certain rights offering pursuant to which (a) each Eligible Party shall have the right to exercise Subscription Rights to acquire its Notes Pro Rata Allocation of the Second Lien Rights Offering Facility in accordance with the terms of the Rights Offering Procedures and (b) each Backstop Party shall purchase its Backstop Commitment in accordance with the terms of the Backstop Agreement.

1.122    Rights Offering Procedures means the procedures for conducting the Rights Offering as approved by the Court [D.I. 728] pursuant to the *Debtors' Motion for Entry of an Order*

*Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, (IV) the Rights Offering Procedures and Related Forms, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* [D.I. 584].

1.123   <u>Rights Offering Stock</u> means the product of (a) 15% of the New Common Stock to be issued by Reorganized UCI (inclusive of the amount of New Common Stock that would be issued to Holders of Allowed General Unsecured Claims notwithstanding any Cash Elections (as such terms are defined in the Plan), on the Effective multiplied by (b) the fraction equal to (i) the principal amount of the Second Lien Rights Offering Facility divided by (ii) $30 million.

1.124   <u>Rights Offering Stock Pro Rata Allocation</u> means, with respect to each Eligible Party, the number of Rights Offering Stock equal to the product of (a) the total number of Rights Offering Common Stock multiplied by (b) the fraction equal to (i) the amount of the Second Lien Rights Offering Facility purchased by such party pursuant to the Rights Offering and/or the Backstop Commitment Agreement divided by (ii) the total amount of the Second Lien Rights Offering Facility funded by the proceeds of the Rights Offering.

1.125   <u>SEC</u> means the U.S. Securities and Exchange Commission.

1.126   <u>Second Lien Rights Offering Facility</u> means a second lien credit facility in an aggregate principal amount of up to $30,000,000, which facility shall be funded by the proceeds of the Rights Offering, if conducted.

1.127   <u>Second Lien Rights Offering Facility Agent</u> means such person or entity (acceptable to the Plan Sponsors) acting in its capacity in its capacity as administrative agent under the Second Lien Rights Offering Facility Agreement.

1.128   <u>Second Lien Rights Offering Facility Agreement</u> means that certain credit agreement, effective as of the Effective Date if the Rights Offering is consummated, which shall be in form and substance acceptable to the Plan Sponsors and the Debtors, by and among the Reorganized Debtors, the Second Lien Rights Offering Agent, and the Second Lien Rights Offering Facility Lenders, together with all related notes, agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and intercompany subordination agreements), documents, and instruments delivered pursuant to or in connection therewith, each in form and substance acceptable to the Plan Sponsors and the Debtors, as it may be amended, modified, or supplemented from time to time.  The principal terms of the Second Lien Rights Offering Facility Agreement shall be set forth on <u>Exhibit 1.122</u>, to be filed with the Plan Supplement, and in form and substance acceptable to the Debtors and the Plan Sponsors.

1.129   <u>Second Lien Rights Offering Facility Lenders</u> means, collectively, each Backstop Party and any other Eligible Party that is party to the Second Lien Rights Offering Facility on the Effective Date as a lender, in each case in such party's capacity as a lender under the Second Lien Rights Offering Facility.

1.130   <u>Section 510(b) Claim</u> means a Claim against any Debtor that is subordinated, or subject to subordination, pursuant to Section 510(b) of the Bankruptcy Code, including, without limitation, a claim arising from the rescission or purchase of a sale or security of any Debtor or an

01:21281009.1

affiliate of any Debtor, for damages arising from the purchase or sale of such security or for reimbursement, or for contribution on account of such Claim pursuant to section 502 of the Bankruptcy Code.

1.131    Secured Claim means any Claim secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the relevant Debtor(s) or (iii) as determined pursuant to a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.132    Senior Noteholder means a Holder of a Senior Unsecured Note.

1.133    Senior Notes Claims means all Claims against the Debtors arising under or evidenced by the Senior Unsecured Notes, the Senior Unsecured Notes Indenture, and related documents; provided, however, that Senior Notes Claims shall not include Claims related to the Senior Unsecured Notes Indenture Trustee Fees.

1.134    Senior Unsecured Notes means the 8.625% senior unsecured notes due 2019 issued pursuant to the Senior Unsecured Notes Indenture.

1.135    Senior Unsecured Notes Indenture means that certain Indenture, dated as of January 26, 2011, for the issuance of 8.625% Notes due 2019, by and among Uncle Acquisition 2010 Corp as issuer, the guarantors from time to time parties thereto, and Wilmington Trust, National Association (as successor by merger to Wilmington Trust FSB), as trustee, as such Indenture may have been amended, amended and restated, modified or supplemented from time to time.

1.136    Senior Unsecured Notes Indenture Trustee means Wilmington Trust, National Association (as successor by merger to Wilmington Trust FSB), in its capacity as trustee under the Senior Unsecured Notes Indenture.

1.137    Senior Unsecured Notes Indenture Trustee Fees means the compensation, fees, expenses, disbursements and indemnity claims of the Senior Unsecured Notes Indenture Trustee, including without limitation, any fees, expenses and disbursements of attorneys, advisors or agents retained or utilized by the Senior Unsecured Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

1.138    Shareholders Agreement means the shareholders agreement of Reorganized UCI, which agreement shall be substantially in the form of Exhibit 1.132 to be filed with the Plan Supplement, and in form and substance acceptable to the Plan Sponsors.

1.139    Subscription Agent means such person or entity (reasonably acceptable to the Plan Sponsors) engaged by the Debtors to administer the Rights Offering in accordance with the Rights Offering Procedures.

1.140    Subscription Deadline means November 29, 2016, or such other date as may be designated in accordance with the Rights Offering Procedures.

1.141   <u>Subscription Form</u> means the form that each Eligible Party must complete by the Subscription Deadline to elect to participate in the Rights Offering.

1.142   <u>Subscription Payment Amount</u> shall have the meaning ascribed to such term in <u>Section 5.4</u>.

1.143   <u>Subscription Rights</u> means the rights of Eligible Parties to purchase, pursuant to a duly completed and signed Subscription Form, their Notes Pro Rata Allocation of the Second Lien Rights Offering Facility in connection with the Rights Offering.

1.144   <u>Subsidiary Debtors</u> means, collectively, Airtex Industries, LLC; Airtex Products, LP; ASC Holdco, Inc.; ASC Industries, Inc.; Champion Laboratories, Inc.; UCI; UCI Acquisition Holdings (No. 3) Corp; UCI Acquisition Holdings (No. 4) LLC; UCI-Airtex Holdings, Inc.; UCI International, LLC; UCI Pennsylvania, Inc.; and United Components, LLC.

1.145   <u>Total GUC Allocation</u> means 91% of the New Common Stock, subject to reduction by the Rights Offering Stock unless the Plan Sponsors and Debtors elect not to proceed with the Rights Offering.

1.146   <u>UCI</u> shall have the meaning ascribed to such term in the introduction of this Plan.

1.147   <u>UCI Holdings</u> means UCI Holdings, Limited.

1.148   <u>UCI International</u> shall have the meaning ascribed to such term in the introduction of this Plan.

1.149   <u>UCI Trade Creditor</u> means a creditor holding one or more unsecured claims as of the Petition Date arising from the provision of goods or services to a Debtor in the ordinary course of business, to the extent that such claim is neither secured nor entitled to priority under applicable law; and shall not include (i) any creditor holding a claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code or (ii) Rank or any of Rank's Affiliates, subsidiary or Related Persons.

1.150   <u>Unexpired Leases</u> means all unexpired leases to which a Debtor is a party.

1.151   <u>Unimpaired</u> means with respect to a Claim or Interest, a Claim or Interest that is not Impaired.

1.152   <u>USEPA</u> means the United States Environmental Protection Agency.

1.153   <u>Voting Deadline</u> means the deadline for returning Ballots to accept or reject this Plan.

1.154   <u>Voting Record Date</u> means October 14, 2016.

B.      <u>Rules of Interpretation</u>.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any

01:21281009.1

reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections or Articles are references to Sections or Articles of or to this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) will apply; and (i) in computing any period of time prescribed or allowed by this Plan, Bankruptcy Rule 9006(a) will apply.

C.      Computation of Time.  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

D.      Exhibits and Plan Supplement.  All Exhibits to this Plan, as well as the Plan Supplement, shall be in form and substance acceptable to the Plan Proponents and are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Plan Supplement and the filed Exhibits upon written request to the Debtors.  Upon their filing, the Plan Supplement and the Exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours or at the Bankruptcy Court's website at http://www.deb.uscourts.gov.

E.      Deemed Acts.  Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

## ARTICLE II:
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

2.1.      Administrative Expense Claims.  Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either: (i) the latest to occur of (x) the Effective Date,

(y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, (a) Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other less favorable treatment as the applicable Debtor and such Holder shall have agreed; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

2.2.    Priority Tax Claims.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Reorganized Debtors, either (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, or as soon as practicable thereafter, together with interest from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

### ARTICLE III:
### CLASSIFICATION AND TREATMENT OF
### CLASSIFIED CLAIMS AND INTERESTS

3.1.    Summary of Classification and Treatment of Classified Claims and Interests.

3.1.1    General.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without limitation, voting, Confirmation and distributions pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

01:21281009.1

(b)       This Plan constitutes, and shall be deemed to constitute, a separate Chapter 11 plan of reorganization for each Debtor.  Each Debtor is set forth under footnote 1 to this Plan.

(c)       Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(d)       Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including all claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against any Released Party, or Holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

3.1.2      Identification of Classes Against the Debtors.  The following chart assigns a letter to each Class with respect to Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition ABL Credit Facility Claims |
| D | Senior Notes Claims |
| E | General Unsecured Claims |
| F | Convenience Claims |
| G | Intercompany Claims |
| H | Section 510(b) Claims |

19

| I | Interests in UCI and UCI Holdings |
| J | Interests in Subsidiary Debtors |

3.2.   Classification and Treatment of Claims Against and Interests in the Debtors.

3.2.1     Class A:  Priority Non-Tax Claims.

(a)     Classification:  Class A consists of all Priority Non-Tax Claims against the Debtors.

(b)     Treatment:  On or as soon as reasonably practicable following the later to occur of the Effective Date and the date such Claim becomes an Allowed Claim, each Holder of an Allowed Priority Non-Tax Claim shall have such Claim Reinstated.

(c)     Voting:  Claims in Class A are Unimpaired.  Each Holder of an Allowed Claim in Class A shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.2     Class B:  Other Secured Claims.

(a)     Classification:  Class B consists of all Other Secured Claims against the Debtors.

(b)     Treatment:  On or as soon as reasonably practicable following the later to occur of the Effective Date and the date such Claim becomes an Allowed Claim, each Holder of an Allowed Other Secured Claim shall have such Claim Reinstated.

(c)     Voting:  Claims in Class B are Unimpaired.  Each Holder of an Allowed Claim in Class B shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.3     Class C:  Prepetition ABL Credit Facility Claims.

(a)     Classification:  Class C consists of all Prepetition ABL Credit Facility Claims against the Debtors.

(b)     Allowance: The Prepetition ABL Credit Facility Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $69,443,839.66 in respect of loans made and $5,803,837.00 in respect of undrawn letters of credit plus any accrued but unpaid interest thereon (including default interest) payable pursuant to the terms of the Prepetition ABL Credit Facility Documents and the Final Cash Collateral Order, plus fees, charges and expenses incurred through the Effective Date that are required to be paid under the Prepetition ABL Credit Facility Documents, subject to any agreements by the parties to the Prepetition ABL

20

Credit Facility Documents modifying the fees, charges and expenses required to be paid under the Prepetition ABL Credit Facility Documents.

(c)    Treatment:  Except to the extent the Holder of an Allowed Prepetition ABL Credit Facility Claim agrees to a less favorable or different treatment, each Holder of an Allowed Prepetition ABL Credit Facility Claim shall receive on account of, in full and complete satisfaction, release and discharge of, and in exchange for such Claim, payment in full, in Cash (excluding any amounts in respect of undrawn letters of credit) on the Effective Date or as soon as reasonably practicable thereafter.  Any undrawn letters of credit outstanding on the Effective Date shall be collateralized with Cash in an amount equal to 103% of the face amount of such undrawn letter of credit in form and substance and issued by a bank or other financial institution acceptable to the issuer thereof until such undrawn letter of credit is (x) replaced by a letter of credit issued in form and substance and issued by a bank or other financial institution acceptable to the issuer thereof or (y) returned to the issuer undrawn and marked cancelled.

(d)    Voting:  Claims in Class C are Unimpaired.  Each Holder of an Allowed Claim in Class C shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.4    Class D:  Senior Notes Claims.

(a)    Classification:  Class D consists of all Senior Notes Claims against the Debtors.

(b)    Allowance:  The Senior Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $400,000,000, plus any accrued but unpaid interest thereon (including default interest) payable through the Petition Date at the interest rate applicable pursuant to the terms of the Senior Unsecured Notes Indenture.

(c)    Treatment:  Each Eligible Party shall have the option to participate in the Rights Offering, subject to the terms and conditions set forth in Section 5.4.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent the Holder of an Allowed Senior Notes Claim agrees to a less favorable or different treatment, each Holder of an Allowed Senior Notes Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Senior Notes Claim, (i) its GUC Pro Rata Allocation of New Common Stock and (ii) unless the Plan Sponsors and the Debtors elect not to consummate the Rights Offering, and if such party elected to participate in the Rights Offering, such party's (A) Notes Pro Rata Allocation of the Second Lien Rights Offering Facility and (B) Rights Offering Stock Pro Rata Allocation that such party elected to purchase through the Rights Offering, if any.

(d)    Voting:  Claims in Class D are Impaired.  Each Holder of an Allowed Claim in Class D shall be entitled to vote to accept or reject this Plan.

3.2.5    Class E:  General Unsecured Claims.

(a)    Classification:  Class E consists of all General Unsecured Claims.

21

(b)    Treatment:  On or as soon as reasonably practicable following the next Distribution Date after such Holder's General Unsecured Claim becomes an Allowed Claim, except to the extent the Holder of an Allowed General Unsecured Claim agrees to a less favorable or different treatment, such Holder shall have the option to receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed General Unsecured Claim either:

(i)    its GUC Pro Rata Allocation of New Common Stock; or

(ii)    if such Holder's Allowed General Unsecured Claim is (a) equal to or less than $1,000,000, or (b) such Holder elects on its Ballot to reduce its Allowed General Unsecured Claim to $1,000,000, a Cash payment (the "GUC Cash Election") equal to (1) if the Pension Plans are assumed by a member of the Rank Group, 19% of the face amount of such Holder's Allowed General Unsecured Claim as of the Effective Date, or (2) if the Pension Plans are not assumed by a member of the Rank Group, 13% of the face amount of such Holder's Allowed General Unsecured Claim as of the Effective Date , provided, however, that if the total amount of Cash payments that would be made to Holders of Allowed General Unsecured Claims pursuant to the GUC Cash Election exceeds $4,500,000 (the "GUC Cash Pool"), each Holder of Allowed General Unsecured Claims making the GUC Cash Election shall receive their Pro Rata Share of the GUC Cash Pool; provided, further, however, that if a Holder of an Allowed General Unsecured Claim votes to reject the Plan, any GUC Cash Election made by such Holder will be invalid.

If an eligible Holder of an Allowed General Unsecured Claim votes to accept the Plan, such Holder may, on such Holder's Ballot, elect the applicable treatment specified in Section 3.2.5(b)(i) or Section 3.2.5(b)(ii). Each such Holder that votes to reject the Plan, does not submit a Ballot or that submits a Ballot but fails to affirmatively elect the treatment set forth in Section 3.2.5(b)(ii) shall be deemed to have elected the treatment specified in Section 3.2.5(b)(i) with respect to its Allowed General Unsecured Claim.

(c)    Voting:  Claims in Class E are Impaired.  Each Holder of an Allowed Claim in Class E shall be entitled to vote to accept or reject this Plan.

3.2.6    Class F:  Convenience Claims

(a)    Classification:  Class F consists of all Convenience Claims.

(b)     Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to Section 7.3 of this Plan, postpetition Interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

(c)     Voting:  Allowed Claims in Class F are Unimpaired, and the Holders of such Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class F are not entitled to vote to accept or reject the Plan; provided, however, that all Claims in Class F shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.7     Class G:  Intercompany Claims.

(a)     Classification:  Class G consists of all Intercompany Claims against the Debtors.

(b)     Treatment:  On the Effective Date, at the option of the Plan Sponsors and the Reorganized Debtors, all Intercompany Claims shall either be (i) Reinstated, in whole or in part, (ii) deemed satisfied, or (iii) discharged and extinguished, in full or in part, and shall be eliminated as of the Effective Date, in whole or in part, in which case such discharged and extinguished portion shall be eliminated and the Holders thereof shall not be entitled to and shall not receive or retain any property or interest on account of such discharged and extinguished portion under this Plan; provided, however, that prior to such discharge and extinguishment such Intercompany Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Debtors and the Plan Sponsors.

(c)     Voting:  Claims in Class G are Unimpaired or are Impaired.  As set forth in Section 4.4, Holders of Intercompany Claims shall be conclusively deemed to have accepted this Plan, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.8     Class H:  Section 510(b) Claims.

(a)     Classification:  Class H consists of all Section 510(b) Claims against the Debtors.

(b)     Treatment:  On the Effective Date, all Section 510(b) Claims shall be discharged and extinguished and the Holders thereof shall not receive or retain any property under this Plan on account of such Section 510(b) Claims.

(c)     Voting:  Claims in Class H are Impaired.  Each Holder of an Allowed Claim in Class H shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.9     Class I:  Interests in UCI and UCI Holdings.

01:21281009.1

(a)      Classification:  Class I consists of all Interests in UCI and UCI Holdings.

(b)      Treatment:  On the Effective Date, all Interests in UCI and UCI Holdings shall be cancelled, annulled, and extinguished and the Holders of such Interests shall not receive or retain any property under this Plan on account of such Interests, subject to the provisions of <u>Section 5.19</u> of the Plan.

(c)      Voting:  Interests in Class I are Impaired.  Each Holder of an Allowed Claim in Class I shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.10      <u>Class J:  Interests in the Subsidiary Debtors</u>.

(a)      Classification:  Class J consists of all Interests in the Subsidiary Debtors.

(b)      Treatment:  On the Effective Date, all Interests in the Subsidiary Debtors shall be Reinstated, subject to the consummation of one or more Restructuring Transactions pursuant to <u>Section 5.7</u>.  Reorganized UCI and the other Reorganized Debtors that are Holders of Interests in the Subsidiary Debtors shall retain, unaltered, the legal, equitable, and contractual rights to which such Interests entitled the Holders thereof immediately prior to the Effective Date.

(c)      Voting:  Interests in Class J are Unimpaired.  Each Holder of an Interest in Class J shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.      <u>Unimpaired Claims and Interests</u>.  Except as otherwise explicitly provided in this Plan, nothing herein shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims or Interests, including, but not limited to, the legal and equitable defenses of setoff or recoupment with respect to the Unimpaired Claims.

**ARTICLE IV:**
**ACCEPTANCE OR REJECTION OF THE PLAN**

4.1.      <u>Impaired Classes of Claims Entitled to Vote on this Plan</u>.  Claims in Class D (Senior Notes Claims) and Class E (General Unsecured Claims) are Impaired, and the Holders of such Claims are entitled to vote to accept or reject this Plan.

4.2.      <u>Acceptance by an Impaired Class of Claims</u>.

4.2.1      Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder whose claims have been designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class

—

have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

        4.2.2        Except for Holders of Claims in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan other than this <u>Section 4.2.2</u>, if Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and such Holders of Claims failed to vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

        4.3.    <u>Presumed Acceptance by Unimpaired Classes</u>.  Classes A (Priority Non-Tax Claims against the Debtors), B (Other Secured Claims against the Debtors), Class C (Prepetition ABL Credit Facility Claims), F (Convenience Claims), and I (Interests in the Subsidiary Debtors) are Unimpaired by this Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted this Plan and therefore shall not be entitled to vote to accept or reject this Plan.

        4.4.    <u>Presumed Acceptance by the Holders of Intercompany Claims</u>.  As proponents of this Plan (or subsidiaries thereof), Holders of Intercompany Claims in Class G are conclusively deemed to accept this Plan and votes shall not be solicited from the Holders of such Claims.

        4.5.    <u>Presumed Rejection by Certain Impaired Classes</u>.  Classes H (Section 510(b) Claims) and I (Interests in UCI Holdings) are Impaired by this Plan.  Holders of Claims and Interests in Class H (Section 510(b) Claims) and Class I (Interests in UCI Holdings) will not receive or retain any property under this Plan on account of such Claims and Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have rejected this Plan and therefore shall not be entitled to vote to accept or reject this Plan.

        4.6.    <u>Confirmability and Severability of this Plan</u>.

        4.6.1    <u>Confirmation</u>.  The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor.  Therefore, notwithstanding the combination of the separate plans of reorganization for all Debtors in this Plan for purposes of, among other things, economy and efficiency, this Plan shall be deemed a separate chapter 11 plan for each such Debtor.

        4.6.2    <u>Reservation of Rights</u>.  The Plan Proponents reserve the right to amend, modify, or supplement this Plan for any reason, including, without limitation, in the event that any separate plan for a particular Debtor is not confirmed.

# ARTICLE V:
## MEANS FOR IMPLEMENTATION OF THE PLAN

        5.1.    <u>Non-Substantive Consolidation</u>.  This Plan is a joint plan that does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan, the Plan Supplement, or the Disclosure Statement shall constitute or be deemed

01:21281009.1

to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, claimants holding Claims against multiple Debtors, to the extent such Claims are Allowed in each Debtor's Chapter 11 Case, will be treated as Holders of separate Claims against each applicable Estate for all purposes (including, but not limited to, voting and distributions); provided, however, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan. Unless otherwise provided by this Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the Cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by the Estate of any the Debtors, at the option of the advancing Debtor.

5.2. <u>Sources of Cash Consideration for Plan Distributions</u>. The Reorganized Debtors shall fund distributions and satisfy applicable Allowed Claims under the Plan with Cash on hand, including Cash from operations, Cash provided pursuant to the New First Lien Credit Facility, the Rights Offering (unless the Debtors and the Plan Sponsors elect not to consummate the Rights Offering), the New Second Lien Exit Facility (if any), and/or the Rank Contribution Election.

5.3. <u>New First Lien Credit Agreement</u>. On the Effective Date, the Reorganized Debtors shall be authorized to enter into the New First Lien Credit Agreement. The New First Lien Lenders shall have valid, binding and enforceable liens on the collateral specified in the New First Lien Credit Agreement. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New First Lien Credit Agreement are granted in good faith as an inducement to the New First Lien Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New First Lien Credit Agreement.

5.4. <u>Rights Offering</u>. Unless the Plan Sponsors and the Debtors elect otherwise, the Debtors shall commence the Rights Offering in accordance with the terms of the Rights Offering Procedures. Notwithstanding anything in this Plan or the Rights Offering Procedures to the contrary, the Debtors may modify the Rights Offering Procedures or adopt additional procedures prior to consummation of the Rights Offering with the consent of the Plan Sponsors. The right to participate in the Rights Offering may not be sold, transferred, or assigned. The closing of the Rights Offering is conditioned upon consummation of the Plan.

5.4.1 <u>Rights Offering Dates.</u> The Rights Offering shall be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures.

5.4.2 <u>Rights Offering Participants</u>. Unless the Debtors and Plan Sponsors elect not to commence and consummate the Rights Offering, each Eligible Party shall be offered the Subscription Rights, pursuant to the Plan and the Rights Offering Procedures. The Subscription Rights shall entitle each holder thereof to purchase its Notes Pro Rata Allocation of the Second Lien Rights Offering Facility and its Rights Offering Stock Pro Rata Allocation for a purchase price equal to the aggregate dollar amount of Second Lien Rights Offering Facility such Eligible Party elects to purchase (the "<u>Subscription Payment Amount</u>"). In accordance with the terms of the Rights Offering Procedures, the Debtors shall deliver a Subscription Form to each Eligible Party to

determine which such parties desire to participate in the Rights Offering. In order to properly exercise a Subscription Right, each Eligible Party shall: (i) return a duly completed and signed Subscription Form to the Subscription Agent so that such form is actually received by such Subscription Agent at or prior to the Election Expiration Time; and (ii) pay to the Subscription Agent (on behalf of the Debtors), at or prior to the Election Expiration Time, the Subscription Payment Amount indicated on such Subscription Form, which payment shall be made by wire transfer in accordance with the wire instructions set forth on the Subscription Form. If, prior to the Election Expiration Time, the Subscription Agent for any reason has not received from an Eligible Party (i) a duly completed and signed Subscription Form, and (ii) such party's Subscription Payment Amount, then such party shall be deemed to have not validly exercised its Subscription Rights and to have relinquished and waived its ability to participate in the Rights Offering.

5.4.3    Backstop Fee. In exchange for providing the Backstop Commitment, whether or not it is called upon, each Backstop Party shall receive its Backstop Fee Share of the Backstop Fee upon the earlier of termination of the Backstop Agreement or the Effective Date, subject to the terms and conditions set forth in the Backstop Agreement.

5.4.4    Refund of Payments. Unless the Debtors and Plan Sponsors elect not to commence and consummate the Rights Offering, once an Eligible Party has properly exercised its Subscription Rights pursuant to its Subscription Form, such exercise cannot be revoked, rescinded or annulled for any reason, without the consent of the Debtors and the Plan Sponsors. In the event the Debtors and Plan Sponsors elect to revoke, withdraw or fail to consummate the Rights Offering or the Plan, or the conditions precedent to the Effective Date shall not have been satisfied in accordance with Section 9.1, the Subscription Agent shall, as soon as reasonably practicable after such revocation, withdrawal or failure to consummate the Rights Offering or the Plan, return to each party that exercised a Subscription Right or paid its Backstop Commitment any payment made by such party pursuant to the Rights Offering or the Backstop Agreement, without interest or deduction.

5.4.5    Distribution of Consideration. Unless the Debtors and Plan Sponsors elect not to commence and consummate the Rights Offering, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall distribute the Second Lien Rights Offering Facility and Rights Offering Stock in accordance with the terms of this Plan and the Rights Offering Procedures to (i) the Eligible Parties that properly exercised their Subscription Rights in accordance with the terms of the Plan and the Rights Offering Procedures and (ii) the Backstop Parties, subject to the terms of the Backstop Agreement.

5.4.6    Second Lien Rights Offering Facility. Unless the Debtors and Plan Sponsors elect not to commence and consummate the Rights Offering, Confirmation of the Plan shall be shall be deemed to constitute approval of the Rights Offering and Second Lien Rights Offering Facility. On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Second Lien Rights Offering Facility Agreement. The Second Lien Rights Offering Facility Lenders shall have valid, binding and enforceable liens on the collateral specified in the Second Lien Rights Offering Facility Agreement. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the Second Lien Rights Offering Facility Agreement are granted in good faith as an inducement to the Second Lien Rights Offering Facility Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or

fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the Second Lien Rights Offering Facility Agreement. The proceeds of the Second Lien Rights Offering Facility shall be used for (i) payment of Allowed Claims and (ii) general corporate purposes.

5.4.7    Rights Offering Stock.  Unless the Debtors and Plan Sponsors elect not to commence and consummate the Rights Offering, on the Effective Date, the Reorganized Debtors shall be authorized to issue the Rights Offering Stock in accordance with the terms of the Plan and the Rights Offering Procedures to (i) the Eligible Parties that properly exercise their Subscription Rights in accordance with the terms of the Plan and the Rights Offering Procedures and (ii) the Backstop Parties, subject to the terms of the Backstop Agreement.

5.5.    New Second Lien Exit Facility.  If, on or prior to the Effective Date, the Debtors and Plan Sponsors elect for the Reorganized Debtors to enter into the New Second Lien Credit Agreement, then, on the Effective Date, the Reorganized Debtors shall be authorized to enter into the New Second Lien Credit Agreement.  The New Second Lien Exit Facility Lenders shall have valid, binding and enforceable liens on the collateral specified in the New Second Lien Credit Agreement.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Second Lien Credit Agreement are granted in good faith as an inducement to the New Second Lien Exit Facility Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New Second Lien Credit Agreement.

5.6.    Rank Contribution Election and Treatment of Pension Plans.

5.6.1    On or before fourteen (14) days following the commencement of solicitation of the Plan, Rank, on behalf of itself and each other member of the Rank Group, may elect to (a) provide the Debtors and/or Reorganized Debtors with agreed upon non-Cash consideration that is acceptable to the Debtors, the Creditors' Committee and the Plan Sponsors and/or pay the Debtors an amount of Cash (which amount may be used (A) for payment of Allowed Claims and (B) general corporate purposes) that is acceptable to the Debtors, the Creditors' Committee and the Plan Sponsors, and (b), become the sponsor of the Pension Plans upon consummation of the Plan ((a) and (b) together, the "Rank Contribution Election").  If Rank, the Debtors, the Plan Sponsors and the Creditors' Committee mutually agree, the Rank Contribution Election may be effectuated pursuant to an Acceptable Settlement subject to approval of the Bankruptcy Court upon a motion pursuant to Bankruptcy Rule 9019.

5.6.2    If the Rank Contribution Election is timely made,

(a)    The Debtors shall either seek approval of (i) the settlement embodied by the Rank Contribution Election in connection with confirmation of the Plan; or (ii) if mutually agreed by the parties thereto, the Acceptable Settlement upon a motion pursuant to Bankruptcy Rule 9019, with a hearing to be held on or prior to the Confirmation Date,

(b)    Each member of the Rank Group and each of their Related Persons (including any former directors or officers of any of the Debtors that are or were Related

Persons of the Rank Group) shall receive releases under this Plan to the extent permitted by applicable law, which releases may be (i) in addition to any releases contained in any Acceptable Settlement and (ii) set forth in Exhibit 5.6.2, to be filed with the Plan Supplement,

(c)     The Debtors and each of their Related Persons shall be deemed to have received releases from each member of the Rank Group and each of their Related Persons to the extent permitted by applicable law, which releases may be (i) in addition to any releases contained in any Acceptable Settlement and (ii) shall be set forth in Exhibit 5.6.2, to be filed with the Plan Supplement, provided, that neither any Prepetition ABL Credit Facility Claim nor any other Claim in respect of which any member of the Rank Group or any of their Related Persons shall have timely filed a proof of claim shall be released except to the extent provided in the Acceptable Settlement.

(d)     Holders of General Unsecured Claims that make a valid GUC Cash Election shall be entitled to receive a Pro Rata Share (together with Senior Notes Claims in Class D)  of any Cash consideration provided by Rank pursuant to the Rank Contribution Election,

(e)     Each Debtor that is a sponsor of the Pension Plans shall resign as a sponsor of the Pension Plans, and the Debtors, Reorganized Debtors, and their respective subsidiaries shall be released from any liability on account of the Pension Plans in a manner satisfactory to the Plan Proponents, or, in the absence of a release, one or more members of the Rank Group will indemnify the Reorganized Debtors and their subsidiaries for any liability on account of the Pension Plans under a control group theory or otherwise, which indemnity shall be satisfactory in form and substance to the Plan Proponents, and

(f)     Approval of the Acceptable Settlement by a final, non-appealable order of the Bankruptcy Court shall be a condition of the occurrence of the Effective Date (as such condition may be waived by the Plan Proponents and Rank, pursuant to Section 9.2 of this Plan).

5.6.3     If the Rank Contribution Election is not made, (i) the Debtors or the Reorganized Debtors, as applicable, shall seek to terminate the Pension Plans if not otherwise terminated in accordance with applicable law, and any resulting termination liability shall be treated as a Class E General Unsecured Claim and (ii) Claims against each member of the Rank Group and each of their Related Persons shall be Preserved Causes of Action.

5.7.     Restructuring Transactions.  On or as soon as reasonably practicable after the Effective Date, any Reorganized Debtor may enter into Restructuring Transactions and may take such actions as may be necessary or appropriate to effect such Restructuring Transactions, as may be determined by such Reorganized Debtor to be necessary or appropriate.  The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable

29

law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of all or certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as may be necessary or appropriate to effectuate Restructuring Transactions that satisfy the requirements set forth in this Section 5.7.

   5.8.  Issuance and Distribution of New Securities.

     5.8.1   Issuance of New Securities.  On the Effective Date, Reorganized UCI shall issue for distribution in accordance with the terms of this Plan the New Common Stock.  Subject to the terms of the Shareholders Agreement, the New Common Stock shall not be transferable to Rank or any of its Related Persons, provided, that, nothing in this Section 5.8.1 shall prohibit Rank or any of its Related Persons from receiving New Common Stock as part of any distribution pursuant to the Plan to which Rank or any its Related Persons is otherwise entitled to receive as Holder of an Allowed Claim.  The New Common Stock and the Rights Offering Stock shall be issued with any and all instruments, certificates and other documents required to be issued pursuant to this Plan in order to effect such issuance and distribution without further act or action under applicable law, regulation, order or rule.  The issuance and distribution of the New Common Stock and Rights Offering Stock, if any, under or in connection with this Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable bankruptcy law and non-bankruptcy law, including, without limitation, section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.  In the event the Debtors and the Plan Sponsors determine that a Shareholders Agreement will be executed and delivered in connection with the Plan, upon receipt of its portion of the New Common Stock issued pursuant to the Plan and/or the Rights Offering, each recipient of New Common Stock shall be deemed to have executed, as of the Effective Date, the Shareholders Agreement.

     5.8.2     Distribution of New Securities.  The New Common Stock shall be distributed to the Holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, Eligible Parties that properly exercised their Subscription Rights in accordance with the terms of the Plan and the Rights Offering Procedures (unless the Debtors and the Plan Sponsors elect not to consummate the Rights Offering), and Backstop Parties as provided in Section 3.2.4(c), Section 3.2.5(b), Section 5.4.6(i), and Section 5.4.6(ii) respectively; provided, however, that distribution of

the Rights Offering Stock shall be subject to (a) the terms and conditions set forth in Section 5.4, including the Rights Offering Procedures, and (b) the terms of the Backstop Agreement if the recipient is a party to the Backstop Agreement.  Distribution of the New Common Stock may be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable.  In connection with such book-entry exchange, the Disbursing Agent(s) shall deliver instructions to the DTC instructing the DTC to effect distributions of New Common Stock and Rights Offering Stock as provided under this Plan.  In the period pending distribution of the New Common Stock to any Holder of Allowed Senior Notes Claims and Allowed General Unsecured Claim, such Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Holder's New Common Stock and to exercise all other rights in respect of the New Common Stock (so that such Holder shall be deemed for tax and all other purposes to be the owner of the New Common Stock).

   5.9. Corporate Governance, Directors, Officers and Corporate Action.

     5.9.1 Certificate of Incorporation; By-Laws; Limited Liability Company Agreements.  On the Effective Date, the Certificate of Incorporation and the By-Laws substantially in the form of Exhibit 1.26 and Exhibit 1.24, respectively, to be included with the Plan Supplement, shall go into effect.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, on the Effective Date, the Certificate of Incorporation shall be amended to prohibit the issuance of non-voting equity securities.  The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

     5.9.2 Directors and Officers of Reorganized UCI.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial directors and officers of Reorganized UCI shall be selected by the Plan Sponsors, in consultation with the Creditors' Committee, and identified prior to the Confirmation Hearing; provided, however, that any Holder of a General Unsecured Claim that, if allowed, would hold in excess of fifteen percent (15%) of the New Common Stock as of the Effective Date shall have the ability to object to the composition of the new board at the Confirmation Hearing.  After the Effective Date, the Certificate of Incorporation and the By-Laws, as each may be amended thereafter from time to time, shall govern the designation and election of directors.

     5.9.3 Directors and Managers or Officers of the Reorganized Debtors Other than Reorganized UCI.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial directors and managers or officers of the Reorganized Debtors other than Reorganized UCI shall be selected by the Plan Sponsors, in consultation with the Creditors' Committee, and identified prior to the Confirmation Hearing.  After the Effective Date, the certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable,

of the Reorganized Debtors other than Reorganized UCI, as each may be amended thereafter from time to time, shall govern the designation and election of directors.

              5.9.4      <u>Corporate Action</u>.  On the Effective Date, (i) the implementation of the Restructuring Transactions, (ii) the selection of directors and officers for Reorganized UCI and each other Reorganized Debtor, (iii) the incurrence of the New First Lien Exit Facility, Second Lien Rights Offering Facility, if any, and New Second Lien Exit Facility, if any, (iv) the issuance and distribution of the New Common Stock and Rights Offering Stock, and (v) all other actions contemplated by this Plan shall be deemed authorized and approved in all respects (subject to the provisions of this Plan).  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors.  On and after the Effective Date, the appropriate officers of Reorganized UCI and/or the other Reorganized Debtors and members of the boards of directors or managers of Reorganized UCI and/or the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of Reorganized UCI and/or the other Reorganized Debtors.

           5.10.   <u>Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors</u>.  On and after the Effective Date, after giving effect to each of the Restructuring Transactions contemplated under this Plan,  each of the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdiction in which they are formed and pursuant to their respective certificates or articles of incorporation (or similar organizational documents) and by-laws in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation (or similar organizational documents) and by-laws are to be amended and/or restated pursuant to the terms of this Plan.  Notwithstanding anything to the contrary in this Plan, the Reinstated Claims against and Interests in a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor following the Effective Date and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided under this Plan (including as specifically contemplated by the Restructuring Transactions), all property of the respective Estate of each Debtor, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to this Plan, shall revest in the applicable Reorganized Debtor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and Interests. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules.  As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens and non-Reinstated Claims and Interests, except as specifically provided in this Plan or the Confirmation Order.

           5.11.   <u>Cancellation of Certain Credit and Debt Documents</u>.  On the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan and except as otherwise provided herein, all (a) Prepetition ABL Credit Facility Documents, Senior Unsecured

Notes, and any other instruments, documents, plans or agreements evidencing or creating any indebtedness or obligations of a Debtor related thereto shall be cancelled, and (b) the obligations of any of the Debtors under any Prepetition ABL Credit Facility Documents, Senior Unsecured Notes, or any other agreements evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests related thereto shall be discharged pursuant to Section 10.2; provided, however, that the Senior Unsecured Notes Indenture shall continue in effect solely for purposes of (i) allowing Senior Noteholders to receive distributions under the Plan, (ii) preserving the Senior Unsecured Notes Indenture Trustee's right to compensation and indemnification under the Senior Unsecured Notes Indenture as against any money or property distributable to Senior Noteholders, including without limitation, permitting the Senior Unsecured Notes Indenture Trustee to maintain, enforce and exercise its charging lien against such distributions, and (iii) permitting the Senior Unsecured Notes Indenture Trustee to enforce any obligation owed to it under the Plan.

5.12.    Cancellation of Liens.  Except as otherwise provided in this Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan, all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition ABL Credit Facility Documents, but excluding any Lien securing an Other Secured Claim that is Reinstated pursuant to this Plan, shall be terminated, null and void and of no effect.  The Holders of Secured Claims (other than Other Secured Claims that are Reinstated pursuant to this Plan) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

5.13.    Payment of Indenture Trustee Allowed Fees.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable Senior Unsecured Notes Indenture Trustee Fees that are required to be paid under the Senior Unsecured Notes Indenture, without the need for the Senior Unsecured Notes Indenture Trustee to file a fee application with the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors shall pay in Cash all Senior Unsecured Notes Indenture Trustee Fees, including, without limitation, all Senior Unsecured Notes Indenture Trustee Fees incurred in connection with distributions to the Senior Unsecured Notes Noteholders. Nothing in this Section 5.13 shall in any way affect or diminish the right of the Senior Unsecured Notes Indenture Trustee to exercise any charging lien against distributions to Holders of Senior Unsecured Notes Claims with respect to any unpaid Senior Unsecured Notes Indenture Trustee Fees, as applicable.

5.14.    Preservation of Rights of Action and Settlement of Ordinary Litigation Claims and Preserved Causes of Action.  Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Estates shall retain the Ordinary Litigation Claims and the Preserved Causes of Action.  The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Ordinary Litigation Claims, Preserved Causes of Action, or any other claims, rights of action, suits or proceedings that

33

any Debtor or Estate may hold against any Person.  If the Rank Contribution Election is made, the Preserved Causes of Action shall be released.

5.15.    Registration of New Common Stock.  On the Effective Date, the New Common Stock and Rights Offering Stock shall not be listed for public trading on any securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act of 1934, and the Reorganized Debtors shall not be required to file reports with the SEC or any other governmental entity.

5.16.    Additional Transactions Authorized Under this Plan.  On or prior to the Effective Date, the Debtors, with the consent of the Plan Sponsors shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Interests or render Claims or Interests not Impaired, as provided for under this Plan.

5.17.    Release of Certain Avoidance Actions. On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all Avoidance Actions that may be asserted against any UCI Trade Creditor.

5.18.    Comprehensive Settlement of Claims and Controversies.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests (i) of the Debtors, the Reorganized Debtors and their respective Estates and property, and (ii) Claim and Interest holders, and are fair, equitable and reasonable.

5.19.    Dissolution of UCI Holdings.  As soon as reasonably practicable following the Effective Date, UCI Holdings may be liquidated, dissolved, administered, restructured or otherwise wound up under applicable law and procedure, at the discretion of the Debtors, the Reorganized Debtors and the Plan Sponsors.

5.20.    Environmental Obligations.  On the Effective Date of the Plan, Reorganized Airtex shall be responsible and liable, to the extent required by and in accordance with applicable law, for conducting, and agrees to conduct, in a timely manner, any and all environmental investigation and remediation in accordance with and to the extent required by all applicable Environmental Laws, arising out of, related to, or originating from or at (i) the property located at 407 West Main Street, Fairfield, Illinois including both land and buildings, and with buildings comprising approximately 150,000 square feet, (ii) the property located at 800 Leininger Road, Fairfield, Illinois including both land and buildings and with land comprising approximately 40 acres and (iii) other real property that Airtex now owns or operates, or formerly owned or operated, in Fairfield, Illinois  (the "Environmental Obligations").

A portion of the costs and expenses of the Environmental Obligations shall be paid through a segregated and restricted account with such funds to be held in trust for use as provided herein (the "Environmental Obligations Account").  On the Effective Date, the Environmental Obligations Account shall be funded in an initial amount equal to $250,000.00, by any or all of the following sources: (i) cash and revenues from the business operations of Airtex or Reorganized Airtex (as applicable); (ii) cash and revenues from the business operations of Airtex affiliates or Reorganized Airtex affiliates (as applicable); (iii) the New First Lien Exit Facility; and (iv) any other sources available to Airtex or Reorganized Airtex (as applicable).  Nothing herein shall limit Reorganized Airtex's financial obligations in respect of the Environmental Obligations to the amount in the Environmental Obligations Account.

Reorganized Airtex shall provide to the USEPA, the IEPA and the City of Fairfield quarterly status reports on the status and scope of the Environmental Obligations and updated estimates of the amounts required to pay for the Environmental Obligations in the next calendar quarter and in total until completion thereof.  Reorganized Airtex shall provide such estimated additional funds to the Environmental Obligations Account on a quarterly basis in the amount of the costs of the Environmental Obligations estimated to be incurred in the next calendar quarter.  All such estimates shall be subject to the review and comment of USEPA, IEPA and the City of Fairfield, and all rights and disagreements, if any, with respect to the quarterly status reports and the cost estimates included therein are reserved by Airtex, USEPA, IEPA and the City of Fairfield.  Any excess funds in the Environmental Obligations Account remaining after performance of all of the Environmental Obligations shall be returned to Reorganized Airtex.

All of the revenues and profits derived from the sale of Reorganized Airtex fuel pumps and related products and services sold in the United States shall be recognized in the financial statements of Reorganized Airtex and its affiliates as Reorganized Airtex revenues and profits.

Nothing herein shall limit Reorganized Airtex's obligations to provide financial assurance under applicable Environmental Laws.

## ARTICLE VI:
## TREATMENT OF EXECUTORY CONTRACTS,
## UNEXPIRED LEASES, INSURANCE POLICIES AND EMPLOYEE BENEFIT PLANS

6.1.    Assumption of Executory Contracts and Unexpired Leases.  On the Effective Date, all Executory Contracts or Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, attached hereto as Exhibit 6.1.2, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected by the relevant Debtor(s), (ii) previously expired or terminated pursuant to its own terms, (iii) is subject to a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (iv) is subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (v) is identified on the Rejected Executory Contract and Unexpired Lease List, attached hereto as Exhibit 6.1, in form and substance acceptable to the Debtors and the Plan Sponsors (which shall not be unreasonably withheld, conditioned or delayed); provided, however, that, notwithstanding any such

assumption, the A&R Letter Agreement and Letter Agreement Order shall each remain in full force and effect, and no party's rights under any agreement affected by either the A&R Letter Agreement or Letter Agreement Order shall be expanded or reduced by this Plan or the Confirmation Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assignments and/or assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to this <u>Article VI</u>, which has not been assigned to a third party before the Effective Date, shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Plan Sponsors, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including forty-five (45) days after the Effective Date.

6.2.    <u>Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases</u>. Any monetary amounts by which each Executory Contract and Unexpired Lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the Executory Contract or Unexpired Lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, at least ten (10) days prior to the Voting Deadline, the Debtors shall cause notice of proposed assumption and proposed Cure Obligations to be sent to applicable counterparties. Any objection by such counterparty must be Filed, served, and actually received by the Debtors not later than fourteen (14) days after service of notice of the Debtors' proposed assumption and associated Cure Obligations. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Obligation.

6.3.    <u>Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases</u>. Unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to this Plan or otherwise must be filed with the Claims, Noticing, and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. Any proofs of claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the

36

01:21281009.1

Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of claim to the contrary. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

6.4.    Assumption of Collective Bargaining Agreements.  All Collective Bargaining Agreements shall be deemed to have been assumed by the applicable Debtor(s) party thereto upon the occurrence of the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the pertinent Reorganized Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

6.5.    Insurance Policies and Agreements.  Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements are considered to be Executory Contracts, this Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy.

6.6.    Management Equity Incentive Plan.  On or after the Effective Date, the new board of directors of Reorganized UCI shall adopt and implement the Management Equity Incentive Plan, the principal terms of which are set forth on Exhibit 6.5, to be filed with the Plan Supplement. The Management Equity Incentive Plan shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing up to 5% of the New Common Stock.

6.7.    Employee Compensation and Benefit Plans.  From and after the Effective Date, each of the Reorganized Debtors shall continue to perform its obligations (whether statutory or contractual) under all employment and severance contracts assumed on or before the Effective Date and all Employee Benefit Plans applicable to its employees, retirees and non-employee directors, including, without limitation, the payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, that such Reorganized Debtor had the obligation to pay and was paying prior to the Petition Date, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code at any time prior to the Confirmation Date, for the duration of the period (if any) that the applicable Reorganized Debtor(s) are obligated to provide such benefits.  For the avoidance of doubt, the Pension Plans shall be treated as set forth in Section 5.6.

6.8.    <u>Postpetition Contracts and Leases</u>.  All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

# ARTICLE VII:
## PROVISIONS GOVERNING DISTRIBUTIONS

7.1.    <u>Distributions on Account of Claims Allowed as of the Effective Date</u>.  Unless the Holder of an Allowed Claim and the Debtors or the Reorganized Debtors agree to a different Distribution Date and except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.2.    <u>Distributions on Account of Claims that Become Allowed after the Effective Date</u>.  Unless the Holder of a Claim that becomes an Allowed Claim after the Effective Date and the Reorganized Debtors agree to a different Distribution Date and except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions on account of Claims that become Allowed Claims after the Effective Date shall be made on the succeeding Quarterly Distribution Date after such Claim becomes Allowed.

7.3.    <u>Interest on Claims</u>.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims (other than Secured Claims), and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim (other than Secured Claims).

7.4.    <u>Distributions by Disbursing Agent(s)</u>.  Other than as specifically set forth in this Plan, the Disbursing Agent(s) shall make all distributions required to be made under this Plan.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other Entities to assist in or make the distributions required by this Plan.

7.5.    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.  The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Claims.

7.5.1    <u>Delivery of Distributions in General</u>.  Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records.

7.5.2    <u>Delivery of Distributions to Holders of Prepetition ABL Credit Facility Claims and Holders of Senior Notes Claims</u>.  Other than as specifically set forth in this Plan, (i) distributions made on account of Allowed Prepetition ABL Credit Facility Claims shall be made by the Disbursing Agent to the Prepetition Administrative Agent for further distribution to the Holders of such Claims in accordance with the terms of the Prepetition ABL Credit Facility Agreement and (ii) distributions made on account of Allowed Senior Notes Claims shall be made by the Disbursing Agent to or at the direction of the Senior Unsecured Notes Indenture Trustee for further distribution to the Holders of such Claims in accordance with the terms of the Senior

Unsecured Notes Indenture.  The Senior Unsecured Notes Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC.

        7.5.3        <u>Undeliverable and Unclaimed Distributions</u>.

        (a)        <u>Holding and Investment of Undeliverable and Unclaimed Distributions</u>.  If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent(s) as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent(s) are notified in writing of such Holder's then-current address.

        (b)        <u>Non-Negotiated Check Distributions</u>. Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period.  After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

        (c)        <u>Failure to Claim Undeliverable Distributions</u>.  Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Common Stock held for distribution on account of such Claim shall be canceled and of no further force or effect.  Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, any of the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim.

        7.6.        <u>Record Date for Distributions</u>.  The Reorganized Debtors and the Disbursing Agent(s) will have no obligation to but may, in their sole and absolute discretion, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

        7.7.        <u>Allocation of Plan Distributions Between Principal and Interest</u>.  To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.8.    <u>Means of Cash Payment</u>.  Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfers from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.9.    <u>Withholding and Reporting Requirements</u>.  In connection with this Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  No distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

7.10.    <u>Setoff and Recoupment</u>.  The Reorganized Debtors may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that any of the Debtors or the Reorganized Debtors may have against the Holder of such Claim; <u>provided</u>, <u>however</u>, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by any of the Reorganized Debtors of any claim that any of the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

7.11.    <u>Fractional Securities</u>.  No fractional securities shall be distributed.  Where a fractional security would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock (or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock.  The total number of shares of New Common Stock and the total number of Rights Offering Stock to be distributed pursuant to this Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.12.    <u>De Minimis Distributions</u>.  No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

## ARTICLE VIII:
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

8.1.    <u>Objection to and Estimation of Claims</u>.  After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.

40

After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim.

8.2.    <u>No Distributions Pending Allowance</u>.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

8.3.    <u>Distributions on Account of Disputed Claims Once They Are Allowed</u>.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent(s) shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any post-Effective Date interest to be paid on account of such Claim.

8.4.    <u>Reinstated Claims and Interests</u>.  Notwithstanding anything contained herein to the contrary, nothing shall affect, diminish or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Interest, including, but not limited to, legal and equitable rights of setoff and/or recoupment against the Holders of any Reinstated Claims.

8.5.    <u>Disputed Claims Reserve(s)</u>.

8.5.1    <u>Administrative Expense Reserve(s)</u>.  On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall create the Administrative Expense Reserve(s). The amount of Cash contributed by the Reorganized Debtors to the Administrative Expense Reserve(s) shall be the amount equal to the Reorganized Debtors' reasonable estimate of Cash required to satisfy distributions to Holders of Disputed Administrative Expense Claims and Holders of Allowed Administrative Claims that are not due and payable on the Effective Date Date (unless such Allowed Administrative Claims are due and payable in the ordinary course of business). In the event a Disputed Administrative Expense Claim becomes an Allowed Claim after the Effective Date or an Allowed Administrative Claim becomes due and payable following the Effective Date, the Disbursing Agent shall, out of the Administrative Expense Reserve(s), distribute to the Holder thereof the distribution, if any, to which such Holder is entitled in accordance with <u>Article VII</u>. After all Administrative Expense Claims have become either Allowed Claims or Disallowed Claims and all distributions to which such Holders are entitled have been made in accordance with <u>Article VII</u>, the Disbursing Agent shall, at the direction of the Reorganized Debtors, distribute any Cash remaining in the Administrative Expense Reserve(s) to the Reorganized Debtors.

8.5.2    <u>Disputed Unsecured Claims Reserve(s)</u>.  On or as soon as reasonably practicable after the Initial Distribution Date, the Reorganized Debtors shall establish the Disputed

Unsecured Claims Reserve(s) to make distributions to the Holders of Disputed General Unsecured Claims that become Allowed Claims after the Effective Date, including any filed or anticipated rejection damages claims.  The amount of Cash and New Common Stock contributed to the Disputed Unsecured Claims Reserve(s) shall be equal to the Reorganized Debtors' reasonable estimate of the sum of (i) the amount of New Common Stock that would have been distributed to the Holders of Disputed General Unsecured Claims electing to receive the treatment set forth in Section 3.2.5(b)(i) if such Disputed Claims had been Allowed on the Effective Date and (ii) an amount of Cash that would have been distributed to Holders of Disputed General Unsecured Claims electing the treatment set forth in Section 3.2.5(b)(ii) if such Disputed Claims had been Allowed on the Effective Date.  To the extent that the Disputed Unsecured Claims Reserve(s) is based on the amount of any Disputed Claim that is less than the amount of the proof of claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors shall file a list of such affected Disputed Claims with the Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan.  To the extent that the Disputed Unsecured Claims Reserve(s) incorporates rejection damages claims arising from the rejection of any Executory Contracts or Unexpired Leases under the Plan, the Debtors shall, at such time as they file a motion to reject such Executory Contract or Unexpired Lease, identify the amount of the Disputed Unsecured Claims Reserve(s) allocated for the putative Rejection Damages Claims arising from the rejection of such Executory Contracts or Unexpired Leases.  Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court sustaining such objection, the Debtors' estimation of each Disputed Claim for purposes of the Disputed Unsecured Claims Reserve(s) for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim, once Allowed, than the pro rata distribution it would have received based on the Debtors' estimation.  Shares of the New Common Stock held in the Disputed Unsecured Claims Reserve(s) pending the resolution of all Disputed Claims shall be deemed to have been voted in the same proportion as the shares of New Common Stock issued on the Initial Distribution Date.  Any transfer or surrender of shares out of the Disputed Unsecured Claims Reserve(s) shall be accompanied by any distributions or proceeds received in respect of such shares while in the Disputed Unsecured Claims Reserve(s).

        8.5.3        <u>Distribution After Allowance</u>. In the event a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will, out of the Disputed Unsecured Claims Reserve(s), distribute to the Holder thereof the distribution, if any, to which such Holder is entitled in accordance with <u>Article VII</u>, <u>provided</u>, that if a Disputed Claim that subsequently becomes an Allowed Claim has already been satisfied in full or in part (whether through insurance or another source of recovery), then the distribution to the Holder for the Allowed Claim shall be reduced by the amount of such recovery.  After all Disputed General Unsecured Claims have become either Allowed Claims or Disallowed Claims and all distributions to which such Holders are entitled have been made in accordance with <u>Article VII</u>, the Disbursing Agent shall, at the direction of the Reorganized Debtors (i) distribute any Cash remaining in the Disputed Unsecured Claims Reserve(s) to the Reorganized Debtors and (ii) cancel any New Common Stock remaining in the Disputed Unsecured Claims Reserve(s).

## ARTICLE IX:
## CONFIRMATION AND CONSUMMATION OF THE PLAN

9.1.    <u>Conditions to Effective Date</u>.  This Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with <u>Section 9.2</u> of this Plan:

9.1.1    The Confirmation Order confirming this Plan shall have been entered by the Bankruptcy Court and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

9.1.2    The aggregate cash payments on account of Allowed General Unsecured Claims under the Plan shall not exceed $4.5 million.

9.1.3    The New First Lien Exit Facility shall be consummated, and, if pursued, the New Second Lien Exit Facility or the Second Lien Rights Offering Facility shall be consummated.

9.1.4    If the Rank Contribution Election is made, (a) the Bankruptcy Court shall have entered a Final Order, acceptable to Rank and the Plan Proponents, approving the Acceptable Settlement under Bankruptcy Rule 9019, (b) Rank shall have: (i) paid the Reorganized Debtors an amount (which amount may be used (A) for payment of Allowed Claims and (B) general corporate purposes) and/or provided non-cash consideration, in each case that is acceptable to the Plan Proponents, and (ii) become the sponsor of the Pensions, and (c) UCI shall have resigned as sponsor of the Pensions, and UCI and Reorganized UCI (including all subsidiaries) shall have been released from any liability on account of the Pensions in a manner satisfactory to the Plan Proponents, or, in the absence of a release, Rank or an affiliate, shall have indemnified Reorganized UCI and its subsidiaries for any liability on account of the Pensions under a control group theory or otherwise, which indemnity shall be satisfactory in form and substance to the Plan Proponents.

9.1.5    All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors in the discretion of the Reorganized Debtors and the Plan Sponsors.

9.1.6    The Pension Plans shall have either been (a) assumed by a member of the Rank Group, or (b) terminated in accordance with applicable law.

9.2.    <u>Waiver of Conditions</u>.  Each of the conditions set forth in <u>Section 9.1</u> of this Plan may be waived in whole or in part by the Plan Proponents after notice to the Bankruptcy Court and parties in interest but without the need for a hearing, <u>provided</u>, <u>that</u>, the condition set forth in Section 9.1.4(a) may only be waived in whole or in part by the Plan Proponents and Rank, collectively, and (b) the condition set forth in <u>Section 9.1.6</u> may only be waived in whole or in part by the Debtors and the Plan Sponsors, collectively.

01:21281009.1

9.3.    <u>Vacatur of Confirmation Order</u>.  If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

9.4.    <u>Notice of Effective Date</u>.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in <u>Section 9.1</u> of this Plan have been satisfied or waived pursuant to <u>Section 9.2</u> of this Plan.

**ARTICLE X:**
**EFFECT OF PLAN CONFIRMATION**

10.1.    <u>Binding Effect</u>.  On the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims against and Interests in each of the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan, and all other parties that are affected in any manner by this Plan.  All agreements, instruments and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

10.2.    <u>Discharge</u>.

10.2.1    <u>Discharge of Claims and Termination of Interests</u>.  Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Interests (other than Unimpaired Claims that are Allowed and Unimpaired Interests) of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests.  On the Effective Date, the Debtors shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims and Interests (other than Unimpaired Claims that are Allowed and Unimpaired Interests), including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, Prepetition ABL Credit Facility Claims, Senior Notes Claims, General Unsecured Claims, and Interests in UCI and UCI Holdings.

10.2.2    <u>Discharge Injunction</u>.  As of the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors and their respective assets, property and

44

Estates, any other or further Claims (other than those Reinstated under this Plan), or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in this Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability.

10.3.    **Releases by the Debtors. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and causes of action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, their respective assets, property and Estates, the Chapter 11 Cases, this Plan, the Plan Supplement or the Disclosure Statement that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates against any of the Released Parties; _provided_, _however_, that nothing in this Section 10.3 shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order. For the avoidance of doubt, no member of the Rank Group or any of its Related Persons shall be Released Parties unless the Rank Contribution Election is made.**

10.4.    **Releases by Certain Holders of Claims. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Holder of a Claim or an Interest that (i) votes to accept or is deemed to accept the Plan or (ii) is entitled to vote to accept or reject the Plan and returns a Ballot by the Voting Deadline, but does not expressly opt out of the release by marking the Ballot indicating his/her/its refusal to grant such release, shall be deemed to have completely and forever released, waived, and discharged unconditionally each of the Released Parties and their respective Related Persons of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or**

**part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases, this Plan, the Plan Supplement, and/or the Disclosure Statement; <u>provided</u>, <u>however</u>, that (i) each Holder of a Claim that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in this <u>Section 10.4</u> and (ii)  nothing in this <u>Section 10.4</u> shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order.  For the avoidance of doubt, no member of the Rank Group or any of its Related Persons shall receive any release under this Section 10.4 unless the Rank Contribution Election is made.**

      10.5.    <u>Exculpation</u>.  From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing this Plan, the Plan Supplement, and/or the Disclosure Statement, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, the administration of this Plan, the property to be distributed under this Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or implementation of this Plan; <u>provided</u>, <u>however</u>, that this <u>Section 10.5</u> shall not apply to release (x) obligations under this Plan, and obligations under the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under this Plan, and (y) any claims or causes of action arising out of willful misconduct or gross negligence as determined by a Final Order.  Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under this Plan.

      Notwithstanding the foregoing, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Plan Sponsors and all of their Related Persons, shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

      Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under this Plan. For the avoidance of doubt, no member of the Rank Group or any of its Related Persons shall be Released Parties unless the Rank Contribution Election is made.

      10.6.    <u>Injunction Related to Exculpation</u>.  Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, of the types described in <u>Section 10.5</u> of this Plan and relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and/or Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on

account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1 of this Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.  For the avoidance of doubt, no member of the Rank Group or any of its Related Persons shall be considered Released Parties and receive the benefit of any injunction under this Section 10.6 unless the Rank Contribution Election is made.

10.7.   Survival of Indemnification Obligations.  The obligations of the Debtors to indemnify any past and present directors, officers, agents, employees and representatives who provided services to the Debtors on or after the Petition Date, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based upon any act or omission related to service with, for or on behalf of the Debtors, shall not be discharged or impaired by Confirmation or consummation of this Plan and shall be assumed by the Reorganized Debtors (other than any obligations of the Debtors' to indemnify members of the Rank Group and their Related Persons if the Rank Contribution Election is not made).  If the Rank Contribution Election is not made, the Debtors shall honor any obligations to indemnify members of the Rank Group and their Related Persons solely for services provided to the Debtors on or after the Petition Date solely to the extent a member claiming indemnity has filed a proof of claim against the Debtors' Estates on account of such indemnification obligations on or before September 30, 2016 and such claim is an Allowed Claim and is not subordinated; provided, that the Debtors or Reorganized Debtors, as applicable, reserve all rights to seek disallowance of such filed claims on any basis, including but not limited to, the basis that such claims relate to prepetition services or conduct.  For the avoidance of doubt, this Section 10.7 affects only the obligations of the Debtors and Reorganized Debtors with respect to any indemnity owed to or for the benefit of past and present directors, officers, agents, employees and representatives of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person, including any provider of director and officer insurance, owed to or for the benefit of such past and present directors, officers, agents, employees and representatives of the Debtors.

10.8.   Term of Bankruptcy Injunction or Stays.  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

10.9.   Liability to Governmental Units.  Nothing in the Confirmation Order or the Plan discharges, releases, resolves, precludes, exculpates, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) (a "Governmental Unit") that is not a "claim"

as defined in 11 U.S.C. § 101(5); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date ; (iii) any police or regulatory liability to a Governmental Unit to the extent of such entity's liability under non-bankruptcy law on account of its status as the owner or operator of property after the Confirmation Date ; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors. For the avoidance of doubt, the foregoing shall not limit the scope of discharge of all Claims and Equity Interests arising prior to the Effective Date under sections 524 and 1141 of the Bankruptcy Code. Nor shall anything in the Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the first sentence of this <u>Section 10.9</u>; *provided*, *however*, that the Bankruptcy Court retains jurisdiction, to determine whether or not any such asserted liability described in the first sentence of this <u>Section 10.9</u> is a Claim. Nothing in the Confirmation Order or the Plan authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under Environmental Law. Nothing in the Confirmation Order or the Plan shall affect any setoff or recoupment rights of any Governmental Unit.

## ARTICLE XI:
## RETENTION OF JURISDICTION

11.1.    <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim, and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    resolve any matters related to the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(d)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(e)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order, and issue injunctions, enter and implement other orders, or take such other

actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

(f)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

(g)    approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(h)    subject to Section 13.2, hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to an order of the Bankruptcy Court;

(i)    hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

(j)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

(l)    determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(m)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n)    hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

(o)    hear and determine (i) all Ordinary Litigation Claims and (ii) all Preserved Causes of Action;

49

        (p)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

        (q)      enter an order closing the Chapter 11 Cases.

## ARTICLE XII:
## MISCELLANEOUS PROVISIONS

        12.1.   <u>Surrender of Instruments</u>.  As a condition to participation in distributions under this Plan, each Senior Noteholder and the Holder(s) of any evidence of indebtedness of the Debtors relating to a non-Reinstated Claim that desires to receive the property to be distributed on account of an Allowed non-Reinstated Claim based on such Senior Unsecured Note or evidence of indebtedness shall surrender such Senior Unsecured Note or evidence of indebtedness to the Debtors, or their designee, and shall execute and deliver such other documents as are necessary to effectuate this Plan; <u>provided</u>, <u>however</u>, that if a claimant is a Holder of a Senior Unsecured Note or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the Senior Unsecured Notes Indenture Trustee may waive the requirement of surrender.  Except as otherwise provided in this <u>Section 13.1</u>, if no surrender of a Senior Unsecured Note or evidence of indebtedness relating to a non-Reinstated Claim occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such Senior Unsecured Note or evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such security, note, debenture or evidence of indebtedness thereof.  The Debtors shall make subsequent distributions only to the persons who surrender Senior Unsecured Notes or evidence of indebtedness, as applicable, for exchange (or their assignees) and the record holders of such Senior Unsecured Notes or other indebtedness shall be those holders of record as of the Distribution Record Date.

        12.2.   <u>Post-Confirmation Date Retention of Professionals</u>.  On the Effective Date, any requirement that Professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for application to or approval by the Bankruptcy Court.

        12.3.   <u>Bar Date for Certain Administrative Expense Claims</u>.  All applications for final allowance of compensation or reimbursement of expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in the Chapter 11 Cases (but excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in <u>Section 12.3</u> of this Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any request for the payment of an Administrative Expense Claim that is not timely filed and served may be discharged and forever barred and the Holder of such Administrative Expense Claim

may be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim.  The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

12.4.    Effectuating Documents and Further Transactions.  Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and the New Common Stock issued under or in connection with to this Plan.

12.5.    Corporate Action.  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or organized without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

12.6.    Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

12.7.    Payment of Statutory Fees.  All fees due and payable pursuant to section 1930(a)(6) of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtor shall be jointly and severally liable for any and all Quarterly Fees when they are due and payable after the Effective Date.  The Debtors shall file all Quarterly Reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court Quarterly Reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtors during the applicable period, attested to by an authorized representative of the Reorganized Debtors. The Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of the Debtors' case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

12.8.    Creditors' Committee.  On the Effective Date, the Creditors' Committee shall dissolve without need for a further order of the Bankruptcy Court; provided, however, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (ii) appeals of the Confirmation Order as to which the Creditors' Committee is a party.  Upon dissolution of the Creditors' Committee, the members thereof and their respective

01:21281009.1

officers, employees, counsel, advisors, and agents shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided, further, however, that obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Debtors and the Reorganized Debtors shall have no obligation to pay or reimburse any fees of the Creditors' Committee incurred after the Effective Date except with regard to the limited purposes identified above or as otherwise provided herein.

12.9.    Amendment or Modification of this Plan.  Subject to section 1127 of the Bankruptcy Code, the Debtors may alter, amend or modify this Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan with the consent of the Plan Proponents.  Any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

12.10.    Severability of Plan Provisions.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.11.    Successors and Assigns.  This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

12.12.    Revocation, Withdrawal or Non-Consummation.  Subject to certain restrictions and requirements set forth herein (including, without limitation, Section 13.9 of this Plan), in section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019, the Debtors, with the consent of the Plan Sponsors reserve the right to revoke or withdraw this Plan as to any or all of the Debtors prior to the Confirmation Date and to file one or more subsequent Plans.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors or if confirmation or consummation of this Plan as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in,

01:21281009.1

such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.13.  <u>Notice</u>.  All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> UCI INTERNATIONAL, LLC
> 1900 West Field Court
> Lake Forest, IL  60045
> Attn:  Keith A. Zar
>
> with a copy to:
>
> SIDLEY AUSTIN LLP
> One South Dearborn Street
> Chicago, Illinois 60603
> Telephone:  (312) 853-7000
> Facsimile:  (312) 853-7036
> Attn:  Larry J. Nyhan
>           Jessica C.K. Boelter
>
> *-and-*
>
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, Delaware 19801
> Telephone:  (302) 571-6600
> Facsimile:  (302) 571-1253
> Attn:  Edmon L. Morton
>
> Counsel to Debtors and Debtors-in-Possession

12.14.  <u>Governing Law</u>.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, and subject further to <u>Section 11.1</u> of this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with (i) the Bankruptcy Code, the Bankruptcy Rules or other federal law to the extent applicable and (ii) if none of such law is applicable, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

12.15.  <u>Tax Reporting and Compliance</u>.  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the

Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

12.16.  <u>Exhibits</u>.  All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

12.17.  <u>Filing of Additional Documents</u>.  On or before substantial consummation of this Plan, the Reorganized Debtors and the Debtors shall, as applicable, file such agreements and other documents as may be necessary or appropriate to effectuate and evidence further the terms and conditions of this Plan.  The Plan and the Plan Supplement, including all Exhibits, supplements, appendices and schedules thereto, and any modifications to any of the foregoing, all shall be in form and substance acceptable to the Plan Sponsors.

12.18.  <u>Plan Documents</u>The Plan and the Plan Supplement, including all Exhibits, supplements, appendices and schedules thereto, and any modifications to any of the foregoing, shall be in form and substance acceptable to the Plan Sponsors.<u>Reservation of Rights</u>.  Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtors with respect to this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors or any other Person with respect to Claims against and Interests in the Debtors.

01:21281009.1

Dated:  December 2, 2016

Respectfully submitted,

UCI INTERNATIONAL, LLC
(for itself and on behalf of the other Debtors)


 /s/  *Brian Whittman*                                       .
Brian Whittman
Chief Restructuring Officer
UCI International, LLC


SIDLEY AUSTIN LLP
Larry J. Nyhan
Jessica C.K. Boelter
Kerriann S. Mills
Geoffrey M.  King
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ashley E. Jacobs (No. 5635)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors-in-Possession

Dated:  December 2, 2016

THE PLAN SPONSORS


  /s/ *Paul V. Shalhoub*
Counsel to the Plan Sponsors


WILLKIE FARR & GALLAGHER LLP
Matthew A. Feldman
Paul V. Shalhoub
Daniel Forman
787 7th Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728 8111

- and -

MORRIS NICHOLS ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

Counsel to the Plan Sponsors

Dated:  December 2, 2016

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS


_/s/  Jonathan I. Levine_
On behalf of the Official Committee of Unsecured
Creditors


MORRISON & FOERSTER LLP
Lorenzo Marinuzzi
Jonathan I. Levine
Erica J. Richards
250 W. 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

- and -

COLE SCHOTZ P.C.
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Counsel to the Official Committee of Unsecured
Creditors