IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UCI INTERNATIONAL, LLC, <u>et al</u>., | ) | Case No. 16-11354 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### REPLY OF THE REORGANIZED DEBTORS IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE PLAN AND CONFIRMATION ORDER, INCLUDING THE DISCHARGE AND INJUNCTION PROVISIONS, AND (II) GRANTING RELATED RELIEF

UCI International, LLC ("<u>UCI</u>") and Champion Laboratories, Inc. ("<u>Champion</u>," and together with UCI, the "<u>Reorganized Debtors</u>") hereby submit this reply (the "<u>Reply</u>") in support of their motion (the "<u>Plan Enforcement Motion</u>")[1] for entry of an order pursuant to sections 105(a), 524, 1129 and 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>"), (i) enforcing the Reorganized Debtors' Plan and Confirmation Order, including the Discharge and Injunction Provisions (each as defined below), against the California Regional Water Quality Board, San Francisco Bay Region (the "<u>SF Board</u>") and (California) State Water Resources Control Board – OCC (the "<u>State Board</u>" and together with the SF Board, the "<u>Water Boards</u>"), and (ii) granting to the Reorganized Debtors other related relief.

Since the filing of the Plan Enforcement Motion, the Water Boards,[2] Cranbrook Realty Investment Fund L.P. ("<u>Cranbrook</u>"), and Maxion Wheels USA LLC ("<u>Maxion</u>"), each filed objections [Docket Nos. 1469, 1471, and 1472, respectively] (collectively, the "<u>Objections</u>").

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Plan Enforcement Motion.

[2] Attached as exhibits to the Water Boards' Objection were declarations of Bill A. Cook, III, Tamarin Austin, and Yuri Won. The Reorganized Debtors object to the entry of the declarations attached as exhibits to the Water Boards' Reply. The Reorganized Debtors have asked for, but have not received, any of the underlying materials which serve as the factual basis for the factual statements upon which Bill A. Cook, III relied in preparing his declaration. Accordingly, the Reorganized Debtors have not been able to schedule or conduct the deposition of Mr. Cook or any other declarants of the Water Boards.

For the reasons set forth herein, the Objections should each be overruled and the Plan Enforcement Motion granted.

### Preliminary Statement

1.      On November 13, 2019, after the filing of the Objections, the California Regional Water Quality Control Board San Francisco Bay Region entered Order R2-2019-0031 (the "<u>Water Board Order</u>"). A copy of the Water Board Order is attached hereto as Exhibit A. The deadline to appeal is December 13, 2019. The Reorganized Debtors intend to appeal the Water Board Order. Accordingly, the Order is not yet final.

2.      First, this Court should not consider the objections of Cranbrook or Maxion, as neither has standing to be heard. The rights of Cranbrook and Maxion are premised entirely upon the Cost Sharing Agreement as the underlying contract has been assumed, and therefore to the extent that either has a claim against the Debtors or Reorganized Debtors, such claims are to be considered outside of this Court and not in the context of the Plan. Neither has standing to be heard under either Article III of the Constitution or Section 1109 of the Bankruptcy Code.

3.      As a factual matter, the Water Boards' allegations of environmental contamination that serve as the basis for their claim are incorrect. The Reorganized Debtors do not dispute that the source of the contaminants started at the top of the hill at 4186 Park Road in Benicia, and may have, in the intervening years moved down the slope of the hill, where it now exists under a relatively flat industrial park. However, there is no evidence of present danger or imminent harm to the environment or human health as a result of chemicals that are at least forty years old, and have been shown to be decreasing in concentration since their release. There is not now (nor at the time of the Reorganized Debtors' emergence from bankruptcy was there any) evidence that the alleged pollutants continue to move toward any area of human occupancy or into water tables

that are being or will ever in the foreseeable future be used as a source of drinking water. Instead, the Water Boards created a situation where the Reorganized Debtors (as well as Cranbrook nor Maxion) face standards that the Water Boards continue to change.

4. On or about November 14, 2002, the Debtors, together with the predecessors of Cranbrook and Maxion entered into the Cost Sharing Agreement, which was subsequently modified on or about July 2, 2014. By the Cost Sharing Agreement, the parties agreed with each other to, among other things, share certain past and future costs related to environmental obligations at the 4186 Park Road property, as well as "downgradient" issues stemming from release at the Park Road property. In their bankruptcy cases, the Debtors assumed the Cost Sharing Agreement, and as a result, the Reorganized Debtors became liable for all postpetition obligations arising under that agreement as subsequently modified on or about July 2, 2014.

5. The Debtors and the Reorganized Debtors were prepared to abide by that agreement and to pay their fair share of their financial obligations. In fact, since the effective date of the Plan, the Reorganized Debtors continue to abide by their obligations. The impetus for the relief sought was the Water Boards' decision to change the standards for the investigation, remediation, and monitoring required by the Reorganized Debtors, Cranbrook, and Maxion, thereby significantly increasing the costs to all three. As a result of the unprompted and unnecessary changes, the Reorganized Debtors can never get a fresh start from financial liabilities created by their predecessor.

6. On a more substantive legal basis, the Plan Enforcement Motion should be granted because the Water Board's reliance upon <u>Torwico</u> is misplaced. As is clear from the underlying statutory scheme and from the Water Board Order, the Water Boards are seeking the payment of an amount. Accordingly, notwithstanding the Water Board's arguments to the

11364790/3

contrary, the Water Boards are, in fact, asserting a claim. Other courts that have addressed similar situations, have concluded that what is being sought is a claim, as defined in Section 105 of the Bankruptcy Code where there is not an ongoing or imminent hazard.

7. And finally, as a matter of fact, there is no ongoing or imminent hazard at the Benicia Industrial Park.

8. Based upon the Plan Enforcement Motion, as supplemented herein, the relief sought by the Reorganized Debtors in the Plan Enforcement Motion should be granted.

## SUPPLEMENTAL FACTUAL BACKGROUND

9. Very little of the factual background involved with respect to the Park Road property and the Benicia Industrial Park is new, as the alleged pollutants date back to at least the 1970s, if not earlier. The ownership and operation of the real property has undergone a number of changes. What has also changed are the parties' responsibilities.

10. On or about November 14, 2002, the Debtors, together with the predecessors of Cranbrook and Maxion entered into the Cost Sharing Agreement, which was subsequently modified on or about July 2, 2014. By the Cost Sharing Agreement, the parties agreed with each other to, among other things, share certain past and future costs related to environmental obligations at the Park Road property and ultimately at the Benicia Industrial Park.

11. The Debtors and the Reorganized Debtors were prepared to abide by that agreement and to pay their fair share of their financial obligations, and to that end, in their bankruptcy cases, the Debtors assumed the Cost Sharing Agreement, and as a result, the Reorganized Debtors became liable for all postpetition obligations arising under the agreement, as subsequently modified  To that end, the Reorganized Debtors have continue to abide by their obligations under the Cost Sharing Agreement since the Plan's Effective Date. The impetus for

11364790/3

the relief sought by this motion was the Water Boards' decision to change the standards for the remediation and monitoring required by the Reorganized Debtors, Cranbrook, and Maxion, thereby significantly increasing the costs to all three.

12. When the On-site and Off-site Feasibility Study/Remedial Action Plans (2013 and 2015, respectively) were submitted to, and ultimately approved by, the Regional Water Quality Control Board (RWQCB), they utilized the then-current standard for estimating chemical vapor intrusion into buildings based upon a soil gas "attenuation factor" ("AF") of 0.001. In 2016, during the time when Debtor was going through reorganization, the Regional Water Quality Control Board was still utilizing this standard, or at least had not made a demand on Debtor to use a more conservative standard. In or about 2017/2018, the RWQCB gravitated towards, and ultimately adopted, a more conservative soil gas vapor intrusion standard, utilizing an AF of 0.03 – 30 times more stringent than before.

13. In 2019, the Regional Water Quality Control Board issued an order requiring that the Debtors perform, among other things, soil gas testing for chemical vapor intrusion into buildings based upon its newer, more conservative AF. This would result in a much more conservative standard for testing additional buildings, likely resulting in much greater costs for remediating contamination in soil vapor so as to avoid further monitoring.

14. On November 13, 2019, the California Regional Water Quality Control Board San Francisco Bay Region entered the Water Board Order. The deadline to appeal is December 13, 2019. The Reorganized Debtors intend to appeal the Water Board Order. Accordingly, the Order is not yet final.

## ARGUMENT

### A. Cranbrook and Maxion Do Not Have Standing to Be Heard with Respect to the Underlying Issues Between the Debtors and the Water Boards.

15. Standing is "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Standing, Black's Law Dictionary (10th ed. 2014). Thus, "any party who invokes the court's authority must establish standing." Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 133 (2011); In re Stone & Webster, Inc., 373 B.R. 353, 361 (2007) ("Standing is a "threshold question in every federal case," including bankruptcy cases"). As a general matter, in federal courts, standing is determined by Article III of the Constitution, which confines the judicial power of the United States to "Cases" and "Controversies." To possess Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." See, e.g, Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

16. Section 1109 of the Bankruptcy Code creates an additional standing requirement in Chapter 11 bankruptcy cases. In re Stone & Webster, Inc., 373 B.R. 353, 361; In re Alpha Nat. Res. Inc., 544 B.R. 848, 854 (Bankr. E.D.Va. 2016). Section 1109(b) provides "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). While Section 1109(b) "is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard," Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.), 907 F.2d 1430, 1433 (4th Cir. 1990) (quoting In re Pub. Serv. Co. of N.H., 88 B.R. 546, 550 (Bankr. D.N.H. 1988)), it is not without it limits.

17. A court may prohibit a prospective "party in interest" from participating in a Chapter 11 case for a lack of standing "if he or she has no cognizable interest (whether directly or indirectly) in the outcome of the proceeding." 7 Collier on Bankruptcy ¶ 1109.01[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018) (emphasis in original). Stated another way, bankruptcy standing requires a "statement of or identification of a pecuniary or an economic or property interest before this court that is susceptible to redress and as to which parties should be able and afforded an opportunity to address the Bankruptcy Court." In re Vantage Drilling Int'l, 603 B.R. 538, 545 (Bankr. D. Del. 2019).

18. Here, there is no question that the Reorganized Debtors assumed the Cost Sharing Agreement in the bankruptcy. Regardless of whether the Water Boards' claims against the Reorganized Debtors are barred, the rights and obligations of the Reorganized Debtors, Maxion, and Cranbrook as among each other are premised entirely upon the Cost Sharing Agreement, which are enforceable outside of the bankruptcy cases. Accordingly, Cranbrook and Maxion do not have a claim in the Debtors' bankruptcy cases that would give either of them a legal claim or seek judicial enforcement of a duty or right in these cases. Moreover, because their rights are governed by the Cost Sharing Agreement they are not "parties in interest" because they have no cognizable interest (whether directly or indirectly) in the outcome of the proceeding.

**B. The Water Boards assert a "Claim" Because Pursuant to the Statute and the Water Board Order, they Are Seeking and Have the Ability to Seek Payment from the Reorganized Debtors, and such Claim is Barred by the Plan and Confirmation Order.**

19. This issue can be easily decided pursuant to Section 101(5) of the Bankruptcy Code, which defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." There is a preliminary and a narrow dispositive

issue before the Court: whether the Water Board Order is a "claim" because it is a demand for payment.

20. The applicable statute pursuant upon which the Water Boards rely, California Water Code Section 13304, provides in relevant part as follows:

> (a) A person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts. A cleanup and abatement order issued by the state board or a regional board may require the provision of, or payment for, uninterrupted replacement water service, which may include wellhead treatment, to each affected public water supplier or private well owner. Upon failure of a person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring the person to comply with the order. In the suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant.
>
> **(b) (1) The regional board may expend available moneys to perform any cleanup, abatement, or remedial work required under the circumstances set forth in subdivision (a), including, but not limited to, supervision of cleanup and abatement activities that, in its judgment, is required by the magnitude of the endeavor or the urgency for prompt action to prevent substantial pollution, nuisance, or injury to any waters of the state. The action may be taken in default of, or in addition to, remedial work by the waste discharger or other persons, and regardless of whether injunctive relief is being sought.**
>
> **(2) The regional board may perform the work itself, or with the cooperation of any other governmental agency, and may use rented tools or equipment, either with operators furnished or unoperated. Notwithstanding any other provisions of law, the regional board may enter into oral contracts for the work, and the contracts, whether written or oral, may include provisions for equipment rental and in addition the furnishing of labor and materials necessary to accomplish the work. The contracts shall not be subject to approval by the Department of General Services**.

Emphasis added.

21. Further, by the Water Board Order, the California Regional Water Quality Control Board San Francisco Bay Region provided as follows:

> Cost Recovery: Pursuant to California Water Code Section 13304, the Dischargers are hereby notified that the Regional Water Board is entitled to, and may seek reimbursement for, all reasonable costs actually incurred by the Regional Water Board to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial action, required by this order

Water Board Order, ¶ 14.

22. First and foremost, California Water Code Section 13304(a) addresses three situations. The first situation addresses a person who has discharged or discharges waste into the waters of the state in violation of any waste discharge requirement or other order issued by a regional board or the state board. That situation does not apply here as there has never been any allegation that, at the time of the alleged discharge (which dates back to at least the 1970s), that the dischargers were in violation of a requirement or other order.

23. The second situation is where a party has "caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance . . . ." In that case, the party "shall, upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts." As of the Plan Effective Date, the regional board had never entered an order that the Debtors (or any other party) clean up any alleged pollution or nuisance. Accordingly, on the Plan Effective Date, there was no injunction under California Water Code Section 13304.

24. And third, "upon failure of a person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that

county for the issuance of an injunction requiring the person to comply with the order. In the suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant." There still has not been any petition to, or order from, the California superior court to issue any injunction against the Debtors or Reorganized Debtors requiring compliance with any order of the Water Boards.

25. Taken together, Section 13304(a) does not provide any basis for the rights of Water Boards to state any right to an injunction, at least as of the Effective Date, if ever. If Section 13304(a) does not apply, the sole basis left for the liability of the Reorganized Debtors are found in 13304(b), which provides for the Water Boards to "expend available moneys to perform any cleanup, abatement, or remedial work required under the circumstances set forth in subdivision (a), including, but not limited to, supervision of cleanup and abatement activities that, in its judgment, is required by the magnitude of the endeavor or the urgency for prompt action to prevent substantial pollution, nuisance, or injury to any waters of the state. The action may be taken in default of, or in addition to, remedial work by the waste discharger or other persons, and regardless of whether injunctive relief is being sought." This cannot be read as anything but a demand for payment from the discharger, and is consistent with the proofs of claim filed by the Water Boards in the Bankruptcy Cases as well as the Water Board Order.

26. The Plan and Confirmation Order unambiguously provide for the discharge of all claims against the Reorganized Debtors and for an injunction from bringing actions based upon such claims arising prior to the Effective Date, subject only to the exceptions set forth in the Plan and Section 1141(d)(3) of the Bankruptcy Code, neither of which are applicable. Accordingly, as of the Effective Date of the Plan, the Water Board's rights were discharged.

11364790/3

C. **The Objecting Parties' Reliance upon <u>Torwico</u> is Misplaced Because There is No Ongoing or Imminent Hazard at the Benicia Industrial Park.**

27. As a prefatory matter, one of the most fundamental purposes of the Bankruptcy Code is to allow a fresh start to an honest but unfortunate debtor.  <u>See</u>, <u>e.g.</u>, <u>Local Loan Co. v. Hunt</u>, 292 U. S. 234, 244 (1934).  This is balanced by the need to maintain a state's or regulatory agency's police and regulatory powers to stop or prevent ongoing hazards.  Courts of Appeals, including the Third Circuit, have struck a balance by recognizing that demands for money are "claims" as defined by Section 101(5), but it is not a claim where the state or regulatory agency asserts a right under its general police powers to enforce compliance to prevent an ongoing or imminent hazard.

28. In their Objection, the Water Boards rely primarily on <u>In re Torwico Electronics, Inc.</u>, 8 F.3d 146, (3d Cir.1993).  In <u>Torwico</u>, the issue before the Third Circuit Court of Appeals was whether an environmental injunction taken by the New Jersey Department of Environmental Protection and Energy was a "claim" discharged by the debtor's bankruptcy where the property where the debtor previously operated had an illegal seepage pit containing hazardous wastes—wastes which were allegedly migrating into local waters.  8 F.3d at 147 (3d Cir.1993).  In that context, the Court of Appeals held that the obligation was not a "claim" because the state was seeking to force the debtor to clean up a waste site which it found posed an ongoing hazard.  <u>Id</u>. at 151. Further, the Court of Appeals found that this was not a situation where the state was attempting to get money from the debtor but rather, it was an exercise of the state's inherent regulatory and police powers.  <u>Id</u>.  Importantly, in so doing, the <u>Torwico</u> Court specifically found that the state was seeking compliance with its laws through a cleanup of a current hazardous situation.  <u>Id</u>. ("In conclusion, we hold that the state's attempt in this case to force a party to

11364790/3

clean up a waste site which **poses an ongoing hazard** is not a "claim" as defined by the Bankruptcy Code.")

29. Similarly, in In re Chateaugay Corp., 944 F.2d 997(2d Cir.1991), the Second Court of Appeals stated that

> a cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim....But an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a "claim" if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation.

997 F.2d at 1000.  Further, the Second Circuit recognized that "in the context of environmental remedies, the line between 'claim' injunctions and non-'claim' injunctions could arguably be drawn somewhat differently, for example, by placing on the non-'claim' side only those injunctions ordering a defendant to stop current activities that add to pollution (e.g., depositing new hazardous substances), **while leaving on the 'claim' side all other injunctions, including those that direct the cleanup of sites from which hazardous substances, previously deposited, are currently contributing to pollution**. But we believe that placing on the non-'claim' side all injunctions that seek to remedy on-going pollution is more faithful to the Supreme Court's [precedents]."  Id. at 1009 (emphasis added).  See also CHC Heartland Partners, 966 F.2d 1143, 1147 (7th Cir.1992) ("To avoid the conclusion that it is repackaging a forfeited claim for damages, the **EPA must establish that harmful releases are threatened or ongoing**--in the language of § 106(a) [of CERCLA], that the Pit poses 'an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance.' Otherwise there is no nuisance to clean up") (emphasis added).

30.     Finally, the case of In re Mark IV Industries, Inc., 459 B.R. 173 (S.D.N.Y. 2011), is instructive.  In Mark IV, the Chapter 11 debtor brought an adversary proceeding against the New Mexico Environment Department seeking a declaratory judgment that its obligation to clean up an environmentally contaminated site, at which the company that debtor had acquired prepetition had formerly conducted operations, was discharged.  The state filed a counterclaim, seeking a declaration that its claim for injunctive relief requiring the debtor to abate groundwater pollution beneath and from site was not dischargeable.  In its ruling, the Mark IV Court found that the state failed to establish ongoing pollution as a matter of law. Id. at 189. Although the court found that the state has presented abundant evidence that the pollutants were migrating and threatening the water supply, the Mark IV Court also found that the debtor had presented evidence demonstrating that the pollution at the site is contained, and such a dispute is not appropriate for resolution on summary judgment.  The Mark IV Court therefore found that it could not grant a motion for summary judgment and that it was up to the Court to make a determination by evaluating the conflicting expert opinions. Id., at 190.

31.     Taken together, the rule is that obligations for remediation are not "claims" as defined by Section 101 of the Bankruptcy Code, where the state or regulatory agency has a right to force the debtor to comply with applicable environmental laws by remedying an existing hazard or probable harm to the waters of the state.

> **D.     As a Factual Matter, the Alleged Contaminants Do Not Present an Existing or Imminent Hazard.**

32.     The Reorganized Debtors intend to take discovery on the factual issue of whether or not there are exiting or imminent hazards posed by the alleged contamination, and intend to supplement this Reply upon the conclusion of discovery.  Based upon information received to date, the Reorganized Debtors believe, among other things, that there is no evidence present

danger or imminent harm to the environment or human health as a result of toxins that are at least forty years old. Nor do the Debtors believe that there is evidence that the alleged pollutants continue to move toward any area of human occupancy or into water tables that will be used as a source of drinking water.

33. Further, the Reorganized Debtors believe that any statements about the amount of migration of contaminants needs to be considered in light of the physical and topographical characteristics of the Benicia Industrial Park and its surrounding areas. Specifically, the 4186 Park Road site is located at the top of a hill with a slope to the south where it flattens out into the Benicia Industrial Park.

34. The Reorganized Debtors intend to submit evidence proving that any allegation of immediate or imminent hazard to the state water caused by contaminants emanating from the 4186 Park Road site is, at best, overstated if not wrong.

## RESERVATION OF RIGHTS

35. The Reorganized Debtors reserve the right to seek discovery from the Water Boards or any other party with respect to admissible evidence that they seek to present to the Court in support of the Plan Enforcement Motion, and to subsequently supplement this Reply or to commence an adversary proceeding to the extent necessary.

WHEREFORE, the Reorganized Debtors seek entry of an Order (i) granting the Plan Enforcement Motion, and overruling any objections thereto, and (ii) granting to the Reorganized

11364790/3

Debtors such other and further relief as is just and proper.

Dated: December 11, 2019  **MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (Bar No. 4159)
Brya M. Keilson (Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
E-mail:  jwaxman@morrisjames.com
            bkeilson@morrisjames.com

Counsel for the Reorganized Debtors